# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| VALEO NORTH AMERICA, INC., | |
| *Plaintiff,* | |
| v. | Court No. 21-00581 |
| UNITED STATES OF AMERICA, | |
| *Defendant,* | ***PUBLIC VERSION*** |
| and | |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP et al., | |
| *Defendant-Intervenors.* | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Dated: March 21, 2022

Daniel J. Cannistra
John Anwesen
Pierce Lee

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Tel: 202.624.2902

*Counsel to Valeo North America, Inc.*

TABLE OF CONTENTS

I.      Administrative Determination Under Review ...............................................1

II.     Issues Presented ...........................................................................................1

STATEMENT OF THE FACTS ....................................................................................2

I.      Procedural History ........................................................................................2

II.     Substantive Background ...............................................................................5

ARGUMENT .................................................................................................................13

I.      Introduction and Summary of Argument ...................................................13

II.     Standard of Review .....................................................................................13

III.    Commerce Unlawfully Conducted a k(2) Analysis ...................................15

IV.     Commerce Failed to Appropriately Interpret the Term "Common" Within the Scope
        Language. ....................................................................................................20

V.      Commerce's Determination That the Term 3xxx Do Not Refer to Designated
        Specifications is Unsupported by Substantial Evidence ............................22

VI.     Commerce's Determination That T-Series Aluminum Sheet Is Not Heat-Treated Is
        Unsupported by Substantial Evidence ........................................................28

VII.    Commerce Misinterpreted that Clad and Heat-Treated Products Are Mutually Exclusive
        ....................................................................................................................31

VIII.   Commerce Failed to Consider Determinations by the Commission in Its (1) Analysis .34

IX.     Commerce's Failure to Disclose the Factual Information Presented in Ex-Pare Meetings
        Was Unlawful..............................................................................................36

CONCLUSION..............................................................................................................39

DCACTIVE-65684753.3

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ArcelorMittal Stainless Belgium N.V. v. United States,*
   694 F.3d 82, 88, n.8 (Fed. Cir. 2012) ................................................................................20

*Atkore Steel Components, Inc. v. United States,*
   313 F.Supp.3d 1374, 1381 (Ct. Int'l Trade 2018). In ..................................................... 15, 16

*Consol. Edison v. NLRB,*
   305 U.S. 197, 229 (1938) ..................................................................................................14

*Corus Staal BV v. Dep't of Commerce,*
   395 F.3d 1343 (Fed. Cir. 2005)..........................................................................................14

*Crawfish Processors Alliance v. United States,*
   483 F.3d 1358 (Fed. Cir. 2007)..........................................................................................14

*Duferco Steel, Inc. v. United States,*
   296 F.3d 1087, 1097 (Fed. Cir. 2002) ................................................................................15

*Ericsson GE Mobile Commc'ns, Inc. v. United States,*
   60 F.3d 778, 782 (Fed. Cir. ...............................................................................................25

*Glob. Commodity Grp. LLC v. United States,*
   709 F.3d 1134 (Fed. Cir. 2013)..........................................................................................14

*King Supply Co. v. United States,*
   674 F.3d 1343, 1350 (Fed. Cir. 2012). ......................................................................... 21, 22

*Litton Sys. v. Honeywell, Inc.,*
   87 F.3d 1559 (Fed. Cir. 1996)............................................................................................14

*Meridian Products*, 851 F.3d at 1382. The relevant scope terms are "unambiguou .............. 15, 20

Nippon Steel Corp. v. United States,
   118 F. Supp. 2d 1366, 1374 (CIT 2000).............................................................................39

*Sachs Auto. Prods. Co. v. United States,*
   17 CIT 290, 291-92 (1993) ................................................................................................39

*Sango Int'l L.P. v. United States,*
   484 F.3d 1371 (Fed. Cir. 2007)..........................................................................................14

ii

*Service v. Dulles*,
354 U.S. 363, 388 (1957)). "It has long been establishe ...................................... 17

*Smith Corona Corp. v. United States*,
915 F.2d 683 (Fed. Cir. 1990) ............................................................................ 25

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) .......................................................................................... 14

*Voge v. United States*,
844 F.2d 776, 779 (Fed. Cir. 1988) .................................................................... 17

*Wagner v. United States*,
365 F.3d 1358, 1361 (Fed. Cir. 2004) ................................................................ 17

*Wheatland Tube Co. v. United States*,
161 F.3d 1365, 1370 (Fed. Cir. 1998) ........................................................... 21, 22

*Whirlpool Corp.*, 890 F.3d at 1308 (citing ........................................ 14, 20, 21, 25

**Statutes**

19 U.S.C. § 1516a(b)(2)(A) ..................................................................................... 39

19 U.S.C. § 1677f(a)(3) ..................................................................................... 38, 39

**Other Authorities**

19 C.F.R. 351.102(b)(21) ........................................................................................ 37

19 C.F.R. 351.225(k)(1) .......................................................................................... 18

19 C.F.R. § 351.104(b) ........................................................................................... 39

19 C.F.R. § 351.225(a) ............................................................................................ 15

19 C.F.R. § 351.225(d) .............................................................................................. 5

19 C.F.R. § 351.225(e) .............................................................................................. 5

19 C.F.R. § 351.225(k)(1) ............................................................................. 7, 15, 21

19 C.F.R. §351.225(k)(2) ............................................................................. 5, 16, 20

19 C.F.R. § 351.225(k)(2)(i) .................................................................................... 20

19 C.F.R. § 351.225(k)(2)(i)-(v) .............................................................................. 15

19 C.F.R. § 351.301(c)(1) ........................................................................................ 38

DCACTIVE-65684753.3

19 C.F.R. § 351.301(c)(4) ...........................................................................................38

19 CFR 351.225(k)(2)(i) .............................................................................................7

*731-TA-1399 (Final)* ...........................................................................................33, 35

*Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,650
(Dep't of Commerce May 26, 2011) ......................................................................18

*Certain Aluminum Foil from the People's Republic of China*, 83 Fed. Reg. 17,362
(Dep't of Commerce Apr. 19, 2018) ......................................................................18

*Common Alloy Aluminum Sheet from China, Inv. Nos. 701-TA- 591 and 731-TA-*
*1399 (Final)*, USITC Pub. No. 4861 (Jan. 2019) at I-11, I-12 ......................................*passim*

*Common Alloy Aluminum Sheet from the People's Republic of China*, 84 Fed.
Reg. 2,813 (Dep't of Commerce February 8, 2019) ...........................................2, 6

DCACTIVE-65684753.3

## RULE 56.2 STATEMENT

### I.    Administrative Determination Under Review

Plaintiff, Valeo North America, Inc. ("Valeo"), challenges the U.S.

Department of Commerce's ("Commerce") determination in an unpublished decision

memorandum, Memorandum, from Frank Schmitt, Case Analyst, Office VI,

AD/CVD Operations, to Scot Fullerton, Associate Deputy Assistant Secretary for

Antidumping and Countervailing Duty Operations, *Antidumping and*

*Countervailing Duty Orders on Aluminum Sheet from the People's Republic of*

*China; Final Scope Ruling Determination: Valeo's Heat-Treated T-Series Aluminum*

*Sheet*, Case Nos. A-570-073 (Oct. 15, 2021), P.R. 40, C.R. 15 ("Decision

Memorandum) that Plaintiff's imported heat-treated T-series aluminum sheet is

covered by the scope of the antidumping ("AD") and countervail ailing duty ("CVD")

orders.

### II.    Issues Presented

**1.    Did Commerce conduct a lawful k(1) scope determination?**

No.  Commerce interwove k(2) elements into its k(1) determination and failed to consider all applicable k(1) elements.

**2.    Was Commerce's refusal to define scope terms lawful?**

No. Commerce unlawfully failed to define key scope terms.

**3.    Was Commerce's determination that the scope of the order was not limited to designated alloys supported by substantial evidence?**

No. The application of the nomenclature utilized by the Aluminum Association is limited to designated alloys. Use of that nomenclature to undesignated alloys is contrary to the terms of the applicable specifications.

1

4.  **Was Commerce's failure to consider the determination by the U.S. International Trade Commission ("Commission") lawful?**

No. Determinations by the Commission are a required k(1) element.

5.  **Was Commerce's determination regarding heat-treated and clad material supported by substantial evidence?**

No. Commerce's determinations were not supported by substantial evidence.

