# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

VALEO NORTH AMERICA, INC.,

   *Plaintiff,*

 v.

UNITED STATES OF AMERICA,

   *Defendant,*

   and

ALUMINUM ASSOCIATION COMMON
ALLOY ALUMINUM SHEET TRADE
ENFORCEMENT WORKING GROUP et
al.,

   *Defendant-Intervenors.*

Court No. 21-00581

***PUBLIC DOCUMENT***

---

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF RULE 56.2
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Dated:  August 12, 2022

Daniel J. Cannistra
Pierce Lee

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
Tel: 202.624.2902

*Counsel to Plaintiff Valeo North America*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 3

I.  Commerce's Determination Was Unlawful ................................................ 3

II.  Defendant and Defendant-Intervenors Fail to Address the Substantial Evidence Issues Raised by Plaintiff .................................................... 5

    A.  The Aluminum Association Nomenclature Is Explicitly Limited to Enumerated Alloys ................................................................. 5

    B.  The Domestic Industry Confirmed that Heat-Treatable Alloys Are Not 3-XXX Series Alloys .......................................................... 10

III.  Defendant Misrepresents Valeo's Position before the International Trade Commission ................................................................. 12

IV.  Defendant-Intervenors' HTS Arguments Are Irrelevant ................................. 14

V.  Defendant Inexplicably Reaches a Determination on Clad/Not Clad............. 14

VI.  The Term "Common" In the Scope Language Confirms That "As Designated" Means Registered Alloys............................................. 15

VII.  Commerce Unlawfully Relied on the Declaration from the Aluminum Association to Resolve the Ambiguity about the Interpretation of "As Designated" ................................................................. 17

VIII.  Commerce's Ex-Parte Meeting Was Unlawful.................................... 20

CONCLUSION.................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arcelormittal Stainless Belgium N.V. v. United States*
    684 F.3d at 87 (Fed. Cir. 2012) ................................................................................. 3

*King Supply Co. v. United States,*
    674 F.3d 1343 (Fed. Cir. 2012)................................................................................. 16

*Whirlpool Corp. v. United States,*
    890 F.3d at 1308 (Fed. Cir. 2018) ........................................................................... 3

**Statutes**

5 U.S.C. § 551(6) ........................................................................................................ 21

5 U.S.C. § 551(13) ...................................................................................................... 21

5 U.S.C. § 557(d)(1)(A) .................................................................................. 20, 21, 22

19 U.S.C. § 351.102(b)(29)(iii) ................................................................................. 18

**Federal Regiser**

87 Fed. Reg. 45,753 (July 29, 2022) ......................................................................... 21

**Other Authorities**

19 C.F.R § 351.225(k)(1) ............................................................................................ 4

19 C.F.R. § 351.310(c) ............................................................................................... 21

Plaintiff Valeo North America, Inc. ("Valeo") hereby submits this reply brief in support of its Rule 56.2 motion for judgment on the agency record contesting the Department of Commerce's ("Commerce's" of the "Department's") scope ruling determination concerning Plaintiff's heat-treated T-series aluminum sheet.

## INTRODUCTION

Commerce's scope determination is unlawful. The regulations provide a regulatory framework for scope determinations, which Commerce ignored. Moreover, Commerce failed to undertake a lawful analysis of the applicable terms in the scope language. For those reasons alone, Commerce's determination must be voided with instructions to undertake a scope analysis in accordance with the applicable regulations.

Defendant and Defendant-Intervenors fail to meaningfully address the determinations challenged by Plaintiff, choosing instead to recast the challenged determination. Namely, they never rationally address the fact that the Aluminum Association nomenclature is limited to enumerated alloys. Nor does Defendant or Defendant-Intervenors address the fact that the very same affidavit relied upon in their defense confirms Plaintiff's position that T-series alloys are not a 3xxx alloy. *See* Letter, "Domestic Industry's Response to Valeo Group's Rebuttal Comments," dated June 25, 2020 (Domestic Parties Surrebuttal Comments) (PR 17; CR 7), at Attachment 1. In fact, a separate HTS category was created to capture the out of scope heat-treated alloys, including the same alloys at issue in this case. *See* Pl. Br., at 12. This affidavit and scope clarification were submitted by Defendant-

Inventor and presumably it is their clients that utilize this classification. This affidavit, however, is irreconcilable with Defendant and Defendant-Intervenors' current position.

