Slip Op. 22-152

## UNITED STATES COURT OF INTERNATIONAL TRADE

|   |   |
|---|---|
| VALEO NORTH AMERICA, INC., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Mark A. Barnett, Chief Judge |
| Defendant, | Court No. 21-00581 |
| and | |
| ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, ET AL., | |
| Defendant-Intervenors. | |

## <u>OPINION AND ORDER</u>

[Remanding the U.S. Department of Commerce's scope determination concerning the antidumping duty and countervailing duty orders on common alloy aluminum sheet from the People's Republic of China.]

Dated: December 21, 2022

Daniel J. Cannistra, Crowell & Moring LLP, of Washington, DC, argued for Plaintiff. With him on the brief was Pierce J. Lee.

Alison S. Vicks, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. On the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Reginald T. Blades, Jr., Assistant Director, and Kyle S. Beckrich, Trial Attorney. Of counsel on the brief was Leslie M. Lewis, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Joshua R. Morey and John M. Herrmann, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenor. With them on the brief was Paul C. Rosenthal.

Barnett, Chief Judge:  This action involves a challenge to a U.S. Department of

Commerce ("Commerce" or "the agency") scope determination for the antidumping duty

("ADD") and countervailing duty ("CVD") orders on common alloy aluminum sheet

("CAAS") from the People's Republic of China ("China").  *See* Compl., ECF No. 4;

*Common Alloy Aluminum Sheet From the People's Republic of China*, 84 Fed. Reg.

2,813 (Dep't Commerce Feb. 8, 2019) (ADD order); *Common Alloy Aluminum Sheet*

*From the People's Republic of China*, 84 Fed. Reg. 2,157 (Dep't Commerce Feb. 6,

2019) (CVD order) (together, "the *China CAAS Orders*");[1] Confid. Final Scope Ruling

Determination: Valeo's Heat Treated T-Series Aluminum Sheet, A-570-073, C-570-074

(Oct. 15, 2021) ("Final Scope Ruling"), CR 15, PR 40, CJA Tab 26.[2]

Plaintiff Valeo North America, Inc. ("Valeo") challenges Commerce's

determination that its T-series aluminum sheet is covered by the scope of the *China*

*CAAS Orders*.  Confid. Mot. for Pl. [Valeo] for J. on the Agency R., ECF No. 23, and

accompanying Confid. Pl.'s Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R.

("Pl.'s Mem."), ECF No. 23-2; Pl.'s Reply Mem in Supp. of Rule 56.2 Mot. for J. on the

Agency R. ("Pl.'s Reply"), ECF No. 35.  Defendant United States ("the Government")

---

[1] The administrative record associated with Commerce's scope determination is
contained in public and confidential administrative records filed in the antidumping and
countervailing proceedings underlying the *China CAAS Orders*.  Because the relevant
parts of the administrative records are identical, the court cites to the documents filed in
the ADD proceeding.  *See* Public ADD Index ("PR"), ECF No. 18-3; Public CVD Index,
ECF No. 18-2; Confid. ADD Index ("CR"), ECF No. 18-5; Confid. CVD Index, ECF No.
18-4.  Valeo submitted joint appendices containing all record documents cited in the
Parties' respective Rule 56.2 briefs.  *See* Confid. J.A. ("CJA"), ECF No. 40; Public J.A.,
ECF No. 41.  The court references the confidential documents.
[2] The public version of the Final Scope Ruling is filed at ECF No. 18-6.

and Defendant-Intervenors[3] urge the court to sustain Commerce's scope ruling.  Def.'s

Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R. ("Def.'s Opp'n"), ECF No. 30;

Confid. Def.-Ints.' Resp. Br. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Def.-Ints.'

Opp'n"), ECF No. 31.  For the following reasons, the court remands Commerce's Final

Scope Ruling.

BACKGROUND

## I.    Legal Framework for Scope Determinations

Because the descriptions of merchandise covered by the scope of an

antidumping or countervailing duty order must be written in general terms, questions

may arise as to whether a particular product is included within the scope of an order.

*See* 19 C.F.R. § 351.225(a) (2020).[4]  When such questions arise, Commerce's

regulations direct it to issue "scope rulings" that clarify whether the product is in-scope.

*Id*.  Although there are no specific statutory provisions that govern Commerce's

interpretation of the scope of an order, Commerce is guided by case law and agency

---

[3] Defendant-Intervenors consist of the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its Individual Members: Aleris Rolled Products, Inc., Arconic Corporation, Commonwealth Rolled Products Inc., Constellium Rolled Products Ravenswood, LLC, Jupiter Aluminum Company, JW Aluminum Company, and Novelis Corporation.  Defendant-Intervenors incorporated by reference some of the Government's arguments and presented additional arguments on certain issues.  *See* Def-Ints.' Opp'n at 13–21.

[4] Commerce recently revised its scope regulations; the revisions apply "to scope inquiries for which a scope ruling application is filed . . . on or after the effective date" of November 4, 2021.  *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,300, 52,327 (Dep't Commerce Sept. 20, 2021).  The court cites to the prior regulations that were in effect when Valeo submitted its complete scope application.

Court No. 21-00581                                                    Page 4

regulations.  *See Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1381 (Fed. Cir.

2017); 19 C.F.R. § 351.225.

Commerce's inquiry must begin with the relevant scope language.  *See, e.g.*,

*OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020).  If the scope

language is unambiguous, "the plain meaning of the language governs."  *Id.*  If,

however, the language is ambiguous, Commerce interprets the scope "with the aid of"

the sources set forth in 19 C.F.R. § 351.225(k)(1) (referred to as a "(k)(1) analysis" or

the "(k)(1) sources").  *Meridian Prods.*, 851 F.3d at 1382 (citation omitted).  Subsection

(k)(1) directs Commerce to consider the descriptions of the subject merchandise in the

petition, initial investigation, and prior determinations by Commerce (including scope

determinations) or the U.S. International Trade Commission ("ITC").  19 C.F.R.

§ 351.225(k)(1).  If the (k)(1) sources are dispositive, Commerce may issue its ruling

based solely on the party's application and the (k)(1) sources.  19 C.F.R. § 351.225(d).[5]

In all other cases, Commerce will initiate a scope inquiry and may consider the factors

enumerated in subsection (k)(2) of the regulation (referred to as "the (k)(2) factors").

*See Meridian Prods.*, 851 F.3d at 1382 (citing 19 C.F.R. § 351.225(k)(2));[6] *see also* 19

C.F.R. § 351.225(e) (providing for Commerce to initiate a scope inquiry).

---

[5] To be dispositive, the (k)(1) factors "must be 'controlling' of the scope inquiry in the
sense that they definitively answer the scope question."  *Sango Int'l L.P. v. United
States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007).
[6] The (k)(2) factors include: "(i) The physical characteristics of the product; (ii) The
expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The
channels of trade in which the product is sold; and (v) The manner in which the
product is advertised and displayed."  19 C.F.R. § 351.225(k)(2).

## II.    Administrative Proceedings and Procedural History

Commerce issued the *China CAAS Orders* in February 2019.  84 Fed. Reg. at

2,813; 84 Fed. Reg. at 2,157.  The scope of the *China CAAS Orders* covers, *inter alia*:

> aluminum common alloy sheet (common alloy sheet), which is a flat-rolled
> aluminum product having a thickness of 6.3 mm or less, but greater than
> 0.2 mm, in coils or cut-to-length, regardless of width.  Common alloy sheet
> within the scope of this order includes both not clad aluminum sheet, as
> well as multi-alloy, clad aluminum sheet.  With respect to not clad
> aluminum sheet, common alloy sheet is manufactured from a 1XXX-,
> 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association.
> With respect to multi-alloy, clad aluminum sheet, common alloy sheet is
> produced from a 3XXX-series core, to which cladding layers are applied to
> either one or both sides of the core.