4.  **Was Commerce's failure to provide a summary of its ex-parte meetings lawful?**

No. Commerce violated both the statute and its policy when it failed to provide a sufficient summary.

## STATEMENT OF THE FACTS

### I.  Procedural History

Certain antidumping and countervailing duty orders cover certain aluminum common alloy sheet from China. *See Common Alloy Aluminum Sheet from the People's Republic of China*, 84 Fed. Reg. 2,813 (Dep't of Commerce February 8, 2019) (antidumping duty order), and 84 Fed. Reg. 2,157 (Dep't of Commerce February 6, 2019) (countervailing duty order) (collectively, the "Orders").

Plaintiff submitted a scope ruling request to Commerce, on May 1, 2020, demonstrating that heat-treated T-series sheet is outside the scope of the Orders. *See* Letter from Crowell & Moring LLP to Sec'y of Commerce, *Common Alloy Aluminum Sheet from the People's Republic of China: Request for Scope Ruling on Heat- Treated T-Series Aluminum Sheet*, Case No. A-570-073 (May 1, 2020), P.R. 1, C.R. 1 ("1st Scope Ruling Request").[1]

---

[1] "P.R." refers to documents in the public record and "C.R." refers to documents in the confidential record. Because the administrative record contains duplicates of

On June 5, 2020, August 7, 2020, and March 24, 2021, Valeo provided supplemental information in response to inquiries from Commerce. *See* Letter from Crowell & Moring LLP to Sec'y of Commerce, *Common Alloy Aluminum Sheet from the People's Republic of China: Request for Scope Ruling on Heat-Treated T-Series Aluminum Sheet*, Case No. A-570-073 (June 5, 2020), P.R. 14, C.R. 5 ("2nd Scope Ruling Request"); Letter from Crowell & Moring LLP to Sec'y of Commerce, *Common Alloy Aluminum Sheet from the People's Republic of China: Request for Scope Ruling and Response to Supplemental Questionnaire on Heat-Treated T-Series Aluminum Sheet*, Case No. A-570-073 (August 7, 2020), P.R. 24, C.R. 10 ("3rd Scope Ruling Request"); Letter from Crowell & Moring LLP to Sec'y of Commerce, *Common Alloy Aluminum Sheet from the People's Republic of China: Request for Additional Information*, Case No. A-570-073 (March 23, 2021), P.R. 31, C.R. 14 ("4th Scope Ruling Request") (submitted after hours and considered to be a submission of March 24). Valeo's submissions were in response to the following rejections and requests by Commerce.

On June 3, 2020, Commerce rejected Valeo's first scope ruling application alleging errors in Valeo's bracketing of business proprietary information, company certification, and certificate of service. *See* Letter from Commerce to Crowell & Moring LLP, *Rejection of Requests for a Scope Inquiry on Heat-Treated T-Series*

---

documents in the AD and CVD proceedings, Plaintiff cites to the record of only one of the proceedings only – AD.

*Aluminum Sheet*, Case No. A-570-073 (June 3, 2020), P.R. 12, ("1st Rejection of

Scope Ruling Request").

On July 20, 2020, Commerce rejected Valeo's second scope ruling application

filed on June 5, 2020, and issued supplemental questions for Valeo to address when

resubmitting its application. *See* Letter from Commerce to Crowell & Moring LLP,

*Common Alloy Aluminum Sheet from the People's Republic of China: Supplemental*

*Questionnaire on Heat-Treated T Series Aluminum Sheet*, Case Nos. A-570-073

(July 20, 2020), P.R. 23, C.R. 9 ("2nd Rejection of Scope Ruling Request").

On August 7, 2020, Valeo submitted its third scope ruling application which

included responses to Commerce's supplemental questions. *See* 3rd Scope Ruling

Request, P.R. 24, C.R. 10. Commerce extended the regulatory deadline for issuing

its scope determination three times by 45 days. *See* Letter from Commerce to

Crowell & Moring LLP, Case No. A-570-073 (Sept. 18, 2020) (extension of scope

ruling), P.R. 26; Letter from Commerce to Crowell & Moring LLP, Case No. A-570-

073 (Nov. 2, 2020) (extension of scope ruling), P.R. 27; Letter from Commerce to

Crowell & Moring LLP, Case No. A-570-073 (Dec. 17, 2020) (extension of scope

ruling), P.R. 29.

On February 3, 2021, Commerce again rejected Valeo's scope ruling

application and issued another supplemental questionnaire.  Letter from Commerce

to Crowell & Moring LLP, *Common Alloy Aluminum Sheet from the People's*

*Republic of China: Second Supplemental Questionnaire on Heat-Treated T-Series*

*Aluminum Sheet*, Case No. A-570-073 (Feb. 3, 2021), P.R. 30, C.R. 12 ("3rd Rejection of Scope Ruling Request").

On March 24, 2021, Valeo submitted its fourth scope ruling application, this time requesting a formal scope ruling and consideration of the factors under 19 C.F.R. §351.225(k)(2) ("(k)(2)" factors). *See* 4th Scope Ruling Request, P.R. 31, C.R. 14. Commerce, then, three times extended the regulatory deadline again. *See* Letter from Commerce to Crowell & Moring LLP, Case No. A-570-073 (May 10, 2021), P.R. 34 ("1st Extension on 4th Scope Ruling Request"); Letter from Commerce to Crowell & Moring LLP, Case No. A-570-073 (June 22, 2021), P.R. 37 ("2nd Extension on 4th Scope Ruling Request"); Letter from Commerce to Crowell & Moring LLP, Case No. A-570-073 (Aug. 6, 2021), P.R. 38 ("3rd Extension on 4th Scope Ruling Request").

On August 17, 2021, Valeo filed its complaint in Court No. 21-00426 challenging Commerce's lack of good cause for serially violating the regulatory deadlines that resulted in an unreasonable delay of either the issuance of a scope ruling based upon the application under 19 C.F.R. § 351.225(d) or the initiation of a scope inquiry under 19 C.F.R. § 351.225(e).

After one more extension of the regulatory deadline, Commerce issued a memorandum asserting that Valeo's T-series aluminum was covered by the scope of the Orders.

## II.   Substantive Background

The plain language of the Orders provides that the scope covers specific types of clad (*i.e.*, multi-alloy) and un-clad aluminum sheet. The language specifies that the covered un-clad sheet is "manufactured from a 1XXX-, 3XXX-, or 5XXX-series

alloy as designated by the Aluminum Association," and the covered clad sheet is produced from a 3xxx-series core, "to which cladding layers are applied to either one or both sides of the core." *See*, *e.g.*, *Common Alloy Aluminum Sheet from the People's Republic of China*, 84 Fed. Reg. 2,813 (Dep't of Commerce February 8, 2019) (antidumping duty order).

Valeo submitted four successive scope ruling requests explaining that its heat-treated T-series aluminum sheet is not covered by the scope of the Orders because it is not manufactured from a designated 1xxx-, 3xxx-, or 5xxx-series alloy. *See* 1st Scope Ruling Request, P.R. 1, C.R. 1; 2nd Scope Ruling Request, P.R. 14, C.R. 5; 3rd Scope Ruling Request, P.R. 24, C.R. 10; 4th Scope Ruling Request, P.R. 31, C.R. 14. Additionally, Valeo argued that its heat-treated T-series aluminum sheet is not covered by the scope of the Orders because the underlying investigation did not encompass alloys that are heat treated or heat treatable. *See*, *e.g.*, 1st Scope Ruling Request at 4-7, P.R. 1, C.R. 1. The following is the description Valeo provided to Commerce concerning heat-treatability:

> The heat-treatment process used to produce heat-treated T-series sheet applies high heat to alter the microstructure of T-series aluminum and changes its mechanical properties. Only the addition of manganese, copper and silicon beyond the levels permitted by any 1xxx, 3xxx, or 5xxx specification allows T-series aluminum to be heat-treated.

> "Heat Treating" for aluminum alloys refers to heating and cooling operations used to increase the strength and hardness of specific products and distinguishes those aluminum alloy products from other aluminum alloys in which no significant strengthening can be achieved by heating and cooling. Heat treating takes the solid, alloyed metal and heats it to a specific point. The alloy elements, called solute, are homogeneously distributed with the aluminum putting them in a solid solution. The metal is subsequently quenched, or rapidly cooled, which freezes the solute atoms in place. Heat

6

treatable alloys are within the 2xxx series, the 6xxx series and the 7xxx series aluminum.