Finally, Defendant-Intervenors' brief contains a number of misrepresentations. Most notably, Defendant-Intervenors mispresent Valeo's position regarding brazing sheet before the International Trade Commission (the "Commission" or "ITC"). *See* Def.-Int. Br. at 10-12.  Plaintiff corrected these misrepresentations at the administrative level, but Defendant-Intervenors continue to perpetuate its misrepresentation.  Defendant-Intervenors also mispresent the time-line of this case, claiming that Valeo's scope exclusion requests were "incomplete." *See id.*, at 8.  Valeo's scope requests were not incomplete. Commerce sought supplemental information related to k(2) factors, which Valeo provided.  *See* Letter from DOC to Crowell & Moring Pertaining to Valeo Scope Supplemental Questionnaire (CR 9; PR 23), at 4.  Commerce now claims that it did not need k(2) information for its determination.  *See* Def. Br. at 24-19.  If that is the case, then Valeo's original submission was complete in the first instance, and Commerce was simply requesting superfluous information.

Scope proceeding such as this involves competing interests.  All parties have the right to expect a fair, impartial and rational application of the law. While the aluminum producers represent an important component of the U.S. industry, the automotive industry represented by Valeo is equally important. In fact, Valeo alone employees more workers in the United States than the entire aluminum industry.

Ignoring deadlines, grossly misapplying the law and claiming that the subject matter of an ex-parte meeting was a blank piece of paper are not consistent with the standards expected of our executive agencies. Therefore, Valeo respectfully request that the determination issued by Commerce be voided and the matter remanded to Commerce.

## ARGUMENT

## I.     Commerce's Determination Was Unlawful

Defendant and Defendant-Intervenors' briefs confirm that Commerce's scope ruling concerning Valeo's T-series alloys was unlawful and unsupported by substantial evidence.  In a scope analysis, the first step is to determine "{i}f the scope is unambiguous. . ." *Whirlpool III*, 890 F.3d at 1308 (quoting *Meridian*, 851 F.3d at 1381); *see Arcelormittal*, 684 F.3d at 87 ("the first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous, and thus requires analysis of the regulatory factors previously outlined")."

Defendant concedes that the scope language is ambiguous. Indeed, the first factual question analyzed by Defendant confirms ambiguity in the scope language. As admitted by Defendant, Commerce tried to determine if Valeo's T-series aluminum sheet constitutes clad aluminum sheet.  *See* Final Scope Ruling (PR 40; CR 15), at 11-13.  But, as noted by Defendant "[t]he scope language lacks an express definition for clad aluminum sheet." Def. Br. at 16.  Then, Commerce attempts to define 3xxx-series alloys, but immediately turns to resources beyond the scope language.  *See* Final Scope Ruling (PR 40; CR 15), at 11-13.   Then, Commerce

3

engages in an extensive discussion of the heat-treatability of T-series aluminum. There is no question that the scope language is ambiguous.

Given that the scope is ambiguous, the regulations instruct Commerce to consider the descriptions of the merchandise contained in the petition, the descriptions of the merchandise contained in the initial investigation pertaining to the order, and prior scope determinations by Commerce and determinations by the Commission. *See* 19 C.F.R § 351.225(k)(1). The regulatory framework limits Commerce to these elements and its k(1) analysis must not go beyond an analysis of these factors. If an analysis beyond these factors is required, Commerce must undertake an additional "k(2)" analysis which provides for a consideration of additional factors.

Defendant's case brief does not even pretend that Commerce limited its analysis to k(1) factors. Among other arguments supporting its determination, Defendant offers the following factors to explain its decision:

- "Notably, the term 'heat-treated' does not appear in the scope language; however, 'clad' is a scope term." Def. Br., at 20.

- "… we find that Valeo has not demonstrated that the phases of diffused alloys within T-series aluminum sheet are not separate layers of a composite clad product." Final Scope Ruling (PR 40; CR 15) at 13.

- "Commerce's inquiry was to determine, based on record evidence, whether Valeo's product constitutes clad or non-clad aluminum sheet and whether it is manufactured with a series alloy as designated by the Aluminum Association." Def. Br., at 21.

- " … upon its finding that Valeo's product constitutes multi-alloy, clad aluminum sheet … " *Id.,* at 22.

- "Commerce quoted the Aluminum Association's Teal Sheets that "{t}he alloy designation in the 2XXX through 8XXX groups is determined by

the alloying element (Mg2Si for 6XXX alloys) present in the greatest mean percentage." *Id.*

These are all k(2) considerations.