84 Fed. Reg. at 2,815; 84 Fed. Reg. at 2,158–59.[7]

On May 1, 2020, Valeo submitted its first scope ruling request.  Req. for Scope

Ruling on Heat-Treated T-Series Aluminum Sheet, Case No. A-570-073 (May 1, 2020)

("First Ruling Req."), CR 1, PR 1, CJA Tab 1.  The domestic interested parties

("DIPs")—Defendant-Intervenors here—filed comments on the First Ruling Request.

Domestic Industry's Resp. to Scope Ruling Request by Valeo Group (May 27, 2020)

("First DIPs Cmts."), CR 2–4, PR 9–11, CJA Tab 2.  On June 3, 2020, Commerce

rejected the First Ruling Request as improperly filed pursuant to Commerce's

regulations.  Rejection of Reqs. for a Scope Inquiry on Heat-Treated T-Series Aluminum

Sheet (June 3, 2020), PR 12, CJA Tab 3.

---

[7] Parties agree that the phrase "as designated by the Aluminum Association" used in
the sentence to describe "not clad aluminum sheet" also modifies the phrase "3XXX-
series core" appearing in the next sentence describing "clad aluminum sheet."  Oral Arg.
2:10–3:20 (reflecting the timestamp from the recording on file with the court).

On June 4, 2020, Valeo resubmitted its scope ruling request.  Req. for Scope

Ruling on Heat-Treated T-Series Aluminum Sheet, Case No. A-570-073 (June 4, 2020)

("Second Ruling Req."), CR 5, PR 14, CJA Tab 5.  On June 12, 2020, Commerce held a

telephone conference with counsel for the DIPs and placed on the record a summary of

the *ex parte* meeting.  Tel. Meeting Re: Scope Inquiry on Valeo Group's Heat-Treated T

Series CAAS (June 17, 2020) ("June 17 *Ex Parte* Mem."), PR 16, CJA Tab 7.  Valeo

and the DIPs submitted various filings regarding Valeo's application.  Rebuttal Cmts. to

Pet'rs' Cmts. on Valeo's Scope Ruling Req. (June 15, 2020) ("Valeo Rebuttal Cmts."),

CR 6, PR 15, CJA Tab 6; [DIPs] Resp. to [Valeo's] Rebuttal Cmts. (June 25, 2020)

("Second DIPs Cmts."), CR 7, PR 17, CJA Tab 8; Resp. to the [DIPs] Cmts. on Valeo's

Rebuttal Cmts. (July 9, 2022), PR 22, CJA Tab 10.

On July 20, 2020, Commerce issued a supplemental questionnaire to Valeo

seeking additional information about the T-series aluminum sheet.  Suppl.

Questionnaire on Heat-Treated T-series Aluminum Sheet (July 20, 2020), CR 9, PR 23,

CJA Tab 11.  Commerce requested that Valeo explain why its T-series aluminum sheet

should not be considered a clad product when Valeo described the product as

containing both "a 'center layer'" and "outer layers."  *Id.* at 3, Qu. 4.

On August 7, 2020, Valeo resubmitted its application.  Req. for Scope Ruling and

Resp. to Suppl. Questionnaire on Heat-Treated T-Series Aluminum Sheet, Case No. A-

570-073 (August 7, 2020) ("Third Ruling Req."), CR 10, PR 24, CJA Tab 12.  The DIPs

responded to Valeo's application.  [DIPs] Resp. to [Valeo's] Resubmitted Scope Ruling

Request (Aug. 24, 2020) ("Third DIPs Cmts."), CR 11, PR 25, CJA Tab 13.  On

February 3, 2021, Commerce rejected Valeo's Third Ruling Request and again

requested additional information.  Second Suppl. Questionnaire on Heat-Treated T-

Series Aluminum Sheet (Feb. 3, 2021), CR 12, PR 30, CJA Tab 17.

On March 24, 2021, Valeo submitted its scope request.  [Resp. to] Req. for Add'l

Info., Case No. A-570-073 (March 23, 2021) ("Fourth Ruling Req."), CR 13, PR 31, CJA

Tab 18.[8]  Commerce accepted this request as a complete scope ruling application.  *See*

Final Scope Ruling at 2.

On April 19, 2021, Commerce held a virtual meeting with counsel for the DIPs

and memorialized the *ex parte* meeting on the record.  Meeting with Couns. for the

Domestic Indus. (Apr. 22, 2021) ("Apr. 22 *Ex Parte* Mem."), PR 33, CJA Tab 19.  On

May 11, 2021, Valeo requested additional information about the *ex parte* meeting, and,

on May 27, 2021, Commerce responded.  *See* Resp. to Dep't's Mem. Regarding Pet'r's

*Ex Parte* Meeting (May 11, 2021), CR 14, PR 35, CJA Tab 21; Letter from Commerce to

Valeo Group (May 27, 2021) ("May 27 Commerce Ltr."), PR 36, CJA Tab 22.

During the administrative proceeding, Commerce issued seven extensions of the

regulatory deadline for issuing its scope determination.  *See* Final Scope Ruling at 2 &

nn.9, 13.  On October 15, 2021, Commerce issued its Final Scope Ruling.[9]

---

[8] Because Valeo filed its Fourth Ruling Request after 5:00pm on March 23, 2021,
Commerce considered the submission "to be filed on March 24, 2021."  Final Scope
Ruling at 1 n.1.

[9] On November 30, 2021, Valeo voluntarily dismissed an action commenced pursuant
to 28 U.S.C. § 1581(i) in which Valeo sought to compel Commerce to issue its scope
ruling and to obtain a declaratory judgment that Commerce's extensions were unlawful.
*See* Notice of Dismissal, *Valeo N. Am., Inc. v. United States*, Court No. 21-cv-00426

Commerce issued its affirmative decision pursuant to 19 C.F.R. § 351.225(d) and

(k)(1).  *See id.* at 10.  Commerce concluded that Valeo's T-series aluminum sheet is

covered by the scope of the *China CAAS Orders* because it "is a flat aluminum product"

with a thickness of "6.3 mm or less, but greater than 0.2 mm," and "is a multi-alloy, clad

aluminum sheet produced from an aluminum core that has a primary alloying element of

manganese, i.e., a 3XXX-series core."  *Id.* at 11.  Discussed further below, Commerce's

determination turned on whether Valeo's T-series aluminum sheet constitutes a clad

product and whether it has a 3XXX-series core.

Clad Product

In the underlying proceeding, Valeo asserted that its product should be

considered heat-treated and excluded from the scope.  *See id.* at 11.  Valeo argued that

"a clad product" has "discrete layers of distinct metals and alloys that are metallurgically

bonded."  *Id.* at 11 & n.91 (citing Second Ruling Req. at 10).  Valeo distinguished a clad

product from a heat-treated product, which Valeo described as "a singular, not

composite, aluminum product" in which "the individual layers los[e] their original

---

(Nov. 30, 2021); Compl. ¶¶ 28–37, *Valeo N. Am., Inc. v. United States*, Court No. 21-cv-00426 (Aug. 17, 2021).  While Valeo's reply brief alluded to the asserted completeness of the First Ruling Request, Valeo did not raise substantive claims or arguments concerning any alleged unlawfulness of Commerce's extensions in this litigation.  *See* Compl. ¶¶ 49–79 (setting out Valeo's claims); Pl.'s Mem. at 13 (summary of Valeo's arguments in which Valeo asserted, without more, that it "wait[ed] more than 18 months for a determination that Commerce is required to conduct in 45 days").

chemistries" during heat treatment such that a "new alloy" is formed "with a unique chemistry." *Id.* at 12 & n.93 (citing Second Ruling Req. at 10).