Non-heat treatable alloys are strengthened only through cold-working.

*Id.* at 6.

Valeo's fourth scope ruling application included responses to two supplemental questionnaires with detailed data regarding the physical properties of Valeo's product, that are to be analyzed pursuant to 19 CFR 351.225(k)(2)(i) ("{t}he physical characteristics of the product"). The physical characteristics submitted by Valeo at Commerce's request extend well beyond the "descriptions of the merchandise" contained in the petition, the original investigation, and prior determinations by Commerce (including prior scope determinations) and the U.S. International Trade Commission ("Commission") and, as such, are beyond the ambit of the factors set out in 19 C.F.R. § 351.225(k)(1).

In its first supplemental questionnaire, Commerce stated that "the record of this scope inquiry does not currently contain all information required to make a scope ruling." Furthermore, Commerce requested information concerning the "heat treatment and/or annealing process which the heat-treated T-series aluminum sheet undergoes," the "distinction between 'heat treatment' and 'annealing' for Valeo's T-series aluminum sheet," when heat-treatment or annealing occurs in the production process, and whether in the production of heat-treated T-series aluminum sheet "the temperature of the aluminum sheet {is} increased to temperatures at or above 850° Fahrenheit." *See* 2nd Rejection of Scope Ruling Request, P.R. 23, C.R. 9, at 4.

In the second supplemental questionnaire, Commerce requested information concerning the following: the differences between the "diffusion and integration of particles between original boundaries" from the "diffusion between the core and cladding" as described by the Aluminum Association; whether "the proprietary core of Valeo's T-series aluminum sheet have a higher melting point than the 4045 aluminum alloy outer layers"; mechanical properties for "heat-treated T-series aluminum sheet and pre-heat-treated center/inner layer of T-series aluminum"; and steps taken after importation "to change the imported heat-treated T-series sheet from an intermediate product to a finished brazing sheet." 3rd Rejection of Scope Ruling Request, P.R. 30, C.R. 12., at 3-5.

In its Decision Memorandum, Commerce determined that Valeo's heat-treated T-series aluminum sheet are clad sheet with a 3xxx-series core as designated by the Aluminum Association and thus covered by the scope of the orders. Commerce engaged in extensive analyses of the series of aluminum alloys designated by the Aluminum Association, distinctions between clad and un-clad aluminum, and heat treated and non-heat-treated products, to reach its determination that Valeo's merchandise was subject to the Orders. *See* Decision Memorandum, P.R. 40, C.R. 15, at 11-19. Commerce relied on the physical characteristics of Valeo's T-series aluminum sheet to interpret the terms of the scope – not to determine whether Valeo's products meets those terms.

Commerce defined a "clad" product as one consisting of a core and metallurgically bonded layers wherein *some* diffusion between the core and each

8

layer takes place. *Id*. at 12. Commerce then concluded that clad and "heat-treated" are mutually exclusive but provided no support for this conclusion. Commerce misinterpreted the associated technical terms. What it defined as "cladding" is actually diffusion-annealing, which is not the same as cladding. Without determining or quantifying the extent of diffusion needed to convert clad into un-clad alloy, Commerce found that Valeo's heat-treated T-series aluminum sheet are clad because the manganese content is higher near the center and the silicon content is higher near the surface of the product after the heat treatment. *Id*. at 11. Commerce provided no explanation of how these facts supported this conclusion.

Commerce found that the Aluminum Association does not have a 3xxx-series alloy identical to Valeo's product. *Id*. at 14.

Commerce interpreted that 3xxx-series alloy means any alloy with manganese as the main alloying element. To make this interpretation, Commerce relied on the Aluminum Association's publications and declarations of the Vice President of Standards and Technology for the Aluminum Association submitted by certain domestic producers in the proceeding at issue. *Id*. at 11. Commerce conflated the terms "group" and "series" to find that the first numerical digit designating a particular group based on primary alloying element meant that all aluminum sheet with primarily that alloying element belong to the series. Commerce also determined that "as designated by the Aluminum Association" also means to include any aluminum sheet having major alloying element of manganese. *Id*. at 14-15.

The designation system cited by Commerce is inapplicable to unregistered alloys. The header prefacing the grouping system cited by Commerce notes that "{a} numerical designation assigned in conformance with this Recommendation should **only** be used to indicate an aluminum or an aluminum alloy having chemical composition limits **identical to those registered** with the Signatories to the Declaration of Accord on an International Alloy Designation System for Wrought Aluminum and Wrought Aluminum Alloys. *See* 4th Scope Ruling Request, P.R. 31, C.R. 14, at Attachment III, Attachment 1, Exhibit 3, p.28 (emphasis added). Commerce disregarded that header and instead wrongly applied the numerical designation system to an alloy that does not feature chemical composition limits within the parameters of those registered with the signatories.

Commerce determined that proprietary alloys can be classified by the Aluminum Association. *Id.* at 13-14. Commerce, however, did not consider that the Aluminum Association sets limits to what may be considered an "equivalent." In the same publication upon which Commerce relied, the Aluminum Association provided the limits for the variations for the chemical elements. Valeo's proprietary grade heat-treated T-series aluminum sheet does not meet those parameters to be considered an equivalent. Commerce did not address these evidence and argument, nor did it explain or even attempt to explain how Valeo's product can be in scope notwithstanding the fact that it is not manufactured from a designated 1xxx-, 3xxx-, or 5xxx-series alloy as required by the scope of the Orders.

Commerce refused to consider the meaning or significance of the word "common" in the applicable scope language. *See* Decision Memorandum, P.R. 40, C.R. 15 at 21.

In conjunction with the Commission investigation, a preliminary hearing was held before the Commission in December 2017. Valeo participated in the Commission's hearing, testifying that its T-series were not included within the scope of the Commission's investigation and that it did not meet the 3xxx specifications. Valeo's testimony on these points was part of the administrative record. *See* 4th Scope Ruling Request, P.R. 31, C.R. 14, at 16 and Exhibit SUPP-5, p.124. At the hearing, chemical specifications outlining the distinction between excluded heat-treatable alloys and in-scope heat-treatable alloys was publicly presented. In December 2018, Valeo filed a post-hearing brief reiterating the distinctions between alloys included and excluded from the investigation. At the conclusion of the investigation, the Commission unequivocally stated that "{a}luminum sheet subject to these investigations are of 1XXX, 3XXX, and 5XXX series alloys that are **non-heat treatable**." *See Common Alloy Aluminum Sheet from China, Inv. Nos. 701-TA- 591 and 731-TA-1399 (Final)*, USITC Pub. No. 4861 (Jan. 2019) at I-11, I-12 (emphasis added). Additionally, the Commission stated that "heat-treated aluminum sheet (**e.g.**, 6xxx alloy series) is not covered by Commerce's scope." *Id*. (emphasis added).  Commerce failed to consider that the Commission excluded heat-treatable aluminum sheet from its injury analysis and improperly disregarded the Commission's determination on the issue, finding that the two

referenced statements are contradictory. *See* Decision Memorandum, P.R. 40, C.R. 15, at 17-18,

Commerce stated that "Valeo has not demonstrated that {the Commission's} statement regarding the scope of the Orders not covering heat-treatable alloys was applicable to 1xxx, 3xxx, and 5xxx-series alloys that the {the Commission} explicitly stated were included in the scope of the Orders." *Id*. This statement presupposes that Valeo's products fell within one of the enumerated alloy series (which as noted above they did not) and at a minimum should have been examined in the contest of a (k)(2) analysis.

At the conclusion of the investigation, new Harmonized Tariff Schedule of the United States ("HTSUS") subheadings were created to capture out-of-scope heat-treatable alloys. HTSUS defines "heat-treatable" alloy as "aluminum containing by weight 3.0 percent or less of magnesium and 3.0 percent or less of silicon, and/or are designated as series 6xxx in the Aluminum Association's specifications of registered alloy." *See* 4th Scope Ruling Request, P.R. 31, C.R. 14, at Exhibit SUPP-4, p.76-3.