Moreover, Defendant's case brief is replete with references to Valeo's "incomplete" scope request. *See*, *e.g.,* Def. Br., at 16. If Commerce was, in fact, undertaking a k(1) analysis, then Valeo's initial scope ruling request was complete in the first instance. The additional information that Commerce sought in its supplemental questionnaires related to k(2) factors, not k(1) factors. None of the information in the supplemental questionnaires were required if Commerce was able to undertake a k(1) analysis. By requesting and then utilizing information related to k(2), Commerce clearly undertook a partial k(2) analysis which it unlawfully characterized as a k(1) analysis. For that reason, Commerce's determination is unlawful.

## II.    Defendant and Defendant-Intervenors Fail to Address the Substantial Evidence Issues Raised by Plaintiff

### A.    The Aluminum Association Nomenclature Is Explicitly Limited to Enumerated Alloys

Defendant never meaningfully addresses two essential elements of Valeo's substantial evidence arguments and instead mischaracterizes the issue as whether or not Valeo's heat-treated alloy is clad. The determination regarding clad or not clad is not dispositive as to scope. Instead, the issue is if Valeo's alloy (core or as whole) is a 3xxx alloy.

Designation of an alloy as a 3xxx alloy necessarily relies on the Aluminum Association's numerical system.  That system is limited to designated alloys and does not encompass other metals containing aluminum.  The header to the numerical system makes that clear and specifies that "a numerical designation assigned in confirmation with the Recommendation <u>should only be used</u> to indicate an aluminum of an aluminum alloy <u>having chemical composition limits identical to those registered with the Signatories</u>…"  *See* 2nd Scope Ruling Request (PR 14; CR 5), at Exhibit 3, p. 28 (emphasis added).  Thus, the entire numerical system is limited to "aluminum alloy having chemical composition limits identical to those registered with the Signatories." <u>Id</u>.

It is clear from the framework of the recommendation that the header governs the entirety of the numerical system:

Barcode:3982800-01 A-570-073 SCO - Scope Inquiry - Heat-Treated T-Series Aluminum Sheet

**RECOMMENDATION**

The Aluminum Association
1525 Wilson Boulevard
Arlington, VA 22209
U.S.A.

INTERNATIONAL DESIGNATION SYSTEM
FOR WROUGHT ALUMINUM AND WROUGHT ALUMINUM ALLOYS

15 December 1970
Revised June 2014

This Recommendation is based on the numerical designation system for wrought aluminum and wrought aluminum alloys which was adopted in the U.S.A. in 1954, and became its national standard in 1957. This Recommendation was officially adopted by the International Signatories of the Declaration of Accord on December 15, 1970.

Designations, registered in accordance with this Recommendation, may be used by any country. For use, see Appendixes A, B, and C.

A numerical designation assigned in conformance with this Recommendation should only be used to indicate an aluminum or an aluminum alloy having chemical composition limits identical to those registered with the Signatories to the Declaration of Accord on an International Alloy Designation System for Wrought Aluminum and Wrought Aluminum Alloys.

1.  Scope

This recommendation describes a four-digit numerical system for designating wrought aluminum and wrought aluminum alloys.

2.  Alloy Groups [1, 2, 3, 6]

The first of the four digits in the designation indicates the alloy group as follows:

Aluminum, 99.00 percent and greater ............................................1xxx
Aluminum alloys grouped by major alloying elements

Copper ............................................................................2xxx
Manganese ......................................................................3xxx
Silicon ...........................................................................4xxx
Magnesium ......................................................................5xxx
Magnesium and Silicon ......................................................6xxx
Zinc ...............................................................................7xxx
Other elements ...............................................................8xxx
Unused series .................................................................9xxx

3.  1xxx Group

(b)  Addition or deletion of not more than one alloying element with limits having an arithmetic mean of not more than 0.30 percent, or addition or deletion of not more than one combination of elements expressed as an alloying element with limits having a combined arithmetic mean of not more than 0.40 percent.

(c)  Substitution of one alloying element for another element serving the same purpose.

(d)  Change in limits for impurities expressed singly or as a combination.

(e)  Change in limits for grain refining elements.

(f)  Maximum iron or silicon limits of 0.12 percent and 0.10 percent, or less, respectively, reflecting high purity base metal.

An alloy shall not be registered as a modification if it meets the requirements for a variation.