The DIPs argued that Valeo's product is instead a clad product covered by the scope. *Id.* at 11. The DIPs argued that "thermal treatment" may result in "some diffusion between the core and cladding layer" such that "it is not the case that each layer [of a clad product] retains its original chemistry." *Id.* at 12 & n.95 (citing First DIPs Cmts. at 8–9; Third DIPs Cmts. at 4). Commerce credited the DIPs argument regarding the potential for diffusion in a clad product because it was supported by documentation from the Aluminum Association. *Id.* at 12 & n.96 (citing First DIPs Cmts. at 9; Third DIPs Cmts. at 4).[10]

Commerce considered whether "Valeo's T-series aluminum sheet should be considered a clad or heat-treated product," and concluded that it is a clad product. *Id.* at 12.[11] Commerce based this finding on evidence that the constituent "layers [of Valeo's T-series aluminum sheet] maintain their separate chemistries because the phases of diffused alloys have a larger manganese content toward the center . . . and a larger silicon content toward the surface." *Id.* at 12 & n.101 (citing Fourth Ruling Req.,

---

[10] The DIPs cited to an Aluminum Association standards publication stating that "[t]he composition of the cladding may be subsequently altered by diffusion between the core and cladding due to thermal treatment." First DIPs Cmts. at 9 (quoting First DIPs Cmts., Attach. 2 at 6-4 n.1). Attachment 2 consists of a publication titled "Aluminum standards and data 2017," issued by the Aluminum Association.

[11] Commerce first found that Valeo's product is a "'multi-alloy' product" based on Valeo's description of the product as one that contains "intermediate input layers of an outer layer of aluminum alloy 4045 that has a principal alloying element of silicon and an inner layer of a proprietary aluminum alloy that has a principal alloying element of manganese." Final Scope Ruling at 12. Valeo does not contest this finding.

Attach. II, Qu. 11).  Commerce found that Valeo had not shown that the "integration

between the outer layer and center core of T-series aluminum sheet" exceeded that

which could be ascribed to a clad product.  *Id.* at 12–13.

> 3XXX-Series / As Designated by the Aluminum Association

Valeo argued that its product is manufactured "from a proprietary alloy core" that

cannot be considered a 3XXX-series core and is, therefore, out-of-scope.  *Id.* at 13.

Valeo further argued that the phrase "as designated by the Aluminum Association"

would be rendered superfluous if Commerce interpreted the scope "to include

unregistered alloys."  *Id.* at 14.  Commerce rejected both arguments.

Commerce explained that the Aluminum Association uses "a four-digit numerical

system for designating registered aluminum alloys," pursuant to which "[t]he first of the

four digits in the designation system indicates the alloy group, also called the series."

*Id.* at 11.  The alloys are "grouped by majoring alloying elements" as indicated in the

following chart, reproduced from Commerce's scope ruling:

Aluminum, 99.00 percent and greater …1xxx
Aluminum alloys grouped by majoring alloying elements
    Copper …2xxx
    Manganese …3xxx
    Silicon …4xxx
    Magnesium …5xxx
    Magnesium and Silicon …6xxx
    Zinc …7xxx
    Other elements …8xxx
    Unused series …9xxx.[87]

*Id.* at 11 & n.87 (citing Second Ruling Req., Ex. 3 at 28); *see also id.* at 13–14 & nn.104–05 (citing same).[12]  Commerce relied on the Teal Sheets to find that Valeo's proprietary core "corresponds to 3xxx-series aluminum alloy because the major alloying element is manganese."  *Id.* at 14 & n. 106 (citing Third Ruling Req., Attach. 2 at 3).

Commerce disagreed with Valeo that Aluminum Association designations are limited to registered alloys.  *Id.* at 14.  Commerce relied on a declaration issued by the Aluminum Association's Vice President for Standards and Technology to find "that an alloy with a principal alloying element corresponding to the Aluminum Association's alloy series is generally referred to by the applicable series designation" even when the alloy is unregistered.  *Id.* at 14 & n.111 (citing First DIPs Cmts., Attach. 6 (Decl. of John Weritz (May 27, 2020) ("Weritz Decl.")) ¶ 7).

Consistent with this interpretation, Commerce found that the phrase "as designated by the Aluminum Association" refers solely "to the <u>series</u> of the aluminum alloy" and clarifies the meaning of "a 1xxx, 3xxx, or 5xxx-series alloy."  *Id.* at 14.  Commerce stated that this interpretation of the scope language is consistent with documentation in the underlying ADD and CVD investigations in which "Commerce refer[red] to a four-digit numerical designation as a 'specific-alloy' and a one-digit alloy series as an 'alloy' and as a 'series alloy.'"  *Id.* at 15 & n.115 (citing Factual Information Relevant to the Final Scope Ruling Determination: Valeo's Heat-Treated T-Series

---

[12] Exhibit 3 consists of the January 2015 version of the Aluminum Association's Teal Sheets.  The record also contains the August 2018 version of the Aluminum Association's Teal Sheets, which the court references and cites herein.  First DIPs Cmts., Attach. 5 ("Teal Sheets").

Aluminum Sheet (Oct. 15, 2021) ("Commerce Factual Information"), Attach. 1 (Mem.

Re: Prod. Characteristics for the [ADD] Investigation of [CAAS] from [China] (Feb. 1,

2018) ("Prod. Characteristics Mem.")), PR 41, CJA Tab 27).[13]

       Commerce also addressed Valeo's argument that because the Aluminum

Association "classifies 3xxx . . . series aluminum alloys as non-heat-treatable," Valeo's

proprietary core cannot be considered a 3xxx-series alloy because it is heat-treated.  *Id.*

at 17.  Commerce noted that Valeo has not established that its product is heat-treated,

but that even if it had, evidence demonstrates that the Aluminum Association

determines the series in which an "alloy falls based on its aluminum content and/or

principal alloying agent" and not on heat-treatability.  *Id.* at 17 & n.127 (citing Weritz

Decl.).  Further, while the ITC, in its injury report, stated that "heat-treated aluminum

sheet (e.g., 6xxx alloy series) is not covered by Commerce's scope," *id.* at 17 & n.129

---

[13] Commerce disagreed with Valeo that the explicit inclusion of proprietary alloys in the scopes of other ADD and CVD orders supports a narrower interpretation of the underlying order that lacks such language.  Final Scope Ruling at 15; *see also Common Alloy Aluminum Sheet From Bahrain, et al.*, 86 Fed. Reg. 22,139 (Dep't Commerce Apr. 27, 2021) (ADD orders) ("*Bahrain CAAS Order*"); *Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,650 (Dep't Commerce May 26, 2011) (ADD order) ("*China Extrusions Order*").  The *Bahrain CAAS Order* contains certain language identical to the *China CAAS Orders* with the following addition: "The use of a proprietary alloy or non-proprietary alloy that is not specifically registered by the Aluminum Association as a discrete 1xxx-, 3xxx-, or 5xxx-series alloy, but that otherwise has a chemistry that is consistent with these designations, does not remove an otherwise in-scope product from the scope."  *Bahrain CAAS Order*, 86 Fed. Reg. at 22,143.  The *China Extrusions Order* covers, *inter alia*, "aluminum extrusions . . . made from aluminum alloys having metallic elements corresponding to the alloy series designations published by The Aluminum Association commencing with the numbers 1, 3, and 6 (or proprietary equivalents or other certifying body equivalents)."  76 Fed. Reg. at 30,650.