At the inception of a series of new investigations involving common alloys, identically defined, the petition notes that subheading 7606.12.3091 of the U.S. HTSUS covers "imports of out-of-scope heat-treatable sheet." *See* Memorandum to the File, *Factual Information Relevant to the Final Scope Ruling Determination: Valeo's Heat-Treated T-Series Aluminum Sheet*, Case No. A-570-073 (Oct. 15, 2021), P.R. 41, at Attachment 6, p.11 and Exhibit GEN-3. This subheading provides for "{h}eat-treatable industrial alloys" described in Statistical Note 6 to Chapter 76,

12

which is defined as "aluminum containing by weight 3.0 percent or less of

magnesium and 3.0 percent or less of silicon, and/or are designated as series 6xxx in

the Aluminum Association's specifications of registered alloys." It is uncontested

that Valeo's T-series alloys meet the definition of a heat-treatable alloy as defined in

the HTSUS and confirmed by the petitioners as capturing out-of-scope heat-

treatable sheet.

## ARGUMENT

### I.     Introduction and Summary of Argument

Commerce's determination regarding Valeo's heat-treated aluminum is

procedurally and factually flawed.  After waiting more than 18 months for a

determination that Commerce is required to conduct in 45 days, Commerce issued a

scope ruling that impermissibly intertwines k(1) and k(2) elements, while

simultaneously disregarding requirements within those requirements. Factually,

Commerce fails to recognize that heat-treated alloys are not 1xxx, 3xxx, or 5xxx

alloys and are not included within the scope of the applicable order, as recognized

by the Commission. Commerce even fails to recognize that the HTSUS schedule

itself, at the request of the domestic interested parties ("DIP"), recognizes the fact

that heat-treated alloys are not 1xxx, 3xxx, or 5xxx alloys.  For these reasons,

Commerce's determination is both unlawful and not supported by substantial

evidence.

### II.    Standard of Review

In reviewing Commerce's scope determinations, the court must not uphold a

scope ruling it finds 'unsupported by substantial evidence on the record, or

otherwise not in accordance with law.'" *Sango Int'l L.P. v. United States,* 484 F.3d 1371, 1378 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *Corus Staal BV v. Dep't of Commerce,* 395 F.3d 1343, 1346 (Fed. Cir. 2005). "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Crawfish Processors Alliance v. United States,* 483 F.3d 1358, 1361 (Fed. Cir. 2007) (quoting *Consol. Edison v. NLRB,* 305 U.S. 197, 229 (1938)); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951) ("{s}ubstantial evidence is more than a mere scintilla").  Support by substantial evidence must be determined on the entirety of the record, considering the evidence that detracts from the agency's conclusion. *Universal Camera Corp.,* 340 U.S. at 488.

In reviewing scope rulings, the Court has emphasized that "Commerce may not . . . interpret the scope of an order contrary to the order's terms or in such a way so as to change the scope of the order." *Glob. Commodity Grp. LLC v. United States*, 709 F.3d 1134, 1138 (Fed. Cir. 2013). "Commerce's inquiry begins with the Orders' scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation . . . . The question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review *de novo*." *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018) (citing *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir. 2017)).

*De novo* in this context means review without deference to Commerce's determination. *Accord Litton Sys. v. Honeywell, Inc.*, 87 F.3d 1559, 1566 n.1 (Fed.

14

Cir. 1996) ("By use of the term *de novo*, this court means that it does not defer to the 'lower court ruling or agency decision in question.'") (quoting *Yepes-Prado v. INS*, 10 F.3d 1363, 1367 n.5 (9th Cir. 1993)). The separate, but related "question of whether a product meets the unambiguous scope terms presents a question of fact reviewed for substantial evidence." *Meridian Prods.*, 851 F.3d at 1382.

## III.   Commerce Unlawfully Conducted a k(2) Analysis

As recognized in Commerce's regulations, issues can arise as to whether a particular product is covered by the scope of an antidumping duty order "because the descriptions of subject merchandise contained in {Commerce's} determinations must be written in general terms." 19 C.F.R. § 351.225(a). In interpreting the scope of an antidumping order, Commerce's regulations explain that it will examine "{t}he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." *Id.* § 351.225(k)(1); *see also Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002). If these factors are dispositive—that is, they clarify the scope of the order—Commerce's inquiry ends there, and Commerce can issue a final ruling. *Tak Fat Trading Co.*, 396 F.3d 1378, 1382 (Fed. Cir. 2005). If not, Commerce considers additional criteria, called the "(k)(2)" factors: "(i) The physical characteristics of the product; (ii) The expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The channels of trade in which the product is sold; and (v) The manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2)(i)-(v).

15

The distinction between a (k)(1) analysis and one which turns toward the enumerated factors under 19 C.F.R. § 351.225(k)(2) is not insignificant. Commerce must initiate a formal scope inquiry in this latter case in order to: (1) provide public notice of the alleged ambiguity at issue; (2) allow all interested parties the opportunity to comment on the prospective ruling; and, (3) provide all parties whose interests may be at stake the due process required to reasonably protect those interests. When the k(1) sources are not dispositive, Commerce must initiate a formal scope ruling to conduct a k(2) analysis. 19 C.F.R. § 351.225(k)(2). Commerce should initiate a formal scope inquiry where there is even a "*risk* that Commerce would inadvertently impose antidumping duties on a 'class or kind of foreign merchandise' for which the pre-duty findings required by {the statute} have not been made… including the {Commission's} injury finding." *Cf. Atkore Steel Components, Inc. v. United States*, 313 F.Supp.3d 1374, 1381 (Ct. Int'l Trade 2018).

In issuing its ruling concerning heat-treatable aluminum, Commerce woefully misapplied its procedural framework.  First, Commerce's determination relies on k(2) factors in the first instance, despite its claim that it conducted a k(1) analysis. Not only does a k(2) analysis rely on different elements, but it requires a different procedural framework, including the ability for parties to comment on preliminary determinations and provide factual information in support or in rebuttal to those preliminary determinations. It also provides for formal notice and comment to the industry writ large of a pending interpretation of ambiguous scope

terms.  Commerce's k(2) analysis, without the required k(2) procedural
requirements, was unlawful.

Because Commerce failed to follow its regulatory framework for issuing a
scope determination, its determination must be vacated. "{A}n agency is bound by
its own regulations." *Wagner v. United States*, 365 F.3d 1358, 1361 (Fed. Cir. 2004)
(citing *Service v. Dulles*, 354 U.S. 363, 388 (1957)). "It has long been established
that government officers must follow their own regulations, even if they were not
compelled to have them at all...." *Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir.
1988).

The scope at issue encompasses sheet "common alloys" "manufactured from a
1-XXX, 3-XXX, or 5_XXX, series alloy as designated by the Aluminum Association"
and clad aluminum sheet "produced from a 3XXX, series core." Both the
Commission and DIPs agree that heat-treatable alloys are outside the scope of the
applicable order (i.e., not a 1-xxx, 3-xxx, or 5_xxx, series alloy as designated by the
Aluminum Association). Heat-treatable alloy's exclusion from the definition of an
in-scope alloys is embodied in the Harmonized Tariff Schedule. Commerce does not
contest that heat-treatable alloys are outside the scope of the antidumping order
and, in fact, Commerce cites to the DIP's confirmation of the heat-treatable
exclusion in its scope determination. *See* Decision Memorandum, P.R. 40, C.R. 15,
at 18.

Commerce's scope ruling claims that the "description of the subject
merchandise, the scope language, and prior rulings, were, together, dispositive as to

whether the product at issue is subject merchandise, in accordance with 19 C.F.R. 351.225(k)(1)." Thus, Commerce's ruling claims to rely on nothing more than the scope language, prior rulings and the description of the imported merchandise to reached its scope determination. That is simply not the case.