6.  Variations

As seen above, the header contains an explicit prohibition against using the numerical system for a non-registered alloy. The headers applies to all notes *including* "note 2" describing alloy groups based on major alloying elements. Despite the explicit prohibition against assigning a numerical designation to a unregistered alloys, that is precisely what Commece did. Namely, Commerce assigned a numerical designation (3xxx) in direct conflict with the Aluminum Association specifications prohibiting the assignment of a numerical designation to a chemical composition limit that is not identical to those registered with the

7

Signatories. *Id.* Commerce's continued disregard for the framework of the numerical destination system utilized by the Aluminum Association must be rejected.

Defendant claims that it relied on "record evidence" for the proposition that unregistered alloys may be assigned an alloy series group (i.e., a numerical designation) based only on the principal alloying element. *See* Def. Br. at 33. In other words, Defendant claims that record evidence supports the position that a numerical designation may be assigned to a chemical composition limit that is not identical to those registered with the Signatories. As "record evidence," Defendant cites to the Final Scope Ruling at 14. The Final Scope Ruling, in turn, cites to First DIPs Comments at Attachment 6 at paragraph 7 as the "record evidence" for Commerce's finding that an alloy that is not registered with the Aluminum Association may be assigned a numerical designation. *See* Final Scope Ruling (PR 40; CR 15) at 13. Attachment 6 at paragraph 7 (i.e., Commerce's "record evidence") provides as follows:

> 6. As stated above in Paragraph 4, the Aluminum Association's Teal Sheets are based on a classification system that designates eight different "series" for the identification of alloys based on the alloy's aluminum content and/or principal alloying element. The eight series are referred to as the "one thousand series" or "1XXX-series" through the "eight thousand series" or "8XXX-series". The eight series and their unique chemistry profiles are as follows:
> - 1XXX-series – Contains at least 99.00 percent aluminum;
> - 2XXX-series – Copper is the principal alloying element;
> - 3XXX-series – Manganese is the principal alloying element;
> - 4XXX-series – Silicon is the principal alloying element;
> - 5XXX-series – Magnesium is the principal alloying element;

- 6XXX-series – Magnesium and silicon are the principal alloying elements;
- 7XXX-series – Zinc is the principal alloying element; and
- 8XXX-series – Other elements are the principal alloying element.

Domestic Parties First Comments, (PR 9) at Attachment 6. Commerce's "record evidence" for the proposition that a notation is not governed by its header is a citation back to the original notation, albeit in affidavit form.

Commerce's focus on notes without regard to the header would fundamentally alter the framework of the Aluminum Association's numerical system. As discussed in our submissions, groups of aluminum alloys have particular end-uses and physical properties. That is because the specific registered alloys in the groups share common characteristics. For example, it is uncontested that 3xxx series alloys are not treat-treatable. If one were to simply assume that any material with manganese as its primary alloying element was a 3xxx series alloy, the entire framework falls apart. For example, a product that is 34 percent aluminum, 34 percent manganese and 32 copper is clearly not a 3xxx series aluminum product.

Commerce's assignment of a numerical designation despite the express prohibition against that assignment is not supported by substantial evidence. Certainly "as designated by the Aluminum Association" must include, at a minimum, the express limitations on those designations as published by the Aluminum Association.

B.   The Domestic Industry Confirmed that Heat-Treatable Alloys Are Not 3-XXX Series Alloys

    i.   *Defendant-Intervenors' Affidavit Confirms That Heat Treatable Alloys Are Not 3xxx Alloys*

Neither the Defendant nor Defendant-Intervenors address the fact that an affidavit from the domestic industry confirms that heat-treated alloys are not 3xxx alloys and are not within the scope of the Orders.  That affidavit specifies as follows:

> 9.   Between calendar years 2017 and 2019, a substantial portion of U.S. imports of CAAS were properly classifiable under HTSUS subheading 7606.12.3090, which provides for not clad aluminum alloy sheet and strip with a thickness exceeding 0.2 millimeters and 6.3 millimeters or less, excluding aluminum can stock. In addition to covering in-scope CAAS, U.S. imports between 2017 and 2019 of merchandise classifiable under **HTSUS subheading 7606.12.3090 also included a limited volume of out-of-scope merchandise, <u>commonly described as heat-treatable aluminum sheet</u>**.

> 10.   Effective January 1, 2020, HTSUS subheading 7606.12.3090 was split into two different statistical categories - **HTSUS subheading 7606.12.3091 and HTSUS subheading 7606.12.3096. HTSUS subheading 7606.12.3091 provides for heat-treatable sheet, and HTSUS subheading 7606.12.3096 provides for in-scope CAAS**.