(citing Second Ruling Req. at 13–14),[14] Commerce found that the ITC's statement did not demonstrably apply "beyond the alloy series that the ITC identified as heat-treatable (e.g., 6xxx-series)," *id*. at 18.  Commerce acknowledged the ITC's characterization of "1xxx, 3xxx, and 5xxx-series alloys [as] non heat-treatable," *id.* at 17 & nn.130–31 (citing, *inter alia*, USITC Pub. 4861 at I-13), and that additional record evidence is consistent with the ITC's characterization, *id.* at 18 & n.133 (citing Second DIPs Cmts., Attach. 1 (Decl. of John Weritz (June 24, 2020) ("Second Weritz Decl.")) ¶ 7).

Lastly, Commerce rejected Valeo's argument that the term "common" should be defined as "known to the community" and Valeo's corresponding argument that the scope therefore excludes proprietary alloys.  *Id.* at 21 & n.152 (citing Second Ruling Req. at 16).  Commerce explained that "[t]he scope includes all products which meet the physical description of the scope and do not otherwise qualify for an exclusion."  *Id.* at 21.[15]

On November 12, 2021, Valeo commenced this action.  Summons, ECF No. 1; Compl.  Valeo's motion is fully briefed, and the court heard oral argument on November 10, 2022.  Docket Entry, ECF No. 46.

---

[14] For the referenced information, see *Common Alloy Aluminum Sheet from China*, Inv. Nos. 701-TA-591 and 731-TA-1399, USITC Pub. 4861 (Jan. 2019) (Final) ("USITC Pub. 4861") at I-18, *available at* https://www.usitc.gov/publications/701_731/pub4861.pdf (last visited Dec. 21, 2022).

[15] Commerce does not cite to the source of this information but describes it as the "Preliminary Scope Memorandum."  The court understands this reference to mean the preliminary scope memorandum from the investigation underlying the *China CAAS Orders*.  *See* Commerce Factual Info., Attach. 4 (Scope Cmts. Prelim. Decision Mem. (June 15, 2018)) at 6.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi) (2018),[16] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

"[W]hether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that [the court] review[s] de novo."  *Meridian Prods.*, 851 F.3d at 1382.  Whether a product is covered by the language of the scope is "a question of fact reviewed for substantial evidence."  *Meridian Prods.*, 851 F.3d at 1382; *see also OMG, Inc.*, 972 F.3d at 1363–64 (discussing the standard of review).

"Commerce is entitled to substantial deference with regard to its interpretations of its own antidumping duty orders."  *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012).  Nevertheless, "Commerce cannot 'interpret' an antidumping order so as to change the scope of th[e] order, nor can Commerce interpret an order in a manner contrary to its terms."  *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citation omitted).

### DISCUSSION

Valeo raises several challenges to Commerce's determination.  As discussed herein, Valeo argues that Commerce (1) exceeded the bounds of a (k)(1) analysis; (2) failed to adequately support its findings (a) that the term "3XXX-series" covers

---

[16] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code and all citations to the U.S. code are to the 2018 edition, unless otherwise specified.

unregistered alloys, (b) that T-series aluminum sheet is a clad product rather than a heat-treated product, or (c) that any such heat-treatment does not remove T-series aluminum sheet from classification as a 3XXX-series alloy; and (3) failed to disclose factual information presented in purportedly unlawful *ex-parte* meetings.  *See* Pl.'s Mem. at 15–20, 22–39; Pl.'s Reply at 3–15, 17–23.

Valeo's arguments concerning Commerce's reliance on 19 C.F.R. § 351.225(k)(1) and determination not to initiate a scope inquiry are relevant to Valeo's arguments concerning the lack of record support for Commerce's determination that the term "3XXX-series" covers unregistered alloys.  Thus, the court discusses those issues together.  The court then addresses Valeo's arguments concerning Commerce's interpretation of the term "clad" and the relevance of heat-treatment.  Next, the court addresses Commerce's *ex parte* communications.

I.    **Commerce's Interpretation of the Phrase "3XXX-Series Core"**

This issue comprises two parts: whether Commerce's interpretation of the scope terms "3XXX-series core" in conjunction with "as designated by the Aluminum Association" is in accordance with the law governing a (k)(1) analysis and whether Commerce supported its interpretation with substantial evidence.

A.  **Parties' Contentions**

Valeo contends that Commerce's determination was unlawful insofar that Commerce exceeded the limits of a (k)(1) analysis in resolving Valeo's ruling request.

Pl.'s Mem. at 15–20; *see also* Pl.'s Reply at 4–5.[17]  Valeo acknowledges that

Commerce may consult trade usage to interpret scope terms, *see id.* at 20 (citing

*ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 88 n.8 (Fed. Cir.

2012)), but contends that Commerce went beyond (k)(1) sources to define and apply

scope and non-scope terms, *see* Pl.'s Mem. at 19–20.  Valeo also faults Commerce for

relying on the Weritz Declaration based on the Aluminum Association's status as a

domestic interested party and defendant-intervenor here.  Pl.'s Reply at 19.

Valeo further contends that Commerce's interpretation of the term "3xxx-series"

to include unregistered alloys is unsupported by substantial evidence.  Pl.'s Mem. at 22.

Valeo argues that the "Aluminum Association nomenclature system is limited to

registered alloys and the chemical content of registered designations."  *Id.* at 22; *see*

*also id*. at 23–24.  Valeo asserts that its proprietary alloy core "is not designated by the

Aluminum Association as a 3xxx-series alloy" or a defined variation thereof, and, thus,

Commerce impermissibly expanded the scope of the *China CAAS Orders* to include

Valeo's product.  *Id.* at 27; *see also* Pl.'s Reply at 6–8.[18]

The Government contends that Commerce issued its ruling in compliance with 19

C.F.R. § 351.225(d) because it relied solely on the scope terms, (k)(1) sources, and

---

[17] Valeo points to various pages and footnotes in the Final Scope Ruling to support its
contention.  Pl.'s Mem. at 19 (citing Final Scope Ruling at 11 n.86, 12 n.100, 13 n.102,
14 n.111, 18 nn.133–34).  Valeo also cites page 16, note 127 of the Final Scope Ruling,
which appears to be a typographical error that should instead point to page 17, note
127.  *See* Pl.'s Mem. at 19.

[18] Valeo further contends that the scope of the *Bahrain CAAS Order* supports its
position.  Pl.'s Mem. at 25–26 (citing Fourth Ruling Req. at 9).  The proper interpretation

Valeo's scope application.  *See* Def.'s Opp'n at 24.  The Government further contends that Commerce's reliance on "industry standards" to interpret scope terms and consideration of record evidence was lawful and consistent with Commerce's obligation to "make its determination based on the entire record."  *Id.* at 25.  The Government contends that Commerce permissibly analyzed certain characteristics of Valeo's T-series aluminum sheet to address the distinctions Valeo drew between its product and the subject merchandise.  *See id.* at 27–28.[19]  The Government also contends that Commerce permissibly relied on the Weritz Declaration as "evidence of the industry standard" in conjunction with the product characteristics memorandum from the investigation to support its scope interpretation.  *Id.* at 31–33.

Defendant-Intervenors likewise contend that Commerce properly relied on Aluminum Association publications and "information on the physical characteristics of Valeo's merchandise" contained in Valeo's submissions to issue its ruling.  Def-Ints.' Opp'n at 15.  Defendant-Intervenors further contend that any delay in Commerce's issuance of the scope ruling stemmed from Valeo's failure to issue "a clear scope ruling application" and the need for "additional information."  *Id.*

---

of the *Bahrain CAAS Order* is not before the court.  There are differences between the respective scopes, moreover, and thus, this is not a situation where Commerce has offered different interpretations of identical language.  *Cf. ArcelorMittal*, 694 F.3d at 88–90 (faulting Commerce for interpreting language contained in the scope of an order covering certain stainless steel plate to be ambiguous when Commerce found the same language in an order covering cut-to-length carbon steel plate to be unambiguous).