Commerce could not move more than two sentences into its scope ruling before it turned to information beyond the "description of the subject merchandise, the scope language, and prior rulings." Unlike other aluminum scope language, the sheet scope terms do not define the chemical parameters for in scope products. Unlike other aluminum scope orders that define the chemical parameters associated with in-scope products, including specific alloy contents associated with specified aluminum association designations, the common alloys scope does not contain chemical parameters for the in-scope products.[2]  It was therefore necessary

---

[2] *See Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011) (antidumping duty order) ("the merchandise covered by the order is aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents). Specifically, the subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 1 contains not less than 99 percent aluminum by weight. The subject merchandise made from aluminum alloy with an Aluminum Association series designation commencing with the number 3 contains manganese as the major alloying element, with manganese accounting for not more than 3.0 percent of total materials by weight. The subject merchandise is made from an aluminum alloy with an Aluminum Association series designation commencing with the number 6 contains magnesium and silicon as the major alloying elements, with magnesium accounting for at least 0.1 percent but not more than 2.0 percent of total materials by weight, and silicon accounting for at least 0.1 percent but not more than 3.0 percent of total materials by weight. The subject aluminum extrusions are properly identified by a four-digit alloy series without either a decimal point or leading letter. Illustrative examples from among the approximately 160 registered alloys that may characterize the subject merchandise are as follows: 1350, 3003, and 6060."); *see also Certain Aluminum Foil from the People's Republic of China*, 83 Fed. Reg. 17,362 (Dep't of Commerce Apr. 19, 2018) (amended final determination and antidumping duty order) ("The merchandise covered by these investigations is aluminum foil having a thickness of 0.2 mm or less, in reels exceeding 25 pounds, regardless of width. Aluminum foil is made from an aluminum alloy that contains more than 92 percent aluminum.").

for Commerce to immediately turn to materials other than the "description of the subject merchandise, the scope language, and prior rulings" to discern the meaning of the terms used on the common alloy scope language.

First, Commerce turned to various publications by the Aluminum Association and declarations of the Vice President of Standards and Technology for the Aluminum Association, neither of which are "the scope language, the description of subject merchandise or prior scope rulings." Decision Memorandum at 11, n.86, 12, n.100, 13, n.102, 14, n.111, 16, n.127, 18, n.133, 134. Moreover, the sources Commerce relied on to define terms, such as "clad," "heat-treated," and "3xxx-series" were not k(1) sources. In addition, "heat-treated" or "heat-treatable" are not even terms in the scope language to interpret. Nevertheless, Commerce dedicates nearly half of its scope analysis to an interpretation of those terms. Commerce's entire scope analysis involved connecting various publications and declarations in its attempt to discern a dispositive meaning. One needs to only look to the 156 footnotes used in Commerce's analysis to conclude that the scope at issue in this matter is not resolvable by the scope terms standing on their own. Had the scope terms been self-evident, no references to external sources would be necessary.

In reviewing Valeo's scope request, Commerce requests detailed information regarding the "combined chemistry," "phases of diffused alloys," "integration of particles," and the "melting point of the proprietary core." None of these highly specific physical characteristics were discussed with respect to this particular product in the underlying investigation or otherwise. These descriptions are not

(k)(1) factors but constitute detailed physical characteristics of the merchandise under 19 C.F.R. § 351.225(k)(2)(i). Commerce cannot now claim that this line of inquiry was superfluous to the inquiry.

While courts have allowed relying on industry jargon to assess whether a term in the scope language is ambiguous, similar to relying on dictionary definitions, Commerce's analysis here went beyond interpretation of a common meaning of a term. *ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 88, n.8 (Fed. Cir. 2012). ("{C}onsideration of industry jargon is not the same as conducting a full-fledged analysis of the factors embodied in 19 C.F.R. § 351.225(k)(2)."). Because Commerce undertook a k(2) analysis, not the claimed k(1) analysis, remand is necessary for Commerce to consider the full scope of k(2) factors.

## IV.    Commerce Failed to Appropriately Interpret the Term "Common" Within the Scope Language.

Commerce failed to appropriately interpret the term "common," which is emedded in the scope language.  As noted above, a scope "inquiry begins with the Orders' scope to determine whether it contains an ambiguity and, thus, is susceptible to interpretation." *Whirlpool Corp.*, 890 F.3d at 1308.  The question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law. *See Meridian Products*, 851 F.3d at 1382. The relevant scope terms are "unambiguous" if they have "a single clearly defined or stated meaning."  *Id*. at 1382.  If the scope "is unambiguous, the plain meaning of the Orders' language governs." *Id*. at 1381.

20

If the scope is ambiguous, Commerce may examine other information, including the description of the merchandise contained in the petition, the records from an investigation, prior scope rulings, and other relevant prior determinations issued by the ITC. *See* 19 C.F.R. § 351.225(k)(1); *see also Whirlpool Corp.*, 890 F.3d at 1308. Commerce must interpret the scope so that it is "informative and non-superfluous," and give effect to all terms that define the scope. *See King Supply Co. v. United States*, 674 F.3d 1343, 1350 (Fed. Cir. 2012). Commerce cannot "interpret" an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1370 (Fed. Cir. 1998)

In its scope ruling request, Valeo argued that the term "common" should be interpreted with the plain meaning "known to the community" based on its dictionary definition. Valeo also argued that this unambiguous term controls the scope inquiry at issue because it confirms that the scope only covers designated alloys. In the Decision Memorandum, Commerce rejected the plain meaning of "common" and noted that the preliminary scope determination from the initial investigation stated that "{t}he scope includes all products which meet the physical description of the scope and do not otherwise qualify for an exclusion." Decision Memorandum at 16.

Commerce did not explicitly state that the term "common" is ambiguous. However, the fact that it referenced a (k)(1) source (*i.e.*, the preliminary scope determination) demonstrates that it, indeed, found the term ambiguous. In its

determination, Commerce failed to explain why the term "common" is ambiguous despite the clear plain meaning associated with it.

Even if Commerce was justified in finding the term "common" ambiguous, Commerce failed to conduct a proper analysis of all (k)(1) factors to interpret the term "common" to resolve the ambiguity. Instead, Commerce relied on one (k)(1) source (*i.e.*, the preliminary scope determination) to render the term meaningless. This is contrary to the law requiring Commerce to interpret the scope so that all terms are given effect. See *King Supply Co.*, 674 F.3d at 1350.

Commerce's finding that the term "common" lacks any meaning cannot be considered "interpretation" of the term. Therefore, Commerce's failure to interpret the term amounts to unlawful modification to the scope language. This is contrary to the law requiring commerce to interpret the scope in a manner that does not change the terms of the scope. *See Wheatland Tube Co.*, 161 F.3d at 1370.

## V. Commerce's Determination That the Term 3xxx Do Not Refer to Designated Specifications is Unsupported by Substantial Evidence

Commerce's finding that that term 3xxx is not limited to registered alloys is unsupported by substantial evidence. The entire Aluminum Association nomenclature system is limited to registered alloys and the chemical content of registered designations. The numerical system, <u>including</u> the categorization of alloy types, has no applicability to alloys beyond the registered designations. This is made abundantly clear by the Aluminum Association itself.

First, the header to each alloy specification states that only composition limits identical to those listed are applicable to the specific alloy designation. Specifically, each header specifies the following:

> Only composition limits which are identical to those listed herein for a registered designation are applicable to that designation.

*See* 4th Scope Ruling Request at 8 and Exhibit 3, pp.1-14.

Second, and more generally the Aluminum Association specifications state that "{a} numerical designation assigned in conformance with this Recommendation should only be used to indicate an aluminum or an aluminum alloy having chemical composition limits identical to those registered with the Signatories to the Declaration of Accord on an International Alloy Designation System for Wrought Aluminum and Wrought Aluminum Alloys." *Id.* at Exhibit 3, p.24. Thus, the numerical system used by the Aluminum Association is only applicable to those alloys "having chemical composition limits identical to those registered."  This includes the general categorization of an alloy as 1xxx, 3xxx, and 5xxx.

That the Aluminum Association nomenclature is only applicable to registered alloys is clear from the framework notation provided within specifications.  As illustrated below, the header to a governs the sub-sections and the general categorization within Aluminum Association nomenclature is expressly limited to registered alloys:

The Aluminum Association
1525 Wilson Boulevard
Arlington, VA 22209
U.S.A.

**RECOMMENDATION**
INTERNATIONAL DESIGNATION SYSTEM
FOR WROUGHT ALUMINUM AND WROUGHT ALUMINUM ALLOYS

15 December 1970
Revised June 2014

This Recommendation is based on the numerical designation system for wrought aluminum and wrought aluminum alloys which was adopted in the U.S.A. in 1954, and became its national standard in 1957.  This Recommendation was officially adopted by the International Signatories of the Declaration of Accord on December 15, 1970.

Designations, registered in accordance with this Recommendation, may be used by any country. For use, see Appendixes A, B, and C.