Memorandum, "Factual Information Relevant to the Final Scope Ruling Determination," dated Oct. 15, 2021 (PR 41), at Attachment 6, Exhibit GEN-3 (emphasis added).  The referenced subheading defines the out-of-scope "{h}eat-treatable industrial alloys" described in Statistical Note 6 to Chapter 76, as "aluminum containing by weight 3.0 percent or less of magnesium and 3.0 percent or less of silicon, and/or are designated as series 6xxx in the Aluminum Association's specifications of registered alloys."  *See* 4th Scope Ruling Request (PR 31; CR 14), at Exhibit 4 (HTSUS Statistical Note 6 to Chapter 76).  This definition

confirms that heat-treatable alloys are not 3xxx alloys.  Moreover, Valeo's heat-treatable alloys meet these terms.

In addition, the domestic producers confirmed in the most recent cases involving common alloys that heat-treatable alloys are not 3xxx alloys.  *See* Pl. Br. at 12.  Specifically, in the most recently initiated CAAS investigations with virtually the same scope language, it is confirmed that HTSUS subheading 7606.12.3091 covers "imports of out-of-scope heat-treatable sheet."  See 2nd Scope Ruling Request (PR 14; CR 5), at 13 (citing Letter, dated March 17, 2020, from Kelley Drye & Warren LLP, Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and Turkey, Petitioners Amendments to Volume I Relating to General Issues, at Exhibit GEN-1S, p. 11).

Moreover, in consideration of the term "designation," the HTSUS statistical note demonstrates that this word also carries significance in the industry and trade of aluminum alloys. The HTSUS number above applies to those heat-treatable alloys which contain less than 3.0 percent magnesium or silicon, and/or "designated as series 6xxx in the Aluminum Association's specification of registered alloys." As this note explains, the word "designation" means those alloys that are designated as such "in the Aluminum Association's specification of registered alloys." The final scope of the *Orders* on CAAS also uses this "designated" language, though the Defendant would have the Court believe the word carries no significance. The

statistical notes to the HTSUS description noted above clearly demonstrate otherwise.

> ii. *The Determination by the International Trade Commission Confirms that Heat-Treated Alloys Are Not 3xxx Alloys*

The ITC's finding regarding heat-treatable/treated alloys is a k(1) source and confirms that the scope does not encompass heat-treatable alloys. While the Department defines the scope, the ITC report demonstrates the ITC's understanding of the scope at the time it was defined by the Department. The ITC's interpretation supports that "as designated" means registered alloys because all registered 1XXX, 3XXX, and 5 XXX alloys are not heat-treatable. *See* Domestic Parties Surrebuttal Comments (PR 17; CR 7), at Attachment 1. Commerce's current interpretation of "as designated" contradicts with the ITC's interpretation. Valeo's interpretation of "as designated" is harmonious with the ITC's interpretation.

## III.   Defendant Misrepresents Valeo's Position before the International Trade Commission

The record from the original investigation confirms that alloys that do not correspond to 1xxx, 3xxx or 5xxx specifications are outside the scope. During the original investigation, Valeo addressed this fact, which was uncontested. Specifically, Valeo made the following point at the ITC's preliminary phase staff conference:

> As a preliminary matter, we note that the vast majority of brazing sheet is already excluded from the scope of this case, and presumably already a separate like product. Brazing sheet is sold pursuant to proprietary grades and does not meet the 3000 series specifications of the aluminum association.

> Specifically, the copper content, a necessary alloy in heat exchange applications, is two to five times higher than that for 3000 aluminum alloy specifications. At issue, then, is the small slice of brazing sheet that may overlap with the 3000 specifications. Should they be aligned with the already excluded brazing sheet? Or treated as a common alloy? That is what we are here to present testimony on today.
>
> We believe the proper answer is that all brazing sheet should be similarly situated and treated as a distinct like product.

2nd Scope Ruling Request (PR 14; CR 5), at 14.  In the final phase of the investigation, the ITC recognized the existence of out-of-scope brazing sheet by requesting Chinese producers to provide separate trade data for "in-scope" brazing sheet, as opposed to all brazing sheet.  *See id.* The merchandise subject to this scope ruling request is the out of- scope brazing sheet made from a non-3xxx series core.