[19] The Government also contends that Commerce would have used limiting language if the agency had intended to limit the scope to registered designations.  Def.'s Opp'n at 31.  What Commerce *could have stated* is beside the point.  The issue before the court is whether Commerce reasonably interpreted the scope language the agency *did* use.

### B.  Analysis

As noted above, whether an ambiguity exists is a question of law that the court

considers *de novo*.  *Meridian Prods.*, 851 F.3d at 1382.  The phrase "3XXX-series" is

not defined in the scope except in reference to the phrase "as designated by the

Aluminum Association," which is also undefined.  Commerce is correct that the latter

phrase aids in the interpretation of the former.  *See* Final Scope Ruling at 14.  The

scope is ambiguous, however, as to whether Commerce intended the scope to cover

any alloy that contains a major alloying element corresponding to the Aluminum

Association's alloy groups (including unregistered alloys), or whether Commerce

intended the scope to be limited to registered alloys within the enumerated series with

four-digit designations assigned by the Aluminum Association.  For the reasons

discussed below, Commerce's scope interpretation exceeded the limits of a (k)(1)

analysis and is unsupported by substantial evidence.

First, Commerce's reliance on the Teal Sheets to interpret "3XXX-series" to

include unregistered alloys fails to account for the Teal Sheets as a whole.  *See* Final

Scope Ruling at 13–14.[20]  The Teal Sheets contain "designations and chemical

---

[20] At the hearing, the Government pointed to additional documentation to demonstrate
use of alloy series regardless of registration status, including a document titled
"Aluminum Alloys 101" published by the Aluminum Association.  Oral Arg. 11:00–11:35
(citing First Ruling Req., Ex. 4 ("Aluminum Alloys 101")).  In addition to being
impermissibly *post hoc*, the Government's reliance on Aluminum Alloys 101 is
misplaced.  While the document discusses various alloy series, the document prefaces
its discussion with the explanation that "[a]lloys are assigned a four-digit number, in
which the first digit identifies a general class, or series, characterized by its main
alloying elements."  Aluminum Alloys 101 at 1.  While the Government emphasizes the

composition limits for wrought aluminum and wrought aluminum alloys *registered with*

The Aluminum Association.  Numerical designations are assigned in accordance with

the Recommendation—International Designation System for Wrought Aluminum and

Wrought Aluminum Alloys," which is printed on pages 31 to 32 of the Teal Sheets

(referred to herein as "the Recommendation").  Foreword to the Teal Sheets (emphasis

added).  Thus, from the outset, the Teal Sheets use the term "designation" to refer to

registered alloys.  Note 1 to the Recommendation "describes a four-digit numerical

system for designating wrought aluminum and wrought aluminum alloys."  *Id.* at 31.

Note 2 to the Recommendation lists the alloy groups recognized by the Aluminum

Association and states that "[t]he *first* of the four digits *in the designation* indicates the

alloy group."  *Id.* (emphasis added).  In Note 4, the Recommendation states that "[t]he

alloy designation in the 2xxx through 8xxx groups is determined by the alloying element

. . . present in the greatest mean percentage."  *Id.*  The Recommendation then goes on

to explain the basis for the second, third, and fourth digits in the designation.  *Id.*  Thus,

when read as a whole, the Aluminum Association's use of "3" in "3XXX" in the list of

alloy groups indicates a major alloying element of manganese while contemplating the

addition of three more digits to complete the four-digit designation.  *See id.*[21]

---

latter assertion, it overlooks the first clause indicating that the alloy series designation is
but one number in a four-digit number assigned by the Aluminum Association.  *See id.*
Thus, even the Government's *post hoc* reasoning does not show that the information
contained in Aluminum Alloys 101 is understood in the industry to apply to unregistered
alloys.

[21] This interpretation of the way the term "designation" is used in the Recommendation
is consistent with Appendix A to the Teal Sheets, which explains the use and

Accordingly, while it *may* be true that an aluminum alloy containing a major alloying element of manganese that is submitted to the Aluminum Association for a designation would receive a designation in the 3XXX-series, Commerce has not identified anything in the Teal Sheets that indicates the Aluminum Association applies this framework to unregistered alloys.

Commerce next relied on the Weritz Declaration to buttress its interpretation. *See* Final Scope Ruling at 14. Commerce's reliance on the Weritz Declaration as evidence of trade usage of the phrase "3XXX-series" is, however, unlawful and unsupported by substantial evidence.

"A petitioner has an obligation to be explicit and precise in its definition of the scope of the petition both prior and during the investigation." *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 921 (Fed. Cir. 2014). Moreover, "(k)(1) sources are afforded primacy in the scope analysis . . . because interpretation of the language used in the orders must be based on the meaning given to that language *during the underlying investigations*." *Id.* (emphasis added). While Commerce—and the court—may consider trade usage to ascertain the intended meaning of scope terms, *see*

––––––––––––––––––––

assignment of designations. *See* Teal Sheets at 33. As explained therein, "[d]esignations for a new alloy registration" are assigned based on whether the alloy has "chemical composition limits that are identical to a registered designation," represents a variation or modification of an existing alloy designation or constitutes "[a] new original designation." *Id.* The Declaration of Accord on an International Alloy Designation System for Wrought Aluminum and Wrought Aluminum Alloys also uses the term designation to refer to a number consistent with the Recommendation that is the product of a registration with the Aluminum Association and subsequent assignment by the Aluminum Association. *See id.* at 34.

*ArcelorMittal*, 694 F.3d at 88 & n.8, the Weritz Declaration is not a trade publication of the type considered in *ArcelorMittal*.[22]  Instead, the declaration was prepared by an interested party specifically for purposes of the scope proceeding.  *See* Weritz Decl. ¶¶ 3–5.  Commerce failed to acknowledge the source of the declaration, instead referring to the document generally as "[r]ecord information," Final Scope Ruling at 14, and thus failed to adequately support the agency's reliance on the declaration as an indicator of trade usage that properly informs the intended meaning of the scope terms. *Cf. Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1303–04 (Fed. Cir. 2013) (finding "subsequent comments made by the petitioners" irrelevant "under subsection 351.225(k)(1)" when "Commerce did not address the comments during the investigation").[23]  Commerce's reliance on the Weritz Declaration is therefore unlawful.

    Additionally, the Weritz Declaration's attempt to connect Aluminum Association designations (and, thus, the meaning of the phrase "as designated by the Aluminum Association") to an alloy series or group alone and, thereafter, to unregistered alloys based on the primary alloying element that *would be considered* when the alloy is

---

[22] In that case, Commerce had relied on a standards publication produced by the American Society for Testing and Materials as evidence of trade usage.  *See* Final Results of Redetermination Pursuant to Remand at 6–8 & n.4, *ArcelorMittal*, 35 CIT 796 (2011) (No. 08-434), ECF No. 60 (docket location for the agency decision reviewed in *ArcelorMittal*, 694 F.3d 82).