A numerical designation assigned in conformance with this Recommendation should only be used to indicate an aluminum or an aluminum alloy having chemical composition limits identical to those registered with the Signatories to the Declaration of Accord on an International Alloy Designation System for Wrought Aluminum and Wrought Aluminum Alloys.

1.   Scope

This recommendation describes a four-digit numerical system for designating wrought aluminum and wrought aluminum alloys.

2.   Alloy Groups [1, 2, 3, 6]

The first of the four digits in the designation indicates the alloy group as follows:
Aluminum, 99.00 percent and greater.............................................................1xxx
Aluminum alloys grouped by major alloying elements
    Copper ..............................................................................................2xxx
    Manganese...........................................................................................3xxx
    Silicon..................................................................................................4xxx
    Magnesium .........................................................................................5xxx
    Magnesium and Silicon .......................................................................6xxx
    Zinc.....................................................................................................7xxx
    Other elements ...................................................................................8xxx
Unused series .........................................................................................9xxx

(b)      Addition or deletion of not more than one alloying element with limits having an arithmetic mean of not more than 0.30 percent, or addition or deletion of not more than one combination of elements expressed as an alloying element with limits having a combined arithmetic mean of not more than 0.40 percent.

(c)      Substitution of one alloying element for another element serving the same purpose.

(d)      Change in limits for impurities expressed singly or as a combination.

(e)      Change in limits for grain refining elements.

(f)      Maximum iron or silicon limits of 0.12 percent and 0.10 percent, or less, respectively, reflecting high purity base metal.

An alloy shall not be registered as a modification if it meets the requirements for a variation.

24

*Id.* at Exhibit 3, p.28. To claim otherwise would require the governing principles of the applicable section to be disregarded, with a notation taking over as the governing principal.  As the specifications clearly indicate, the entire numerical system only applies to registered alloys. Note 2 to those specifications simply group those registered alloys. An alloys that is not a registered alloy (or a defined variant of those alloys) is not governed by the Aluminum Association specifications and cannot, therefore, be assigned a numerical value in accordance with those specifications, be it a 1 digit specification or 4 digit specification.

Although Commerce "enjoys substantial freedom to interpret and clarify its antidumping duty orders… it may not change them." *See Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995). Accordingly, a final order may not be interpreted "in a way contrary to its terms," nor in a way "so as to change the scope of that order." *Whirlpool Corp.*, 890 F.3d at 1308 (citing *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990) and *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001)).  As demonstrated, Valeo's T-series aluminum sheet is not equivalent to the enumerated common alloys designated by the Aluminum Association in the final scope of the Orders on common alloy aluminum sheet ("CAAS") from China.  Moreover, Valeo's T-series aluminum sheet is not even similar to the enumerated "designated" common alloys.

Subsequent scope rulings concerning the same product reinforce this point. The scope of the final orders on CAAS from Italy, *et al*, states:

> "Common alloy sheet within the scope of this investigation includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet. With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1xxx-, 3xxx-, or 5xxx-series alloy as designated by the Aluminum Association. With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3xxxseries core, to which cladding layers are applied to either one or both sides of the core. The use of a proprietary alloy or non-proprietary alloy that is not specifically registered by the Aluminum Association as a discrete 1xxx-, 3xxx-, or 5xxx-series alloy, **but that otherwise has a chemistry that is consistent with these designations**, <u>does not remove an otherwise in-scope product from the scope</u>."

*See* 4th Scope Ruling Request, P.R. 31, C.R. 14, at 9 (citing Memorandum, *Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and Turkey: Scope Comments Final Decision Memorandum*, dated March 1, 2021.).

The refinement embodied in the Italian matter confirms that only registered alloys (or their proprietary equivalents) are included within the scope of the order. Aluminum alloys that are not specifically registered by the Aluminum Association <u>and</u> do not have a chemistry that is consistent with these designations are not subsumed within the scope of the order. To read the above otherwise would render the "but that otherwise" provisions meaningless.

The scope language above also highlights the over expansive definition adopted by Commerce in Valeo's scope ruling. Had the scope applied to all aluminum with 99 percent or greater of aluminum, and aluminum with manganese or magnesium as the primary alloying element, it would have so stated. It does not, however, so state. Neither the instant Chinese scope at issue nor the companion Italian scope contain that simple provision. Instead, both scopes limit applicability

26

to 1xxx-, 3xxx-, or 5xxx-series alloy "<u>as designated by the Aluminum Association</u>."
As such, Commerce improperly expanded the scope in Valeo's ruling and that ruling
is not in accordance with the law and not supported by substantial evidence.

Moreover, the base alloy used in Valeo's heat-treated T-series sheet is not
designated by the Aluminum Association as a 3xxx-series core, nor is it a chemical
equivalent or variation of any designated 3xxx-series alloy.  This fact is not
contested.

The Aluminum Association defines a variation as follows:

> A variation has composition limits which are similar but not identical to a
> modification or an original alloy, with differences such as:

| | |
|---|---|
| (a) Change of not more than the following amounts in the arithmetic mean of the limits for an individual alloying element or combination of elements expressed as an alloying element or both: Arithmetic Mean of Limits for Alloying Elements in Original Alloy or Modification | Maximum Change |
| | |
| Up through 1.0 percent | 0.15 |
| Over 1.0 through 2.0 percent | 0.20 |
| Over 2.0 through 3.0 percent | 0.25 |
| Over 3.0 through 4.0 percent | 0.30 |
| Over 4.0 through 5.0 percent | 0.35 |
| Over 5.0 through 6.0 percent | 0.40 |
| Over 6.0 percent | 0.50 |

> To determine compliance when maximum and minimum limits are specified for a
> combination of two or more elements in one alloy composition, the arithmetic
> mean of such combination is compared to the sum of the mean values of the same
> individual elements, or any combination thereof, in another alloy composition.

*See* 4th Scope Ruling Request at Exhibit 3, p.28.

Valeo's heat-treated aluminum requires the following amounts of copper and manganese.

| Cu | | Mn | | Mean |
|---|---|---|---|---|
| Min | Max | Min | Max | |
| [ | | | | ] |

*See* 4th Scope Ruling Request at 9.

There are no designated 3-xxx series alloys that meet the definition of a variation or modification for Valeo's T-series aluminum. Presented below are the closest alloys. None of these alloys are close to meeting the definition of a variation or modification of a registered alloy:

| Grade | Cu | | Mn | | Mean |
|---|---|---|---|---|---|
| | Min | Max | Min | Max | |
| 3001 | 0.15 | 0.45 | 0.6 | 1.2 | 1.2 |
| 3103B | 0 | 0.5 | 0.7 | 1.3 | 1.25 |
| 3403 | 0 | 0.5 | 0.8 | 1.5 | 1.4 |
| 3304 | 0 | 0.6 | 0.8 | 1.4 | 1.4 |
| 3304 | 0 | 0.6 | 0.8 | 1.4 | 1.4 |
| 3014 | 0 | 0.5 | 1 | 1.5 | 1.5 |
| 3019 | 0 | 0.9 | 0.3 | 0.9 | 1.05 |
| 3021 | 0.2 | 0.6 | 0.05 | 0.8 | 0.825 |
| 3065 | 0.4 | 0.8 | 0.6 | 0.9 | 1.35 |

*See* 4th Scope Ruling Request at 3 and Exhibit 1.

Therefore, Valeo's T-series alloy is not a proprietary equivalent to any designated 3-xxx alloy.

## VI.   Commerce's Determination That T-Series Aluminum Sheet Is Not Heat-Treated Is Unsupported by Substantial Evidence

In its Decision Memorandum, Commerce's determined that T-series aluminum sheet is not a heat-treated product because it is a clad product, without

28

explaining why they are mutually exclusive. *See* Decision Memorandum at 13. In doing so, Commerce failed to consider the record evidence demonstrating that T-series sheet is heat-treated.

The record evidence demonstrates that T-series sheet is heat-treated. In particular, the following excerpt clearly describes the heat treatment process applicable to T-series sheet:

> Valeo's heat-treated T-series sheet is manufactured through a unique three-stage heat treatment mechanism. During the homogenization process, the aluminum is heated to [          ] °F to redistributes the precipitating elements evenly through the material. The aluminum is then reheated to [          ] °F. The aluminum is also annealed in high temperatures between [          ] °F and rapidly cooled.