It is clear from the above that Valeo did <u>not</u> take the position that brazing sheet was excluded from the scope of the investigation. Instead, Valeo's position was that most brazing sheet was already excluded from the scope of the investigation and the *remainder* of brazing sheet should likewise be excluded. In fact, at the hearing itself, Valeo presented a variety of chemical specifications that were already excluded from the scope of the investigation.  *See* 4th Scope Ruling Request (PR 31; CR 14), at Exhibit SUPP-5, p. 146-153.  One such product had precisely the same specifications as Valeo's T-series aluminum.  It is simply inaccurate to claim that Valeo understood that brazing sheet was within the scope of the ITC investigation.

**IV.    Defendant-Intervenors' HTS Arguments Are Irrelevant**

Defendant-Intervenors present an exhaustive discussion of the HTS

classification of T-series aluminum.  HTS classification of the imported good in not

among the enumerated k(1) or k(2) factors.  As such, it is not relevant to the scope

inquiry.  Moreover, Defendant-Intervenors' arguments regarding the HTS

classification are merely an extension of their clad/not-clad discussion which is not

dispositive as to scope.

As explained in the underlying scope request, while Valeo believes that the

proper classification of its T-series aluminum is HTSUS 7606.12.3091, which

provides for not clad aluminum sheet made of heat-treatable industrial alloys, this

scope ruling request is not based on the classification of the product. As explained

above, the heat-treated T-series aluminum is outside the scope of the Orders based

on the plain language of the scope and the (k)(1) factors. Therefore, Valeo's product

is excluded regardless of the HTSUS classification, which is the province of

Customs, not Commerce.


**V.    Defendant Inexplicably Reaches a Determination on Clad/Not Clad**

Much is made by the Defendant and Defendant-Intervenors regarding the

clad/not-clad distinction with respect to Valeo's heat-treated T-series aluminum

sheet. As the scope states, not clad aluminum sheet is, in this case, made entirely of

a 1xxx, 3xxx, or 5xxx-series alloy. Multi-alloy, clad aluminum sheet is, as the scope

states, produced from a 3xxx-series core, to which layers of other alloys are clad to

14

either one or both sides. Valeo imports a multi-alloy aluminum sheet which has all the physical characteristics of a not clad product.

Under the plain language of the scope, however, this distinction only matters if the Department were to assume that Valeo's T-series heat-treated sheet is produced using a designated 3xxx-series core with cladding layers. As stated in the scope, what is dispositive is the "the written description of the scope," which clearly states that only the enumerated "designated" common alloys are included. Valeo's heat-treated T-series aluminum sheet is not produced from a designated 3xxx-series core. Also, the ITC did not distinguish between clad or not clad aluminum sheet when it confirmed that heat-treated aluminum sheet was not included in the scope of the underlying investigation (i.e., not a 3xxx series alloy).

## VI.   The Term "Common" In the Scope Language Confirms That "As Designated" Means Registered Alloys

In its response brief, Defendant incorrectly argues that Commerce appropriately interpreted the term "common" in the scope ruling.  *See* Def. Br. at 29-31.  That is factually incorrect.  Commerce did not interpret the term "common." The only finding Commerce made was that the scope of the Orders does not exclude proprietary alloys.  *See* Final Scope Ruling (PR 40; CR 15), at 21.  Even that finding was based on the circular reasoning that "there is no exclusion listed in the scope for proprietary alloys."  *Id.*  However, that was not the question presented before Commerce.  The question was whether the existence of the term "common" in the

scope language confirms that the scope only covers registered alloys.  Commerce did not answer this question.

In the underlying scope ruling request, Valeo argued that the scope of the CAAS Order should be interpreted to include only registered alloys because the scope specifically refers to "a 1XXX-, 3XXX-, or 5XXX-series alloy <u>as designated</u> by the Aluminum Association."  *See* 4th Scope Ruling Request (PR 31; CR 14), at 7-13. Valeo also argued that the existence of the term "common" confirms that the scope only includes registered alloys.  *See* Letter, "Common Alloy Aluminum Sheet from the People's Republic of China: Request for Scope Ruling and Response to Supplemental Questionnaire on Heat-Treated T-Series Aluminum Sheet," dated August 7, 2020 (Valeo's Third Submission) (PR 24; CR 10), at 15.  Therefore, Commerce must interpret both "as designated" and "common" to determine whether the scope only covers registered alloys.

Defendant seems to claim that the term "common" needs not be interpreted because "common alloy" is defined in the scope as "a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association."  *See* Def. Br. at 29.  However, the issue in this case is whether that *definition* covers only registered alloys. Therefore, Commerce must interpret the term "common" to resolve the ambiguity.