[23] The current version of Commerce's regulation contains a new provision permitting Commerce to "consider secondary interpretive sources under paragraph (k)(1) . . ., such as any other determinations of [Commerce] or the Commission not identified above, Customs rulings or determinations, industry usage, dictionaries, *and any other relevant record evidence*."  19 C.F.R. § 351.225(k)(1)(ii) (eff. Nov. 4, 2021) (emphasis added). As mentioned above, however, Commerce's Final Scope Ruling is governed by the previous version of the regulation, which lacks this provision.

submitted for a designation, *see* Weritz Decl. ¶¶ 6–7, is undermined by the manner in

which the Aluminum Association uses the term "designation" in the Teal Sheets, as set

forth above.  Commerce's findings in reliance on the Weritz Declaration are therefore

unsupported by substantial evidence.[24]

Lastly, Commerce's reliance on the product characteristics memorandum fails to

persuade the court that Commerce's interpretation was supported by substantial

evidence.  *See* Final Scope Ruling at 15.  In the cited memorandum, Commerce

requested information from the respondents in the underlying investigation.  *See* Prod.

Characteristics Mem. at 1.  In Field Number 2.1, titled "Specific Alloy," Commerce asked

respondents to "[r]eport the appropriate series grade number for the aluminum sheet

(e.g., 3003)."  *Id.* at 3.  In Field Number 3.1, titled "Alloy," Commerce requested

respondents to "[r]eport the code based on the requirements of the appropriate grade

series noted above."  *Id.* at 4.  Commerce provided the following information to guide

reporting:

---

[24] Commerce's reliance on the Weritz Declaration stands in contrast to Commerce's
reliance on the Aluminum Association's 2017 Aluminum standards and data publication
to define "clad" with respect to the extent of diffusion.  *See* Final Scope Ruling at 12–13
& nn.100, 102 (citing First DIPs Cmts., Attach. 2, Table 6.1).  The cited publication
predates the scope proceeding, represents the product of a committee composed of
persons from an array of companies, and was prepared "as a guide to aid the
manufacturer, the consumer, and the general public."  First DIPs Cmts., Attach. 2
(acknowledgment and notice/disclaimer).

DESCRIPTION:    1000 = All 1000-series alloys
                    3000 = All 3000-series alloys
                    5000 = All 5000-series alloys, unless code 5500 applies
                    5500 = All 5000-series alloys for which the minimum required
                                percentage content of magnesium is over 3.00 percent
                                (regardless of the actual magnesium content) (*e.g.*, 5083,
                                5086, *etc.*)

*Id.*

Commerce found support in Field Number 3.1 through its use of the phrase "series alloy." Final Scope Ruling at 15. Commerce contrasted its use of series-based reporting in Field Number 3.1 with its use of the phrase "specific alloy" in Field Number 2.1 to find that the phrase "series alloy" in the scope means "a one-digit alloy series" and not "a specific four-digit numerical alloy designation." *Id.* Field Number 3.1 does not, however, indicate that Commerce contemplated the respondents reporting alloys lacking a four-digit code in accordance with the referenced codes and series. In fact, Commerce's reference to specific four-digit codes in the description (5500, 5083, 5086) indicates the opposite. *See* Prod. Characteristics Mem. at 4. Moreover, while Commerce used the phrases "series alloy" and "3XXX-series" in the scope, it did so in conjunction with the phrase "as designated by the Aluminum Association." The product characteristics memorandum does not address or contain the latter phrase and, thus, does not "definitively answer the scope question." *Sango Int'l L.P.*, 484 F.3d at 1379.

In sum, Commerce's interpretation of the phrase "3XXX-series" in conjunction with "as designated by the Aluminum Association" to include unregistered aluminum alloys with a major alloying element of manganese is unlawful insofar as Commerce

relied on the Weritz Declaration and is unsupported by substantial record evidence.[25]

Commerce's Final Scope Ruling is therefore remanded.[26]  On remand, if Commerce

continues to rely on (k)(1) sources, it must reconsider and further explain its ruling

pursuant to 19 C.F.R. § 351.225(d) consistent with this opinion.  Alternatively,

Commerce may determine to conduct a scope inquiry pursuant to 19 C.F.R.

§ 351.225(e).[27]

## II.    Commerce's Discussion of the Relevance of Heat-Treatment

Commerce examined Valeo's arguments concerning heat-treatment both in the

context of addressing the distinction between clad and non-clad products and when

---

[25] Valeo's arguments that Commerce exceeded the bounds of a (k)(1) analysis are premised on Commerce's reliance on the Teal Sheets and purported consideration of the physical characteristics of the T-series aluminum sheet.  *See* Pl.'s Mem. at 19. Except to the extent discussed herein, Commerce's determination complied with 19 C.F.R. § 351.225(k)(1) and (d).  Valeo itself submitted a copy of the Teal Sheets to support its scope application.  *See* Second Ruling Req. at 7–8, Ex. 3.  And while "[t]he physical characteristics of the product" constitutes a (k)(2) factor, 19 C.F.R. § 351.225(k)(2)(i), a complete scope application must contain "[a] detailed description of the product, including its technical characteristics and uses, and its current U.S. Tariff Classification number," *id.* § 351.225(c)(1)(i).  Commerce's request for additional product information and consideration of such information included in Valeo's submissions in order to issue a ruling complied with section 351.225(d).

[26] In its reply, Valeo argued that Statistical Note 6 to Chapter 76 provides further evidence that the phrase "as designated" has a narrow meaning in the industry.  Pl.'s Reply at 10–11 (citing Fourth Ruling Req., Ex. SUPP-4, ECF pp. 789–91 (Chapter 76 and accompanying Notes)).  Valeo did not present this argument to Commerce or include it in its moving brief and, therefore, the court will not address it in the first instance.

[27] The court does not reach Valeo's arguments concerning the meaning of the term "common."  *See* Pl.'s Mem. at 21–22.  Valeo's arguments implicate the meaning of the scope terms subject to the remand and thus, the court will defer resolution of them, to the extent they remain live, until Commerce issues its remand redetermination.

responding to Valeo's argument that 3XXX-series alloys are not heat-treatable.  The

court discusses these issues, and the need for further explanation, in tandem.

### A.  Parties' Contentions

Valeo contends that Commerce impermissibly regarded heat-treatment and

cladding as mutually exclusive.  Pl.'s Mem. at 28–29, 31.  Valeo further contends that

the record establishes that its T-series aluminum sheet is heat-treated and not simply

annealed, and that, because its product is heat-treated, it is out-of-scope regardless of

whether it is a clad product.  *Id.* at 29–31.

By way of support, Valeo points to statements by the ITC during the

investigation.  Valeo contends that Commerce failed to consider the ITC's assertion that

"heat-treated aluminum sheet (e.g., 6xxx alloy series) is not covered by Commerce's

scope."  Pl.'s Mem. at 34 (citing USITC Pub. 4861 at I-18).  Valeo also contends that the

ITC's statement indicates that "heat-treated aluminum sheet," such as Valeo's, is out of

scope, and that the ITC explicitly characterized 3XXX-series alloys as "non-heat-

treatable."  *Id.* at 35.

The Government contends that substantial record evidence supports

Commerce's determination that Valeo's T-series aluminum sheet is a clad product

despite "some diffusion between the core and cladding layer."  Def.'s Opp'n at 18.

According to the Government, the distinction Commerce drew between clad products

and heat-treated products was "responsive to Valeo's arguments that its product is not

clad because it is heat-treated," *id.* at 20, and, in fact, that Commerce recognized that

Valeo's T-series aluminum sheet "undergoes heat-treatment processes," *id.*

The Government further contends that Commerce considered and correctly interpreted the ITC's findings not to imply an exclusion for heat-treated 3XXX-series series alloys.  *Id.* at 35–36.  The Government argues that record evidence demonstrates that the Aluminum Association links alloys with groups or series "based on its aluminum content and/or principal alloying agent."  *Id.* at 37.  The Government pointed to alloy 4643 as an example of an alloy that is heat-treatable notwithstanding the Aluminum Association's classification of 4XXX-series alloys as non-heat-treatable.  *Id.* at 37–38. Thus, the Government contends, Valeo has not shown "why its proprietary aluminum alloy" is "precluded from being considered a 3XXX-series aluminum based on its heat-treatability."  *Id.* at 38.