2nd Scope Ruling Request, at Att. 2 (SQR Response; p. 4). The record also shows that the heat treatment process alters the chemical and mechanical properties of both the core and outer layers of T-series sheet:

> Not only is T-series aluminum heat-treatable, it is, in fact, heat-treated multiple times. The pre-heat treated outer layers of T-series have a high silicon content and low melting temperature compared to the inner layer. During heat treatment, the silicon diffuses from the outer layers and leads to the precipitation of densely distributed AlMnSi particles.

> During the heat-treatment process, the Cu in the center layer diffuses outwards, which enhances its long life effect on corrosion resistance. The alloy resulting from this process has a chemical content that is specific to Valeo's heat-treated T-series sheet and is not classifiable within any 1xxx, 3xxx or 5xxx series alloy. Due to its unique chemical composition and manufacturing processes, heat-treated T-series sheet exhibits high strength and high corrosion resistant characteristics that are different than common alloys.

*Id.* at 7. The heat-treatment process described above is consistent with the definition of "heat-treatment" provided by both Valeo and the Domestic Industry,

which essentially refers to the process of strengthening aluminum through heating and rapid cooling. *See id.* at 6; *see also* Domestic Industry Comments (June 25, 2022), at 11.

In its Comments, the Domestic Industry claimed that Valeo's T-series sheet is not heat-treated, but rather "annealed" which refers to the process of heating aluminum to increase ductility instead of strength. *See id.* at 12. However, explained above, Valeo clearly identified and described the three-stage heat treatment process which <u>includes</u> annealing. Valeo clearly stated that "annealing is part of the comprehensive heat-treatment mechanism" and T-series sheet "is both heat-treated and annealed." *See* 2nd Scope Ruling Request, P.R. 14, C.R. 5, at Att. 2 (SQR Response; p. 4). Valeo also stated that the aluminum is "rapidly cooled" during the heat-treatment. *See id.* The heat-treatment process improves the mechanical properties of T-series sheet including "high strength." *See id.* at 7. Therefore, the record demonstrates that T-series sheet is heat-treated and not just annealed.

Furthermore, the record evidence also demonstrates that both the core and outer layers of T-series aluminum meet the following definition of "heat-treatable industrial alloys" in the U.S. Harmonized Tariff Schedule ("HTSUS").

> For the purposes of statistical reporting numbers 7604.21.0010, 7604.29.1010, 7604.29.3060, 7604.29.5050, 7606.12.3025 and 7606.12.3091, "heat-treatable industrial alloys" refers to aluminum containing by weight 3.0 percent or less of magnesium and 3.0 percent or less of silicon, <u>and/or</u> are designated as series 6xxx in the Aluminum Association's specifications of registered alloys.

Statistical Note 6 to Chapter 76, HTSUS (emphasis added).  Valeo demonstrated that both the core and outer layers of T-series aluminum contains 3 percent of less of magnesium and silicon.  *See* 2nd Scope Ruling Request, P.R. 14, C.R. 5, at Att. 2 (SQR Response; p. 5 and Ex. S-1).  It is uncontested that this definition is used to capture "out-of-scope heat-treatable sheet" classified as "not clad" in 7606.12.3025 and 7606.12.3091.  Therefore, when individually considered, both the core and outer layers of T-series aluminum are out-of-scope heat-treatable sheets.  More importantly, all of those layers undergo the three-stage heat-treatment process contributing to the high strength of T-series sheet.  Therefore, T-series sheet is a heat-treated product whether or not it is considered a clad product.

In its Decision Memorandum, Commerce failed to address any of the above facts establishing the heat-treatability of T-series sheet.  As such Commerce's determination that T-series sheet is not a heat-treated product is unsupported by substantial evidence.

**VII.   Commerce Misinterpreted that Clad and Heat-Treated Products Are Mutually Exclusive**

In its Decision Memorandum, Commerce's determined that Valeo's T-series sheet is not heat-treated solely based on the presumption that clad and heat-treated products are mutually exclusive.  *See* Decision Memorandum at 13.  Commerce determined that Valeo's T-series sheet is not a clad product because the integration between the intermediate layers is not sufficient to result in a non-clad product. *See id.* Commerce then determined that the T-series sheet is not heat-treated because it "can be considered to be a clad product rather than a heat-treated

31

product." *Id.* However, Commerce failed to explain why clad products cannot be heat-treated.

Commerce's misinterpretation of the relationship between clad and heat-treated products is evident in the following excerpt from the Decision Memorandum:

> Because the DIPs contend that the T-series aluminum sheet imported by Valeo is a clad product, whereas Valeo contends that it is a heat-treated product, we first examined the record evidence concerning the description of a clad product <u>versus</u> the description of a heat-treated product.

Decision Memorandum at 11 (emphasis added).  The Domestic Industry claimed that Valeo's T-series sheet is covered by the scope because it is a clad product manufactured from a "3xxx-series core." *See* Domestic Industry Comments (May 27, 2020), P.R. 9, C.R. 2, at 10-15. Valeo claimed that T-series sheet is excluded because it is a heat-treated product and the Commission explicitly found that heat-treated products are excluded from the scope.  *See* 2nd Scope Ruling Request, P.R. 14, C.R. 5, at 13. These are two separate issues, and neither Valeo nor the Domestic Industry claimed that clad and heat-treated products are mutually exclusive.

The record does not demonstrate that the clad and heat-treated products are mutually exclusive. In fact, the technical literature provided by the Domestic Industry demonstrates that clad products can undergo "thermal treatment."  See Domestic Industry Comments (May 27, 20220), P.R. 9, C.R. 2, at 9. The Domestic Industry also recognized that "thermal treatment may alter the chemical composition of the core and/or cladding layers in a clad product."  *Id.*  The record

32

does not distinguish between heat treatment and thermal treatment.  In fact, the Commission used the terms interchangeably in the initial investigation:

> Heat-treatable alloys are alloys that can be strengthened through a thermal (heating) process, usually in an annealing furnace. Non-heat treatable alloys are alloys which are primarily strengthened through further working (e.g. rolling, extruding, drawing) and not by thermal treatment.

*Common Alloy Aluminum Sheet from China, Inv. Nos. 701-TA- 591 and 731-TA-1399 (Final)*, USITC Pub. No. 4861 (Jan. 2019) at I-12 (emphasis added). Therefore, the record demonstrates that clad products can undergo heat treatment.

The Domestic Industry distinguished heat-treatment from "annealing" which softens aluminum as opposed to "heat treatment" which strengthens the aluminum. The difference between the two processes is identified as the rapid cooling process following heating.  *See* Domestic Industry Comments (June 25, 2020), at 12 ("reduce quickly the sheet's temperature").  However, there is nothing in the record that suggests that the thermal treatment involving clad products only includes annealing and not rapid cooling.  In fact, the heat-treatment for Valeo's T-series sheet includes a rapid cooling process.  *See* 2nd Scope Ruling Request, P.R. 14, C.R. 5, at 7.  Therefore, if *arguendo* T-series sheet is a clad product, it follows logically that clad products can be heat-treated.

In its scope ruling, Valeo argued that T-series sheet is not a clad product because the heat-treatment results in "diffusion and integration of particles between original boundaries {of the intermediate layers}, resulting in a product with a combined chemistry."  2nd Scope Ruling Request, P.R. 14, C.R. 5, at Att. 2 (SQR

Response; p. 2).  Commerce rejected this argument based on the finding that "some diffusion may occur between the core and cladding layer for clad products." However, this finding does not negate the fact that both heat-treatment and diffusion occur for T-series sheet.  Therefore, Commerce's misinterpreted that clad and heat-treated products are mutually exclusive.

## VIII.  Commerce Failed to Consider Determinations by the Commission in Its (1) Analysis

Among other factors, Commerce is required to consider determinations by the Commission in its scope determination.  Rather that undertaking the necessary analysis regarding that element, Commerce simply disregarded the Commission's determination and misconstrues the determinations made by the Commission. Critically, Commerce misstates and misunderstands the foundation upon which the Commission's factual finding regarding heat-treatable alloys was based. This misunderstanding explains Commerce's hopelessly disjointed reasoning regarding heat-treatable alloys and the Commission's finding.