Defendant also claims that Commerce interpreted the term "common" because it interpreted the term "as designated."  *See id.* at 29-30.  However, Commerce's interpretation of the term "as designated" cannot coexist with the plain meaning of "common."  Commerce determined that "as designated" means any alloy

16

that can be registered.  However, how can a "common" alloy be _any_ alloy?

Commerce cannot answer this question without rendering the term "common"

superfluous.  That is why Commerce could not interpret the term "common" in its

scope ruling.

 Commerce's interpretation of "as designated" renders the term "common"

superfluous.[1]  In the scope ruling, Commerce determined that the term "common

alloy" simply means a subset of all aluminum alloys meeting _certain_ chemical

requirements.  _See_ Final Scope Ruling (PR 40; CR 15), at 14-15.  However, in

situations like that, Commerce generally uses the term "certain" to describe the

covered merchandise – for example, _certain_ aluminum foil.  Otherwise, a term in the

name of covered merchandise generally describes a characteristic associated with

the in-scope products – for example, _raw_ honey.  Therefore, the term "common"

must have a meaning other than simply referring to "certain" alloys defined in the

scope.  Commerce must clarify that meaning.

## VII. Commerce Unlawfully Relied on the Declaration from the Aluminum Association to Resolve the Ambiguity about the Interpretation of "As Designated"

 In the scope ruling, Commerce unlawfully relied on the declaration of Mr.

John Weritz, the Aluminum Association's Vice President for Standards and

Technology to resolve the ambiguity about the interpretation of "as designated."

---

[1] Commerce must interpret the scope so that it is "informative and non-superfluous."  _See King Supply Co. v. United States_, 674 F. 3d 1343, 1350 (Fed. Cir. 2012).

17

*See* Final Scope Ruling (PR 40; CR 15), at 14-15.  In particular, Commerce relied on the following statement made by Mr. Weritz:

> Based on this classification system, any alloy with a principal alloying element identified in Paragraph 6 is generally referred to by the applicable series designation – even in instances where the alloy is not registered with the Aluminum Association. For example, any alloy that has manganese as its principal alloying element is commonly referred to as a "3XXX-series alloy," irrespective of whether that alloy is registered with the Aluminum Association. …

*See* Letter, "Domestic Industry's Response to Scope Ruling Request by Valeo Group," dated May 27, 2020 (Domestic Parties First Comments) (PR 9-11; CR 2-4), at Attachment 6.  This is a self-serving statement from an interested party.  More importantly, this statement is not dispositive on the fundamental question raised in the scope ruling request – i.e., whether "as designated" refers to registered alloys.

Defendant claims that Commerce's reliance on this statement was lawful because the declaration was part of the record evidence.  *See* Def. Br. at 15-24. However, this document is distinguishable from other materials on the record.  The Aluminum Association is a business association consisting of U.S. aluminum producers.  It is an interested party pursuant to 19 U.S.C. § 351.102(b)(29)(iii) and Defendant-Intervenor in this court case.  In all proceedings involving the Orders, the Aluminum Association played the same role as a "petitioner" in other cases; it scrutinized, opposed, and rebutted respondents, and that is exactly the role it played in response to Valeo's scope ruling request.  Yet, Commerce relied on Mr. Weritz's declaration as if he was testifying on behalf of a neutral organization.

In its scope ruling request, Valeo used various (k)(1) sources as well as pre-existing industry literature to demonstrate that the phrase "as designated" refers to registered alloys.  The Aluminum Association however conveniently rebutted Valeo's evidence with a self-serving statement from its own representative that was prepared for the specific purposes of contradicting the record evidence.  This self-created evidence was even contradictory to the Aluminum Association's own authority on alloy designation.  In his declarations, Mr. Weritz stated that a "3XXX-series alloy" refers to "any alloy that has manganese as its principal alloying element" "irrespective of whether that alloy is registered with the Aluminum Association."  This statement is directly contradictory to the Aluminum Association's Teal Sheet, which states that "numerical designation … should only be used to indicate … an aluminum alloy having chemical composition limits identical to those registered … {alloys}."  2nd Scope Ruling Request (PR 14; CR 5), at Exhibit 3, p. 28.

Furthermore, Mr. Weritz's declaration mischaracterizes the question at issue.  The question is whether "as designated" refers to registered alloys.  This is analogous to asking whether 7-series cars "as designated" by BMW refer to 740, 750, and 760; or all full-size luxury sedans that are comparable to those cars.  This is a question of interpretation of the phrase "as designated" which can only be answered by Commerce.  However, Mr. Weritz attempts to usurp that decision-making authority by mischaracterizing the issue as the trade usage of the term "series."  Therefore, Commerce's reliance on Mr. Weritz's declaration was unlawful.