Defendant-Intervenors contend that because substantial evidence supports Commerce's determination that Valeo's T-series aluminum sheet is a clad product, "Valeo's arguments concerning 'heat-treatable' alloys are irrelevant."  Def-Ints.' Opp'n at 17–18.  Defendant-Intervenors also contend that Commerce has previously recognized that the ITC's reference to 6XXX-series alloys pertained solely to "not clad aluminum sheet" and, thus, "do not encompass" Valeo's clad product.  *Id.* at 17.  Defendant-Intervenors argue that although Commerce may consider ITC determinations in a (k)(1) analysis, such determinations "cannot overcome the plain scope language or [Commerce's] own scope interpretation."  *Id.* at 19.

### B.  Analysis

Commerce's determination that Valeo's T-series aluminum sheet is a clad product is supported by substantial evidence.  However, Commerce's response to

Valeo's argument concerning the heat-treatability of 3XXX-series alloys requires further explanation.

In the underlying proceeding, Valeo presented Commerce with definitions of clad products and heat-treated products that appeared to be in conflict. *See* Final Scope Ruling at 11–12. On the one hand, Valeo argued, a clad product contains "discrete layers of distinct metals and alloys that are metallurgically bonded." *Id.* at 11. On the other hand, Valeo argued, a heat-treated product may begin with "layers that bond during the heat-treatment, resulting in . . . a new alloy with a unique chemistry." *Id.* at 12. The DIPs presented Commerce with evidence that a clad product can contain some "diffusion between the core and cladding layer" as a result of "thermal treatment." *Id.* at 12 & n.96 (citing First DIPs Cmts. at 9; Third DIPs Cmts. at 4). Commerce accepted the DIPs position as backed by industry standards, *id.*, and found, based on record evidence, that Valeo's T-series aluminum sheet constitutes a clad product, *id.* at 12–13. Valeo does not identify record evidence undermining Commerce's findings. Thus, Commerce's determination that Valeo's product is a clad product is supported by substantial evidence.

That finding does not, however, end the inquiry. If Commerce continues to find, on remand, that the scope terms are reasonably interpreted to include unregistered alloys, Commerce must further address Valeo's arguments regarding heat-treatment.

Commerce explained that "the Aluminum Association 'determines which of the eight groupings (or series) into which the alloy falls based on its aluminum content and/or principal alloying agent" and *not* heat-treatability. Final Scope Ruling at 17 &

n.127 (citing Weritz Decl.).  Commerce's reliance on the Weritz Declaration fails as a

matter of law for the reasons set forth above.  Moreover, while it may be true that the

Aluminum Association would consider the principal alloying element to determine the

alloy group for an alloy submitted for a registered designation, *see* Teal Sheets at 31,

that alone is not substantial evidence for Commerce's finding that heat-treatability is

irrelevant.

Commerce attempted to support its explanation with evidence purportedly

showing that alloy 4643 is heat-treatable, despite 4XXX-series alloys being classified as

non-heat-treatable by the Aluminum Association.  Final Scope Ruling at 17 & n.128

(citing Valeo Rebuttal Cmts., Exs. 1, 3).  Commerce thus found that heat-treatment

does not preclude characterization as a 3XXX-series alloy even if such alloys are

otherwise characterized as non-heat-treatable.  *See id.* (finding that, even if Valeo's

product "was heat-treated, . . . record evidence contradicts Valeo's conclusion that a

heat-treatable alloy that otherwise meets the criteria of [a 3xxx-series alloy] would be

precluded from being classified as such").  Commerce's reliance on 4XXX-series alloys

to find heat-treatability non-dispositive as to alloy series is unpersuasive.

Exhibit 3 to Valeo's Rebuttal Comments explains that certain 4XXX-series alloys

are heat-treatable (such as alloy 4643) whereas others (such as alloys 4043 and 4047)

are not.  Valeo Rebuttal Cmts., Ex. 3 at 1–2; *see also id.*, Ex. 1 (listing "[c]old work" as

the "[s]trengthening method" for 4XXX series alloys with the notation "some heat treat,"

indicating that some 4XXX-series alloys are heat-treated).  Information provided by the

DIPs likewise states that 4XXX-series alloys are "the *only* alloy series that consists of

both heat-treatable *and* not heat-treatable alloys."  Second DIPs Cmts. at 8 (emphasis added).  Commerce's explanation did not account for this industry-recognized characteristic of 4XXX-series alloys.  Moreover, to the extent the record shows that 3XXX-series alloys are not heat-treatable,[28] unlike 4XXX-series alloys, the record does not indicate that there are exceptions within the 3XXX-series alloys.  *See id.*  Thus, it appears that heat-treatability could be relevant to whether an alloy may be considered a 3XXX-series alloy and covered by the scope of the *China CAAS Orders*.

To the extent that Commerce also construed the ITC's determination to indicate that heat-treatability was irrelevant to scope coverage beyond the 6XXX-series alloys, that reasoning is misplaced.  *See* Final Scope Ruling at 18.  The ITC listed 6XXX-series alloys as an example of excluded heat-treated sheet—not the universe thereof.  *See* USITC Pub. 4861 at I-18 ("[H]owever, heat-treated aluminum sheet (e.g., 6xxx alloy series) is not covered by Commerce's scope.").

Underlying the court's difficulty in discerning the path of Commerce's reasoning is the lack of any explanation by Commerce regarding the meaning of the phrases "heat-treated" or "heat-treatable" for purposes of understanding the relevance of thermal treatment to classification as a 3XXX-series alloy.  Commerce appeared to consider the question whether the scope contains an *exclusion* for heat-treatable 3XXX-series alloys, *see* Final Scope Ruling at 18 (finding no such exclusion), when the key question is

---

[28] The Aluminum Alloys 101 publication lists 3XXX-series alloys under the heading "Non Heat-Treatable Alloys."  Aluminum Alloys 101 at 2–3; *cf.* USITC Pub. 4861 at I-13 (describing 3XXX-series alloys as non-heat-treatable).

whether a heat-treated (or heat-treatable) clad sheet *can be classified as* having a

3XXX-series core and therefore be in-scope. [29]  On remand, to the extent necessary to

its determination, Commerce must address evidence that Valeo's product undergoes

heat-treatment, *see* Fourth Ruling Req. at 4; Third Ruling Req., Attach. 2 at 4, and

reconcile such evidence with evidence indicating that 3XXX-series alloys are non-heat-

treatable, *see* USITC Pub. 4861 at I-13.[30]

### III.   Commerce's *Ex-Parte* Meetings and Memoranda

#### A.  Parties' Contentions

As noted above, Commerce held two *ex-parte* meetings with DIPs and placed

summaries of the meetings on the record.  June 17 *Ex Parte* Mem.; Apr. 22 *Ex Parte*

Mem.  Valeo contends that the memoranda Commerce placed on the record failed to

adequately disclose the factual information presented at the meetings.  Pl.'s Mem. at

36–39.  With respect to the April 22 *Ex Parte* Memorandum, Valeo contends that the

underlying meeting involved discussions about an ongoing, related administrative

review and that the memorandum should have included the review questionnaire

---

[29] Commerce's reliance on the Second Weritz Declaration to find that the term "heat-treatable" does not apply to 3XXX-series alloys and to find the absence of an exclusion for heat-treatable 3XXX-series alloys, *see* Final Scope Ruling at 18 & nn.133, 137 (citing Second Weritz Decl. ¶ 7), suffers from the same problems the court recognized in relation to Commerce's reliance on the Weritz Declaration.  The Second Weritz Declaration is not a type of document included in the (k)(1) sources and Commerce did not address the propriety of relying on a declaration authored and placed on the record by an interested party.