The issue is <u>not</u> if that there is an exclusion for heat-treatable aluminum. Instead, the issue that heat-treatable alloys are not 1xxx, 3xxx, or 5xxx aluminum in the first instance.  This is how the Aluminum Association's specifications are organized, this is how the industry recognizes the terms "1-XXX, 3-XXX, and 5-XXX," and this is the fact recognized by the Commission.  The Commission's determination that "heat-treated aluminum sheet (e.g., 6xxx alloy series) is not covered by Commerce's scope." is a simple recognition of the nomenclature utilized by the Aluminum Association. *See Common Alloy Aluminum Sheet from China,*

34

*Inv. Nos. 701-TA- 591 and 731-TA-1399 (Final)*, USITC Pub. No. 4861 (Jan. 2019) at I-18 (emphasis added).  In other words, heat-treated aluminum sheet is not a 1-xxx, 3-xxx, 5-xxx alloy.

Commerce misunderstands this fact.  This misunderstanding is reflected in Commerce's determination that the exclusion for heat-treated alloys is not applicable beyond "the alloy series that the ITC identified as heat-treatable (e.g., 6xxx-series)" because the Commission explicitly stated that "1xxx, 3xxx, 5xxx-alloy series are included in Commerce's scope" and described those series as "non-heat-treatable." *See id*.  For these reasons, Commerce found that the Commission did not intend to an exclusion for "heat-treatable 1xxx, 3xxx, or 5xxx-series alloys." *See id*.

Commerce misses the point.  There are no heat-treatable 1xxx, 3xxx, or 5xxx alloys as those alloys are defined by the registered Aluminum Association specifications.  1xxx, 3xxx, or 5xxx alloys are not heat-treatable. The Commission correctly described 3xxx-alloy series as non-heat-treatable.  An alloy that is heat-treatable is not a 1xxx, 3xxx or 5xxx alloy.

Had Commerce recognized this fact, it would have recognized that the Commission's determination regarding heat-treatable alloys is easily reconciled with the scope language. Commerce could have resolved the perceived discrepancy by correctly interpreting the scope to cover only "designated" (i.e., registered) 1xxx, 3xxx, and 5xxx alloys.  This interpretation is logically harmonious with the Commission's explicit language about exclusion of heat-treated products because all registered 1xxx, 3xxx, and 5xxx alloys are non-heat-treatable.  Due to its

misinterpretation of the scope, Commerce failed to give effect to the Commission'

unequivocal finding that heat-treated products are excluded from the scope.

The record demonstrates that the pre-heat-treated core layer of T-series sheet

is heat-treatable. *See* 2nd Scope Ruling Request, P.R. 14, C.R. 5, at Att. 2 (SQR

Response; p. 3); see also 4th Scope Ruling Request, at Att. 2 (2SQR Response; p. 3).

Had Commerce undertaken its regulatory obligation and properly considered the

Commission's determination, it would have concluded that heat-treatable alloys are

not 1xxx, 3xxx or 5xxx alloys as defined by the Aluminum Association.

## IX.   Commerce's Failure to Disclose the Factual Information Presented in Ex-Pare Meetings Was Unlawful

Twice Commerce held ex-parte meetings with the DIP and twice Commerce

violated its statutory obligation and its policy regarding ex-party meetings.  On

April 22, 2021, an ex-parte memorandum was placed on the administrative record

by Commerce.  However, Commerce's memorandum provides only a very cursory

statement of the factual information discussed and submitted at that meeting.  In

fact, the entirety of Commerce's disclosure regarding the substantive and factual

information presented at that meeting is as follows -- "{i}n particular, counsel for

the domestic industry discussed how Alcha Group's U.S. sales database related to

the Heat-Treated T-Series Aluminum Sheet scope inquiry."  Following placement of

the ex-parte meeting memorandum on the record, Valeo requested information

related to the factual information discussed or presented at that meeting so that it

could provide a meaningful response. Commerce rejected Valeo's request.

Commerce's meeting summary does not provide any information to permit interested parties to meaningfully respond (either in writing or in a subsequent meeting) to the factual information discussed or presented at the meeting.  This is particularly true given that the meeting discussed information and issues relevant to two separate proceedings, including: (1) the current ongoing administrative review requested by Jiangsu Alcha Aluminium Co., Ltd. and its affiliates ("Alcha Group") and (2) the ongoing scope ruling request submitted by Valeo Group.

 These two proceedings have entirely separate records containing both proprietary and public factual information as defined by 19 C.F.R. 351.102(b)(21). Therefore, any discussion including factual information received in the course of the separate ongoing scope proceeding is untimely under 19 C.F.R. § 351.301(c)(1) as to both Alcha Group's initial and supplemental questionnaire responses submitted on August 5, 2020 and March 24, 2021, respectively, and improper unless the Department here now places the information on the record in accordance with 19 C.F.R. § 351.301(c)(4), thereby allowing Valeo the opportunity to rebut, clarify, or correct such information.

The statute requires a complete and fulsome discussion of the facts presented at an ex-parte meeting. The relevant statute instructs that the Department "shall maintain a record of any ex parte meeting{s}" including an summary.  Under 19 U.S.C. § 1677f(a)(3), the Department must maintain a record of any ex parte meeting between -

       (A) interested parties or other persons providing factual information in connection with a proceeding, and

> (B) the person charged with making the determination, or any person charged with making a final recommendation to that person, in connection with that proceeding, if information relating to that proceeding was presented or discussed at such meeting.

There is no dispute that the DIP engaged in ex-parte meetings with Commerce. There also can be no dispute that memoranda placed on the record does not summarize factual information discussed at those meetings. Nor does Commerce explain how, and if, confidential information submitted in one proceeding relates to an entirely different producer in another proceeding.

The memoranda memorializing each such ex parte communication must include "the identity of the persons present at the meeting, the date, time, and place of the meeting, and a summary of the matters discussed or submitted." 19 U.S.C. § 1677f(a)(3). The memoranda must be included in the official "record of the proceeding," and must be available for inspection and copying. 19 C.F.R. § 351.104(b). Any memoranda detailing ex parte communications must be a part of the record for judicial review. 19 U.S.C. § 1516a(b)(2)(A). *See Sachs Auto. Prods. Co. v. United States*, 17 CIT 290, 291–92 (1993).

Commerce's refusal to provide a meaningful summary is disrespectful of the administrative process, as well as violative of the statute. For over 20 years, Commerce has a policy in place regarding ex-parte meeting, flowing from its history of violating the notice statute. Commerce itself summarizes the history of its violations in that policy notice, as well as its policy moving forward:

> In Nippon Steel Corp. v. United States, 118 F. Supp. 2d 1366, 1374 (CIT 2000), the Court of International Trade held that the Department's implementation, in the underlying antidumping duty

investigation, of the *ex-parte* memoranda provision of its statute constituted a violation of that statute. The Department acknowledges that the *ex-parte* memoranda in that proceeding contained inadequate information and were not timely placed on the record. In order to assure better compliance with this provision, the following policy statement was issued to all Import Administration staff. In addition, the Office of the Under Secretary for International Trade and the Office of the Secretary were notified.

POLICY STATEMENT ON *EX-PARTE* MEMORANDA:

All Import Administration staff are instructed that *ex-parte* memoranda required by Section 777(a)(3) of the Act will be drafted expeditiously in all cases, reviewed by a person in attendance at the meeting, and placed in the record as soon as possible, so that parties may comment effectively on the factual matters presented. The memoranda are required whether or not the factual information received was received previously, is expected to be received later in the proceeding, or is expected to be used or relied on. This statutory provision is included below

*Policy Statement Regarding Issuance of Ex-Parte*, 66 Fed. Reg. 16,906 (Dep't of Commerce Mar. 28, 2001).

Given that there was no information that would allow Valeo to "comment effectively on the factual matters presented," Commerce violated its policy regarding ex-parte meetings, as well as the governing statutory requirements. Therefore, this case must be remanded to Commerce so that is may issue a meaningful ex-parte meeting summary and provide Valeo with an opportunity to comment effectively on that factual information.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court reverse and remand this matter to Commerce for it to conduct a lawful k(2) analysis and amend the administrative record to remedy its statutory obligation to provide meaningful summaries of factual information discussed at ex-parte meetings.

Respectfully submitted,

Dated:  March 21, 2022

_____

Daniel Cannistra
John Anwesen
Pierce Lee

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
Tel: 202.624.2902
E-mail: DCannistra@crowell.com

*Valeo North America, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 10,163 words, including text, footnotes, and headings and excluding the table of contents, table of authorities, and counsel's signature block.

Daniel Cannistra