## VIII.   Commerce's Ex-Parte Meeting Was Unlawful

Again, Defendant and Defendant-Intervenors highlight the unlawful conduct by the Department.  Government claims that the meetings related to the incorporation of factual information from one proceeding into another proceeding. *See* Def. Br. at 38-42.  No explanation was provided for why and in what context that was discussed.  *See id*

In addition, Defendant's explanation of the meeting must be disregarded as either factually inaccurate or unlawful.  Defendant claims that the subject of the meeting was Alcha's Section C and D datafiles and their relationship to the underlying scope inquiry.  *See* April 22, 2021, Ex Parte Memo (PR 33).  Defendant also claims that no factual information was incorporated from the administrative review into the scope inquiry.  *See id*.  But the referenced documents by Defendant (Section C and D datafiles) are confidential in their entirety.  As they are datafiles, no public summary is provided.  As a result, the public versions of those datafiles are literally a blank sheet of paper. It is entirely unclear to Plaintiff how a meeting was held when the topic of discussion was a blank sheet of paper.  Commerce's memorandum is clearly not consistent with Commerce's policy regarding ex-party meetings.  Nor does it fulfil the statutory purpose of providing transparency and preventing the agency from being swayed by communications from one party to which the other party is not privy.  As such, this matter should be remanded with instructions that Commerce provide a summary of its two ex-party meetings and a meaningful discussion of the subject matter of those meetings.

Moreover, neither Defendant nor Defendant-Intervenors explain why the ex-parte communication was not violative of 5 U.S.C. § 557(d)(1)(A), generally known as the Government in the Sunshine Act.  Since 1976, the Government in the Sunshine Act has prohibited anyone from making an ex parte communication to an administrative agency decision-maker concerning the merits of an issue that is subject to formal agency proceedings.

A scope proceeding conducted pursuant to 351.225(k)(1) or 351.225(k)(2) is within the parameters of the Sunshine Act. The Sunshine Act applies to "any agency proceeding which is subject to subsection (a) of this section."  5 U.S.C. § 557(d)(1).  Subsection (a) applies when a "hearing is required to be conducted in accordance with section 556 of this title." Section 556 applies to "…every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing…"

The Department of Commerce is an agency and a scope inquiry is an agency proceeding.  An agency proceeding is an action that results in an agency order, among other actions.  5 U.S.C. § 551(13). An "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing.  5 U.S.C. § 551(6).  A final scope determination arising from either a 351.225(k)(1) or 351.225(k)(2) analysis is a final disposition of an agency matter other than rule making. Therefore, a final scope determination is an agency order arising from an agency proceeding.

Regarding the hearing element, hearings in scope determinations are requested pursuant to 19 C.F.R. § 351.310(c).  *See, for example*, Certain Hardwood Plywood Products From the People's Republic of China: Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders, 87 Fed. Reg. 45,753 (July 29, 2022) ("Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, limited to issues raised in the case and rebuttal briefs, must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, within 30 days after the date of publication of this notice.").  Therefore, a scope proceeding is an "adjudication required by statute to be determined on the record after opportunity for an agency hearing."  Consequently, Commerce's scope proceedings are an adjudication on the record after opportunity for an agency hearing.

The Government in the Sunshine Act specifically prohibits certain off-the-record comments, known as ex parte communications, directed to executive or independent agency officials on the merits of matters under their formal consideration.  Specifically, "no interested person outside the agency shall make or knowingly cause to be made to any member of the body comprising the agency, administrative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of the proceeding, an ex parte communication relevant to the merits of the proceeding.   5 U.S.C. § 557(d)(1)(A) Parties before an agency are entitled to a fair, impartial hearing and to equal access

to the fact-finder.  The ex parte rule is designed to preserve the due process rights of all parties to administrative proceedings.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully urge this Court to reject the arguments of Defendant and Defendant-Intervenors in their response briefs.

Respectfully submitted,

Daniel J. Cannistra
Pierce Lee

Dated:  August 12, 2022

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
Tel: 202.624.2902

*Counsel to Plaintiff Valeo North America*

23

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court and the Court's scheduling order in that it contains 5,184 words, including text, footnotes, headings, and exhibits and excluding the table of contents, table of authorities, and counsel's signature block.

_____

Daniel Cannistra