[30] The ITC described two heat-treating processes (annealing and solution heat-treatment and aging) and stated that heat-treated alloys are excluded from the scope. USITC Pub. 4861 at I-18.

responses discussed at the meeting.  *Id.* at 37; *see also* Pl.'s Reply at 20 (arguing that the court should remand this matter for Commerce to provide "a meaningful discussion of the subject matter of those meetings").

The Government contends that Valeo waived any challenges to the June 17 *Ex Parte* Memorandum by failing to specify the deficiencies in the memorandum. Def.'s Opp'n at 39 n.6.  The Government also contends that Commerce's April 22 *Ex Parte* Memorandum complied with statutory, regulatory, and other agency requirements. *Id.* at 40.  The Government further contends that factual information from the administrative review was never placed on the record of this proceeding, and Commerce did not rely on such information in reaching its decision. *Id.* at 40–42.

In its reply brief, Valeo contends that Commerce's scope proceedings are governed by the Government in the Sunshine Act ("the Act"), 5 U.S.C. § 557(d)(1)(A),[31] and the *ex parte* communications were unlawful pursuant thereto.  Pl.'s Reply at 21–23. Valeo did not respond to the Government's argument regarding waiver.

### B.  Analysis

The statute requires Commerce to "maintain a record of any *ex parte* meeting between . . . interested parties" and the agency "if information relating to [the relevant] proceeding was presented or discussed at such meeting."  19 U.S.C. § 1677f(a)(3).

---

[31] On September 13, 1976, Congress enacted "An Act to provide that meetings of Government agencies shall be open to the public, and for other purposes," P.L. No. 94-409, 90 Stat 1241 (1976), referred to as the "Government in the Sunshine Act."  The Act was codified at 5 U.S.C. § 552(b) and further amended 5 U.S.C. § 557 to include subsection (d)(1), the provision on which Valeo relies.

"The record of such an *ex parte* meeting shall include the identity of the persons present at the meeting, the date, time, and place of the meeting, and a summary of the matters discussed or submitted.  The record of the *ex parte* meeting shall be included in the record of the proceeding."  *Id.*; *cf.* 19 C.F.R. § 351.104(a) (requiring placement of *ex parte* memoranda on the administrative record).  Commerce has issued a policy statement requiring *ex parte* memoranda to "be drafted expeditiously in all cases, reviewed by a person in attendance at the meeting, and placed in the record as soon as possible, so that parties may comment effectively on the factual matters presented." *Policy Statement Regarding Issuance of Ex-Parte Memoranda*, 66 Fed. Reg. 16,906, 16,906 (Dep't Commerce Mar. 28, 2001).  Additionally, "memoranda are required whether or not the factual information received was received previously, is expected to be received later in the proceeding, or is expected to be used or relied on."  *Id.*

Valeo waived its challenge to the June 17 *Ex Parte* Memorandum by failing to present substantive arguments challenging the insufficiency of the memorandum.  *See United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013). Additionally, the memorandum appears sufficient on its face.  The statute requires Commerce to summarize "the matters discussed or submitted."  19 U.S.C. § 1677f(a)(3).  Commerce's June 17 *Ex Parte* Memorandum summarized the "matters discussed" as the DIPs "May 28, 2020, comments on the Valeo Group's scope request." June 17 *Ex Parte* Mem.  Valeo has not shown that the statute requires more.

Valeo's challenge to the April 22 *Ex Parte* Memorandum also fails.  Therein, Commerce explained that, during the meeting, the DIPs discussed how a respondent's

sales database in an administrative review of the underlying antidumping order related to the scope proceeding.  Apr. 22 *Ex Parte* Mem. at 1.  In a subsequent letter, Commerce further explained that counsel for the DIPs "did not submit any facts or reference any documents not currently on the record of the first administrative review of the antidumping duty order" and noted that the DIPs "inquired about the logistics of filing information from one segment of a proceeding to another segment of the same proceeding."  May 27 Commerce Ltr. at 1–2.  The agency officials in attendance referred the DIPs to the relevant agency office and further indicated that the scope ruling would be based on its own record.  *See id.*  Valeo asserts, without supporting authority, that "[t]he statute requires a complete and fulsome discussion of the facts presented at an *ex-parte* meeting," Pl.'s Mem. at 37, but the statute does not use those terms.   While Valeo might prefer more information, the statute simply requires a "summary of the matters discussed."  19 U.S.C. § 1677f(a)(3).  Commerce complied with that requirement and Valeo fails to identify any deficiency in Commerce's memorandum.

    Valeo's reliance on the Government in the Sunshine Act, Pl.'s Reply at 21–23, is wholly misplaced.[32]  The Act prohibits *ex parte* communications in certain agency proceedings.  *See* 5 U.S.C. § 557(d)(1)(A)–(B).  The Act applies "when a hearing is required to be conducted in accordance with section 556 of this title," *id.* § 557(a),

---

[32] Valeo raised the argument for the first time in its reply brief.  At the hearing, however, the court afforded the Government and Defendant-Intervenors the opportunity to address the issue.  Oral Arg. 1:40:20–1:45:25.

"except to the extent required for the disposition of *ex parte* matters as authorized by

law," *id.* § 557(d)(1). Commerce hearings are not, however, "subject to the provisions of

subchapter II of chapter 5 of Title 5," which includes sections 556 and 557. 19 U.S.C.

§ 1677c(b); *see also* 19 C.F.R. § 351.310(d)(2) ("The hearing is not subject to 5 U.S.C.

§§ 551–559 . . . .").[33] Moreover, both 19 U.S.C. § 1516a(b)(2)(A)(i)[34] and 19 U.S.C.

§ 1677f(a)(3) contemplate the occurrence of *ex parte* meetings.

At the hearing, the court asked Valeo to reconcile its reliance on the Act with the

above-mentioned authorities that appear to emphatically preclude such reliance. Valeo

suggested that its argument presupposed the requirement for a hearing pursuant to a

scope inquiry. Oral Arg. 1:38:25–1:38:30. As explained above, however, whether

Commerce conducts a hearing is beside the point because any hearing is not subject to

the statutory provision—5 U.S.C. § 556—that triggers application of the Government in

the Sunshine Act, *see* 5 U.S.C. § 557(a), (d)(1). Accordingly, Valeo's argument is

completely lacking in merit.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Final Scope Ruling is remanded to the agency for

further consideration in accordance with the terms of this opinion; it is further

---

[33] Valeo points to 19 C.F.R. § 351.310(c) as authority to request a hearing in a scope
proceeding but does not address 19 C.F.R. § 351.310(d)(2). *See* Pl.'s Reply at 22.
[34] Pursuant to 19 U.S.C. § 1516a(b)(2)(A)(i), the administrative record compiled in a
scope proceeding may include a "record of *ex parte* meetings required to be kept by
section 1677f(a)(3)."

Court No. 21-00581                                                                Page 35

     **ORDERED** that the agency shall file its redetermination on remand on or before

March 21, 2023; it is further

     **ORDERED** that subsequent proceedings shall be governed by USCIT Rule

56.2(h); and it is further

     **ORDERED** that any comments or responsive comments must not exceed 5,000

words.

                          /s/     Mark A. Barnett
                          Mark A. Barnett, Chief Judge

Dated: December 21, 2022
       New York, New York