A-570-073, C-570-074
Remand
Slip Op. 22-152
Scope Inquiry – Heat-Treated T-Series Aluminum Sheet
~~Business Proprietary Document~~
**Public Version**
E&C/OVI:  FS

***Valeo North America, Inc., v. United States*,**
**Court No. 21-00581, Slip Op. 22-152**
**Common Alloy Aluminum Sheet from the People's Republic of China**

## FINAL RESULTS OF REDETERMINATION
## PURSUANT TO COURT REMAND

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination in accordance with the opinion and remand order of the U.S. Court of

International Trade (CIT or the Court) in *Valeo North America, Inc. v. United States,* Court No.

21-00581, Slip Op. 20-129 (December 21, 2022) (*Remand Order*).  This action arises out of

Commerce's Final Scope Ruling[1] that heat-treated T-series sheet (T-series sheet) imported by

Valeo Group and its affiliates (collectively, Valeo)[2] falls within the scope of the antidumping

duty (AD) and countervailing duty orders on common alloy aluminum sheet (CAAS) from the

People's Republic of China (China).[3]

---

[1] *See* Memorandum, "Antidumping and Countervailing Duty Orders on Aluminum Sheet from the People's
Republic of China; Final Scope Ruling Determination:  Valeo's Heat-Treated T-Series Aluminum Sheet," dated
October 15, 2021 (Final Scope Ruling).
[2] In the *Remand Order*, the Court uses the name "Valeo" to refer to the plaintiff Valeo North America, Inc.  In the
underlying administrative proceeding, the scope requester did not identify itself as Valeo North America, Inc.
Rather the scope requester identified itself as Valeo Group and its affiliates.  The company certifications provided
from the scope requester were from multiple Valeo affiliates including Valeo Inc., and Valeo North America, Inc.
Further, the U.S. Customs and Border Protection (CBP) 7501 form provided in the administrative protective order
application was from [                                        ].  Accordingly, Commerce's use of the name "Valeo" is slightly
incongruous with the Court's use of the same name.
[3] *See Common Alloy Aluminum Sheet from the People's Republic of China:  Antidumping Duty Order*, 84 FR 2813
(February 8, 2019); and *Common Alloy Aluminum Sheet from the People's Republic of China:  Countervailing Duty
Order*, 84 FR 2157 (February 6, 2019) (collectively, *Orders*).

The CIT held that Commerce's scope ruling, conducted pursuant to 19 CFR 351.225(d), "exceeded the limits of a (k)(1) analysis and is unsupported by substantial evidence,"[4] and that "the scope is ambiguous {…} as to whether Commerce intended to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys)."[5] Further, the CIT held that, "Commerce's determination that Valeo's product is a clad product is supported by substantial evidence," but "on remand, to the extent necessary to its determination, Commerce must address evidence that Valeo's product undergoes heat-treatment."[6] Lastly, the Court held that on the issue of Commerce's *ex parte* meetings and memoranda, "Valeo's argument is completely lacking in merit."[7] In its *Remand Order*, the CIT remanded to Commerce to "reconsider and further explain its ruling pursuant to 19 CFR 351.225(d) consistent with {the *Remand Order*, or} alternatively, Commerce may determine to conduct a scope inquiry pursuant to 19 CFR 351.225(e)."[8]

On February 15, 2023, in accordance with the CIT's *Remand Order*, after determining that the issue of whether Valeo's T-series sheet is included within the scope cannot be determined based solely upon the application and the descriptions of the merchandise referred to in 19 CFR 351.225(k)(1), Commerce initiated a scope inquiry under 19 CFR 351.225(e)[9] and established a schedule for interested parties to submit comments and information.[10] Between

---

[4] *See Remand Order* at 18.
[5] *Id.*
[6] *Id.* at 27 and 30.
[7] *Id.* at 34.
[8] *Id.* at 24.
[9] Commerce has recently revised its scope regulations, and provided that the revisions apply "to scope inquiries for which a scope ruling application is filed … on or after the effective date" of November 4, 2021. *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300, 52327 (September 20, 2021). Commerce is conducting this scope inquiry pursuant to the prior regulations that were in effect when Valeo submitted its complete request for a scope ruling.
[10] *See* Commerce's Letter, "Initiation of Scope Inquiry and Request for Information," dated February 15, 2023 (Scope Initiation Letter).

February 23 and March 1, 2023 Commerce twice extended the deadlines for interested parties to submit comments and information.[11]  On March 2, 2023, the Common Alloy Aluminum Sheet Trade Enforcement Working Group and its individual members (the domestic industry)[12] and Valeo submitted comments and factual information relating to the scope inquiry.[13]  On March 9, 2023, the domestic industry and Valeo submitted rebuttal comments and information.[14]

On March 23, 2023, pursuant to 19 CFR 351.301(c)(4), Commerce placed new factual information (NFI) onto the record of the administrative scope remand proceeding.[15]  On March 29, 2023, the domestic industry and Valeo submitted comments and information to rebut, clarify, or correct the factual information within the NFI Memorandum.[16]

On remand, we have further analyzed the evidence on the record, in accordance with the Court's *Remand Order*.  We find that the 19 CFR 351.225(k)(1) factors were not dispositive to determine whether Valeo's T-series sheet is within the scope of the *Orders*, and we further considered factors under 19 CFR 351.225(k)(2).  As a result of our further analysis including

---

[11] *See* Commerce's Letters, "T-Series Aluminum Sheet Scope Inquiry; Extension of Deadline for Submissions," dated February 23, 2023 (First Extension of Deadline for Submissions); and "T-Series Aluminum Sheet Scope Inquiry:  Second Extension of Deadline for Submissions," dated March 1, 2023 (Second Extension of Deadline for Submissions).

[12] The individual members of Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group are:  Arconic Corporation; Commonwealth Rolled Products, Inc.; Constellium Rolled Products Ravenswood, LLC; Jupiter Aluminum Corporation; JW Aluminum Company; and Novelis Corporation.

[13] *See* Domestic Industry's Letter, "Common Alloy Aluminum Sheet from the People's Republic of China – Domestic Industry's Response to Department's Request for Comments and Information," dated March 2, 2023 (Domestic Industry's Scope Initiation Comments); *see also* Valeo's Letter, "Common Alloy Aluminum Sheet from the People's Republic of China:  Valeo's Comments and Supporting Information for Scope Inquiry on Heat-Treated T-Series Aluminum Sheet," dated March 2, 2023 (Valeo's Scope Initiation Comments).

[14] *See* Domestic Industry's Letter, "Domestic Industry's Response to Valeo's Comments and Supporting Information for Scope Inquiry," dated March 9, 2023 (Domestic Industry's Scope Initiation Rebuttal Comments); *see also* Valeo's Letter, "Valeo's Rebuttal Comments and Supporting Information for Scope Inquiry on Heat-Treated T-Series Aluminum Sheet," dated March 9, 2023 (Valeo's Scope Initiation Rebuttal Comments).

[15] *See* Memorandum, "Scope Inquiry regarding Antidumping and Countervailing Duty Orders of Common Alloy Aluminum Sheet from the People's Republic of China; T-Series Sheet," dated March 23, 2023 (NFI Memorandum).

[16] *See* Domestic Industry's Letter, "Domestic Industry's Comments on Commerce's… Release of New Factual Information," dated March 29, 2023 (Domestic Industry's NFI Rebuttal Comments); *see also* Valeo's Letter, "Valeo's Comments and Rebuttal Factual Information," dated March 29, 2023 (Valeo's NFI Rebuttal Comments).

analysis of 19 CFR 351.225(k)(2) factors (the (k)(2) factors), we continue to find that the scope of the *Orders* covers Valeo's T-series sheet.

## II.    SCOPE OF THE *ORDERS*

The merchandise covered by the *Orders* is aluminum common alloy sheet (common alloy sheet), which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width.  Common alloy sheet within the scope of the Orders includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet.  With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association.  With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core.

Common alloy sheet may be made to ASTM specification B209-14, but can also be made to other specifications.  Regardless of specification, however, all common alloy sheet meeting the scope description is included in the scope.  Subject merchandise includes common alloy sheet that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the *Orders* if performed in the country of manufacture of the common alloy sheet.

Excluded from the scope of the *Orders* is aluminum can stock, which is suitable for use in the manufacture of aluminum beverage cans, lids of such cans, or tabs used to open such cans.  Aluminum can stock is produced to gauges that range from 0.200 mm to 0.292 mm, and has an H-19, H-41, H-48, or H-391 temper.  In addition, aluminum can stock has a lubricant applied to the flat surfaces of the can stock to facilitate its movement through machines used in the

4

manufacture of beverage cans.  Aluminum can stock is properly classified under Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7606.12.3045 and 7606.12.3055.

Where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set for the above.

Common alloy sheet is currently classifiable under HTSUS subheadings 7606.11.3060, 7606.11.6000, 7606.12.3090, 7606.12.6000, 7606.91.3090, 7606.91.6080, 7606.92.3090, and 7606.92.6080.  Further, merchandise that falls within the scope of the *Orders* may also be entered into the United States under HTSUS subheadings 7606.11.3030, 7606.12.3030, 7606.91.3060, 7606.91.6040, 7606.92.3060, 7606.92.6040, 7607.11.9090.  Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the *Orders* is dispositive.

## III.   BACKGROUND

On May 1, 2020, Valeo submitted its original scope request.[17]  On June 3, 2020, we rejected Valeo's May 1, 2020, submission because it was not properly filed pursuant to Commerce's regulations.[18]  On June 5, 2020, Valeo resubmitted its scope request.[19]  On July 20, 2020, we rejected Valeo's June 5, 2020, submission because it did not contain all the information necessary to make a scope ruling, and we issued an accompanying supplemental questionnaire.[20]  Valeo refiled its scope request and responded to our supplemental questions on August 7, 2020.[21]

---

[17] *See* Valeo's Letter, "Request for Scope Ruling on Heat-Treated T-Series Aluminum Sheet," dated May 1, 2020.
[18] *See* Commerce's Letter, "Rejection of Requests for a Scope Inquiry on Heat-Treated T-Series Aluminum Sheet," dated June 3, 2020.
[19] *See* Valeo's Letter, "Request for Scope Ruling on Heat-Treated T-Series Aluminum Sheet," dated June 4, 2020 (Valeo's June 5, 2020, Submission).  Although dated June 4, 2020, the submission was filed on June 5, 2020.
[20] *See* Commerce's Letter, "Supplemental Questionnaire on Heat-Treated T-Series Aluminum Sheet," dated July 20, 2020.
[21] *See* Valeo's Letter, "Request for Scope Ruling and Response to Supplemental Questionnaire on Heat-Treated T-Series Aluminum Sheet," dated August 7, 2020 (Valeo's August 7, 2020, Submission).

Between May 28 and August 25, 2020, the domestic industry submitted comments and rebuttal information regarding Valeo's submissions.[22]  Between June 15 and July 9, 2020, Valeo responded to the domestic industry's comments.[23]  Between September 18 and December 17, 2020, we extended the deadline for issuing a scope ruling.[24]  On February 3, 2021, we rejected Valeo's August 7, 2020, submission because it did not contain all of the information necessary to make a scope ruling, and we issued another accompanying supplemental questionnaire.[25]  On March 24, 2021, Valeo submitted a complete scope ruling request with responses to Commerce's supplemental questions.[26]  Between May 10 and September 20, 2021, we extended the deadline for issuing a scope ruling four times.[27]

On October 15, 2021, we released a final scope ruling determining that Valeo's T-series sheet fell within the scope of the *Orders* based on the scope language and sources described in 19 CFR 351.225(k)(1).[28]  Specifically, we first determined that the plain language of the scope covered multi-alloy, clad aluminum sheet, produced from a 3XXX-series core.[29]  We also determined the record evidence demonstrated that Valeo's T-series sheet was a clad product, and

---

[22] *See* Domestic Industry's Letters, "Domestic industry's Response to Scope Ruling Request by Valeo Group," dated May 28, 2020 (First Domestic Industry Comments);  "Domestic Industry's Response to Valeo Group's Rebuttal Comments," dated June 26, 2020; and "Domestic Industry's Response to Valeo Group's Resubmitted Scope Ruling Request," dated August 25, 2020.

[23] *See* Valeo's Letters, "Rebuttal Comments to Petitioners' Comments on Valeo's Scope Ruling Request," dated June 15, 2020; and "Response to the Domestic Producers' Comments on Valeo's Rebuttal Comments," dated July 9, 2020.

[24] *See* Commerce's Letters, "Extension of Deadline," dated September 18, 2020; "Extension of deadline," dated November 2, 2020; and "Extension of Deadline," dated December 17, 2020.

[25] *See* Commerce's Letter, "Second Supplemental Questionnaire on Heat-Treated T-Series Aluminum Sheet," dated February 3, 2021.

[26] *See* Valeo's Letter, "Request for Additional Information," dated March 24, 2021 (Scope Request).  Because this scope request was filed on March 23, 2021, after 5 p.m. Eastern Time (ET), it is considered to be filed on March 24, 2021.

[27] *See* Commerce's Letters, "Extension of Deadline," dated May 10, 2021; "Extension of Deadline," dated June 22, 2021; "Extension of Deadline," dated August 6, 2021; and "Extension of Deadline," dated September 20, 2021.

[28] *See* Memorandum, "Final Scope Ruling Determination:  Valeo's Heat-Treated T-Series Aluminum Sheet," dated October 15, 2021 (Final Scope Ruling), at 10-22.

[29] *Id.* at 11.

was not a heat-treated product.[30]  Next, we determined that Valeo's T-series sheet was produced

from a 3XXX-series core, because the core of Valeo's T-series sheet had a major alloying

element of manganese.[31]  Finally, we determined the scope of the *Orders* did not exclude heat-

treated aluminum sheet that otherwise met the scope description of the *Orders*.[32]

On August 17, 2021, Valeo filed a complaint with the Court pursuant to 28 U.S.C.

§1581(i).[33]  On November 30, 2021, the Court dismissed Valeo's complaint.[34]

On November 12, 2021, Valeo filed a complaint with the Court pursuant to 28 U.S.C.

§1581(c).[35]  On December 21, 2022, the Court remanded Commerce's scope ruling for further

consideration in accordance with the *Remand Order*.  First, the Court held that "the scope is

ambiguous {…} as to whether Commerce intended to cover any alloy that contains a major

alloying element corresponding to the Aluminum Association's alloy groups (including

unregistered alloys)," and "Commerce's scope interpretation exceeded the limits of a (k)(1)

analysis and is unsupported by substantial evidence."[36]  Next, the Court held that, "Commerce's

determination that Valeo's product is a clad product is supported by substantial evidence,"[37] but

that, "to the extent necessary to its determination, Commerce must address evidence that Valeo's

product undergoes heat-treatment."[38]  Finally, the Court held that concerning Commerce's *ex

parte* meetings and memoranda, "Valeo's argument is completely lacking in merit."[39]

Accordingly, the Court stated, "{o}n remand, if Commerce continues to rely on (k)(1) sources, it

---

[30] *Id.* at 11-13.
[31] *Id.* at 13-16.
[32] *Id.* at 16-22.
[33] *See* Complaint, *Valeo North America Inc. v. United States*, Court No. 21-cv-00426.
[34] *See* Notice of Dismissal, *Valeo North America Inc. v. United States*, Court No. 21-cv-00426.
[35] *See* Complaint, *Valeo North American Inc. v. United States*, Court No. 21-cv-00581.
[36] *See Remand Order* at 18.
[37] *Id.* at 27.
[38] *Id.* at 30.
[39] *Id.* at 34.

must reconsider and further explain it rulings pursuant to 19 CFR 351.225(d)," or,

"{a}lternatively, Commerce may determine to conduct a scope inquiry pursuant to 19 CFR 351.225(e)."[40]

On May 19, 2023, Commerce released the Draft Results of Redetermination to all interested parties and invited parties to comment.[41]  On June 2, 2023, we received comments from Valeo and the domestic industry.[42]

## IV.    LEGAL FRAMEWORK

When a request for a scope ruling is filed, Commerce examines the scope language of the order(s) and the description of the product contained in the scope ruling request.[43]  Pursuant to Commerce's regulations, Commerce may also examine other information, including the description of the merchandise contained in the petition, the records from the investigation(s), and prior scope determinations made for the same product.[44]  If Commerce determines that these sources are sufficient to decide the matter without further inquiry, it will issue a final scope ruling as to whether the merchandise is covered by an order.[45]

Conversely, where the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the five additional factors set forth at 19 CFR 351.225(k)(2).  These factors are:  (i) the physical characteristics of the merchandise; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product;

---

[40] *Id.* at 24.
[41] *See* Draft Results of Redetermination Pursuant to Court Remand, *Valeo North America, Inc., v. United States*, Court No. 21-00581, Slip Op. 22-152, dated May 19, 2023 (Draft Results of Redetermination).
[42] *See* Valeo's Letter, "Valeo's Comments on Draft Remand Redetermination of Scope Ruling on Heat-Treated T-Series Aluminum Sheet," dated June 2, 2023 (Valeo's Comments on Draft Results); *see also* Domestic Industry's Letter, "Domestic Industry's Comments on Draft Redetermination Pursuant to Court Remand," dated June 2, 2023 (Domestic Industry's Comments on Draft Results).
[43] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[44] *See* 19 CFR 351.225(k)(1).
[45] *See* 19 CFR 351.225(d).

(iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.  The determination as to which analytical framework is most appropriate in any given scope proceeding is made on a case-by-case basis after consideration of all evidence before Commerce.

## V.     POST-INITIATION PARTY COMMENTS

### Valeo Comments

#### Description of the Product

According to Valeo, T-series sheet is an engineered product produced from multiple layers of heat-treatable aluminum alloys which undergo a heat-treatment process.[46]  During the heat-treatment process, the chemical composition of the intermediate layers change and results in a product with a combined chemistry.[47]  T-series sheet has a core produced from proprietary YB-18 alloy and an outer layer produced from 4045 alloy.[48]  While YB-18 has a major alloying element of manganese, it is not a 1XXX, 3XXX, or 5XXX-series alloy.[49]  Moreover, YB-18 is not comparable to any alloy registered in the 3XXX-series because it has more copper and manganese than any 3XXX-series alloy.[50]  Due to chemical composition of YB-18, it is heat-treatable while 3XXX-series alloys are not heat-treatable.[51]

T-series sheet is manufactured through a unique three-stage heat treatment process.[52]  T-series sheet is both annealed and heat-treated.[53]  The unique heat-treatment mechanism removes discrete boundaries between intermediate alloys and results in a product with a combined

---

[46] See Valeo's Scope Initiation Comments at 3.
[47] Id.
[48] Id.
[49] Id.
[50] Id. at 4.
[51] Id.
[52] Id.
[53] Id.

9

chemistry.[54]  The major alloying element of the finished T-series sheet is silicon.[55]

*Procedural Issues*

Valeo states that before initiating a scope inquiry Commerce is required to find that a scope issue cannot be determined based solely upon the plain meaning of the scope language and the (k)(1) sources.[56]  Further, in a scope initiation Commerce is required to explain its reasons for finding that it cannot make a determination based on the plain meaning of the scope language and (k)(1) sources.[57]  Valeo argues that the Court implied that the ambiguity of the scope language could be resolved if aided with trade usage of the term "designation" in *Teal Sheets*.[58]  Commerce's scope initiation lacks an explanation of why it was unable to make a determination based on the plain meaning of the scope language and (k)(1) sources; accordingly, Commerce violated an important procedural requirement.[59]

Valeo contends that Commerce must follow its own regulatory framework.[60]  Commerce deviated from its normal schedule for requesting comments and supporting information.[61]

Further, Valeo asserts that Commerce must revoke its prior instructions to CBP concerning merchandise subject to this scope inquiry.[62]  Commerce's previous scope ruling was found unlawful by the CIT;[63] accordingly, continued suspension of liquidation of and obligation to post cash deposits for Valeo's entries dating back to October 15, 2021, is unlawful.[64]

---

[54] *Id.*
[55] *Id.*
[56] *Id.* at 6.
[57] *Id.* at 6-7.
[58] *Id.* at 7 (*see, e.g.*, First Domestic Industry Comments at Attachment 5 (containing *Teal Sheets*)).
[59] *Id.* at 7.
[60] *Id.* at 9.
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.*

Commerce should issue new instructions to CBP effective February 15, 2023, the date of the initiation of the scope inquiry.[65]

*Scope Analysis*

Valeo argues that, based upon the plain meaning of the scope language, T-series sheet is outside the scope of the *Orders* because it is not manufactured from a "3XXX-series alloy."[66] The Aluminum Association's *Teal Sheets* is the only definitional source for the designated "3XXX-series alloys."[67]  *Teal Sheets* uses the term "designation" to refer to registered alloys.[68] *Teal Sheets* does not create a separate designation called "3XXX-series;" rather, *Teal Sheets* describes a four-digit numerical system.[69]  If *Teal Sheets* was meant to create a standalone system for describing all alloys including unregistered alloys, the "9XXX-series" would include some alloys; however there is no "9XXX-series."[70] YB-18 is a proprietary alloy with no aluminum designation assigned by the Aluminum Association; accordingly, T-series sheet is not covered by the *Orders*.[71]

T-series sheet is not a 3XXX-series alloy because T-series sheet is heat-treatable, while 3XXX-series alloys are not heat-treatable.[72]  Valeo claims that the petition, Commerce's initial investigations on CAAS from China, Commerce's investigations on CAAS from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and Turkey, the U.S. International Trade Commission

---

[65] *Id.* at 9-10.
[66] *Id.* at 10.
[67] *Id.* at 11-12.
[68] *Id.* at 12-14.
[69] *Id.* at 14-16.
[70] *Id.* at 15
[71] *Id.* at 16-17.
[72] *Id.* at 17-18.

(ITC) Final Injury Determination,[73] and the domestic industry's own admission in CAAS proceedings demonstrate that heat-treatable alloys are not covered by the scope of the *Orders*.[74]

The ITC Final Injury Determination defined "heat-treatable alloys" as "alloys that can be strengthened through a thermal (heating) process, usually in an annealing furnace."[75]  According to Valeo, both the proprietary core and outer layer of Valeo's T-series sheet are manufactured from heat-treatable alloys.  Recent scientific studies demonstrate that an alloy does not always reflect the properties of its alloy groups when the secondary alloying element is impactful.[76] YB-18 contains significant amounts of elements that improve heat-treatability, which makes YB-18 heat-treatable.[77]  YB-18 has a higher combined content of alloying elements known to impact heat-treatability than some 6XXX-series alloys which are known to be heat-treatable.[78]  Valeo's T-series sheet undergoes a process that fits the description of heat treatment provided in the ITC Final Injury Determination.[79]

Valeo argues that analysis of the (k)(2) factors confirms that Valeo's T-series sheet is not covered by the scope of the *Orders*.[80]  Specifically, T-series sheet has a unique chemistry compared to 3XXX-series alloys; T-series sheet is heat-treatable, while 3XXX-series alloys are non-heat-treatable; and T-series sheet is heat-treated.[81]  The unique alloy used by Valeo develops a band of dense precipitates and a sacrificial "brown band" during the brazing process.[82]  This

---

[73] *Id.* at Exhibit 8 (containing *Common Alloy Aluminum Sheet from China*, Inv. Nos. 701-TA-591 and 731-TA-1399 (Final), USITC Pub. 4861 (January 2019) (ITC Final Injury Determination)).
[74] *Id.* at 17-24.
[75] *Id.* at 25 (citing ITC Final Injury Determination at I-12).
[76] *Id.* at 27-28.
[77] *Id.* at 26-27.
[78] *Id.* at 27-28.
[79] *Id.* at 29-30 (citing ITC Final Injury Determination at I-18).
[80] *Id.* at 30-37.
[81] *Id.* at 30-31.
[82] *Id.* at 31.

brown band remains after the brazing process and protects the core alloy from corrosion.[83] Because 3XXX-series alloys do not develop this brown band, corrosion immediately attacks the core alloy.[84]  T-series sheet has yield strength and tensile strength that exceed the strengths of any 3XXX-series alloys.[85]  T-series sheet must meet an exact chemical specification for customers in the automotive industry, often involving zirconium, titanium, copper, magnesium, iron, and silicon in proportions that are often proprietary and developed jointly between automotive manufacturers and suppliers of brazing sheet.[86]  By comparison, the chemical composition of CAAS is much simpler.[87]

Valeo states that T-series sheet is used for heat-exchangers (HEX) and heating, ventilation, and air conditioning (HVAC) applications and cannot be interchanged with mainstream CAAS, which is used for other industrial applications.[88]  Testing for T-series sheet includes burst testing of the material, brazed analysis, pressure and thermal cycle testing, heat transfer, and corrosion analysis.  Testing can take between [                    ].[89]  By comparison, CAAS customers seek a commodity product with average specifications readily available from a wide range of producers and distributors.[90]

Further, Valeo explains that T-series sheet is sold by a limited number of specialized producers.  These producers invest significant resources to work with their customers.[91]  In comparison, CAAS is produced in continuous and sizeable quantities for sale as generally

---

[83] *Id.*
[84] *Id.* at 30-31.
[85] *Id.* at 32.
[86] *Id.* at 32-33.
[87] *Id.* at 33.
[88] *Id.* at 33 and 35.
[89] *Id.* at 34.
[90] *Id.*
[91] *Id.* at 36.

interchangeable products by a large number of various distributors.[92]  T-series sheet is not

advertised or displayed for general commercial use, or use in certain applications identified by

Commerce in the initial investigations.[93]  CAAS producers cannot, and do not, advertise and sell

T-series sheet.[94]

*Domestic Industry Comments*

The domestic industry argues that a wide range of sources, such as *Teal Sheets*, the

declaration of John Weritz,[95] Valeo's Scope Ruling Request,[96] the ITC Final Injury

Determination,[97] ASM International's publication *Understanding the Basics*,[98] the ITC

publication 4703 on the competitive conditions affecting the U.S. aluminum industry,[99] the

domestic industry's comments on the draft questionnaire in the ITC injury investigation,[100] and

other industry publications, demonstrate that "3XXX-series alloys" means any alloy that contains

manganese as its principal alloying element.[101]

According to the domestic industry, Valeo's T-series sheet is clad brazing sheet and is

used for thermal management applications (*e.g.*, automotive HEX).[102]  All brazing sheet has

similar physical characteristics regardless of whether the core is a registered 3XXX-series alloy

such as 3003.[103]  For brazing sheet, while the core alloy may be a registered or unregistered

---

[92] *Id.*
[93] *Id.* at 36-37.
[94] *Id.* at 37.
[95] *See* First Domestic Industry Comments at Attachment 6 (containing Weritz Declaration).
[96] *See* Scope Request.
[97] *See* Valeo Scope Initiation Comments at Exhibit 8 (containing ITC Final Injury Determination).
[98] *See* Domestic Industry's Scope Initiation Comments at Attachment 1 (containing ASM International *Understanding the Basics*).
[99] *Id.* at Attachment 3 (containing USITC Pub. 4703 "Aluminum:  Competitive Conditions Affecting the U.S. Industry," dated June 2017).
[100] *Id.* at Attachments 4 and 5 (containing the domestic industry's comments on the draft questionnaire in the ITC injury investigation).
[101] *Id.* at 3-9.
[102] *Id.* at 9-10.
[103] *Id*. at 10.

3XXX-series alloy, the key factor in the chemistry is that the core's melting point remains above the temperature at which the aluminum sheet will be brazed.[104]  The high melting point of 3003 alloy (*i.e.*, 676 degrees Celsius) makes it particularly well-suited as the core alloy for brazing sheet.[105]  While different core alloys can have different physical properties (*e.g.*, strength and corrosion resistance), the differences are a matter of degree.[106]

The domestic industry states that brazing sheet product is covered by the scope regardless of the temper, thickness, or number of cladding layers, so long as the core is a 3XXX-series alloy and the thickness is 6.3 mm or less, but greater than 0.2mm.[107]  Brazing sheet has several specific applications, but is generally used in thermal management applications.[108]  Brazing sheet is sold to a limited number of ultimate end-use customers, but can be sold either directly to the end users or through a distributor.[109]  Sales of brazing sheet generally involve limited advertising.[110]  These characteristics apply to brazing sheet regardless of whether the core is a registered or unregistered 3XXX-series alloy.[111]  Arconic Corporation (Arconic) produces brazing sheet for customers using both 3003 alloy and unregistered 3XXX-series alloys.[112]

Lastly, the domestic industry contends that whether Valeo's T-series sheet has been heat-treated or is capable of heat-treatment is irrelevant to the whether the sheet is covered by the scope of the *Orders*.[113]

---

[104] *Id.*
[105] *Id.*
[106] *Id.* at 11.
[107] *Id.* at 11-12.
[108] *Id.* at 12.
[109] *Id.*
[110] *Id.* at 12.
[111] *Id.*
[112] *Id.*
[113] *Id.* at 13-15.

*Valeo Rebuttal Comments*

Valeo argues that the domestic industry's interpretation of *Teal Sheets* is out of context.[114] *Teal Sheets* only applies to registered alloys.[115]  No party has ever disputed that the scope does not encompass heat-treatable alloys.[116]  "Common" should be interpreted as "known to the community."[117]  Only registered alloys are known to the community; thus, the scope only covers registered alloys.[118]  Further, Valeo states that the sources cited by the domestic industry do not demonstrate that "3XXX-series alloys," "as designated by the Aluminum Association" are terms meant to refer to any alloy with a major alloying element of manganese (including unregistered alloys).[119]  Rather, industry sources demonstrate that 3XXX-series alloys, as designated by the Aluminum Association, should be interpreted to refer only to registered alloys in that series.[120]

According to Valeo, heat-treatability is critical when considering the physical characteristics of the product.[121]  The *Orders* do not cover all brazing sheet but, rather, cover only brazing sheet manufactured from the designated alloys described in the scope.[122]  T-series sheet is not interchangeable with in-scope brazing sheet.[123]  T-series sheet has superior corrosion resistance, yield strength, and tensile strength than any 3XXX-series alloy.[124]  The specific automotive parts that require T-series sheet cannot be manufactured using in-scope CAAS

---

[114] *See* Valeo's Scope Initiation Rebuttal Comments at 1.
[115] *Id.* at 1-2.
[116] *Id.* at 2-4.
[117] *Id.* at 3.
[118] *Id.* at 3-4.
[119] *Id.* at 4-13.
[120] *Id.* at 13-15.
[121] *Id.* at 15-17.
[122] *Id.* at 18-20.
[123] *Id.* at 20.
[124] *Id.*

products such as brazing stock with a 3XXX-series core.[125]  T-series sheet is produced by a

limited number of specialized producers.[126]  Brazing sheet manufactured from a 3XXX-series

alloy is readily available and does not require any research and development efforts.[127]  T-series

sheet is not advertised or displayed to general customers, while in-scope brazing sheet is

advertised to general customers.[128]

*Domestic Industry Rebuttal Comments*

The domestic industry argues that Commerce should not revoke its instructions to CBP to

suspend liquidation of Valeo's imports.[129]  Valeo's arguments are wrong and without merit.[130]

The CIT did not reverse or vacate Commerce's ruling; rather, the CIT remanded the ruling for

further explanation.[131]  Further, the domestic industry agrees with Valeo that it was unnecessary

for Commerce to initiate a formal scope inquiry under 19 CFR 351.225(e),[132] as it is possible for

Commerce to make a ruling based on (k)(1) sources.[133]  In prior cases where Commerce issued

an affirmative scope ruling, but that ruling was subsequently remanded by the CIT, Commerce

did not revoke its suspension of liquidation instructions until the completion of the litigation.[134]

---

[125] *Id.* at 21.

[126] *Id.*

[127] *Id.*

[128] *Id.* at 21-22.

[129] *See* Domestic Industry's Scope Initiation Rebuttal Comments at 2-3.

[130] *Id.*

[131] *Id.* at 3.

[132] While the domestic industry agrees with Valeo that Commerce may resolve the scope ambiguity using (k)(1) sources, the domestic industry disagrees with Valeo in which direction the (k)(1) sources dictate, *see generally* Domestic Industry Scope Initiation Rebuttal Comments.

[133] *Id.* at 3-4.

[134] *Id.* at 4-5 (citing Memorandum, "Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China: Final Scope Ruling on Vandewater International Inc.'s Steel Branch Outlets," dated September 10, 2018; *Vandewater International Inc., v. United States*, 476 F. Supp. 3d. 1357, 1358 (CIT 2020); CBP message number 2265404, dated September 22, 2022; Memorandum, "Final Scope Ruling for Certain Hardwood Plywood Products from the People's Republic of China:  Request by the Coalition for Fair Trade in Hardwood Plywood and Masterbrand Cabinets Inc.," dated September 7, 2018; *Fabuwood Cabinetry Corp. v. United States,* 469 F. Supp. 3d 1373, 1389 (CIT 2020); *Fabuwood Cabinetry Corp. v. United States*, 519 F. Supp. 3d 1335 (CIT 2021); CBP message number 1229405, dated August 17, 2021; and CBP message number 1225402, dated August 13, 2021).

Consistent with its practice, Commerce should wait until after the appeals process to issue any revised instructions to CBP.[135]

According to the domestic industry, the question of whether the plain language of the scope covers Valeo's T-series sheet is not at issue in this remand segment; the CIT has already ruled that the plain language of the scope is ambiguous.[136] The record has been supplemented with a wide range of trade publications and similar sources which demonstrate that "3XXX-series" refers to all alloys for which manganese is the primary alloying element.[137] Valeo's interpretation of *Teal Sheets* is flawed, as *Teal Sheets* is intended to cover all alloys sold in commercial quantities.[138]

The domestic industry contends that the (k)(2) factors demonstrate that Valeo's T-series sheet is covered by the scope.[139] Heat-treatability is not relevant to the scope.[140] Commerce should reject Valeo's claim that T-series sheet has a higher corrosion resistance than other in-scope clad aluminum sheet because Valeo provided no record evidence to support its claim.[141] The evidence on the record demonstrates that a common purpose of cladding is to protect the core alloy against corrosion.[142] Therefore, T-series sheet is not unique in that it has cladding to protect the core from corrosion.[143] Contrary to Valeo's claims, the domestic industry asserts that all other in-scope brazing sheet are expected to perform in the thermal management applications for which they are intended – namely HVAC and automotive HEX applications.[144] T-series

---

[135] *Id.* at 5.
[136] *Id.* at 6
[137] *Id.* at 6-7 and 9-10.
[138] *Id.* at 8-9.
[139] *Id.* at 12-14.
[140] *Id.* at 10-11.
[141] *Id.* at 12.
[142] *Id.* at 13.
[143] *Id.*
[144] *Id.*

18

sheet is sold through the same channels of trade as other in-scope brazing sheet and is advertised similarly as other in-scope brazing sheet.[145]  All in-scope brazing sheet involves producers and customers developing products jointly and maintaining long-standing relationships.[146]

## VI.   COMMENTS AND INFORMATION TO REBUT, CLARIFY, OR CORRECT THE FACTUAL INFORMATION WITHIN THE NFI MEMORANDUM

### *Valeo's Comments*

Valeo claims that there is no relationship between the documents Commerce placed on the record and the current scope inquiry.[147]  How a company reports its sales during an administrative review has no bearing on any scope inquiry.[148]  Jiangsu Alcha Aluminum Group Co., Ltd. (Jiangsu Alcha),[149] Alcha International Holdings Limited (Alcha International), and Yinbang Clad Material Co., Ltd. (Yinbang Clad) participated in administrative reviews to obtain rates *if* the products at issue were found to be within the scope of the *Orders*, *not because* their products were deemed to be within the scope.[150]  Valeo's T-series sheet is manufactured by Yinbang Clad.[151]  Jiangsu Alcha and Alcha International (collectively, Alcha)[152] are not involved in the manufacture of T-series sheet and, therefore, the factual information relating to Alcha is

---

[145] *Id.* at 14.

[146] *Id.*

[147] *See* Valeo's NFI Rebuttal Comments at 2.

[148] *Id.*

[149] In the underlying AD investigation, this company's name was Jiangsu Alcha Aluminum Co., Ltd.  In the first administrative review, Commerce determined that Jiangsu Alcha Aluminum Group Co., Ltd. is the successor-in-interest to Jiangsu Alcha Aluminum Co., Ltd.  *See Common Alloy Aluminum Sheet from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, Final Successor-In-Interest Determination, and Final Determination of No Shipments; 2018-2020*, 86 FR 74066, 74067 (December 29, 2021), unchanged in *Common Alloy Aluminum Sheet from the People's Republic of China:  Amended Final Results of Antidumping Duty Administrative Review, 2018-2020*, 87 FR 6504 (February 4, 2022).  Commerce's NFI Memorandum contains information obtained from Jiangsu Alcha Aluminum Co., Ltd during the AD investigation and information obtained from Jiangsu Alcha Aluminum Group Co., Ltd. during the 2018-2020 administrative review.  For purposes of these final results of redetermination, we use the name "Jiangsu Alcha" when referring to either Jiangsu Alcha Aluminum Co., Ltd. or Jiangsu Alcha Aluminum Group Co., Ltd.

[150] *See* Valeo's NFI Rebuttal Comments at 2 (emphasis in original)*.*

[151] *Id.* at 3.

[152] For purposes of these final results of redetermination, we use the collective name "Alcha" to refer to the entity of Jiangsu Alcha Aluminum Co., Ltd and Alcha International Limited or the entity of Jiangsu Alcha Aluminum Group Co., Ltd and Alcha International.

irrelevant.[153]  Valeo does not contest that certain imports from its suppliers are in-scope merchandise; however, Valeo also imports out-of-scope merchandise.[154]

Valeo states that Granges International is the single biggest importer of heat-treatable alloys from China.[155]  Commerce should request CBP data to determine the importers and exporters of merchandise classified in non-subject HTSUS subheadings.[156]  Further, Valeo notes that the Aluminum Association's publication, *Rolling Aluminum*, demonstrates that a "series" is a collection of registered alloys sharing the same first digit, and that the main alloying element is just a characteristic shared by the registered alloys in the same series.[157]

Finally, Valeo argues that the screenshot from Yinbang Clad's website that Commerce placed on the record does not have a direct relationship to the current scope inquiry.[158]  Brazing sheet is manufactured from both in-scope alloys and out-of-scope alloys.[159]  Yinbang Clad manufacturers both in-scope and out-of-scope brazing sheet.[160]  YB-18 is not publicly advertised or displayed on Yinbang Clad's website.[161]

*Domestic Industry Comments*

The domestic industry claims that the NFI placed on the record demonstrates that Chinese exporters understand that 3XXX-series alloys refer to alloys with manganese as the principal alloying element.[162]  The information demonstrates that, from the outset of the less-

---

[153] *See* Valeo's NFI Rebuttal Comments at 3*.*
[154] *Id.*
[155] *Id.* at 4.
[156] *Id.*
[157] *Id.* (citing Valeo's NFI Rebuttal Comments at Attachment 1 (pages 9-4)).  *Rolling Aluminum* is a manual published by the Aluminum Association for "the user who wants to learn the general features of aluminum production and rolling."
[158] *Id.* at 5.
[159] *Id.* at 5-6.
[160] *Id.* at 6.
[161] *Id.*
[162] *See* Domestic Industry's NFI Rebuttal Comments at 3-5.

than-fair-value investigation, Alcha understood that its exports of [      ] aluminum sheet produced from proprietary alloy [

      ] are covered by the scope of the *Orders*.[163]  The information also demonstrates that whether a product is heat-treated or heat-treatable is irrelevant in determining whether a particular products falls within the scope of the *Orders*.[164]  According to the domestic industry, even if the merchandise identified in Alcha's submission is [                ] to the merchandise at issue in the scope ruling, the merchandise is at least comparable in terms of several key physical characteristics.[165]  This information within Commerce's NFI Memorandum further supports an affirmative scope ruling under 19 CFR 351.225(k)(2).[166]

## VII.   ANALYSIS

### A.  *Relevance of Heat-Treatment*

In the *Remand Order*, the Court stated that, "{u}nderlying the court's difficulty in discerning the path of Commerce's reasoning is the lack of any explanation by Commerce regarding the meaning of the phrases 'heat-treated' or 'heat-treatable' for purposes of understanding the relevance of thermal treatment to classification as a 3XXX-series alloy."[167]  In accordance with the *Remand Order*, we further address the evidence on the record regarding whether Valeo's T-series sheet undergoes heat-treatment.  To provide a clearer path for our reasoning, we first define key terms and explain their relevance to the classification of aluminum alloys.

---

[163] *Id.* at 4.
[164] *Id.* at 4-5.
[165] *Id.* at 5.
[166] *Id.* at 5-6.
[167] *See Remand Order* at 29.

To provide a thorough explanation of heat-treatable alloys, we first discuss non-heat-treatable alloys. The Aluminum Association's *Aluminum Alloys 101* website lists 3XXX-series, 4XXX-series, and 5XXX-series under the heading "Non Heat-Treatable Alloys."[168] *Aluminum Alloys 101* provides the following explanation under "Non-Heat-Treatable Alloys":

> Non-heat treated alloys are strengthened through cold-working. Cold working occurs during rolling or forging methods and is the action of "working" the metal to make it stronger. For example, when rolling aluminum down to thinner gauges, it gets stronger. This is because cold working builds up dislocations and vacancies in the structure, which then inhibits the movement of atoms relative to each other. This increases the strength of the metal. Alloying elements like magnesium intensify this effect, resulting in even higher strength.[169]

The Aluminum Association publication *Rolling Aluminum*[170] explains that aluminum alloys are called "non-heat-treatable" if an alloy "will not gain strength and hardness from heat treatment;" rather, "non-heat-treatable alloys can be tempered only by cold working and annealing operations."[171] *Rolling Aluminum* defines "cold working" as "plastic deformation of metal at such temperature and rate that strain hardening occurs."[172] *Rolling Aluminum* defines "strain-hardening" as "modification of a metal structure of a metal structure by cold working resulting in an increase in strength and hardness with a corresponding loss of ductility."[173] "Work-hardening" is another term that is synonymous with "strain-hardening."[174]

The Aluminum Association's *Aluminum Alloys 101* website lists 2XXX-series, 6XXX-series, and 7XXX-series under the heading "Heat-Treatable Alloys."[175] *Aluminum Alloys 101* provides the following explanation under "Heat-Treatable Alloys":

---

[168] *See* Valeo's June 5, 2020, Submission at Exhibit 4 (containing *Aluminum Alloys 101*).
[169] *Id.*
[170] *See* Valeo's NFI Rebuttal Comments at Attachment 1.
[171] *Id.* at Attachment 1 (pages 2-6).
[172] *Id.* at Attachment 1 (pages 9-2).
[173] *Id.* at Attachment 1 (pages 9-4).
[174] *Id.* at Attachment 1 (pages 9-5).
[175] *See* Valeo's June 5, 2020, Submission at Exhibit 4.

Some alloys are strengthened by solution heat-treating and then quenching, or rapid cooling. Heat treating takes the solid, alloyed metal and heats it to a specific point. The alloy elements, called solute, are homogeneously distributed with the aluminum putting them in a solid solution. The metal is subsequently quenched, or rapidly cooled, which freezes the solute atoms in place. The solute atoms consequently combine into a finely distributed precipitate. This occurs at room temperature which is called natural aging or in a low temperature furnace operation which is called artificial aging.[176]

*Rolling Aluminum* further explains that an aluminum alloy is called "heat-treatable" if it is an aluminum alloy that "can be significantly hardened and strengthened by controlled heating and quenching sequences known as 'heat treatment' followed by natural or artificial aging."[177] Further,

heat treatment or solution heat treatment, is an elevated-temperature process designed to put the soluble element or elements in solid solution. This is followed by rapid quenching, usually in water, which momentarily "freezes" the structure and for a short time renders the alloy very workable. It is at this stage that some fabricators retain this more workable structure by story the alloys at below freezing temperature until they are ready to form them. At room or elevated temperatures the alloys are not stable after quenching, however, and precipitation of the constituents from the super-saturated solution begins. After a period of several days at room temperature, termed aging or room temperature precipitation, the alloy is considerably stronger. Many alloys approach a stable condition at room temperature, but some alloys, particularly those containing magnesium and silicon or magnesium and zinc, continue to age-harden for long period at room temperature.

By heating for a controlled time at slightly elevated temperatures, even further strengthening is possible and properties are stabilized. This process is called artificial aging or precipitation hardening.[178]

However, the *Rolling Aluminum* glossary contains alternative definitions related to heat-treatment and heat-treatable alloy. *Rolling Aluminum* defines "heat-treating" as "heating and cooling a solid metal or alloy in such a way as to obtain desired conditions or properties," and states that it is "commonly used as a shop term to denote a thermal treatment to increase

---

[176] *Id.*
[177] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (pages 2-6).
[178] *Id.* at Attachment 1 (Appendix C).

23

strength."[179]  *Rolling Aluminum* defines "heat-treatable alloy" as "{a}n alloy which may be strengthened by a suitable thermal treatment."[180]  *Rolling Aluminum* defines "thermal treatment" as "a very general term meaning any treatment in which heat is applied, usually to alter the mechanical properties of solid metal; it includes homogenizing or precipitation treatment of ingots to affect grain size or some other property."[181]  *Rolling Aluminum* defines "annealing" as "a thermal treatment to soften metal by removal of stress resulting from cold working or by coalescing precipitates from solid solution."[182]

Accordingly, we find that the record contains two possible definitions each for the terms of "heat-treatment" and "heat-treatable alloy."  "Heat-treatment" could be used as a synonym for solution heat-treatment and therefore refers to a specific process as described in Appendix C of *Rolling Aluminum*.  Alternatively, "heat-treatment" could be used as a broad shop term that includes solution heat-treatment but also many other types of thermal treatment including annealing.  "Heat-treatable alloy" could be used to refer to an alloy that can undergo solution heat-treatment.  Alternatively, "heat-treatable alloy" could be used to refer to an alloy that can undergo suitable thermal treatment, even if the thermal treatment is not specifically solution heat-treatment.

The Court held that "the key question is whether a heat-treated (or heat-treatable) clad sheet *can be classified* as having a 3XXX-series core and therefore be in-scope."[183]  *Aluminum Alloys 101* is the Aluminum Association website that differentiated the alloy series specifically based on heat-treatability of the alloy.[184]  Accordingly, we compare the two possible definitions

---

[179] *Id.* at Attachment 1 (pages 9-3).
[180] *Id.*
[181] *Id.* at Attachment 1 (pages 9-5).
[182] *Id.* at Attachment 1 (pages 9-1).
[183] *See Remand Order* at 29-30 (emphasis in original).
[184] *See* Valeo's June 5, 2020, Submission at Exhibit 4.

of "heat-treatment" and "heat-treatable alloy" to the language within *Aluminum Alloys 101*. As explained above, under "Heat-Treatable Alloy," *Aluminum Alloys 101* addresses "solution heat-treatment" and describes a process consistent with the definition of "solution heat-treatment" given in *Rolling Aluminum* in Appendix C.[185] Accordingly, we find the language used in *Aluminum Alloys 101* to be consistent with the narrower definitions of "heat-treatment" to mean a synonym for "solution heat-treatment" and "heat-treatable alloy" to mean an alloy that can undergo solution heat-treatment. Further, *Rolling Aluminum* explains that "both heat-treatable and non-heat-treatable alloys may be deliberately softened and made more formable by annealing,"[186] and that "all wrought aluminum alloys are available in annealed form."[187] *Aluminum Alloys 101* lists certain alloys as non-heat-treatable despite the fact all wrought aluminum alloys are available in annealed form. Therefore, we find the broader definition of "heat-treatment," which includes several types of thermal treatments including annealing, is inconsistent with the statement in *Aluminum Alloys 101* that only certain series of aluminum are heat-treatable. Based on the analysis and record information described above, we have reasonably determined to adopt the narrower definition of heat-treatment to mean a synonym for solution heat-treatment. Accordingly, to address the key question identified by the court (*i.e.,* whether a heat-treated (or heat-treatable) clad sheet can be classified as having a 3XXX-series core (and, therefore, be in-scope)), we examine whether Valeo's T-series sheet undergoes solution heat-treatment.

As explained further below, we find that the temper designation of Valeo's T-series sheet indicates that Valeo's T-series sheet does not undergo solution heat-treatment. *Rolling*

---

[185] *Id.*; *see also* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix C).
[186] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (pages 2-6).
[187] *Id.* at Attachment 1 (Appendix C).

*Aluminum* defines "temper" as "the combination of mechanical properties, particular strength, hardness and ductility, induced in a metal product by the thermal and/or mechanical treatments applied during its preparation."[188]  Accordingly, an alloy's temper designation indicates the mechanical process that an alloy has undergone.[189]  *Rolling Aluminum* explains that, "the temper designation system is used for all forms of wrought and cast aluminum and aluminum alloys except ingot.  It is based on the sequences of basic treatment used to produce the various tempers."[190]  Aluminum sheet that has undergone solution heat-treatment is assigned one of the following temper designations:  W, T3, T4, T6, T7, T8, or T9.[191]  The specific temper designation depends upon which processes, if any, the aluminum sheet underwent in addition to solution heat-treatment.  For example, an aluminum sheet that was solution heat-treated, artificially aged, and then cold worked would be assigned a T9 designation.[192]  An aluminum sheet that was solution heat-treated, cold worked, and then artificially aged (switching the order of cold working and artificially aging from the previous example), would be assigned a T8 designation.[193]

Valeo reported that its T-series sheet is available in the temper designation of either O or of H24.[194]  Thus, the information on the record indicates that Valeo's T-series sheet is not available in any of the temper designations that correspond to solution-heat treatment (*i.e.*, W, T3, T4, T6, T7, T8, or T9).[195]  Based on the above analysis, we find that Valeo's T-series sheet

---

[188] *Id.* at Attachment 1 (pages 9-5).
[189] *See* Valeo's NFI Rebuttal Comments at Exhibit S-2 (page 17).
[190] *Id.* at Attachment 1 (Appendix B).
[191] *Id.*
[192] *Id.*
[193] *Id.*
[194] *See* Valeo's Scope Initiation Comments at Exhibit-2; *see also* Valeo's August 7, 2020, Submission at Attachment 2 (Exhibit S-1).
[195] *Id.*

does not undergo solution heat-treatment, and that the tempering processes used on Valeo's T-series sheet are inconsistent with those of a heat-treatable alloy.[196]

Valeo's T-series sheet temper designation of O corresponds to alloys that are annealed.[197] The first two digits of Valeo's T-series sheet temper designation H24 (*i.e.*, H2) corresponds to alloys that are strain-hardened[198] and then partially annealed.[199]  The third digit in the temper designation H24 (*i.e.*, 4) corresponds to the degree of strain-hardening as identified by the aluminum sheet's tensile strength.[200]  Accordingly, the information on the record demonstrates that Valeo's T-series undergoes a combination of cold-working and partial annealing.  As explained above, "non-heat-treatable alloys can be tempered only by cold working and annealing operations."[201]  Further, *Rolling Aluminum* explains that "partial annealing" is when "annealing stops short of full annealing and, instead applies patterns of temperature and time to strain-hardened, *non-heat-treatable* wrought alloys in order to develop properties between fully soft and fully work hardened" (emphasis added).[202]  Accordingly, although annealing may be applied to both heat-treatable and non-heat-treatable alloys, *partial* annealing is only applied to non-heat-treatable alloys.  Based on the above analysis, we find the tempering processes that Valeo's T-series sheet undergoes (*e.g.*, cold working and partial annealing) are consistent with those of a non-heat-treatable alloy.

---

[196] *See* Valeo's Scope Initiation Comments at Exhibit-2; *see also* Valeo's August 7, 2020, Submission at Attachment 2 (Exhibit S-1); and Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix B).

[197] Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix B).

[198] As explained above, *Rolling Aluminum* defines "strain-hardening" as "modification of a metal structure of a metal structure by cold working resulting in an increase in strength and hardness with a corresponding loss of ductility."

[199] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix B).

[200] *Id.*

[201] *Id.* at Attachment 1 Valeo's (pages 2-6).

[202] *Id.* at Attachment 1 (pages 5-7).

Further, we find that Valeo's description of the post-thermal-treatment of its T-series sheet is inconsistent with the description of a product that has undergone solution heat-treatment. *Aluminum Alloys 101* explains that during solution heat-treatment, "alloy elements, called solute, are homogeneously distributed with the aluminum putting them in a solid solution.  The metal is subsequently quenched, or rapidly cooled, which freezes the solute atoms in place."[203]  Valeo stated that after its T-series aluminum sheet undergoes thermal treatment,[204] its T-series aluminum sheet has "discernable phases of diffused alloys."[205]  Valeo provided further clarification regarding the "discernable phases of diffused alloys," explaining, "the chemical composition is not uniform throughout the entire product" and "{the chemical properties} are not spread evenly throughout the product.  The precise chemical properties differ upon the point of measurement, with the manganese content higher near the center and the silicon content higher near the surface of the product."[206]  We find the description of Valeo's T-series sheet—that the product has discernable phases of alloys with manganese content higher near the center and the silicon content higher near the surface of the product—is inconsistent with the description of solution heat-treatment in which alloying elements are homogenously distributed.  Further, Valeo explains that during the thermal treatment process, "the aluminum is also *annealed* in high temperatures between [          ]°F."[207]  Accordingly, we find the evidence on the record is insufficient to demonstrate that Valeo's product undergoes solution heat-treatment.  Rather, we

---

[203] *See* Valeo's June 5, 2020, Submission at Exhibit 4.

[204] Valeo uses the term "heat-treated"; however, because parties contest if Valeo's T-series sheet is in fact heat-treated, we use a broader term "thermal treatment" which includes any treatment in which heat is applied.

[205] *See* Valeo's August 7, 2020, Submission at Attachment 2 (pages 2-3).

[206] *See* Scope Request at Attachment II at question 11.

[207] *See* Valeo's August 7, 2020, Submission at Attachment 2 (question 8) (emphasis added).

find the evidence on the record demonstrates that Valeo's T-series sheet is a clad product[208] that undergoes a combination of annealing and cold-working.

Based on the above analysis, it is no longer necessary to examine "whether a heat-treated (or heat-treatable) clad sheet *can be classified* as having a 3XXX-series core and therefore be in-scope."[209]  As explained above, we have determined that the evidence demonstrates that the description of Valeo's T-series sheet is consistent with a non-heat-treatable clad aluminum product that undergoes a combination of annealing and cold-working, and that the description is inconsistent with a heat-treatable alloy that undergoes solution heat-treatment.  Accordingly, because Valeo's T-series sheet is not a heat-treated or heat-treatable alloy within the meaning of *Aluminum Alloys 101*, we find that it is not necessary to examine the question of whether a heat-treated or heat-treatable clad sheet can be classified as having a 3XXX-series core.  Commerce is not making a finding that the evidence on the record is sufficient to analyze whether a heat-treated or heat-treatable clad sheet can be classified as having a 3XXX-series core.  Rather, we find that such an analysis is unnecessary because the product at issue in this scope inquiry is a non-heat-treatable clad product that undergoes a combination of annealing and cold-working.

Valeo argues that the ITC's definitions of "heat-treatable alloy" and "heat-treating" should be afforded primacy in the scope analysis.[210]  Valeo argues that the ITC defines "heat-treatable alloys" as "alloys that can be strengthened through a thermal (heating) process, usually in an annealing furnace," and the ITC defines a "non-heat-treatable alloys" as "alloys which are primarily strengthened through further working (*e.g.,* rolling, extruding, drawing) and not by

---

[208] The CIT upheld Commerce's finding in the Final Scope Ruling that Valeo's T-series sheet was a clad product. *See* Final Scope Ruling at 11-13; *see also Remand Order* at 27.
[209] *See Remand Order* at 29-30.
[210] *See* Valeo's Scope Initiation Comments at 25-26 (citing *Fedmet Res. Corp. v. Unites States*, 755 F.3d 912, 921 (Fed. Cir. 2014) (*Fedmet*)).

thermal treatment."[211]  Further, Valeo states that the ITC has described "heat-treating" as follows:

> During this process, the aluminum is heated to temperatures in excess of 600 degrees Fahrenheit in an annealing furnace in order to strengthen the metal. Certain aluminum alloys undergo a two-stage heat-treating process known as "solution heat-treatment and aging."  During this process, metal is heated to an extremely high temperature then rapidly cooled to room temperature.  The metal then develops its full properties through a low-temperature aging process.[212]

We clarify that (k)(1) sources are afforded primacy in the scope analysis only if the scope language is ambiguous.  In the *Remand Order*, the CIT held, "Commerce's inquiry must begin with the relevant scope language.  If the scope language is unambiguous, 'the plain meaning of the language governs.'"[213]  The scope of the *Orders* states, "Subject Merchandise includes common alloy sheet that has been further processed in a third country, including but not limited to *annealing*, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that *would not otherwise remove the merchandise from the scope of the Orders* if performed in the country of manufacture of the common alloy sheet" (emphasis added).[214]  As explained above, thermal treatment is a very general term meaning any treatment in which heat is applied.[215]  Further, as explained above, Valeo's T-series sheet is annealed at high temperatures.  Accordingly, Valeo's T-series sheet would meet the definition of a heat-treatable alloy if a heat-treatable alloy is defined as "alloys that can be strengthened through a thermal (heating) process, usually in an annealing furnace."[216]  However, we find the argument that a product is not included in the scope because the product is annealed is contradictory to the plain language of

---

[211] *Id.* at 25 (citing Valeo's Scope Initiation Comments at Exhibit 8 (ITC Final Injury Determination at I-12)).
[212] *Id.* (citing ITC Final Injury Determination at I-18).
[213] *See Remand Order* at 4 (citing, *e.g.*, *OMG, Inc. v. United States,* 972 F. 3d 1358, 1363 (Fed. Cir. 2020)).
[214] *See Orders*.
[215] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (pages 9-5).
[216] *See* Valeo's August 7, 2020, Submission at Attachment 2 (question 8).

the scope. The plain language of the scope clearly states that annealing is not a process that would remove merchandise from the scope of the *Orders*. Accordingly, we find that the plain language of the scope is unambiguous in this respect, *i.e.*, the scope of the *Orders* includes CAAS regardless of whether it is annealed.

While the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has held that "(k)(1) sources are given primacy in a scope analysis,"[217] the Federal Circuit has also held, "the plain language of the {} order is 'paramount' in determining whether particular products are included within its scope."[218] As explained above, "heat-treatment" could be used as a broad shop term that includes solution heat-treatment as well as many other types of thermal treatment, including annealing. This broad definition of "heat-treatment" is consistent with the definition in the ITC Final Injury Determination that Valeo cites. However, the plain language of the scope unambiguously states that annealing is not a process that removes merchandise from the scope of the *Orders*. Therefore, Commerce must make a finding based on this unambiguous plain language and may not find, based on (k)(1) sources that, as Valeo claims that the scope of the *Orders* does not cover annealed CAAS merely because the CAAS is annealed or able to be annealed. Accordingly, to the extent that Valeo argues that its T-series sheet is not covered by the scope of the *Orders* because it meets the broad definition of "heat-treatable alloy" (*e.g.*, alloys that can be strengthened through a thermal (heating) process, usually in an annealing furnace), we find that this argument is contradicted by the plain language of the scope which states annealing is not a process that removes merchandise from the scope of the *Orders*.

Further, as explained above, "heat-treatment" can also be understood as a synonym for solution heat-treatment, based on information on the record, and therefore, refer to a specific

---

[217] *See Fedmet*, 755 F.3d at 921.
[218] *See Meridian Products v. United States*, 890 F.3d 1272, 1277 (Fed. Cir. 2018).

process.  The ITC Final Injury Determination also provides evidence that supports this narrower definition.  For example, the ITC's definition of "heat-treating" specifically references solution heat-treatment.[219]  Additionally, the ITC Final Injury Determination includes a chart in which alloys are identified as either heat-treatable or non-heat-treatable.[220]  The ITC's source for this chart is *Aluminum Alloys 101*.[221]  Accordingly, when the ITC classified alloys as either heat-treatable or non-heat-treatable, it did so based on the definition of "heat-treatment" within *Aluminum Alloys 101*.  As explained above, we find the language used in *Aluminum Alloys 101* to be consistent with the narrower definition of "heat-treatment" to mean a synonym for "solution heat-treatment," and find "heat-treatable alloy" to mean an alloy that can undergo solution heat-treatment.  Accordingly, when analyzing the key question identified by the CIT, "whether a heat-treated (or heat-treatable) clad sheet *can be classified* as having a 3XXX-series core and therefore be in-scope," because the ITC cited *Aluminum Alloys 101* in its chart of heat-treatable and non-heat-treatable alloys, we find the (k)(1) sources support using the narrow definition of "heat-treatment" to mean a synonym for "solution heat-treatment."

Based on the above analysis, it is irrelevant to this scope inquiry whether Valeo's T-series sheet is heat-treatable based on the broad definition that Valeo identified in the ITC Final Injury Determination (*i.e.*, "alloys that can be strengthened through a thermal (heating) process, usually in an annealing furnace").[222]  As explained above, the plain language of the scope is paramount, and in this case, the scope clearly states that annealing, which fits within the broad definition of "heat-treatment," is not a process that removes merchandise from the scope of the *Orders*.  Further, when the ITC classified alloys based on the heat-treatability of the alloys, the

---

[219] *See* ITC Final Injury Determination at I-18.
[220] *Id.* at I-13.
[221] *Id.*
[222] *See* Valeo's Scope Initiation Comments at 26-26 (citing ITC Final Injury Determination at I-12).

ITC used the definition of heat-treatment within *Aluminum Alloys 101*.[223]  As explained above,

the use of the term "heat-treatment" within *Aluminum Alloys 101* is consistent with the narrow

definition meaning a synonym for solution heat-treatment.  Finally, we explain above that

Valeo's T-series sheet undergoes thermal treatment in the form of annealing; however, it does

not undergo solution heat-treatment.

Next, Valeo argues that its T-series sheet undergoes heat-treatment.  Valeo states that its

T-series sheet is "manufactured through a unique three-stage heat treatment process.  During the

homogenization stage, the aluminum is heated to [          ]°F to redistribute the precipitating

elements evenly through the material.  The aluminum is then reheated to [          ]°F.  During

the last stage, the aluminum is heated in high temperatures between [          ]°F and rapidly

cooled."[224]  We recognize that the description of Valeo's three-stage thermal-treatment[225]

process is similar to the description of solution heat-treatment.[226]  However, we disagree that

Valeo's T-series sheet is solution heat-treated.  *Rolling Aluminum* explains that certain annealing

processes occur "at approximately {the} same time and temperature required for solution heat{-

}treatment and slow cooled to room temperature."[227]  Accordingly, we find that evidence on the

record supports finding that some thermal treatments such as annealing undergo processes which

descriptions are similar to solution heat-treatment.  Therefore, the description of Valeo's three-

stage thermal-treatment process is not by itself sufficient evidence to demonstrate that its T-

series sheet is solution heat-treated.  Rather, the evidence on the record demonstrates that

annealing can take place at the same time and temperature as solution heat-treatment.  Further, as

---

[223] *See* ITC Final Injury Determination at I-13.
[224] *See* Valeo's Scope Initiation Comments at 29.
[225] As noted above, Valeo uses the term "heat-treatment" however, because parties contest if Valeo's T-series sheet is in fact heat-treated, we use a broader term "thermal treatment" which includes any treatment in which heat is applied.
[226] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix C).
[227] *Id.* at Attachment 1 (Appendix B).

explained above, if Valeo's T-series sheet underwent solution heat-treatment it would be
assigned a temper designation of W, T3, T4, T6, T7, T8, or T9.[228]  However, the evidence on the
record demonstrates that Valeo's T-series sheet is available in either the temper designations of
O or H24.[229]  Moreover, solution heat-treatment results in the alloy elements being
"homogeneously distributed with the aluminum."[230]  As explained above, we find the description
of Valeo's T-series sheet which explains the product has discernable phases of alloys with
manganese content higher near the center and silicon content higher near the surface of the
product inconsistent with the description of solution heat-treatment in which alloying elements
are homogenously distributed.  Accordingly, based on the above analysis, despite the description
of Valeo's three-stage thermal treatment process being similar to the description of solution heat-
treatment, we find that Valeo's T-series sheet is not, in fact, solution heat-treated.

Additionally, Valeo argues that its T-series sheet is manufactured from heat-treatable
alloys.[231]  Valeo argues that copper, magnesium, zinc, and silicon are the elements known to
improve the heat-treatability of an alloy.[232]  Thereafter Valeo argues that YB-18, the alloy used
in the proprietary core of Valeo's T-series sheet, has a unique combination of chemistry that
contributes to its heat-treatability.[233]  Specifically, Valeo states, "most importantly, YB-18
contains almost three times more copper than most 3xxx alloys."[234]  However, when the
chemical composition of YB-18 is compared to the chemical composition of known non-heat-
treatable alloys, we find that the chemical composition of YB-18 is [                    ].

---

[228] *Id.*
[229] *See* Valeo's Scope Initiation Comments at Exhibit-2; *see also* Valeo's August 7, 2020, Submission at Attachment
2 (Exhibit S-1).
[230] *See* Valeo's June 5, 2020, Submission at Exhibit 4.
[231] *See* Valeo's Scope Initiation Comments at 26-29.
[232] *Id.* at 26-27.
[233] *Id.* at 28
[234] *Id.* at 26.

The CIT held, "to the extent that the record shows that 3XXX-series alloys are not heat-treatable, unlike 4XXX-series alloys, the record does not indicate that there are exceptions within the 3XXX-series alloys."[235]  *Aluminum Alloys 101* lists 3XXX-series under non-heat-treatable alloys.  Accordingly, to the extent that the record does not indicate there are exceptions within the 3XXX-series, 3065 alloy is a non-heat-treatable alloy.

To examine Valeo's claim that YB-18 has a unique chemistry combination that allows it to be heat-treatable, we compare the chemical composition of YB-18 to the chemical composition of non-heat-treatable 3065 alloy for each element known to improve heat-treatability.  YB-18 has an allowable copper composition between [                    ].[236] 3065 alloy has an allowable copper composition between [                    ].[237] Accordingly, we find that the copper composition for YB-18 and 3065 alloy [

                                                                          ].  YB-18 has an allowable magnesium composition between [                    ].[238]  3065 alloy has an allowable magnesium composition between [                    ].[239]  Accordingly, we find that the magnesium composition for YB-18 and 3065 alloy [

                                                                          ].  For zinc and silicon, we find that chemical compositions of YB-18 and 3065 alloy [

                                                                          ].[240]  For all elements known to increase heat-treatability YB-18 has a combined chemical composition between [                    ].[241]  For all elements known to

---

[235] *See Remand Order* at 29.
[236] *See* Valeo's June 5, 2020, Submission at 9.
[237] *See* First Domestic Industry Comments at Attachment 5.
[238] *See* Valeo's June 5, 2020, Submission at 9.
[239] *See* First Domestic Industry Comments at Attachment 5.
[240] *See* Valeo's June 5, 2020, Submission at 9; *see also* First Domestic Industry Comments at Attachment 5.
[241] *See* Valeo's June 5, 2020, Submission at 9.

increase heat-treatability 3065 alloy has a combined composition between [

] .[242]  Accordingly we find that for all elements known to increase heat-treatability, YB-18 and 3065 alloy [                                        ].  In fact, the chemical specifications of YB-18 and 3065 alloy [                                                          ], an element not known to increase heat-treatability.[243]  Based on the above analysis, we find evidence on the record demonstrates that the chemical composition of YB-18 is [            ] when compared to 3065 alloy.

The chemical composition limits of known non-heat-treatable registered 3xxx-series alloys demonstrate that the chemical combination of YB-18 is [            ] in its inclusion of elements that are known to increase heat-treatability.

To illustrate this comparison more clearly, we provide below a few examples.  Aluminum sheet with a copper content of [   ] percent, a silicon content of [ ] percent, a magnesium content of [ ] and a zinc content of [ ] percent could meet the chemical specifications of YB-18 (Example A).[244]  Aluminum sheet with a copper content of 0.8 percent, a silicon content of 0.3 percent, a magnesium content of 0.25 percent, and a zinc content of 0.05 percent could meet the chemical specifications of 3065 alloy (Example B).[245]  Valeo argues that the unique chemical combination of Example A allows it to be heat-treatable.  Contrary to Valeo's argument, Example B [

], despite the fact Example B is a 3XXX-series alloy recognized to be non-heat-treatable by *Aluminum Alloys 101*.[246]  Similarly, aluminum sheet with a copper content of 0.9

---

[242] *See* First Domestic Industry Comments at Attachment 5.
[243] *See* Valeo's June 5, 2020, Submission at 9; *see also* First Domestic Industry Comments at Attachment 5; and Valeo's Scope Initiation Comments at 26-27.
[244] *See* Valeo's June 5, 2020, Submission at 9.
[245] *See* First Domestic Industry Comments at Attachment 5.
[246] *See* Valeo's June 5, 2020, Submission. at Exhibit 4.

percent, a silicon content of 0.6 percent, a magnesium content of 0.9 percent and zinc content of 0.9 percent could meet the chemical specifications of another 3XXX-series alloy, 3019 alloy (Example C).[247]  Similarly, Example C is a 3XXX-series alloy recognized by *Aluminum Alloys 101* as non-heat-treatable[248] and Example C [

                                      ] than Example A.  Based on the analysis above we find that the evidence on the record demonstrates that YB-18 is [          ] in its inclusion of alloying elements known to increase heat-treatability.  Rather, we find the evidence on the record demonstrates that there are multiple non-heat-treatable registered 3XXX-series alloys that [

                  ].

        The domestic industry and Valeo each submitted multiple arguments concerning whether the scope of the *Orders* covers heat-treatable alloys.[249]  As explained above, we find that Valeo's T-series sheet is not a heat-treated sheet within the meaning of *Aluminum Alloys 101*.  Additionally, as explained above, we find that the center layer Valeo's T-series sheet, YB-18, does [                                      ] that would allow heat-treatability (meaning the ability to undergo solution heat-treatment).  Accordingly, because the product under consideration in this scope inquiry is not heat-treated and non-heat-treatable, we find it unnecessary to analyze interested parties' comments regarding whether the scope of the *Orders* covers heat-treatable alloys.

---

[247] *See* First Domestic Industry Comments at Attachment 5.
[248] *See* Valeo's June 5, 2020, Submission at Exhibit 4.
[249] *See* Domestic Industry's Scope Initiation Comments at 13-15; *see also* Valeo's Scope Initiation Comments at 17-24; Domestic Industry's Scope Initiation Rebuttal Comments at 10-11; Valeo's Scope Initiation Rebuttal Comments at 2-4; Domestic Industry's NFI Rebuttal Comments at 4-5; and Valeo's NFI Rebuttal Comments at 3-5.

B. *Analysis of (k)(1) sources to determine whether the scope covers unregistered alloys*

In the *Remand Order*, the Court held that, "whether an ambiguity exists is a question of the law that the court considers *de novo*{,}"[250] and "the scope is ambiguous {as} to whether Commerce intended the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys), or whether Commerce intended the scope to be limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association."[251]

After holding that an ambiguity exists within the scope language, the Court held that "Commerce's scope interpretation exceeded the limits of a (k)(1) analysis and is unsupported by substantial evidence."[252] First, the Court stated that, "Commerce's reliance on the *Teal Sheets* to interpret '3XXX-series' to include unregistered alloys fails to account for the *Teal Sheets* as a whole{,}" and "*Teal Sheets* use the term 'designation' to refer to registered alloys."[253] Next the Court held that, "Commerce's reliance on the Weritz Declaration as evidence of trade usage of the phrase '3XXX-series' is {} unlawful and unsupported by substantial evidence."[254] Lastly, the Court held that, "Commerce's reliance on the product characteristics memorandum fails to persuade the court," and that the product characteristics memorandum, "does not {} indicate that Commerce contemplated the respondents reporting alloys lacking a four-digit code in accordance with the referenced codes and series."[255] In accordance with the *Remand Order*, we reconsider the (k)(1) sources.[256] For the reasons set forth below, we find that the (k)(1) sources are not

---

[250] *See Remand Order* at 18.
[251] *Id.*
[252] *Id.* at 18.
[253] *Id.* at 18-19.
[254] *Id.* at 20; *see also* First Domestic Industry Comments at Attachment 6 (Weritz Declaration).
[255] *See Remand Order* at 22-23.
[256] *Id.* at 24.

dispositive in determining whether the scope of the *Orders* includes the T-series aluminum sheet from China imported by Valeo.

The scope of the *Orders* covers "flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width." With respect to not clad aluminum sheet, "common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association," and with respect to multi-alloy, clad aluminum sheet, "common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core."[257] No party contests that Valeo's T-series sheet is a flat aluminum product having a thickness of 6.3 mm or less, but greater than 0.2mm.[258] Further, the Court sustained Commerce's previous determination that Valeo's T-series sheet is a clad product.[259] Accordingly, this scope analysis is centered on whether Valeo's T-series sheet is produced from a 3XXX-series core as designated by the Aluminum Association.[260]

The Aluminum Association utilizes a four-digit numerical system for designating registered aluminum alloys.[261] The first of the four digits in the designation system indicates the alloy group, also called the series.[262] The one-digit alloy series (*i.e.*, the first of the four digits in a four-digit numerical designation for registered alloys) are as follows:

> Aluminum, 99.00 percent and greater …1xxx
> Aluminum alloys grouped by majoring alloying elements:
>     Copper …2xxx
>     Manganese …3xxx
>     Silicon …4xxx

---

[257] *See Orders*.

[258] *See* Final Scope Ruling at 11 (citing Valeo's August 7, 2020, Submission at Attachment 2 (page 5)).

[259] *Id.* at 11-13; *see also Remand Order* at 27.

[260] *See Remand Order* at 18 ("The phrase '3XXX-series' is not defined in the scope except in reference to the phrase 'as designated by the Aluminum Association,' which is also undefined. Commerce is correct that the latter phrase aids in the interpretation of the former.").

[261] *See* First Domestic Industry Comments at Attachment 5 (page 31).

[262] *Id*.

Magnesium …5xxx
Magnesium and Silicon …6xxx
Zinc …7xxx
Other elements …8xxx
Unused series …9xxx.[263]

Based on the above excerpt from *Teal Sheets*, registered alloys in which "3" is the first of the digits in a four-digit numerical designation are produced from aluminum with a primary alloying element of manganese.  Valeo states that the "core used in the manufacture of Valeo's heat-treated[264] T-series sheet is YB-18"[265] and "the major alloying element of YB-18 is manganese."[266]  Accordingly, we find that both registered 3XXX-series alloys and the core of Valeo's T-series sheet are produced from aluminum with a primary alloying element of manganese.

Explained further below, *Teal Sheets*, as a whole, uses the word "designation" to refer to alloys with a four-digit designation from the Aluminum Association.  However, under 19 CFR 351.225(a), "the description of the merchandise subject to the scope is written in general terms." The term "3XXX-series" is an industry-specific term defined only by the industry publication *Teal Sheets*.  In contrast, the term "designate" is a general term that may be used in the common vernacular.  For instance, Merriam Webster dictionary defines "designate" among other things as "to point out the location of."[267]  Accordingly, the dictionary definition of the term "designate" does not require the term to be used in reference to a four-digit alloy designation from the Aluminum Association.

---

[263] *Id.*

[264] Commerce's direct quote from Valeo's submissions does not indicate that Commerce agrees with Valeo's description of its product as "heat-treated."

[265] *See* Valeo's August 7, 2020, Submission at Attachment 2 (page 3).

[266] *Id.*

[267] *See Merriam Webster*, "designate," retrieved May 5, 2023, https://www.merriam-webster.com/dictionary/designate.

Because the scope language is written in general terms, the term "designate" could be understood not to refer only to registered alloys with a four-digit designation from the Aluminum Association but, rather, any alloy with a primary alloying element corresponding to the alloy series (*e.g.*, "3XXX-series alloys" meaning any alloy with a primary alloying element of manganese regardless of registration). Even under the general dictionary definition of the term "designate," the phrase "as designated by the Aluminum Association," would serve a purpose in the scope language. Without this phrase, the scope language would be unclear as to what is meant by a 1XXX, 3XXX, or 5XXX-series alloy. The phrase "as designated by the Aluminum Association" in the scope language, directs us to the location of the alloy series definitions where we could interpret a 1XXX-series aluminum as being commercial pure aluminum, a 3XXX-series alloy as having a major alloying agent of manganese, and a 5XXX-series alloy as having a major alloying agent of magnesium.

Based on the above analysis, noting these differing but plausible interpretations, and consistent with the *Remand Order*, we find that the "the scope is ambiguous {as} to whether Commerce intended the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys), or whether Commerce intended the scope to be limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association."[268] Therefore, we first examined the (k)(1) sources and other record information concerning trade usage below to attempt to resolve the ambiguity.

In reading *Teal Sheets* as a whole, we find that this source supports the interpretation that scope term "3XXX-series" is limited to registered alloys within the enumerated series with four-

---

[268] *See Remand Order* at 18.

digit designations assigned by the Aluminum Association.  *Teal Sheets* explains that it contains "designations and chemical composition limits for wrought aluminum and wrought aluminum alloys *registered* with the Aluminum Association."[269]  Note 1 of the *Teal Sheets* recommendation states that, "{t}his recommendation describes a four-digit numerical system for designating wrought aluminum and wrought aluminum alloys."[270]  Note 2 of the *Teal Sheets* recommendation states that, "{t}he *first* of the *four* digits in the designation indicates the alloy group{.}"[271]  Note 4 of the *Teal Sheets* recommendation states that, "{t}he alloy designation in the 2XXX through 8XXX groups is determined by the alloying element … present in the greatest mean percentage."[272]  Note 4 of the *Teal Sheets* recommendation further states that, "{t}he second digit in the alloy designation indicates the original alloy," and "the last two of the four digits in the digits in the designation have no special significance but serve only to identify the different aluminum alloys in the group."[273]

Based on the *Teal Sheets* recommendation, and consistent with the *Remand Order*,[274] we find that the first digit that allocates the alloy series contemplates the addition of three more digits to account for a complete four-digit registration.  Accordingly, we find that this source weighs in favor of finding that the scope of the *Orders* is limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association.

Next, we find that Commerce's separate rate determination in the underlying AD investigation regarding Alcha supports the interpretation that the scope term "3XXX-series" is intended to cover any alloy that contains a major alloying element corresponding to the

---

[269] *See* First Domestic Industry Comments at Attachment 5 (i) (emphasis added); *see also Remand Order* at 18-19.
[270] *See* First Domestic Industry Comments at Attachment 5 (page 31); *see also Remand Order* at 19.
[271] *Id.*
[272] *Id.*
[273] *Id.*
[274] *See Remand Order* at 19-20.

Aluminum Association's alloy groups (including unregistered alloys).  In the underlying AD investigation, Jiangsu Alcha and Alcha International each submitted a separate rate application.[275]  As part of the separate rate applications, Jiangsu Alcha and Alcha International were required to document that each company "has exported, or has sold for export, subject merchandise to the United States during the period of investigation."[276]  Jiangsu Alcha and Alcha International reported their first sale of subject merchandise during the period of investigation and provided supporting documentation in the form of commercial invoices and packing lists.[277]  Within the supporting documentation, both Jiangsu Alcha and Alcha International identified their sale of [    ] alloy as subject merchandise.  The first digit of [    ] is a [ ], indicating that the major alloying element of [    ] alloy is [              ].  However, the four-digit alloy designation [    ] does not correspond with any of the registered alloys in *Teal Sheets*.[278]  Accordingly, [    ] alloy is an unregistered alloy that has a major alloying element of [              ].

In the *Final AD Determination*, Commerce determined that the export-producer combination of Alcha International and Jiangsu Alcha was entitled to a separate rate.[279]  For a company to be assigned a separate rate, it must be an exporter of merchandise under consideration and sufficiently independent from the non-market entity.[280]  Accordingly,

---

[275] *See* NFI Memorandum at Attachments 1 (containing Jiangsu Alcha's Letter, "Common Alloy Aluminum Sheet from the People's Republic of China:  Jiangsu Alcha Separate Rate Application," dated January 5, 2018 (Jiangsu Alcha SRA)) and 2 (containing Alcha International's Letter, "Common Alloy Aluminum Sheet from the People's Republic of China:  Alcha International Separate Rate Application," dated January 5, 2018 (Alcha International SRA)).

[276] *See* Jiangsu Alcha SRA; *see also* Alcha International SRA.

[277] *See* Jiangsu Alcha SRA at Exhibits 6, 7, 8, and 9; *see also* Alcha International SRA at Exhibits 6 and 7.

[278] *See* First Domestic Industry Comments at Attachment 5.

[279] *See Antidumping Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-than-Fair Value, Preliminary Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*, 83 FR 29088 (June 22, 2018) (*Preliminary AD Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 12-17, unchanged at *Antidumping Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China:  Affirmative Final Determination of Sales at Less-Than-Fair-Value*, 83 FR 57421 (November 15, 2018) (*Final AD Determination*), and accompanying Issues and Decision Memorandum (IDM).

[280] *See Preliminary AD Determination* PDM at 12.

Commerce's determination that Alcha International and Jiangsu Alcha were entitled to a separate rate demonstrates that Commerce considered Alcha International to be an exporter of subject merchandise.  Because Alcha International reported its sale of [     ] to establish that it was an exporter of subject merchandise, Commerce granting Alcha International a separate rate demonstrates that Commerce considered [     ] alloy to be subject merchandise during the underlying AD investigation.  Because [     ] does not correspond with an Aluminum Association registration, Commerce's separate rate determination indicates that Commerce understood the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys).  Accordingly, we find that this (k)(1) source weighs in favor of finding that the scope includes any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys).

Based on the above analysis, we find that certain (k)(1) sources support finding that the scope is limited to registered alloys while other (k)(1) sources or record information of trade usage support finding that the scope includes unregistered alloys.  Accordingly, Commerce must weigh the evidence to determine if it is possible resolve the scope ambiguity among the (k)(1) sources.  First, we recognize that not all (k)(1) sources should be given equal weight.  Commerce may consider trade usage in its scope analysis of (k)(1) sources;[281] however, the interpretation of the language used in the *Orders* must be based on the meaning given to that language during the underlying investigations.[282]  *Teal Sheets* represents industry usage of the term "3XXX-series," while Commerce's separate rate determination is reflective of the meaning of the scope language

---

[281] *See ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012) (*ArcelorMittal*) ("{O}rders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry.")
[282] *See Fedmet*, 755 F.3d at 921.

as interpreted in the underlying AD investigation. Based on the analysis that, though Commerce should consider industry usage of language, the interpretation of the language used in administering the *Orders* must be consistent with the meaning given in the investigation, we give greater weight to Commerce's separate rate determination in the underlying AD investigation than industry terminology in *Teal Sheets*.[283]

However, we find the limited analysis in Commerce's separate rate determination detracts from weight that should be given to Commerce's separate rate determination with regard to Alcha in the underlying AD investigation. As explained above, for a company to be assigned a separate rate, it must be an exporter of merchandise under consideration and demonstrate that it is independent from the non-market economy entity. Commerce's analysis regarding separate rates in the *Final AD Determination* was centered on whether exporters were independent from the non-market economy entity.[284] Commerce provided minimal analysis regarding whether companies were exporters of subject merchandise.[285] Although a determination that a company is eligible for a separate rate does demonstrate that Commerce considers that company to be an exporter of subject merchandise, we find the limited analysis regarding this matter in Commerce's determination detracts from the weight that should be given to this (k)(1) source.

Based on the above analysis, we find that *Teal Sheets* supports an interpretation that the scope is limited to registered alloys. We find that Commerce's separate rate determination in the underlying AD investigation regarding Alcha supports the interpretation that the scope includes

---

[283] While this scope inquiry is conducted in accordance with the regulations that were in effect when Valeo submitted its complete scope application, our weighing of (k)(1) sources is consistent with the current regulations. *See* 19 CFR 351.225(k)(1)(i) identifying the description of merchandise contained in the initial investigation and previous determinations of the Secretary as primary interpretative sources; *see also* 19 CFR 351.225(k)(1)(ii) identifying industry usage as secondary interpretative source; and 19 CFR 351.225(k)(1)(ii) explaining in the event of conflict between primary and secondary interpretative sources, the primary interpretative source will normally govern.
[284] *See Preliminary AD Determination* PDM at 12-17; *see also Final AD Determination*.
[285] *Id.*

any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys).  When we initially weigh the evidence, we give greater weight to Commerce's separate rate determination because it reflects Commerce's interpretation of the scope at the time of the investigation.  However, we detract weight from Commerce's separate rate determination because Commerce's analysis regarding separate rates in the underlying AD investigation was centered on whether exporters were independent of the non-market economy entity and Commerce provided minimal analysis regarding whether a company exported subject merchandise.  Because the (k)(1) sources are contradictory and the respective weight of the (k)(1) sources is not sufficient to clearly demonstrate preeminence over the other available (k)(1) sources, we find that the (k)(1) sources on the record are not dispositive in resolving the scope ambiguity.

The domestic industry argues that a wide range of sources, such as *Teal Sheets*, the declaration of John Weritz, Valeo's Scope Ruling Request, the ITC Final Injury Determination, ASM International's publication *Understanding the Basics*, the ITC publication 4703 on the competitive conditions affecting the U.S. aluminum industry, the domestic industry's comments on the draft questionnaire in the ITC injury investigation, and other industry publications, demonstrate that "3XXX-series alloys" means any alloy that contains manganese as its principal alloying element (including unregistered alloys).[286]  While we have fully considered all the evidence, individual written analysis for each of these documents is impractical and unnecessary.[287]

---

[286] *See* Domestic Industry's Scope Initiation Comments at 3-9.
[287] *See Coalition of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1351 (CIT 2020) ("Moreover, the agency is not required to address every piece of evidence submitted by the parties, and Commerce is presumed to have considered all the evidence in the record absent a showing to the contrary.") (quoting *Aluminum Extrusions Fair Trade Comm. v. United States*, Slip Op. 2012-12, 36 CIT 1370, 1373, (2012) (*Aluminum Extrusions Fair Trade Comm.*); and *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002) (*USEC Inc.*)).

In general, we find the evidence the domestic industry provides is insufficient to demonstrate dispositively that the term "3XXX-series alloys" is meant to cover any alloy with a major alloying element of manganese regardless of registration.  Generally, the domestic industry argues that these sources define "3XXX-series" with "manganese is the major alloying element of alloys in this group,"[288] and the lack of mention of "unregistered" or "proprietary alloys" indicates that the term "3XXX-series" is meant to cover any alloy with a major alloying element of manganese (including unregistered alloys).[289]  We find these sources unpersuasive because all parties recognize that 3XXX-series alloys correspond to an alloy group where the major alloying element is manganese.  This scope inquiry is centered on whether the scope language should be interpreted such that 3XXX-series includes all aluminum-manganese alloys or if 3XXX-series alloys are a subset of aluminum-manganese alloys such that only registered 3XXX-series alloys are covered by the scope.  While the sources the domestic industry identified may not set apart unregistered or proprietary alloys from the general alloy groups, the sources also never affirmatively state that the alloy groups are meant to include unregistered alloys.  Without a clear affirmative statement that alloy groups are meant to include unregistered alloys, we find the sources the domestic industry identified are insufficient to demonstrate that the term "3XXX-series" is meant to include unregistered alloys with a major alloying element of manganese.

Valeo submitted multiple industry documents to rebut the domestic industry's argument that "3XXX-series" alloy was intended to cover all alloys with a major alloying element of

---

[288] *See, e.g.*, Domestic Industry's Scope Initiation Comments at 8 and Attachment 7 ("A publication title "Aluminum and Aluminum Alloys" published by this source defines "3xxx series" alloys as "Manganese is the major alloying element of alloys in this group.")

[289] *Id.* at 6 ("Notably, nowhere does this publication discuss "unregistered" or "proprietary" alloys separately from alloys in the various alloy groups.").

manganese regardless of registration.[290]  Again, we have fully considered all the evidence;

individual written analysis for each of these documents is impractical and unnecessary.[291]  We

find that certain documents submitted by Valeo, such as websites of aluminum suppliers and

Google search results, are insufficient to demonstrate that "3XXX-series" alloy is meant to cover

only registered alloys.  Valeo argues that the fact that none of the websites of aluminum

suppliers that it submitted on the record advertises unregistered 3XXX-series alloys indicates

that the term "3XXX-series alloy" is limited to registered alloys.[292]

　　　We disagree with Valeo that the lack of mention of unregistered 3XXX-series alloys

indicates that the term "3XXX-series alloys" is limited to registered alloys.  In general, the

aluminum suppliers' websites include a list of registered 3XXX-series alloys which the supplier

carries, then the website includes a phrase such as "other alloys available upon request."[293]

Accordingly, the list of aluminum alloys on the websites of aluminum suppliers is not

exhaustive; it is illustrative of the aluminum alloys available.  For example, the website of

United Aluminum lists numerous registered alloys it has in-stock.  The website also states,

"brazing sheet, and other available.  Please inquire for other alloys."[294]

　　　Accordingly, while these aluminum suppliers may not explicitly advertise unregistered

3XXX-series alloys, this does not indicate that these aluminum suppliers understand that

unregistered 3XXX-series alloys are non-existent.  Rather, these aluminum suppliers list the

most popular alloys on their websites and for other alloys customers have to file an inquiry.

---

[290] *See* Valeo's Scope Initiation Rebuttal Comments at 14-15.

[291] *See Coalition of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1351 (CIT 2020) ("Moreover, the agency is not required to address every piece of evidence submitted by the parties, and Commerce is presumed to have considered all the evidence in the record absent a showing to the contrary.") (quoting *Aluminum Extrusions Fair Trade Comm*., Slip Op. 2012-12, 36 CIT at 1373, 34; and *USEC*, 34 F. App'x at 731).

[292] *See* Valeo Scope Initiation Rebuttal Comments at 15 and Exhibit S-6.

[293] *Id.* at Exhibit S-6 (website of Global Metals).

[294] *Id.* at Exhibit S-6 (website of United Aluminum).

Thus, it is possible that these aluminum suppliers understand that unregistered 3XXX-series alloys do exist; however, the alloys are available only upon request. Based upon the above analysis, we find that the websites of aluminum suppliers are insufficient to demonstrate the term "3XXX-series alloys" is meant to include only registered alloys with a major alloying element of manganese.

We find Valeo's Google search results are insufficient to demonstrate that the term "3XXX-series alloys" is limited to registered alloys with a major alloying element of manganese.[295] Valeo conducted a Google search of the phrases "unregistered 3XXX" and "undesignated 3XXX" and received no results from Google.[296] First, Valeo does not explain how a general search engine result fits within the sources Commerce relies on for trade usage as it evaluates record information under 19 CFR 351.225(k)(1). Next, we find that a general search engine may not be adequate when searching specialized industry terms. Finally, we do not find the lack of results indicative that the term "3XXX-series alloy" is limited to registered alloys with a major alloying element of manganese. Alternatively, the lack of search results could be explained if "3XXX-series alloy" was widely understood to include all alloys with a major alloying element of manganese (including unregistered alloys). Under such a scenario, it would be unnecessary for parties to clarify that the term "3XXX-series alloys" was meant to include unregistered alloys with a major alloying element of manganese. Based on the analysis above, we find that Valeo's Google search results are insufficient to establish that the term "3XXX-series alloy" is limited to registered alloys with a primary alloying element of manganese.

Next, Valeo identifies several internet articles regarding the aluminum classification system from websites such as sunrisemetals.com, iqsdirectory.com, fastradius.com,

---

[295] *Id.* at 15 and Exhibit S-7.
[296] *Id.*

substech.com, handforge.com, and belmontmetals.com.[297]  Generally, we find that these internet

articles reflect and explain the recommended aluminum alloy designation system within *Teal

Sheets*.[298]  As explained above, we find that *Teal Sheets* weighs in favor of finding that the scope

of the *Orders* is limited to registered alloys within the enumerated series with four-digit

designations assigned by the Aluminum Association.  However, we find *Teal Sheets*, even with

the support of the internet articles submitted by Valeo, is insufficient to demonstrate that the term

"3XXX-series alloys" is limited to registered alloys with a major alloying element of manganese.

As explained above, there is evidence on the record that supports the alternative interpretation

that the term "3XXX-series alloy" is intended to include any alloy with a major alloying element

of manganese (including unregistered alloys).  The evidence on the record demonstrates that the

Chinese CAAS exporter Alcha International and the Chinese CAAS producer Jiangsu Alcha

during the underlying AD investigation understood the scope to include any alloy that contains a

major alloying element corresponding to the Aluminum Association's alloy groups (including

unregistered alloys).[299]  Further, as explained above, Commerce's separate rate determination in

the underlying AD investigation concerning Alcha indicates Commerce understood the scope to

include any alloy that contains a major alloying element corresponding to the Aluminum

Association's alloy groups (including unregistered alloys).  Thus, in light of contradictory

evidence, we find the internet articles submitted by Valeo do not resolve the ambiguity in the

scope language.

The domestic industry argues that the information in Commerce's NFI Memorandum

demonstrates that during the underlying AD investigation, the term "3XXX-series alloys"

---

[297] *Id.* at 13-15 and Exhibits S-1, S-2, S-3, S-4, S-5, and S-12.
[298] *Id.* at Exhibit S-4 ("classification of aluminum alloys is established by the International Alloy Designation System (IADS), based on the classification developed by Aluminum Association of the United States").
[299] *See* NFI Memorandum at Attachments 1 and 2.

referred to any alloy with manganese as the principal alloying element (including unregistered alloys)."[300]  As explained above, we agree with the domestic industry that the information within the NFI Memorandum such as Alcha International and Jiangsu Alcha's separate rate applications, when analyzed in conjunction with Commerce's separate rate determination in the underlying AD investigation, weighs in favor of finding that the scope includes any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys).  However, because the (k)(1) sources and record information of trade usage are contradictory and the respective weight of the (k)(1) sources and record information of trade usage are insufficient to clearly demonstrate preeminence over the other available (k)(1) sources, we find that the (k)(1) sources and record information of trade usage on the record are not dispositive in resolving the ambiguity in the scope language.

Valeo argues that the information placed on the record in Commerce's NFI Memorandum is unrelated to the current scope inquiry.[301]  We disagree with Valeo.  First, this scope inquiry is centered on whether the scope covers unregistered alloys with a major alloying element corresponding to the Aluminum Association's alloy groups.  As explained above, Alcha's [     ] alloy is an unregistered alloy that has a major alloying element of [          ].  Accordingly, we find that evidence related to whether Commerce considered Alcha's [     ] alloy to be subject merchandise during the underlying AD investigation is relevant to the instant scope inquiry.

Next, Valeo argues that Alcha's questionnaire responses in the first AD administrative review have no bearing on any scope inquiry.[302]  Under 19 CFR 351.225(k)(1), Commerce will take into account "the description of the merchandise contained in the petition, the initiation of

---

[300] *See* Domestic Industry's NFI Rebuttal Comments at 3-5.
[301] *See* Valeo's NFI Rebuttal Comments at 2-3.
[302] *Id.* at 2; *see also* NFI Memorandum at Attachments 3 and 4.

the investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."[303]  Thus, we find that Alcha's separate rate applications and Commerce's separate rate determination regarding Alcha in the underlying AD investigation are valid (k)(1) sources of information, because they relate to a determination of Commerce and the description of the merchandise in the AD investigation.

Commerce's analysis regarding the separate rate determination in the underlying AD investigation is centered on Alcha International and Jiangsu Alcha's separate rate applications. As explained above, the first digit of [    ] is [  ], which corresponds to containing a major alloying element of [          ], and the four-digit designation [    ] does not correspond with any of the Aluminum Association registered alloys.  Therefore, based solely on the separate rate applications, it is possible to discern that [    ] is an unregistered alloy with a major alloying element of [          ].  Alcha's questionnaire responses in the first AD administrative review are relevant insofar as they further clarify language Alcha used in its separate rate applications in the AD investigations.  For instance, in the first administrative review questionnaire, Alcha states, "{t}here are no Aluminum Association {designations} that correspond to [    ]."[304] Further, in the first AD administrative review Alcha reported its [    ] as corresponding to [

    ] in its U.S. sales database.[305]  Accordingly, while it is possible to decipher that [    ] alloy is an unregistered alloy with a major alloying element of [          ] based solely upon the separate rate applications in the underlying AD investigation, Alcha's questionnaire responses in the first AD administrative review further clarify the correct description of the

---

[303] *See* 19 CFR 351.225(k)(1).
[304] *See* NFI Memorandum at Attachment 4 (containing Alcha's Letter, "Common Alloy Aluminum Sheet from the People's Republic of China:  Alcha's Supplemental Section Section A and C Questionnaire Response," dated March 24, 2021 (Alcha's SCQR in First Administrative Review)).
[305] *Id.* at Attachments 3 (containing Alcha's Letter, "Common Alloy Aluminum Sheet from the People's Republic of China:  Alcha Group's Section C and D Questionnaire Response," dated August 5, 2020) and 4 (containing Alcha's SCQR in First Administrative Review).

product.  Accordingly, we find that Alcha's questionnaire responses in the first administrative review are valid (k)(1) sources to the extent the responses further clarify language used by Alcha in the underlying AD investigation.

Based upon the above analysis, we find that the (k)(1) sources and certain record information concerning trade usage are contradictory and the respective weights of these sources are not sufficient to clearly demonstrate preeminence over the other available record information. Accordingly, we find that the (k)(1) sources are not dispositive in resolving the ambiguity in the scope language.

C.  *Analysis of (k)(2) Factors*

As explained above, we find the description of the merchandise in the sources described in 19 CFR 351.225(k)(1) is not dispositive.  Accordingly, we examine the factors under 19 CFR 351.225(k)(2).  These factors are:  (i) the physical characteristics of the merchandise; (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product; (iv) the channels of trade in which the product is sold; and (v) the manner in which the product is advertised and displayed.

(i)  *Physical Characteristics of the Merchandise*

We find the evidence on the record is insufficient to support Valeo's arguments that its T-series sheet has physical characteristics distinct from merchandise unambiguously within the scope of the *Orders*.[306]  Rather, explained below, we find the evidence on the record is sufficient

---

[306] *See* Scope Request at Attachment 1 (pages 18-24); *see also* Valeo's Scope Initiation Comments at 30-37; Valeo's Scope Initiation Rebuttal Comments at 15-22.

to conclude that Valeo's T-series sheet has physical characteristics similar to merchandise unambiguously within the scope of the *Orders*.

First Valeo argues that, regarding physical characteristics, T-series sheet is distinct from unambiguously in-scope merchandise because T-series sheet is manufactured from a heat-treatable core alloy that undergoes heat-treatment.[307]  Further, Valeo argues that the unique chemical composition of YB-18, the core alloy in T-series sheet, allows YB-18 to be heat-treatable while registered 3XXX-series alloys are non-heat-treatable.[308]  As explained in the section "Relevance of Heat-Treatment," above, we find the evidence on the record is insufficient to demonstrate that Valeo's product undergoes solution heat-treatment.  Rather, we find the evidence on the record demonstrates that Valeo's T-series sheet is a clad product that undergoes a combination of annealing and cold-working.  Further, as explained in the "Relevance of Heat-Treatment" section, YB-18 is [            ] in its inclusion of alloying elements known to increase heat-treatability.  Rather, we find the evidence on the record demonstrates there are multiple non-heat-treatable registered 3xxx-series alloys that [

].[309]  Accordingly, we find that T-series sheet is similar to merchandise unambiguously within the scope of the *Orders* because both T-series sheet and registered 3XXX-series alloys are non-heat-treatable alloys that are strengthened through cold-working.[310]

Next Valeo argues, with regard to physical characteristics, that its T-series sheet is distinct from unambiguously in-scope merchandise because T-series sheet is manufactured

---

[307] *See* Valeo's Scope Initiation Comments at 30-31; *see also* Valeo's Scope Initiation Rebuttal Comments at 15-17.
[308] *See* Valeo's Scope Initiation Comments at 30-31 and 33.
[309] *See* Valeo's June 5, 2020, Submission at 9 and Exhibit 4; *see also* First Domestic Industry Comments at Attachment 5.
[310] *See* Valeo's June 5, 2020, Submission at Exhibit 4.

through direct chill casting and hot-rolling.[311]  Valeo cites no evidence to support its claim.  Even if Valeo's claims were true, the ITC Final Injury Determination states that, "{a}nother method of casting used in the production of CAAS is direct chill casting."[312]  Further, the ITC Final Injury Determination explains, "{s}emi-finished forms of aluminum derived from the continuous casting and direct chill casting processes are reduced in thickness in a rolling mill.  Hot rolling and cold rolling are two different methods by which semi-finished forms of aluminum are reduced in thickness between rollers."  Accordingly, we find the ITC Final Injury Determination supports finding that certain in-scope CAAS is manufactured through direct chill casting and hot-rolling.  Based on the analysis above, we do not find T-series sheet distinct from merchandise unambiguously within the scope of the *Orders*.  Rather, we find T-series sheet and certain merchandise unambiguously within the scope of the *Orders* are both manufactured through direct-chill casting and hot-rolling.

Additionally, Valeo argues, regarding physical characteristics, that T-series sheet is distinct from merchandise unambiguously within the scope of the *Orders* because the unique alloy used by Valeo develops a desirable band of dense precipitates (brown band) during the brazing process.[313]  Valeo explains that this brown band protects T-series sheet from corrosion.[314]  Valeo contends that, in contrast, merchandise unambiguously within the scope of the *Orders* cannot develop this type of corrosion protection.  Valeo again does not provide any record evidence to support this claim.  The domestic industry argues that corrosion resistance is not unique to T-series sheet but, rather, a feature of all clad aluminum products including clad

---

[311] *See* Valeo's Scope Initiation Comments at 30.
[312] *See* ITC Final Injury Determination at I-17.
[313] *See* Valeo's Scope Initiation Comments at 31.
[314] *Id.*

aluminum products that are unambiguously within the scope.[315]  As explained in the Final Scope Ruling, a clad aluminum product is a composite product in which discrete layers of distinct metals are metallurgically bonded (albeit some diffusion may occur between the layers due to thermal treatment).[316]  The central layer of the clad aluminum product is called "the core."  The outside layer of the clad aluminum product is called "clad" or "cladding."[317]  Further, in the Final Scope Ruling, we explained T-series sheet is a clad aluminum product.[318]

We agree with the domestic industry's argument, because the evidence on the record demonstrates that all clad aluminum products offer high-resistance to corrosion, including clad aluminum products unambiguously covered by the scope (*e.g.*, a clad aluminum product with a core produced from a registered 3XXX-series alloy).  The Aluminum Association's publication *Aluminum Standards and Data 2017*[319] states that, "{w}hen the cladding is aluminum or an aluminum alloy of high resistance to corrosion and is anodic to the core alloy it covers, thus physically and electrolytically protecting the core alloy against corrosion, the product is designated Alclad (sometimes expressed Alc)."[320]  The quotation from *Aluminum Standards and Data 2017* demonstrates that the purpose of adding a cladding layer to a core aluminum is to protect the core against corrosion.  Accordingly, even a clad aluminum product produced from a registered 3XXX-series alloy would have a high resistance to corrosion due to the cladding layer.  Thus, we find no evidence that differentiates T-series sheet from a clad aluminum product produced from a registered 3XXX-series core.  Further, *Rolling Aluminum* provided a chart with the known corrosion resistance of certain alloys.[321]  The chart used ratings A through E in

---

[315] *See* Domestic Industry Scope Initiation Rebuttal Comments at 12.
[316] *See* Final Scope Ruling at 11-13.
[317] *Id.*
[318] *Id.* at 11-13.
[319] *See* First Domestic Industry Comments at Attachment 2.
[320] *Id.* at Attachment 2 (pages 6-3).
[321] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix A 10C-16).

decreasing order of merit.[322]  Multiple registered 3XXX-series alloys (*e.g.*, 3003 alloy, 3004 alloy) achieved a rating of "A" for their corrosion resistance.[323]  Accordingly, we find that certain registered 3XXX-series alloys offer high corrosion resistance.  Based on the analysis above, we find the evidence on the record is insufficient to demonstrate that T-series sheet is unique in its corrosion resistance.  Rather, we find the evidence on the record demonstrates that certain merchandise unambiguously covered by the scope has high degrees of corrosion resistance.

Next Valeo argues, regarding physical characteristics, that its T-series sheet is distinct from merchandise unambiguously within the scope of the *Orders*, because T-series sheet has superior mechanical properties (*i.e.*, superior tensile strength, yield strength, and elongation) compared to registered 3XXX-series alloys.[324]  Valeo relies on a chart with self-reported values comparing the mechanical properties of T-series sheet and 3003 alloy.[325]  We find the evidence on the record is insufficient to support Valeo's claim.

First, Valeo provides no documentation to support the values it reported in its chart for the mechanical properties of T-series sheet and 3003 alloy.  Accordingly, we find that the chart Valeo provided is unreliable.  Valeo also provides the mechanical properties of T-series sheet and 3003 alloy before and after heat-treatment.[326]  No party contests that 3003 alloy is unable to be solution heat-treated; thus, it is unclear which type of thermal treatment Valeo is referring to when it reports the mechanical properties of 3003 alloy *with heat-treatment*.  We find that the

---

[322] *Id.* at Attachment 1 (Appendix A 10C-19).
[323] *Id.*
[324] *See* Valeo's Scope Initiation Comments at 32.
[325] *Id.* at Exhibit 2.
[326] *Id.*

lack of clarity as to which type of thermal treatment Valeo is referencing in its chart further adds to the chart's unreliability.

Additionally, to the extent that there is evidence on the record regarding the mechanical properties of 3003 alloy, the evidence contradicts the values within Valeo's chart.  For example, Valeo reports a clad aluminum product with a core produced from 3003 alloy with an O temper would have a yield strength of 120 megapascals (MPa) before heat-treatment and yield strength of 35 MPa with heat-treatment.[327]  While Valeo's chart is unclear as to the meaning of the phrase "with Heat-Treatment," *Rolling Aluminum* reports that a clad aluminum product with a core produced from 3003 alloy with an O temper would have a yield strength of 40 MPa.[328] Accordingly, neither the 120 MPa nor the 35 MPa that Valeo reports for a clad aluminum product with a core produced from 3003 alloy with an O temper matches the yield strength value found in *Rolling Aluminum*.  Thus, we find the evidence on the record contradicts Valeo's chart of mechanical properties of T-series sheet and 3003 alloy.

We also find Valeo's chart of mechanical properties is insufficient because it only compares T-series sheet to a single registered 3XXX-series alloy (3003 alloy),[329] despite the existence of over 40 registered 3XXX-series alloys.[330]  Thus, we find a comparison to single registered 3XXX-series alloy is insufficient to demonstrate T-series sheet is distinct from merchandise unambiguously covered by the scope.  Based on the analysis above, we find that the evidence on the record is insufficient to support Valeo's claim that T-series sheet has superior mechanical properties to merchandise unambiguously covered by the scope.  Rather, we find that Valeo failed to support its claim with evidence; the comparison Valeo made to a single registered

---

[327] *Id.*
[328] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix C 10C-11).
[329] *See* Valeo's Scope Initiation Comments at Exhibit 2.
[330] *See* First Domestic Industry Comments at Attachment 5.

3XXX-series alloy was insufficient to demonstrate that T-series sheet is distinct from merchandise unambiguously covered by the scope; and the evidence on the record contradicts certain values Valeo reported in its chart.

Finally, the domestic industry argues that T-series sheet and 3003 alloy have similar physical characteristics, because the physical characteristics are well-suited to be used as brazing sheet.[331]  Valeo describes brazing sheet as "widely used in fabricating major components of heat exchangers for motor vehicles.  Brazing sheet is characterized by its unique ability to form a uniform durable, leak-proof bond with other aluminum surfaces."[332]  The *Aluminum Standards and Data 2017* defines "brazing" as "joining metals by fusion of nonferrous alloys that have melting points above 800F (425C) but lower than those of the metals being joined."[333]  The *Aluminum Standards and Data 2017* defines brazing sheet as "sheet of a low melting point alloy or clad with a low melting point alloy used for brazing."[334]  The domestic industry describes Valeo's T-series sheet as brazing sheet,[335] whereas Valeo describes T-series sheet as an intermediary product used in the manufacture of brazing sheet.[336]  However, Valeo reports that T-series sheet has the same chemistry as brazing sheet and T-series sheet does undergo brazing.[337]  Because Valeo's T-series sheet has the same chemistry as brazing sheet and T-series sheet undergoes brazing, we find that the physical properties of T-series sheet make it well-suited to be used as brazing sheet.  *Rolling Aluminum* contains a chart with the known brazeability of certain alloys.[338]  The chart used ratings A through E in decreasing order of

---

[331] *See* Domestic Industry's Scope Initiation Comments at 10-11.
[332] *See* Valeo's August 7, 2020, Submission at Attachment 2 (question 3).
[333] *See* Valeo Scope Initiation Comments at Exhibit 10 (pages 5-3).
[334] *Id.* at Exhibit 10 (pages 5-19).
[335] *See* First Domestic Industry Comments at 3-9.
[336] *See* Valeo's August 7, 2020, Submission at Attachment 2 (question 3).
[337] *Id.* at Attachment 2 (question 12 and Exhibit S-1).
[338] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix A 10C-16).

merit.[339] Multiple registered 3XXX-series alloys received an A for their brazeability (*e.g.*, 3003 alloy and 3105 alloy).[340] Accordingly we find the evidence on the record is sufficient to demonstrate both T-series sheet and certain merchandise unambiguously covered by the scope are similar in terms of their brazeability.

Based on the analysis above, we find that T-series sheet and certain merchandise unambiguously covered by the scope are similar in their physical characteristics. The evidence on the record demonstrates that T-series sheet and certain merchandise unambiguously covered by the scope are non-heat-treatable alloys, manufactured through direct chill casting and hot-rolling, have high corrosion-resistance, and have high brazeability. Moreover, the evidence on the record is insufficient to demonstrate that T-series sheet has superior mechanical properties compared to merchandise unambiguously covered by the scope. Accordingly, we find the (k)(2) factor of physical characteristics supports finding T-series sheet and merchandise unambiguously covered by the scope are sufficiently similar to conclude the two are merchandise of the same class or kind.

(ii) *Expectations of the Ultimate Purchaser*

First, Valeo argues, regarding expectations of the ultimate purchaser, that T-series sheet is distinct from merchandise unambiguously covered by the scope because T-series sheet is used for HEX/HVAC applications, whereas mainstream CAAS is used for other industrial applications. We find the evidence on the record contradicts Valeo's claim. *Aluminum Alloys 101* states "3003 {alloy} … may be used in applications such as *heat exchangers* and cooking utensils."[341] In its report on the competitive conditions affecting the U.S. aluminum industry, the

---

[339] *Id.* at Attachment 1 (Appendix A 10 C-19).
[340] *Id.* at Attachment 1 (Appendix A 10 C-16).
[341] *See* Valeo's June 5, 2020, Submission at Exhibit 4 (emphasis added).

ITC listed heat exchangers as a major end use for 3XXX-series alloys.[342]  In the ITC Final Injury
Determination, the ITC stated "one industry representative noted that during the manufacturing
of brazing sheet for *heat exchangers*, the materials cladded to a *3XXX-series* core will melt at a
lower temperate than the core."[343]  *Aluminum Standards and Data 2017* lists specification SB-
234 as covering "1060, *3003*, *Alclad 3003*,[344] 5052, 5454, and 6061 drawn, seamless tube for
condensers and *heat exchangers*."[345]  Accordingly we find several sources on the record
demonstrate that 3XXX-series alloys can be used for heat-exchangers.  Based on the above
analysis, we find that T-series sheet is not distinct from merchandise unambiguously covered by
the scope because T-series sheet is used in heat exchangers.  Rather, we find the evidence on the
record demonstrates both T-series sheet and certain merchandise unambiguously covered by the
scope are similar in that both can be used in heat-exchangers.

Next, Valeo argues, regarding expectations of the ultimate purchaser, that T-series sheet
is distinct from merchandise unambiguously covered by the scope because T-series sheet
undergoes approximately [        ] weeks of testing, including burst testing, brazed analysis,
pressure and thermal cycle testing, heat transfer, and corrosion analysis.[346]  However, Valeo
provides no documentation to support its claim that T-series sheet undergoes approximately [

] weeks of testing.  Further, Valeo provides no evidence concerning the normal testing
period for 3XXX-series alloys when they are used in heat-exchange applications.  Accordingly,
we find the evidence on the record is insufficient to analyze Valeo's claim that T-series sheet is

---

[342] *See* Valeo's Scope Initiation Comments at Exhibit 17 (page 530).
[343] *See* ITC Final Injury Determination at I-12 (emphasis added).
[344] Alclad 3003 refers to an aluminum clad product with a core produced from 3003 alloy.  *See* Valeo's Scope Initiation Comments at Exhibit 10 (page 5-1, defining "Alclad").
[345] *See* Valeo's Scope Initiation Comments at Exhibit 10 (pages 1-23) (emphasis added).
[346] *Id.* at 34.

distinct from merchandise unambiguously covered by the scope of the *Orders* because T-series sheet undergoes approximately [          ] weeks of testing.

Finally, Valeo argues, regarding expectations of the ultimate purchaser, that T-series sheet is distinct from merchandise unambiguously covered by the scope of the *Orders* because T-series sheet is a heat-treated product and CAAS is non-heat-treatable.[347]  As explained the "Relevance of Heat-Treatment" section, above, we find the evidence on the record is insufficient to demonstrate that Valeo's product undergoes solution heat-treatment.  Rather, we find the evidence on the record is sufficient to demonstrate that Valeo's T-series sheet is a clad product that undergoes a combination of annealing and cold-working.

Based on the above analysis, we find that the expectations of the ultimate purchaser of T-series sheet and certain merchandise unambiguously covered by the scope of the *Orders* are similar because the ultimate purchaser would expect both products to be a non-heat-treatable alloy able to be used in HVAC/HEX applications.  We find the evidence on the record is insufficient to support Valeo's claim regarding the length of testing of T-series sheet and merchandise unambiguously covered by the scope of the *Orders*.  Accordingly, we find the (k)(2) factor of expectations of the ultimate purchaser supports finding T-series sheet and merchandise unambiguously covered by the scope are sufficiently similar to conclude the two are merchandise of the same class or kind.

(iii) *Ultimate Use of the Product*

Valeo argues, regarding the ultimate use of the product, that T-series sheet is distinct from merchandise unambiguously covered by the scope because T-series sheet is used in the manufacture of automotive HEX/HVAC assemblies, while in-scope CAAS is used in basic

---

[347] *Id.* at 33-35.

transportation, building and constructions, infrastructure, electrical, and marine applications.[348]
Further, Valeo argues that no CAAS product is sufficiently sophisticated to be used in the
manufacture of automotive HEX/HVAC components.  As explained above, *Aluminum Alloys
101* states "3003 {alloy} … may be used in applications such as *heat exchangers* and cooking
utensils."[349]  In its report on the competitive conditions affecting the U.S. aluminum industry, the
ITC listed heat exchangers as a major end use for 3XXX-series alloys.[350]  In the ITC Final Injury
Determination, the ITC states that, "one industry representative noted that during the
manufacturing of brazing sheet for *heat exchangers*, the materials cladded to a *3XXX-series* core
will melt at a lower temperate than the core."[351]  *Aluminum Standards and Data 2017* lists
specification SB-234 as covering "1060, *3003*, *Alclad 3003*,[352] 5052, 5454, and 6061 drawn,
seamless tube for condensers and *heat exchangers*."[353]  Further, the ITC U.S. Producers'
Questionnaire regarding Common Alloy Aluminum sheet from China provided the following
definition of brazing stock:[354]

> Aluminum brazing tube stock ("brazing stock") is defined as a composite material
> consisting of multiple sheets of aluminum alloy metallurgically bonded to one
> another, with the center or "core" alloy generally being much thicker than the outer
> "clad" (or "filler") layers.  It consists of a high-end, often proprietary, core alloy
> and one or more layers of braze clad.  The material is typically 0.05mm to 1.0mm
> in thickness, of which the cladding generally represents $10\% \pm 2\%$.  *Aluminum
> brazing tube stock is used in such applications as automotive heat exchangers
> (HEX) and heating, ventilation, and air conditioning (HVAC) equipment.*[355]

---

[348] *Id.* at 35.
[349] *See* Valeo's June 5, 2020, Submission at Exhibit 4 (emphasis added).
[350] *See* Valeo's Scope Initiation Comments at Exhibit 17 at 530.
[351] *See* ITC Final Injury Determination at I-12 (emphasis added).
[352] Alclad 3003 refers to an aluminum clad product with a core produced from 3003 alloy.  *See* Valeo's Scope
Initiation Comments at Exhibit 10 at 5-1 defining "Alclad."
[353] *See* Valeo's Scope Initiation Comments at Exhibit 10 at 1-23 (emphasis added).
[354] Commerce understands "Brazing Stock" and "Brazing Sheet" to be interchangeable terms.
[355] *See* Domestic Industry's First Comments at Attachment 8 (containing ITC U.S. Producers' Questionnaire
regarding Common Alloy Aluminum sheet from China) (emphasis added).

Next the ITC stated that "this definition of brazing stock covers both 'in-scope brazing stock' and 'out-of-scope brazing stock.'"[356]  Accordingly, the statement regarding "Aluminum brazing tube stock is used in such applications as automotive heat exchangers (HEX) and heating, ventilation, and air conditioning (HVAC) equipment," applies equally to in-scope brazing stock (*i.e.*, brazing stock produced with a 3XXX-series alloy core with a thickness of 6.3mm or less, but greater than 0.2mm)[357] as it does to out-of-scope brazing stock (*e.g.*, brazing sheet either produced from a non-3XXX-series alloy core, having a thickness of greater than 6.3mm or less than 0.2mm).  Accordingly, the ITC U.S. Producers Questionnaire indicates the existence of in-scope brazing stock that is used in such applications as automotive HEX/HVAC equipment.

Based on the analysis above, we find that the evidence on the record is not sufficient to demonstrate that T-series sheet has an ultimate end-use distinct from merchandise unambiguously covered by the scope of the *Orders*.  Rather, we find multiple pieces of evidence on the record, including *Aluminum Alloys 101*, the ITC Final Injury Determination, *Aluminum Standards and Data 2017*, and the ITC Questionnaire to U.S. Producers, demonstrate that certain merchandise unambiguously covered by the scope of the *Orders* is used for HEX/HVAC applications.  Accordingly, because both T-series sheet and certain merchandise unambiguously covered by the scope of the *Orders* have an ultimate use in HEX/HVAC applications, we find that this (k)(2) factor of ultimate use of the product supports finding T-series sheet and merchandise unambiguously covered by the scope are sufficiently similar to conclude the two are merchandise of the same class or kind.

---

[356] *Id.*

[357] Valeo and the domestic industry disagree on if the ITC included brazing stock produced from a proprietary alloy core with a primary alloying element of manganese in its definition of in-scope brazing stock.  *See* Domestic Industry's Scope Initiation Comments at 5; *see also* Valeo Scope Initiation Rebuttal Comments at 8.

(iv) *Channel of Trade*

Valeo argues, regarding channel of trade, that T-series sheet is distinct from merchandise unambiguously covered by the scope because T-series sheet is sold by a limited number of specialized producers, and producers invest significant resources to work with their customers.[358] In contrast, Valeo argues that in-scope CAAS is produced in continuous and sizeable quantities for sale as generally interchangeable products by a large number of various distributors.[359] Valeo provides no documentation to support its claim that T-series sheet is sold by a limited number of specialized producers, or that producers invest significant resources to work with their customers. Accordingly, we find that there is not sufficient evidence on the record to analyze Valeo's claim that T-series sheet is distinct from merchandise unambiguously covered by the scope with regards to channel of trade.

The domestic industry rebuts that T-series sheet is not unique in that producers and customers develop products jointly and often maintain long-standing relationships.[360] The domestic industry argues this channel of trade is true of all brazing sheet including brazing sheet unambiguously covered by the scope.[361] The domestic industry supports its argument by relying on a declaration from John Newman, a director of technology and market development with the Aluminum Association.[362] We find the declaration of John Newman is from an interested party for the purpose of these final results of redetermination and, as such, does not alone constitute a reliable source of information. Because the domestic industry does not cite any other evidence

---

[358] *See* Valeo Scope Initiation Comments at 36.
[359] *Id.*
[360] *See* Domestic Industry's Scope Initiation Rebuttal Comments at 14.
[361] *Id.*
[362] *Id.* (citing Domestic Industry's Scope Initiation Comments at Attachment 9 (containing Declaration of John Newman)).

on the record to support the declaration of John Newman, we find the declaration of John Newman to be unreliable.

Valeo also argues that a price comparison between HTSUS subheadings for heat-treatable and non-heat-treatable alloys demonstrate that the prices of T-series sheet and in-scope CAAS are significantly different.[363]  We disagree with Valeo.  The HTSUS subheadings Valeo provided in its price comparison are specific to unclad aluminum sheet.[364]  The Court upheld Commerce's determination in the Final Scope Ruling that T-series sheet is a clad aluminum product.[365]  Because the price comparison Valeo provides is specific to unclad aluminum sheet and T-series sheet is a clad aluminum product, we find no relevance in Valeo's price comparison.

Based on the analysis above, we find the interested parties did not provide sufficient evidence to allow Commerce to analyze if this (k)(2) factor supports finding T-series sheet and merchandise unambiguously covered by the scope are sufficiently similar to conclude the two are merchandise of the same class or kind.

(v) *Manner in Which the Product is Advertised and Displayed*

Valeo argues that, regarding the manner in which the product is advertised and displayed, the key difference between T-series sheet and merchandise unambiguously covered by the scope is that T-series sheet is not advertised or displayed to general customers.[366]  We find the evidence on the record contradicts Valeo's claim that T-series sheet is different in the manner in which it is advertised and displayed.  Yinbang Clad, the Chinese exporter of T-series sheet that is imported by Valeo, does display and advertise its YB alloy series to general customers on its

---

[363] *See* Valeo Scope Initiation Comments at 36 and Exhibit 17.
[364] *Id.* at Exhibits 17 and 19.
[365] *See Remand Order* at 26-27; *see also* Final Scope Ruling at 11-13.
[366] *See* Valeo's Scope Initiation Rebuttal Comments at 21.

website.[367]  Valeo rebuts that while Yinbang Clad's website shows that many of Yinbang Clad's brazing sheets are manufactured from a proprietary core with an alloy name starting with "YB," the website does not display or advertise the proprietary alloy YB-18 which is used in the core of T-series sheet.[368]  Yinbang Clad's website advertises its YB series and lists a limited number of specific YB alloys (*e.g.*, YB311).[369]  Further, Yinbang Clad's website demonstrates that it can customize a specific alloy to meet customer requirements.[370]

The evidence on the record demonstrates that CAAS producers may advertise an alloy series, or a sampling of specific alloys, rather than advertise every specific alloy available.  For example, the website of Global Metals advertises 3XXX-series and lists a limited number of specific 3XXX-series alloys.[371]  The website also states, "other alloys available upon request."[372]  Additionally, the Global Metals Website states, "{o}ur aluminum strip can be produced in standard dimensions or *custom made to your requirements*," and "tighter tolerances are available upon request."[373]  Accordingly, we find that Global Metals' website advertises the 3XXX-series, but does not advertise every specific 3XXX-series alloy available.  Rather, the Global Metals' website indicates that additional alloys are available, including alloys custom made to fit tighter chemical composition content requirements.  We find Global Metal's website to be analogous to Yinbang Clad's website in that both websites advertise an alloy series, a non-exhaustive list of specific alloys, and indicate alloys can be custom-made to customer requirements.

Based on the foregoing analysis, we find that Yinbang Clad's website advertises its YB alloy series to general customers.  Further we find Yinbang Clad's website is akin to the website

---

[367] *See* NFI Memorandum at Attachment 5.
[368] *See* Valeo's NFI Rebuttal Comments at 6.
[369] *Id.* at Attachment 2.
[370] *Id.*
[371] *See* Valeo's Scope Initiation Rebuttal Comments at Exhibit S-6.
[372] *Id.*
[373] *Id.* (emphasis added).

of CAAS supplier Global Metals.  Accordingly, we find that this (k)(2) factor, the manner in which the product is displayed and advertised, supports a finding that T-series sheet and merchandise unambiguously covered by the scope are sufficiently similar to conclude the two are merchandise of the same class or kind.

      (vi) *Interplay of (k)(2) Factors*

      As explained above, we find that four of the (k)(2) factors (Physical Characteristics of the Merchandise, Expectations of the Ultimate Purchaser, Ultimate Use of the Product, and Manner in Which the Product is Advertised and Displayed) support a finding that T-series sheet and merchandise unambiguously covered by the scope are sufficiently similar to conclude the two are merchandise of the same class or kind.  We find for one of the (k)(2) factors, *i.e.*, channel of trade, the evidence on the record is insufficient to make a finding regarding whether this (k)(2) factor supports finding that T-series sheet and merchandise unambiguously covered by the scope are sufficiently similar to conclude the two are merchandise of the same class or kind. Accordingly, multiple (k)(2) factors support finding T-series sheet and merchandise unambiguously covered by the scope are sufficiently similar to conclude the two are merchandise of the same class or kind, while none of the (k)(2) factors support the opposite finding.  Based on the analysis above, when we weigh the (k)(2) factors, we find that T-series sheet is sufficiently similar to merchandise unambiguously covered by the scope to conclude the two are merchandise of the same class or kind.  Thus, we continue to find that T-series sheet imported by Valeo is included within the scope of the *Orders*.

D. *Analysis of Procedural Issues*

Both Valeo and the domestic industry argue that it was unnecessary for Commerce to initiate a formal scope inquiry under 19 CFR 351.225(e).[374]  We disagree.  As explained above, the (k)(1) sources were not dispositive in determining whether T-series sheet was covered by the scope of the *Orders*.  Accordingly, Commerce determined that it was necessary to initiate a formal scope inquiry under 19 CFR 351.225(e) in order to analyze the factors under 19 CFR 351.225(k)(2).

Valeo argues that Commerce violated an important procedural requirement because the Scope Initiation Letter lacks an explanation of why Commerce was unable to make a determination based on the plain meaning of the scope language and (k)(1) sources.[375]  We disagree with Valeo.  In the Scope Initiation Letter, Commerce explained that the CIT held "Commerce's scope ruling, conducted pursuant to 19 CFR 351.225(d), exceeded the limits of a (k)(1) analysis and is unsupported by substantial evidence," and that "the scope is ambiguous {…} as to whether Commerce intended to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys)."[376]  Further, Commerce solicited information to "address the meaning of the scope language '3XXX-series' in conjunction with 'as designated by the Aluminum Association.'"  Accordingly, the Scope Initiation Letter demonstrated that Commerce lacked the required information regarding

---

[374] *See* Valeo Scope Initiation Comments at 7; *see also* Domestic Industry's Scope Initiation Rebuttal Comments at 3-4.

[375] *See* Valeo's Scope Initiation Comments at 7

[376] *See* Scope Initiation Letter.

the meaning of the scope language "3XXX-series" in conjunction with "as designated by the Aluminum Association" to make a scope determination pursuant to 19 CFR 351.225(k)(1).

Next Valeo argues that Commerce deviated from its own regulatory framework.[377]  In the Scope Initiation Letter, Commerce allowed only 12 days for the initial submission and seven days for the rebuttal submission.[378]  Valeo argues that after the Scope Initiation Letter was issued, parties should have been allowed 20 days to provide comments on, and supporting factual information relating to, the inquiry, and 10 days to provide any rebuttal to such comments.[379] We disagree with Valeo.  Section 351.225(f) of Commerce's regulations states that the notice of the initiation of scope inquiry will include "a schedule for submissions of comments that *normally* allow interested parties 20 days in which to provide comments on, and supporting factual information relating to, the inquiry, and 10 days in which to provide any rebuttal comments" (emphasis added).  The term "normally" indicates that, under certain circumstances, Commerce may deviate from the schedule provided for submissions.  This scope inquiry is within the confines of an administrative remand proceeding and involves analyzing complex issues such as types of processes used to treat aluminum and classification of aluminum. Accordingly, in this case, Commerce's deviation from the normal submission schedule was warranted.  Further, Commerce twice extended the deadline for interested parties to file their submissions.[380]  After extensions, parties were allowed 15 days for their initial submissions.[381] Based on the above analysis, we find that Commerce did not deviate from its own regulatory framework.

---

[377] *See* Valeo's Scope Initiation Comments at 8-9.
[378] *See* Scope Initiation Letter.
[379] *See* Valeo's Scope Initiation Comments at 8-9.
[380] *See* First Extension of Deadline for Submissions; and Second Extension of Deadline for Submissions.
[381] *Id.*

Lastly, Valeo argues that Commerce must revoke its prior customs instructions concerning merchandise subject to this scope inquiry.[382]  We disagree.  Commerce's prior customs instructions were properly transmitted following the Final Scope Ruling, pursuant to 19 CFR 351.225(l)(3).  Valeo relies on *United Steel and Fasteners* to support its argument that Commerce may not suspend entries pursuant to its affirmative Final Scope Ruling, but may only suspend liquidation following the initiation date of scope inquiry on remand.[383]  However, *United Steel and Fasteners* involved a challenge to the retroactive suspension of liquidation to the initial suspension date of entries under the order, and held that Commerce may only begin the suspension of liquidation of the relevant entries starting on the day that the final scope ruling was issued, pursuant to 19 CFR 351.225(d).[384]  Commerce has done so here.

While Commerce initiated a broader scope inquiry under 19 CFR 351.225(e) on remand, this does not disturb Commerce's authority to suspend liquidation pursuant to a final scope ruling under 19 CFR 35.225(d).  Section 351.225(l)(1) of Commerce's regulations also provides that, "{w}hen {Commerce} conducts a scope inquiry under paragraph (b) or (e) of this section, *and the product in question is already subject to suspension of liquidation*, that suspension of liquidation will be continued, pending a preliminary or a final scope ruling, at the cash deposit rate that would apply if the product were ruled to be included within the scope of the order" (emphasis added). Therefore, the initiation of the scope inquiry would continue the suspension of liquidation pursuant to the Final Scope Ruling.  Lastly, we agree with the domestic industry that

---

[382] *See* Valeo's Scope Initiation Comments at 1.
[383] *Id.* at 9-10 (citing *United Steel and Fasteners, Inc. v. United States*, 947 F.3d 794, 801 (Fed. Cir. 2020) (*United Steel and Fasteners*)).
[384] *See United Steel and Fasteners*, 947 F.3d at 803.

Commerce should wait until after the pendency of appeals to issue any revised instructions to CBP that may be warranted.[385]

## VIII. INTERESTED PARTY COMMENTS ON DRAFT RESULTS OF REDETERMINATION

On May 19, 2023, Commerce released the Draft Results of Redetermination to all interested parties and invited parties to comment.[386] On June 2, 2023, we received comments from Valeo and the domestic industry.[387] These comments are summarized and addressed below.

**Comment 1: Relevance of Heat-Treatment**

*Valeo's Comments:*

- In Commerce's analysis of whether a heat-treatable alloy can be considered an alloy subject to the scope of the *Orders*, Commerce determined that an analysis of (k)(1) sources was unnecessary and relied exclusively on the plain meaning of annealing.[388]

- Commerce's draft results of redetermination misrepresents the production process of T-series sheet, misinterprets industry terms, disregards applicable terms utilized by the ITC, improperly focuses on the multi-layer finished product instead of the single core layer of aluminum, and ignores both the Aluminum Association's and HTSUS definitions of heat-treatable alloy.[389]

- In the underlying investigations, Commerce defined heat-treatable alloy and also confirmed that heat-treatable alloys were out-of-scope merchandise.[390]

---

[385] *See* Domestic Industry's Rebuttal Comments at 2-5.
[386] *See* Draft Results of Redetermination.
[387] *See* Valeo's Comments on Draft Results; *see also* Domestic Industry's Comments on Draft Results.
[388] *See* Valeo's Comments on Draft Results at 1.
[389] *Id.* at 4.
[390] *Id.* at 4-5.

- In the final results of redetermination Commerce should rely on the definition of heat-treatable alloys from the investigations.[391]

- The definition of "heat-treatable" Commerce adopted in the Draft Results of Redetermination creates a disharmony with the ITC Final Injury Determination.[392]

- No party has ever contested that Valeo's T-series sheet meets the definition of heat-treatable found in the HTSUS.[393]

- Commerce's determination did not address the fact that heat-treatable alloys, as defined solely based on chemical specifications, were not considered a 3XXX-series alloy at the investigation phase or included in the ITC Final Injury Determination.[394]

- Commerce's definitions of heat-treatable are not supported by substantial evidence.[395]

- Commerce must address the declaration from Ryan Olsen, Vice President of Business Information & Statistics with the Aluminum Association, regarding heat-treatable alloys and out-of-scope merchandise.[396]

- Commerce's determination that Valeo's T-series sheet is not heat-treated is not supported by substantial evidence.[397]

- Valeo's T-series sheet is not only annealed but also heat-treated.[398]

---

[391] *Id.* at 5.
[392] *Id.* at 5.
[393] *Id.* at 6.
[394] *Id.* at 17.
[395] *Id.* at 18-19.
[396] *Id.*
[397] *Id.* at 19-21.
[398] *Id.* at 19-20.

- The description of the heat-treatment process that T-series sheet undergoes is consistent with the ITC definition of heat-treatment in the ITC Final Injury Determination and the narrow definition of heat-treatment meaning a synonym for solution heat-treatment.[399]

- The fact that T-series sheet has "discernable phases of diffused alloys" does not demonstrate that T-series sheet is non-solution-heat-treated.[400]

- The homogenization of alloying elements occurs within the central layer of T-series sheet.[401]

- Commerce's finding that T-series sheet is not manufactured from a heat-treatable core is unsupported by substantial evidence.[402]

- No party contests that the core layer of T-series sheet, *i.e.*, YB-18 alloy, meets the definition of heat-treatable found in the HTSUS.[403]

- YB-18 alloy, if imported unprocessed, would meet the definition of heat-treatable industrial alloy in the HTSUS and would be classified under subheading 7606.12.3091.[404]

- Commerce's finding that YB-18 alloy does not have a unique combination of chemistry that would allow heat-treatability is unsupported by substantial evidence.[405]

- In the draft results of redetermination Commerce compared YB-18 alloy with 3065 alloy. However, YB-18 alloy contains more manganese and copper than 3065 alloy.[406]  Manganese contributes to heat-treatability in alloys containing copper.[407]

---

[399] *Id.* at 20.
[400] *Id.* at 20-21.
[401] *Id.* at 20.
[402] *Id.* at 24.
[403] *Id.*
[404] *Id.* at 6 and 24.
[405] *Id.* at 22 and 25.
[406] *Id.* at 25.
[407] *Id.*

- YB-18 alloy contains zirconium and titanium, the combined effect of which improves heat treatability in alloys with high copper content.[408]

- Commerce must examine whether heat-treatable and heat-treated alloys can be classified as 3XXX-series alloys.[409]

- Commerce impermissibly disregarded the definition of heat-treatment within the ITC Final Injury Determination.[410]

- The definition of heat-treatment within the ITC Final Injury Determination does not include annealing.[411]

- Commerce must find that T-series sheet is manufactured from heat-treatable alloys in accordance with the ITC Final Injury Determination.[412]

*Domestic Industry's Comments:*

- The domestic industry agrees with Commerce's analysis regarding T-series sheet not being heat-treated.[413]

- Commerce must clarify that heat-treatment is irrelevant to the question of whether a product is included in the scope of the *Orders*.[414]

**Commerce's Position:**  After reviewing interested party comments, we continue to find that the record contains two possible definitions for the term, "heat-treatment," and, thus, two possible definitions for "heat-treatable alloy."  For the purposes of answering the key question identified by the court (*i.e.*, whether a heat-treated (or heat-treatable) clad sheet can be classified as having

---

[408] *Id.*
[409] *Id.* at 26-27.
[410] *Id.* at 31.
[411] *Id.* at 31-32.
[412] *Id.* at 32.
[413] *See* Domestic Industry's Comments on Draft Results at 2.
[414] *Id.* at 2-3.

a 3XXX-series core (and, therefore, be in-scope)), for the reasons discussed below, we continue

to adopt the narrower definition of heat-treatment as a synonym for solution heat-treatment.

Further, we continue to find that the evidence on the record demonstrates that Valeo's T-series

sheet is non-heat-treatable (*i.e.*, unable to be solution heat-treated). Accordingly, because

Valeo's T-series sheet is non-heat-treatable, we continue to find that it is not necessary to

examine whether a heat-treated (or heat-treatable) clad sheet can be classified as having a

3XXX-series core (and, therefore, be classified as in-scope merchandise).

First, we address Valeo's argument that Commerce improperly determined that an

analysis of (k)(1) sources was unnecessary in its analysis of heat-treatable alloys and relied

exclusively on the plain meaning of annealing.[415]  We disagree with Valeo that Commerce did

not consult (k)(1) sources while analyzing the relevance of heat-treatment.  Commerce's analysis

on the relevance of annealing was only a small portion of the overall analysis on the relevance of

heat-treatment.

As part of its analysis regarding the relevance of heat-treatment, Commerce analyzed

whether the treatment process known as annealing has any relevance on the key question

identified by the CIT (*i.e.*, whether a heat-treated (or heat-treatable) clad sheet can be classified

as having a 3XXX-series core (and therefore be classified as in-scope merchandise)).  Commerce

undertook this analysis because the evidence on the record demonstrates that Valeo's T-series

sheet is annealed.  For example, Valeo's T-series sheet is available in tempers O and H24, both

of which correspond to certain amounts of annealing.[416]  Further, certain sources on the record

include annealing as a type of heat-treatment.  For example, the ITC Final Injury Determination

---

[415] *See* Valeo's Comments on Draft Results at 1.

[416] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix B).

states "certain flat-rolled aluminum products can undergo a heat-treating process known as annealing."[417]

Commerce found that annealing had no relevance to the key question identified by the CIT (*i.e.*, whether a heat-treated (or heat-treatable) clad sheet can be classified as having a 3XXX-series core (and therefore be classified as in-scope merchandise)).  This is because the plain language of the scope clearly states, "Subject merchandise includes common alloy sheet that has been further processed in a third country, including but not limited to *annealing*, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that *would not otherwise remove the merchandise from the scope* of the *Orders* if performed in the country of manufacture of the common alloy sheet."  Accordingly, annealing is clearly not a process that would remove merchandise from the scope of the *Orders*.[418]  Further, *Rolling Aluminum* explains that "all wrought aluminum alloys are available in annealed form."[419] Accordingly, both the plain language of the scope and industry publications such as *Rolling Aluminum* confirm that a clad aluminum sheet can be classified as having a 3XXX-series core and be included in the scope, regardless of whether it is annealed or not.

However, Commerce's analysis of the relevance of heat-treatment was not centered on the relevance of annealing.  In the section "Relevance of Heat-Treatment," Commerce provided a thorough and detailed analysis on the relevance of heat-treatment, whereas Commerce's analysis regarding the plain language of the scope and annealing accounted for a small portion of that analysis.  Accordingly, Valeo is incorrect in its claim that Commerce did not analyze (k)(1) sources or other record information indicating trade usage regarding the relevance of heat-

---

[417] *See* Valeo's Scope Initiation Comments at Exhibit 8 (containing ITC Final Injury Determination) (page I-18).
[418] *See Orders* (emphasis added).
[419] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix C).

treatment and, instead, relied exclusively on the plain meaning of annealing. Rather, Commerce's analysis was centered on determining an appropriate definition of heat-treatment based on record evidence and on analyzing whether Valeo's T-series met the definition of heat-treatable alloy. As shown above in the section "Relevance of Heat-Treatment," Commerce's analysis did not rely exclusively on the plain meaning of annealing. Rather, Commerce conducted a complete analysis of (k)(1) sources. Specifically, Commerce relied on (k)(1) sources and other record information indicating trade usage such as *Rolling Aluminum*, *Aluminum Alloys 101*, and the ITC Final Injury Determination.

Next, Valeo argues that Commerce adopted a different definition of heat-treatment in the underlying investigations, that T-series sheet meets this definition, and that in the investigations Commerce confirmed that heat-treatable alloys are not included in the scope.[420] First, in the *Remand Order*, the CIT stated that, "Commerce appeared to consider the question whether the scope contains an *exclusion* for heat-treatable 3XXX-series alloys, {}(finding no such exclusion), when the key question is whether a heat-treated (or heat-treatable) clad sheet can be *classified* as having a 3XXX-series core and therefore be in-scope."[421] Here, Valeo's argument does not attempt to address the question of whether a heat-treated or heat-treatable sheet can be classified as having a 3XXX-series core. Rather, Valeo is once again arguing if the scope should be interpreted to *exclude* heat-treatable sheet.

However, to the extent the CIT finds its helpful and necessary, we address Valeo's argument below. We disagree with Valeo that record information is dispositive to indicate that the scope excludes heat-treatable sheet. To support its argument, Valeo cites a declaration from Ryan Olsen, Vice President of Business and Information & Statistics with the Aluminum

---

[420] *See* Valeo's Comments on Draft Results at 4.
[421] *See* Remand Order at 30 (emphasis in original).

Association.[422]  While Valeo claims this information is on the record of the underlying investigations, we clarify that the declaration Valeo cites was not submitted on the records of either the underlying AD or CVD investigations of CAAS from China.[423]  Rather, the Olsen declaration was submitted on the record of later investigations on *CAAS from Italy, et. al.*,[424] and then submitted on the record of this remand proceeding.

The Olsen declaration does not demonstrate that Commerce adopted a definition of heat-treatment in the underlying CAAS from China investigations, nor does it demonstrate that Commerce intended to exclude heat-treatable alloys from the scope of the *Orders*.  In the declaration, Olsen states that, "HTSUS 7606.12.3091 provides for heat-treatable sheet, and HTSUS subheading 7606.12.3096 provides for in-scope CAAS."[425]  While the Olsen declaration discusses which HTSUS subheadings may be applicable to merchandise subject to the *CAAS from Italy, et. al.* investigations, it never puts forward a definition of "heat-treatment," "heat-treatable alloy," or any other relevant phrase.  Further, although Olsen described HTSUS subheading 7606.12.3091 as covering heat-treatable sheet and HTSUS subheading 7606.12.3096 as covering merchandise within the scope of the *CAAS from Italy, et. al.* investigations, the scope of the orders on *CAAS from Italy, et. al.* states that merchandise may be entered under HTSUS subheadings including 7606.12.3091, *i.e.*, the subheading described by Olsen as covering heat-treatable sheet.[426]  HTSUS subheading 7606.12.3091 was not yet effective at the time of the

---

[422] *See* Valeo's Scope Initiation Comments at Exhibit 21 (containing Declaration of Ryan Olsen).
[423] *Id.*
[424] *Id.*; *see also Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and the Republic of Turkey*: *Antidumping Duty Orders*, 86 FR 22139 (April 27, 2021) (*CAAS from Italy, et. al.*).
[425] *See* Valeo's Scope Initiation Comments at Exhibit 21.
[426] *See CAAS from Italy, et. al.* ("Further, merchandise that falls within the scope of these orders may also be entered into the United States under HTSUS subheadings 7606.11.3030, 7606.12.3015, 7606.12.3025, 7606.12.3035, *7606.12.3091*, 7606.91.3055, 7606.91.6055, 7606.92.3025, 7606.92.6055, 7607.11.9090") (emphasis added).

*CAAS from China Orders*;[427] the *CAAS from Italy, et. al. Orders* explicitly state that subject merchandise may enter under HTSUS subheading 7606.12.3091.[428]  Accordingly, we find that the evidence on the record of this proceeding does not support Valeo's argument that Commerce intended to exclude from the scope of the *Orders* heat-treatable aluminum sheet that meets the written scope description.

Further, we find that the statements regarding 7606.12.3091 in the Olsen declaration are not applicable to this scope inquiry.  The HTSUS subheading 7606.12.3091 is applicable only to non-clad products.[429]  In the Final Scope Ruling, Commerce determined that Valeo's T-series sheet is a clad product,[430] and the CIT affirmed this determination.[431]  Clad products are classified under HTSUS subheading 7606.12.6000.[432]  The Olsen Declaration states multiple times that for the *CAAS from Italy, et. al.* investigations, in-scope CAAS was entered under HTSUS subheading 7606.12.6000.[433]  Further, both the *CAAS from China Orders* and the orders on *CAAS from Italy, et. al.* list HTSUS subheading 7606.12.6000 as an HTSUS subheading under which CAAS is currently classifiable.[434]  Accordingly, there is no evidence indicating that Commerce intended to exclude the HTSUS subheading relevant to clad products.  Rather, the evidence on the record demonstrates that CAAS is currently classifiable under the HTSUS subheading applicable to clad products.

Based on the analysis above, we disagree with Valeo that the Olsen declaration demonstrates that Commerce intended to exclude heat-treatable sheet that meets the written

---

[427] *See Orders*; *see also* Valeo's Scope Initiation Comments at Exhibit 21.

[428] *See CAAS from Italy, et. al.*

[429] *See* Valeo's Scope Initiation Comments at Exhibit 19 (containing HTSUS chapter 76).

[430] *See* Final Scope Ruling at 11-13;

[431] *See Remand Order* at 27.

[432] *See* Valeo's Scope Initiation Comments at Exhibit 19.

[433] *Id.* at Exhibit 21 (paragraphs 7 and 8).

[434] *See Orders; see also CAAS from Italy, et. al.*

description of the scope from the *Orders*.  Rather, the evidence demonstrates the Olsen

declaration discussed which non-dispositive HTSUS subheadings to include in the scope of the

*CAAS from Italy, et. al.* orders.   To the extent that the HTSUS subheadings may provide an

indication of whether a product is covered by the scope of the *Orders*, the evidence on the record

demonstrates that Commerce recognizes CAAS may enter under both HTSUS 7606.12.3091

(which Olsen described as covering heat-treatable sheet) and HTSUS 7606.12.6000 (which

covers clad products).

Next, Valeo argues that Commerce must adopt the definition of "heat-treatable" found in

the HTSUS,[435] and that no party contests that T-series sheet meets the definition of "heat-

treatable" as defined in the HTSUS; thus T-series sheet should not be included in the scope.  We

disagree with Valeo.  Commerce already analyzed this argument in the Final Scope Ruling and

found that T-series sheet did not meet the definition of "heat-treatable" as defined in the HTSUS

because none of the HTSUS numbers listed in the statistical note are applicable to Valeo's T-

series sheet:

> Valeo also argues that T-series aluminum sheet is heat-treatable because it meets
> the description of statistical note 6 to HTSUS Chapter 76.  Statistical note 6 to
> HTSUS Chapter 76 states, "For the purposes of statistical reporting numbers
> 7604.21.0010, 7604.29.1010, 7604.29.3060, 7604.29.5050, 7606.12.3025 and
> 7606.12.3091, "heat-treatable industrial alloys" refers to aluminum containing by
> weight 3.0 percent or less of magnesium and 3.0 percent or less of silicon, and/or
> are designated as series 6xxx in the Aluminum Association's specifications of
> registered alloys."   However, four of these HTSUS codes (i.e., 7604.21.0010,
> 7604.29.1010, 7604.29.3060, 7604.29.5050) do not appear to be applicable to T-
> series aluminum sheet because HTSUS subheading 7604 applies to aluminum bars,
> rods, and profiles, whereas T-series aluminum sheet appears to be properly
> classified within subheading 7606 (Aluminum plates, sheets and strip, of a
> thickness exceeding 0.2 mm).  The other two HTSUS codes referenced in statistical
> note 6 (i.e., 7606.12.3025 and 7606.12.3091) do not appear to apply to T-series
> aluminum sheet because the 8-digit HTSUS code 7606.12.30 only is applicable for
> not clad aluminum products.  We recognize that Valeo has imported the T-series
> aluminum sheet under HTSUS code 7606.12.3091; however, Valeo has not

---

[435] *See* Valeo's Comments on Draft Results at 6.

demonstrated through it description of its merchandise or through a classification ruling from CBP that its merchandise should be classified as "not clad" within the 8-digit HTSUS code 7606.12.30. Therefore, because none of the HTSUS codes listed in statistical note 6 to HTSUS Chapter 76 appear to be applicable to T-series aluminum sheet, we find that the chemical composition of heat-treatable industrial alloys listed in Statistical note 6 is not relevant in determining if T-series aluminum sheet is heat-treatable for purposes of our scope determination.[436]

Consistent with the Final Scope Ruling and the *Remand Order*, we find that because Valeo's T-series sheet is a clad product and Valeo has failed to demonstrate that any of the HTSUS subheadings listed in statistical note 6 are applicable to T-series sheet, the chemical composition of heat-treatable industrial alloys listed in statistical note 6 is irrelevant to determining if T-series aluminum sheet is heat-treatable.

Further, as explained above in the section "Relevance of Heat-Treatment," we find that the record supports the existence of several permissible definitions of heat-treatment. However, the CIT identified the key question "whether a heat-treated (or heat-treatable) clad sheet *can be classified* as having a 3XXX-series core and therefore be in-scope."[437] The definition of "heat-treatable industrial alloys" listed in statistical note 6 is not appropriate to use for the question identified by the CIT. Statistical note 6 identifies 6XXX-series alloys as heat-treatable.[438] However, statistical note 6 does not specify whether 1XXX-series, 2XXX-series, 3XXX-series, 4XXX-series, 5XXX-series, 7XXX-series, or 8XXX-series alloys are classified as heat-treatable or non-heat-treatable.[439] In contrast, *Aluminum Alloys 101* classified each alloy series into heat-treatable or non-heat-treatable.[440] Accordingly, we find it is more appropriate to use the definition of heat-treatable alloys within *Aluminum Alloys 101*, because this source addresses the

---

[436] *See* Final Scope Ruling at 18-19.
[437] *See Remand Order* at 29-30 (emphasis in original).
[438] *See* Valeo's Scope Initiation Comments at Exhibit 19.
[439] *Id.*
[440] *See* Valeo's June 5, 2020, Submission at Exhibit 4.

relevance of heat-treatment as it pertains to the classification of 3XXX-series alloys (*i.e.,* the alloy series applicable to clad CAAS products). As explained above in the section "Relevance of Heat-Treatment," *Aluminum Alloys 101* addresses "solution heat-treatment" and describes a process consistent with the definition of "solution heat-treatment" given in *Rolling Aluminum* in Appendix C.[441]  Accordingly, we find the language used in *Aluminum Alloys 101* to be consistent with the narrower definitions of "heat-treatment" to mean a synonym for "solution heat-treatment" and "heat-treatable alloy" to mean an alloy that can undergo solution heat-treatment.

Additionally, Valeo does not explain why T-series sheet meeting the definition of heat-treatable within the HTSUS precludes T-series sheet from being classified as 3XXX-series. Under HTSUS statistical note 6, an aluminum alloy containing by weight 3.0 percent or less of magnesium and 3.0 percent or less of silicon would be considered a heat-treatable industrial alloy. The maximum magnesium composition of any registered 3XXX-series alloy is 1.5 percent (*see, e.g.*, 3004A alloy and 3204 alloy).[442]  The maximum silicon composition of any registered 3XXX-series alloy is 1.8 percent (*see*, *e.g.*, 3009 alloy).[443]  Accordingly, every registered 3XXX-series alloy has a magnesium composition of 3.0 percent or less and a silicon composition of 3.0 percent of less. Thus, based on the chemical composition limits for a heat-treatable industrial alloy in statistical note 6, every registered 3XXX-series alloy would be considered heat-treatable. Based on the analysis above, we reject Valeo's argument that its T-series sheet is not included in the *Orders* because it meets the definition of "heat-treatable industrial alloy" within the HTSUS. The evidence on the record demonstrates that the definition of "heat-treatable industrial alloy" is not applicable to the HTSUS subheading covering clad

---

[441] *Id.*; *see also* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix C).
[442] *See* First Domestic Industry Comments at Attachment 5.
[443] *Id.*

products, the definition of "heat-treatable industrial alloy" is inappropriate to use for the classification of aluminum alloy series, and every registered 3XXX-series alloy would meet this definition of "heat-treatable industrial alloy."

Next, Valeo argues that the definition of "heat-treatment" that Commerce adopted in the draft results of redetermination to mean a synonym for solution-heat-treatment would create a disharmony with the ITC Final Injury Determination.[444]  Valeo states, "as indicated in Exhibit GEN 12 of the initiation memo, imports of heat treatable industrial alloys, as defined above, were removed from the volume of subject imports to derive in scope subject merchandise. Therefore, there was no injury analysis regarding imports, as defined above."[445]  However, Commerce is unable to fully analyze Valeo's argument, because it does not include a full citation for Exhibit GEN 12 of the initiation memorandum.  Neither the AD Initiation Memorandum nor the CVD Initiation Memorandum of the *CAAS from China* investigations contain an Exhibit GEN 12.[446]  The country-specific checklists[447] for the *CAAS from Italy, et al.* investigations do not contain an Exhibit GEN 12.[448]  The *Federal Register* notice of the ITC's institution of antidumping and countervailing duty investigations on common alloy aluminum sheet from China does not indicate that it is accompanied by an initiation memorandum.[449]  Further the *Federal Register* notice of the ITC's institution of antidumping and countervailing duty

---

[444] *See* Valeo's Scope Initiation Comments at 5.

[445] *See* Valeo's Comments on Draft Results at 5.

[446] *See* Valeo's Scope Initiation Comments at 19; *see also See Common Alloy Aluminum Sheet from the People's Republic of China:  Initiation of Less-Than-Fair-Value and Countervailing Duty Investigations*, 82 FR 57214 (December 4, 2017) (*CAAS from China Initiation Notice*) and accompanying memoranda, "Initiation of Antidumping Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China," (AD Initiation Memorandum) and "Initiation of the Countervailing Duty Investigations of Common Alloy Aluminum Sheet from the People's Republic of China," (CVD Initiation Memorandum).

[447] Because the *CAAS from Italy, et. al.*, investigations were not self-initiated by the Department of Commerce, the initiation of these investigations are not accompanied by an initiation memorandum.

[448] *See e.g.,* Valeo's Scope Initiation Comments at Exhibit 7 (containing country-specific checklist for the AD investigation of CAAS from Croatia).

[449] *See Common Alloy Aluminum Sheet from China; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase investigations*, 82 FR 58025 (December 8, 2017).

investigations on common alloy aluminum sheet from *Italy, et. al*., does not indicate that it is accompanied by an initiation memorandum.[450]  Because Valeo did not provide a complete citation, the record of this proceeding does not appear to include the cited document, and neither Commerce's initiation notices nor the ITC's institution notices appear to be accompanied by an initiation memorandum that contains an Exhibit GEN 12, we are unable to address Valeo's specific argument with respect to this document.

To the extent that evidence on the record exists to analyze Valeo's argument, we disagree that the final results of redetermination create a disharmony with the ITC Final Injury Determination.  The ITC Final Injury Determination states, "that an industry in the United States is materially injured by reason of imports of common alloy aluminum sheet from China, provided for in subheadings 7606.11.30, 7606.11.60, 7606.12.30, *7606.12.60*, 7606.91.30, 7606.91.60, 7606.92.30, and 7606.92.60 of the Harmonized Tariff Schedule of the United States."[451]  As explained in the Final Scope Ruling and affirmed by the CIT, Valeo's T-series sheet is a clad product.[452]  Entries of clad products may enter under HTSUS subheading 7606.12.60.[453]  Accordingly, because the ITC's final determination included the HTSUS subheading under which clad products are categorized, we find that the ITC did consider clad products similar to Valeo's T-series sheet within the ITC Final Injury Determination.  Thus, Commerce finding Valeo's T-series sheet to be within the scope of the *Orders* would not create a disharmony with the ITC Final Injury Determination.  Further, in the ITC Final Injury

---

[450] *See Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and Turkey; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations,* 85 FR 14702 (March 13, 2020).

[451] *See* Valeo Scope Initiation Comments at Exhibit 8 (containing ITC Final Injury Determination (page 1)).

[452] *See* Final Scope Ruling at 11-13; *See also Remand Order* at 27. *See* Valeo's Scope Initiation Comments at Exhibit 19.

[453] *See* Valeo's Scope Initiation Comments at Exhibit 19.

Determination, the ITC classified aluminum alloy series as heat-treatable and non-heat-treatable based on *Aluminum Alloys 101*.[454]  Thus, Commerce, relying on *Aluminum Alloys 101* to define "heat-treatable alloy" for purposes of answering the CIT's key question (whether a heat-treated (or heat-treatable) clad sheet *can be classified* as having a 3XXX-series core and, therefore, be in-scope)[455] does not create a disharmony with the ITC Final Injury Determination.  Finally, as explained above in the section "Analysis of (k)(2) Factors," Commerce's analysis of (k)(2) factors confirms that T-series sheet is sufficiently similar to merchandise unambiguously covered by the scope to conclude that the two are merchandise of the same class or kind.  The ITC defined a single domestic like product consisting of all CAAS coextensive with the scope of the investigations.[456]  Thus, Commerce's (k)(2) analysis confirms that including Valeo's T-series sheet within the scope of the *Orders* would not create a disharmony with the ITC Final Injury Determination because T-series sheet is the same class or kind as the merchandise unambiguously covered by the scope and the ITC's coextensive single domestic like product.  While Commerce was unable to discern which evidence Valeo was attempting to cite, the evidence on the record demonstrates that these final results of redetermination do not create disharmony with the ITC Final Injury Determination.

Next, Valeo argues that Commerce's definition of "heat-treatable" is not supported by substantial evidence.[457]  We disagree.  As explained above in the section "Relevance of Heat-Treatment," Commerce reasonably determined to adopt the narrower definition of heat-treatment to mean a synonym for solution heat-treatment.  Several sources on the record support Commerce adopting the definition of heat-treatment to mean a synonym for solution heat-

---

[454] *Id.* at Exhibit 8 (containing ITC Final Injury Determination (page I-13)).
[455] *See Remand Order* at 29-30 (emphasis in original).
[456] *See* Valeo Scope Initiation Comments at Exhibit 8 (containing ITC Final Injury Determination (page 11)).
[457] *See* Valeo's Comments on Draft Results at 18-19.

treatment. *Aluminum Alloys 101* explains in the section "Heat-treatable alloys" that "some alloys are strengthened by *solution* heat-treating."[458]  In the ITC Final Injury Determination, the ITC classified aluminum alloy series as heat-treatable and non-heat-treatable based on *Aluminum Alloys 101*.[459]  *Aluminum Standards and Data 2017* states, under the caption "heat-treatable alloys," that "the first step, *called heat treatment or solution heat treatment*, is an elevated-temperature process designed to put the soluble element or elements in solid solution."[460]  ASM International's[461] publication *Introduction to Aluminum Alloys and Tempers* states, with respect to "heat treatable aluminum alloy," that "this type of alloy, the major, and perhaps some minor, alloying elements do provide significant solid solution and precipitation strengthening during *solution heat treatment* and subsequent aging.  These alloys are referred to as *heat treatable*."[462]  *Rolling Aluminum* states under "Heat-Treatable Alloys" that "some alloys, usually in the 2XXX, 6XXX, and 7XXX series, are '*solution* heat treatable.'"[463]  Further, *Rolling Aluminum* states that, "*Heat-treatable alloys* may be sufficiently heated and cooled during hot-rolling to undergo some partial *solution heat treatment* and precipitation hardening."[464] In *Rolling Aluminum* Appendix C, in another section also titled "Heat-Treatable Alloys," it states, "The first step, called *heat treatment or solution heat treatment*, is an elevated temperature process."[465]  Accordingly, multiple industry publications on the record demonstrate that the terms "heat-treatment" and "solution heat-treatment" are synonymous.  Further, multiple industry publications on the record

---

[458] *See* Valeo's June 5, 2020, Submission at Exhibit 4.
[459] *See* Valeo's Scope Initiation Comments at Exhibit 8 (containing ITC Final Injury Determination (page I-13)).
[460] *Id.* at Exhibit 10 (page 1-11) (emphasis added).
[461] ASM International describes itself as the world's largest and most established materials information society. *See* Domestic Industry's Scope Initiation Comments at 5 and at Attachment 2.
[462] *Id.* at Exhibit 12 (containing *Introduction to Aluminum Alloys and Tempers*) (page 6) (emphasis added to "solution heat treatment," emphasis in original for "heat treatable").
[463] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (page 2-6) (emphasis added).
[464] *Id*. at Attachment 1 (page 5-6).
[465] *Id.* at Attachment 1 (Appendix C).

demonstrate that the term "heat-treatable alloy" references an alloy's ability to undergo solution heat-treatment.  Thus, contrary to Valeo's argument, Commerce's adoption of the narrow definition of heat-treatment to mean solution heat-treatment is reasonable and supported by sufficient record evidence.

Next, Valeo argues that Commerce's determination that Valeo's T-series sheet is not heat-treated is unsupported by substantial evidence.[466]  Valeo argues that its T-series sheet is both annealed and heat-treated.[467]  Further, Valeo states the heat-treatment process that T-series sheet undergoes is consistent with the description of solution heat-treatment.[468]  We agree with Valeo that its T-series sheet is annealed and is heated at the same time and temperature required for solution heat-treatment.[469]  However, as explained above in the section "Relevance of Heat-Treatment" according to *Rolling Aluminum*, certain annealing processes occur "at approximately same time and temperature required for solution heat{-}treatment and slow cooled to room temperature."[470]  Accordingly, to ascertain if Valeo's T-series sheet was solution-heat-treated rather than merely annealed, we examined both the temper designation of T-series sheet and the description of T-series sheet post-thermal-treatment.  The evidence on the record demonstrates that Valeo's T-series sheet is not available in any of the temper designations that correspond to solution-heat treatment (*i.e.*, W, T3, T4, T6, T7, T8, or T9).[471]  Rather, the evidence demonstrates that the temper designations in which T-series sheet is available (*i.e.*, O and H24) correspond to products that have undergone annealing.[472]  Further, a product that has undergone

---

[466] *See* Valeo's Comments on Draft Results at 19-21.
[467] *Id.*
[468] *Id.* at 20.
[469] *See* Valeo's August 7, 2020, Submission at Attachment 2 (page 4).
[470] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix B).
[471] *See* Valeo's Scope Initiation Comments at Exhibit-2; *see also* Valeo's August 7, 2020, Submission at Attachment 2 (Exhibit S-1); and Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix B).
[472] *See* Valeo's Scope Initiation Comments at Exhibit-2; *see also* Valeo's August 7, 2020, Submission at Attachment 2 (Exhibit S-1); Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix B).

solution heat-treatment has alloy elements, called solute, that are homogeneously distributed.[473] In contrast, Valeo's T-series sheet post-thermal treatment has discernable phases of alloys with manganese content higher near the center and the silicon content higher near the surface of the product.[474]  Accordingly, both the temper designation of T-series sheet and the description of T-series sheet post-thermal treatment demonstrate that T-series sheet is not solution heat-treated. Thus, we continue to find that Commerce's determination that T-series sheet is not solution heat-treated is supported by substantial evidence.

Next, Valeo argues that the description of Valeo's T-series sheet post-thermal-treatment is consistent with a solution heat-treated product.[475]  Commerce found that alloying elements are not distributed homogeneously throughout Valeo's T-series sheet; however, Valeo argues that T-series sheet is manufactured from two layers of aluminum and that the homogenization of elements occurs within the core layer.[476]  We understand Valeo is arguing that T-series sheet is not a single heat-treated product where the alloying elements are homogeneously distributed throughout the product.  Rather, Valeo is arguing that the core layer is solution heat-treated with elements homogeneously distributed within the core layer.[477]  We disagree.  First, Valeo does not describe its core layer as having alloying elements homogeneously distributed.  Rather, Valeo states that for T-series sheet "the exact chemical properties may differ depending on the exact point of measurement."[478]  This description indicates that within each layer the alloying elements may not be completely homogeneously distributed.  Accordingly based on the above analysis, we find the evidence on the record is insufficient to demonstrate the core layer of T-series sheet

---

[473] *See* Valeo's June 5, 2020, Submission at Exhibit 4.
[474] *See* Scope Request at Attachment II at question 11.
[475] *See* Valeo's Comments on Draft Results at 20.
[476] *Id*. at 20-21.
[477] *Id.*
[478] *See* Scope Request at Attachment II at question 9.

has homogeneously distributed alloying elements consistent with a solution heat-treated product. Rather, we find that Valeo's description of the chemistry of the product depending on the exact point of measurement indicates that the alloying elements may not be completely homogeneously distributed in the core layer. Further, Valeo's explanation that only the core of T-series sheet undergoes solution heat-treatment does not address Commerce's finding that T-series sheet is not available in a temper designation that correspond to solution-heat treatment (*i.e.*, W, T3, T4, T6, T7, T8, or T9).[479]

Next, Valeo argues that Commerce's determination that the aluminum alloy used to produce the core of T-series sheet, YB-18, does not have a unique combination of chemistry that would allow heat-treatability is unsupported by substantial evidence.[480] As shown above in the section "Relevance of Heat-Treatment" Commerce determined that because the chemical specifications of YB-18 and 3065 alloy [

], an element that does not increase heat-treatability,[481] the evidence on the record demonstrates that the chemical composition of YB-18 is [          ] when compared to 3065 alloy. Valeo argues that YB-18 contains more copper, manganese, zirconium, and titanium than 3065 alloy, and that copper, manganese, zirconium, and titanium all contribute to an alloy's heat-treatability.[482] We disagree.

First, as explained above in the section "Relevance of Heat-Treatment," YB-18 has an allowable copper composition between [                    ],[483] and 3065 alloy has an allowable copper composition between [                    ].[484] Accordingly, we find that the

---

[479] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix B).
[480] *See* Valeo's Comments on Draft Results at 25.
[481] *See* Valeo's June 5, 2020, Submission at 9; *see also* First Domestic Industry Comments at Attachment 5; and Valeo's Scope Initiation Comments at 26-27.
[482] *See* Valeo's Comments on Draft Results at 25.
[483] *See* Valeo's June 5, 2020, Submission at 9.
[484] *See* First Domestic Industry Comments at Attachment 5.

copper composition for YB-18 and 3065 alloy [                              ].  *Aluminum Alloys* lists

3XXX-series alloys, such as 3065 alloy, as non-heat-treatable,[485] yet the evidence on the record

demonstrates it is possible for an aluminum sheet produced from 3065 alloy [

].[486]

Second, Valeo cites the academic article *Precipitation Behavior of Aluminum-Manganese*

*Alloy Under Different Heating Method* to support its claim that manganese can contribute to an

alloy's heat-treatability, but this article is focused on *annealing* not *solution heat-treatment*.[487]

The abstract of the article states, "{i}n this study, the precipitation behavior of a Al Mn alloy

*annealed* with two heating methods (electric resistance heating and radiative furnace heating) at

different temperature has been studied."[488]  The article finds that "as compared to radiative

furnace heating, electric resistance heating promotes precipitation of Al Mn alloy during

*annealing*."[489]  Accordingly, the evidence on the record is insufficient to demonstrate that

manganese contributes to an aluminum alloy's heat-treatability.  Valeo cites the academic article

*Effect of Zr and Ti Addition and Aging Treatment on the Microstructure and Tensile Properties*

*of Al-2% Cu-Based Alloys* to support its claim that zirconium and titanium can contribute to an

alloy's heat-treatability, but this article is inapplicable to YB-18.[490]  The academic article

explains that "in the present study, the effects of Zr and Ti additions/interactions to/with an Al-

2% Cu base alloy."  Accordingly, the academic study was limited to a specific alloy with a

copper composition of two percent.  Specifically, the study used an aluminum alloy with a

---

[485] *See* Valeo's June 5, 2020, Submission at Exhibit 4 (containing *Aluminum Alloys 101*).
[486] *Id.* at 9; *see also* First Domestic Industry Comments at Attachment 5.
[487] *See* Valeo's Scope Initiation Comments at Exhibit 15 (containing *Precipitation Behavior of Aluminum-Manganese Alloy under Different Heating Methods*).
[488] *Id.* (emphasis added)*.*
[489] *Id.* (emphasis added).
[490] *Id.* at Exhibit 11 (containing *Effect of Zr and Ti Addition and Aging Treatment on the Microstructure and Tensile Properties of Al-2% Cu-Based Alloys*).

copper composition of two percent, a silicon composition of 1.05 percent, a manganese composition of 0.6 percent.[491]  Accordingly the aluminum alloy relevant to the study has a copper composition [                                                                    ], has a silicon composition [

            ], and manganese composition [

            ].[492]  Thus, the evidence demonstrates the aluminum alloy study *Effect of Zr and Ti Addition and Aging Treatment on the Microstructure and Tensile Properties of Al-2% Cu-Based Alloys* was limited to an aluminum alloy with a chemical composition [

                        ].  Further, the article does not provide any evidence that zirconium and titanium would have similar effects on heat-treatability for alloys other than the specific alloy used in the study.[493]  Thus, we find the evidence on the record is insufficient to demonstrate that zirconium and titanium would contribute to the heat-treatability of YB-18.  Further, even if zirconium and titanium did contribute to the heat-treatability of an alloy, for these elements, the chemical compositions of YB-18 and 3065 alloy [                              ].[494]  Based on the analysis above, we find the evidence on the record is insufficient to demonstrate that manganese, zirconium, or titanium contribute to an aluminum alloy's heat-treatability.

        The evidence on the record demonstrates that the elements that contribute to heat-treatability of an alloy are copper, magnesium, silicon, and zinc.  *Aluminum Standards and Data 2017* for "heat-treatable alloys" states that, "the initial strength of alloys in this group is enhanced by the addition of alloying elements such as *copper, magnesium, zinc, and silicon*,"

---

[491] *Id.*
[492] *Id.; see also* Valeo's June 4, 2020, Submission at 9.
[493] *See* Valeo's Scope Initiation Comments at Exhibit 11.
[494] *See* June 4, 2020, Submission at 9 showing YB-18 has a minimum titanium composition of [          ] and a minimum zirconium composition of [        ]; *see also* First Domestic Industry Comments at Attachment 5 showing 3065 alloy has a maximum titanium composition of 0.05 percent and a maximum zirconium composition of 0.05 percent.

and "…these elements singly or in various combinations show *increasing solid solubility* in aluminum with increasing temperature."[495]  Thus, *Aluminum Standards and Data 2017* demonstrates that it is the elements of copper, magnesium, zinc, and silicon that allow an alloy to be strengthened through heat-treatment.  As explained above, in the section "Relevance of Heat-Treatability," YB-18 and 3065 alloy have chemical compositions that [

].  Accordingly, we continue to find the chemical compositions of YB-18 and 3065 alloy [

], an element not known to increase heat-treatability.[496]  Thus, we continue to find that Commerce's determination that the aluminum alloy used to produce the core of T-series sheet, YB-18, does not have a unique combination of chemistry that would allow heat-treatability, is supported by substantial evidence

Next, Valeo argues that annealing is not a process that would be included in the broad definition of heat-treatment (*i.e.*, a shop term to denote a thermal treatment to increase strength).[497]  Valeo argues that the broad definition of heat-treatment includes only thermal treatments that increase strength.[498]  Valeo argues that annealing does not strengthen aluminum alloys but, rather, softens them.[499]  The evidence on the record is mixed on whether the broad definition of heat-treatment includes annealing.  While *Rolling Aluminum* defines "annealing" as "a thermal treatment to soften metal,"[500] Valeo's June 4, 2020, Submission states that "the annealing process occurs when the aluminum is heated to temperatures in excess of 600 degrees

---

[495] *See* Valeo's Scope Initiation Comments at Exhibit 10 (page 1-11) (emphasis added).
[496] *See* Valeo's June 5, 2020, Submission at 9; *see also* First Domestic Industry Comments at Attachment 5; and Valeo's Scope Initiation Comments at 26-27.
[497] *See* Valeo's Comments on Draft Results at 31-32.
[498] *Id.*
[499] *Id.*
[500] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (page 9-1).

Fahrenheit in order to *strengthen* the metal."[501]  Accordingly, Valeo's June 4, 2020, Submission describes annealing as a thermal treatment meant to increase strength (*i.e.*, fitting within the broad definition of heat-treatment).  However, whether annealing is included in the broad definition of heat-treatment (*i.e.*, a shop term to denote a thermal treatment to increase strength) is not central to Commerce's analysis of the relevance of heat-treatment.  Rather, as explained above, multiple industry publications on the record demonstrate that the terms "heat-treatment" and "solution heat-treatment" are synonymous.  Further, multiple industry publications on the record demonstrate that the term "heat-treatable alloy" references an alloy's ability to undergo solution heat-treatment.  Accordingly, regardless of whether annealing is a process included in the broad definition of heat-treatment, we continue to find that Commerce's adoption of the narrow definition of heat-treatment (*i.e.*, a synonym for solution heat-treatment) is reasonable and supported by record evidence.

Next, Valeo argues that its T-series sheet is heat-treatable because, if YB-18 entered the United States as a non-clad product, it would enter the United States under HTSUS subheading 7606.12.3091 (which the Olsen declaration describes as covering heat-treatable sheet).[502]  We disagree.  First, Valeo's argument is based upon a hypothetical scenario.  This scope inquiry is centered on T-series as it *actually* enters the United States (*i.e.*, as a clad product).  Further, as explained above, the definition of "heat-treatable industrial alloys" listed in HTSUS Chapter 76 statistical note 6 is not appropriate to use for the question identified by the CIT (*i.e.*, whether a heat-treated (or heat-treatable) clad sheet can be classified as having a 3XXX-series core and therefore be in-scope)).  As explained above, we find that it is more appropriate to use the definition of heat-treatable alloys within *Aluminum Alloys 101*.

---

[501] *See* Valeo's June 4, 2020, Submission at 4 (emphasis added).
[502] *See* Valeo's Scope Initiation Comments at 6 and at 24.

Finally, Valeo argues that Commerce must examine whether heat-treatable or heat-treated sheet can be classified as a 3XXX-series alloy.[503]  In contrast, the domestic industry argues that Commerce should clearly determine that whether a product is heat-treated or heat-treatable is irrelevant to determine whether products are covered by the scope.[504]  As explained above, we continue to find that the evidence on the record demonstrates that Valeo's T-series sheet is non-heat-treatable (*i.e.*, unable to be solution heat-treated).  Because the product subject to this scope inquiry is neither heat-treated nor heat-treatable, we continue to find that it is not necessary to examine whether a heat-treated (or heat-treatable) clad sheet can be classified as having a 3XXX-series core (and therefore be in-scope merchandise).

## Comment 2:  Analysis of (k)(1) sources to determine whether the scope covers unregistered alloys

*Valeo Comments:*

- Commerce disregarded the plain meaning of "3XXX-series" based on the dispositive industry guidance in *Teal Sheets*.[505]

- Commerce should explain why it replaces "as designated by the aluminum association" in the draft results of redetermination with "as implied by Alcha in a separate rate application."[506]

- In the underlying investigation, Commerce refused to make scope determinations for individual products.  This invalidates Commerce's claim that it made a scope determination with respect to Alcha's imports during the investigation.[507]

---

[503] *See* Valeo's Comments on Draft Results at 26-27.

[504] *See* Domestic Industry's Comments at 13-15.

[505] *See* Valeo's Comments on Draft Results at 1.

[506] *Id.* at 2.

[507] *Id.*

- The final results of redetermination must disavow any representation that Valeo endorsed an interpretation during the investigation that the scope of the *Orders* encompassed unregistered alloys.[508]

- Commerce must explain how Alcha's separate rate application is a trade publication of a type considered in *ArcelorMittal*.[509]

- Commerce did not make a scope determination with respect to Alcha's imports during the investigation, this asserted "determination" can only be implied.[510]

- Commerce cherry picks one line from *Teal Sheets* and disregards both its context and express meaning.  The CIT has already rejected Commerce's interpretation of *Teal Sheets*.[511]

- Commerce's reliance of Alcha's separate rate application is unsupported by law.[512]

- Under 19 CFR 351.225 how a company reports its sales during an administrative review has no bearing on any scope inquiry.[513]

- Valeo sought a scope ruling from Commerce and its suppliers Alcha and Yinbang participated in administrative reviews to obtain applicable AD and CVD rates in case the products at issue are found to be within the scope of the *Orders*, not because their products are deemed to be within the scope.[514]

- Commerce's regulations permit an administrative review and scope inquiry to be conducted simultaneously.  Commerce infers that a company's participation in a scope proceeding signifies that its products are within scope.[515]

---

[508] *Id.*
[509] *Id.* at 2-3.
[510] *Id.* at 3.
[511] *Id.* at 3-4.
[512] *Id.* at 6-8.
[513] *Id.* at 6.
[514] *Id.* at 6-7.
[515] *Id.* at 7-8.

- Alcha's separate rate application is not an interpretative (k)(1) source.[516]

- Commerce's decision on Alcha's separate rate application does not contain any determination or analysis regarding a scope issue.[517]

- Commerce never made a determination that the merchandise exported by Alcha falls within the scope of the investigation.[518]

- Commerce's separate rate determinations were entirely based on whether the applicants demonstrated absence of both *de jure* and *de facto* government control over their export activities.[519]

- Commerce did not discuss any scope issues regarding unregistered alloys in either the preliminary or final scope decision memoranda.[520]

- Commerce's separate rate decision is not an interpretative source because it lacks any discussion or explanation about a scope issue.[521]

- At the time of the investigation, it was factually impossible for Commerce to determine if Alcha exported unregistered alloys.[522]

- [   ] is not a numerical code used by the Aluminum Association, therefore Commerce cannot determine the major alloying element of this alloy based on the first digit.[523]

- Whether an alloy is a registered with the Aluminum Association is based on the chemical composition of the alloy and not a name or numerical code.[524]

---

[516] *Id.* at 8-10.
[517] *Id.* at 8.
[518] *Id.*
[519] *Id.* at 8-9.
[520] *Id.* at 9-10.
[521] *Id.* at 10.
[522] *Id.* at 11.
[523] *Id.* at 12.
[524] *Id.*

- The fact that Commerce confirmed [    ] alloy is an unregistered alloy in the first administrative review is irrelevant.[525]

- Alcha listed two products in its separate rate application.  Therefore, even if Commerce understood [    ] alloy as an unregistered alloy, it could have granted Alcha's separate rate status based on its export activities for the other product.[526]

- In the underlying ITC injury investigation, there is evidence that unregistered alloys are not subject to the scope of the *Orders*.[527]

- Commerce did not address the term "designation" as used in the HTSUS.[528]  The HTSUS demonstrates the word "designate" is not a general term.[529]

- Commerce did not address the use of the word "common."  Based on the plain meaning of the term "common," Commerce must interpret the scope to cover only registered alloys.[530]

- Commerce failed to identify what terms it deemed ambiguous.  Commerce's (k)(1) analysis is not centered on the apparent ambiguity it identified.[531]

- The language of the scope is unambiguous. The CIT did not hold that the phrase "3XXX-series alloys" is ambiguous, rather, the CIT held "3XXX-series alloys" must be interpreted in conjunction with "as designated by the Aluminum Association."[532]

- The CIT held that Commerce must account for *Teal Sheets* as a whole.[533]

---

[525] *Id.*
[526] *Id.* at 12 -13.
[527] *Id.* at 13.
[528] *Id.* at 15-16.
[529] *Id.*
[530] *Id.* at 16-17 and at 31.
[531] *Id.* at 28.
[532] *Id.* at 28-29.
[533] *Id.* at 30.

- The CIT held that "from the outset, the *Teal Sheets* use the term "designation' to refer to registered alloys," implying that the plain meaning of "3XXX-series alloys" as defined in *Teal Sheets* unambiguously include only registered alloys.[534]

- Commerce must address the fact that Granges International is the single biggest importer of non-subject heat-treatable alloys from China.[535]

*Domestic Industry's Comments:*

- The industry sources that the domestic industry submitted demonstrate that there is a general understanding that "3XXX-series alloys" is equivalent to alloys with a "principal" or "major" alloying element of manganese.[536]

**Commerce's Position:**  After considering interested parties' comments, we continue to find that the (k)(1) sources and certain record information concerning trade usage are contradictory and the respective weights of these sources are not sufficient to clearly demonstrate preeminence over the other available record information.  Accordingly, we find that the (k)(1) sources are not dispositive in resolving the ambiguity in the scope language.

First, we address Valeo's argument that Commerce should make a scope ruling based on the plain meaning of "common."[537]  Valeo argues that "common" should be interpreted as "known to the community."[538]  Thus, Valeo argues that Commerce must interpret the scope term "3XXX-series alloy" to only include alloys known to the community (*i.e.*, registered alloys).[539] We disagree with Valeo.  In the Preliminary Scope Memorandum, Commerce stated that, "{t}he scope includes *all products* which meet the physical description of the scope and do not

---

[534] *Id.* at 28-29.
[535] *Id.* at 6.
[536] *See* Domestic Industry's Comments on Draft Results at 3-4.
[537] *See* Valeo's Comments on Draft Results at 16-17 and at 31.
[538] *See* Valeo's Scope Initiation Comments at 3.
[539] *Id.* at 16-17.

otherwise qualify for an exclusion."[540]  The only exclusion described in the scope of the *Orders*

is for aluminum can stock which is not applicable to T-series sheet.[541]   Accordingly, this scope

inquiry properly focuses on whether T-series sheet meets the physical description provided in the

scope.  Further, according to Merriam Webster, "common" can also be interpreted to mean "the

best known or most frequently seen kind."[542]   Accordingly, it is possible to interpret "common"

and "3XXX-series alloy" together to mean that alloys with a primary alloying agent of

manganese are a frequently seen kind of aluminum alloy.  Based on the analysis above, we

disagree with Valeo that the scope term "common" necessitates the interpretation that only

registered alloys are included in the scope of the *Orders*.  Rather, we find that the evidence on

the record demonstrates that *all products* are included within the scope of the *Orders* that meet

the physical description of the scope and do not otherwise qualify for an exclusion.  Further,

there are additional meanings of the word "common" beyond the interpretation that Valeo

advances.

Next, we analyze Valeo's argument that Commerce "cherry picks one line" from *Teal

Sheets*.[543]  Valeo argues that the CIT held Commerce must account for *Teal Sheets* as a whole.[544]

We disagree with Valeo that Commerce failed to account for *Teal Sheets* as a whole.  In the

*Remand Order*, the CIT held that, "when read as a whole, the Aluminum Association's use of

"3" in "3XXX" in the list of alloy groups indicates a major alloying element of manganese while

---

[540] *See* Memorandum, "Factual Information Relevant to the Final Scope Ruling Determination," dated October 15, 2021 (October 15, 2021, Memorandum) at Attachment 4 (containing Memorandum, "Scope Comments Preliminary Decision Memorandum," dated June 15, 2018 (Preliminary Scope Memorandum))(emphasis added).

[541] *See Orders*, "Excluded from the scope of the Orders is aluminum can stock, which is suitable for use in the manufacture of aluminum beverage cans, lids of such cans, or tabs used to open such cans.  Aluminum can stock is produced to gauges that range from 0.200 mm to 0.292 mm, and has an H-19, H-41, H-48, or H-391 temper."

[542] *See Merriam Webster*, "common," retrieved May 5, 2023, https://www.merriam-webster.com/dictionary/common.

[543] *See* Valeo's Comments on Draft Results at 3-4.

[544] *Id.* at 30.

contemplating the addition of three more digits to complete the four-digit designation."[545]  As explained above in the section "Analysis of (k)(1) sources to determine whether the scope covers unregistered alloys," based on the *Teal Sheets* recommendation, we find that the first digit that identifies the alloy series contemplates the addition of three more digits to account for a complete four-digit registration.  Accordingly, we find that this source weighs in favor of finding that the scope of the *Orders* is limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association.  Accordingly, our analysis of *Teal Sheets* did account for *Teal Sheets* as a whole and is consistent with the *Remand Order*.

Valeo's objection to the draft results of redetermination appears less centered on Commerce's interpretation of *Teal Sheets* (*i.e.*, that *Teal Sheets* weighs in favor of finding that the scope of the *Orders* is limited to registered alloys) and more centered on the weight given to *Teal Sheets*.  Valeo refers to *Teal Sheets* as "dispositive industry guidance," while we find the (k)(1) sources as a whole not to be dispositive.[546]  Further, Valeo argues that Commerce improperly disregarded *Teal Sheets* as not dispositive.[547]   However, "disregarding" evidence and finding evidence "as not dispositive" are not equivalent.  Commerce considered *Teal Sheets* and found the evidence supported the interpretation of the scope as advanced by Valeo (*i.e.*, that the scope is limited to including registered alloys).  As explained above in the section "Analysis of (k)(1) sources to determine whether the scope covers unregistered alloys," the record contains evidence that supports the alternative interpretation that the term "3XXX-series alloy" is intended to include any alloy with a major alloying element of manganese including unregistered alloys (*e.g.*, Commerce's separate rate determination in the underlying AD investigation

---

[545] *See Remand Order* at 19.
[546] *See* Valeo's Comments on Draft Results at 3-4.
[547] *Id.* at 1.

regarding Alcha). Accordingly, Commerce had to weigh the contradictory evidence. As explained above, Commerce's methodology of weighing the evidence is reasonable. When we initially weigh the evidence, we give greater weight to Commerce's separate rate determination than *Teal Sheets*, because the separate rate determination reflects Commerce's interpretation of the scope at the time of the investigation. However, we detract weight from Commerce's separate rate determination, because Commerce's analysis regarding separate rates in the underlying AD investigation was centered on whether exporters were independent of the non-market economy entity and Commerce provided minimal analysis regarding whether a company exported subject merchandise. Because the (k)(1) sources and other record information indicating trade usage provide support for differing conclusions, and because the respective weight of the (k)(1) sources is not sufficient to clearly demonstrate preeminence over the other available (k)(1) sources, we find that the (k)(1) sources on the record are not dispositive in resolving the scope ambiguity.

Next, Valeo argues that the CIT implied that the plain meaning of "3XXX-series alloys" as defined in *Teal Sheets* unambiguously includes only registered alloys.[548] Thus, Valeo argues that Commerce must determine, without conducting an analysis of (k)(1) sources, that the scope of the *Orders* is limited to registered alloys. We disagree. The CIT explained that "whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that the court reviews *de novo*."[549] Proceeding under that standard of review, the CIT held that "the scope is ambiguous {} as to whether Commerce intended the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys), or whether Commerce intended the scope to be

---

[548] *Id.* at 30.
[549] *See Remand Order* at 14.

limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association."[550]  Accordingly, the CIT has already decided, as a question of law, that an ambiguity exists within the scope language.  Further, as explained above in the section "Analysis of (k)(1) sources to determine whether the scope covers unregistered alloys," *Teal Sheets* as a whole uses the word "designation" to refer to alloys with a four-digit designation from the Aluminum Association.  However, under 19 CFR 351.225(a), "the description of the merchandise subject to the scope is written in general terms."  The term "3XXX-series" is an industry-specific term defined only by the industry publication *Teal Sheets*.  In contrast the term "designate" is a general term that may be used in the common vernacular.  Accordingly, consistent with the *Remand Order*, we find that the interpretation of "3XXX-series alloy" with "designated by the Aluminum Association," to be ambiguous as to whether Commerce intended unregistered alloys to be included in the scope of the *Orders*.  Thus, according to 19 CFR 351.225(k)(1), Commerce must take into account "the description of the merchandise contained in the petition, the initial investigation, and the determinations of the secretary (including prior scope determinations) and the commission."[551]

Next, Valeo argues that Commerce's determination regarding Alcha's separate rate is not an interpretive (k)(1) source.[552]  We disagree.  Under 19 CFR 351.225(k)(1), Commerce will take into account the initial investigation and determinations of Commerce (including prior scope determinations).  Commerce's determination regarding Alcha's separate rate is included within the preliminary and final determinations of the AD investigation on *CAAS from China*.  Thus,

---

[550] *Id.* at 18.
[551] *See* 19 CFR 351.225(k)(1).
[552] *See* Valeo's Comments on Draft Results at 8-10.

our analysis of Commerce's determination regarding Alcha's separate rate is consistent with 19 CFR 351.225(k)(1).

Valeo argues that Commerce's determination regarding Alcha's separate rate in the underlying AD investigation is not an interpretative (k)(1) source because it does not discuss a scope issue; however, we disagree. The parenthetical phrase within 19 CFR 351.225(k)(1), "determinations of the secretary (including prior scope determinations)," indicates that the determinations that Commerce may consider under a (k)(1) analysis are not limited to scope determinations. Rather, the preliminary and final determinations of the underlying investigations are also taken into account in a (k)(1) analysis. Further the Federal Circuit has held that, "the interpretation of the language used in the *Orders* must be based on the meaning given to that language during the underlying investigations."[553] The meaning given to the scope language during the underlying investigations is not limited to explicit discussions surrounding scope issues. Rather, the meaning given to the scope language during the underlying investigations is reflected throughout the preliminary and final determinations of the AD and CVD investigations. In the *Preliminary AD Determination*, Commerce stated "Commerce's policy is to assign all exporters of *merchandise under consideration* that are in an NME country this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate."[554] In the *Final AD Determination*, Commerce explained that it "determines whether an exporter has demonstrated an ability to control its own commercial decision-making concerning exportation of the *subject merchandise.*"[555] Accordingly, Commerce's separate rate determinations are, in-part, dependent upon the meaning Commerce gave the terms

---

[553] *See Fedmet*, 755 F.3d at 921.
[554] *See Preliminary AD Determination* PDM at 12 (emphasis added).
[555] *See Final AD Determination* IDM at 33 (emphasis added).

"merchandise under consideration" and "subject merchandise" during the underlying AD investigation. Thus, Commerce's determination that Alcha International was entitled to a separate rate indicates that Commerce understood the proof of sale listed in Alcha International's separate rate application to be applicable to "merchandise under consideration." As explained above in the section "Analysis of (k)(1) sources to determine whether the scope covers unregistered alloys," the sale listed in Alcha International's separate rate application was of an unregistered alloy.[556]   Accordingly, evidence on the record indicates that, during the underlying AD investigation, the meaning given to the scope language included unregistered alloys.

Next, Valeo argues that in the underlying investigation, Commerce refused to make scope determinations for individual products, and that this invalidated Commerce's analysis that it made a scope determination with Alcha's imports during the investigation.[557] We disagree with Valeo. First as a factual matter, Commerce did make scope determinations for certain individual products during the investigations. For example, Commerce determined "based on the plain language of the scope, the wide sheet products described by TTMA are covered by the scope."[558] However, Valeo misunderstands our analysis regarding Alcha's separate rate determination. We did not find that Commerce directly made a scope determination in the underlying AD investigation such that the (k)(1) sources dispositively demonstrate unregistered alloys with major alloying elements corresponding to 1XXX, 3XXX, and 5XXX-series alloys are included in the scope of the *Orders*. Rather we analyzed the specific use of language within Commerce's separate determinations.

---

[556] *See* NFI Memorandum at Attachment 2 (containing Alcha International's SRA).
[557] *See* Valeo's Comments on Draft Results at 2 and at 10.
[558] *See* October 15, 2021, Memorandum at Attachment 1 (containing Preliminary Scope Memorandum) at Comment 1.

We find that, based on the language used in the *Preliminary AD Determination* and *Final AD Determination*, Commerce considered the companies that received separate rates to be exporters of merchandise under consideration/subject merchandise.[559]  When we analyze the use of the language "exporters of merchandise under consideration" used in the *Preliminary AD Determination* in conjunction with Commerce's determination to grant Alcha International a separate rate, we reasonably find that, during the underlying AD investigation, Commerce considered Alcha International to be an exporter of merchandise under consideration. Commerce's determination that Alcha International was an exporter of merchandise under consideration was based upon the information included in Alcha International's separate rate application.  The sale listed in Alcha International's separate rate application was of  an unregistered alloy.[560]  Accordingly, when we analyze the "exporters of merchandise under consideration" language used within the *Preliminary AD Determination* regarding separate rates, with respect to Alcha International's separate rate application, we find the determination to grant Alcha International a separate rate indicates that, during the underlying AD investigation, the meaning given to the scope language included unregistered alloys with major alloying elements corresponding to 1XXX, 3XXX, and 5XXX-series.

Next, Valeo argues that there is nothing on the record to demonstrate that Commerce considered scope issues within its separate rate determinations.[561]  We disagree.  Valeo assumes that the limited analysis regarding scope issues within the separate rate determinations reflects that Commerce did not consider whether companies were exporters of merchandise under consideration.  However, in the *Preliminary AD Determination* and *Final AD Determination*,

---

[559] *See Preliminary AD Determination* PDM at 12 (emphasis added); *see also Final AD Determination* IDM at 33.
[560] *See* NFI Memorandum at Attachment 2 (containing Alcha International's SRA).
[561] *See* Valeo's Comments on Draft Results at 8.

Commerce explained that exporters of merchandise under consideration/subject merchandise are eligible for a separate rate.[562]  We agree that Commerce's separate rate determination centered on whether a company was independent from the non-market economy entity.  This reflects that the most debated portion of a separate rate determination is whether a company is independent from the non-market economy entity.  In contrast the limited analysis devoted to whether a company qualifies as an exporter of subject merchandise is reflective that this portion of the separate rate determinations is uncontentious.  Thus, we do not disregard this (k)(1) source, but we do adjust the weight given to this source to reflect that the analysis was centered on whether a company was independent from the non-market economy entity.  As explained above in the section, "Analysis of (k)(1) sources to determine whether the scope covers unregistered alloys," although a determination that a company is eligible for a separate rate does demonstrate that Commerce considers that company to be an exporter of subject merchandise, we find the limited analysis regarding this matter in Commerce's determination detracts from the weight that should be given to this (k)(1) source.

Next Valeo argues that Commerce's regulations expressly permit an administrative review and scope inquiry to be conducted simultaneously.[563]  Valeo argues that Commerce inferred that Alcha's unregistered alloy is included within the scope of the *Orders* because Alcha participated in a scope inquiry and an administrative review.[564]  We agree with Valeo that a company is permitted to participate in, and Commerce is permitted to conduct, an administrative review and scope inquiry simultaneously.  We disagree that our analysis ever infers that a company's participation in a scope proceeding, or in an administrative review, signifies that the

---

[562] *See Preliminary AD Determination* PDM at 12; *see also Final AD Determination* IDM at 33.
[563] *See* Valeo's Comments on Draft Results at 6-8.
[564] *Id.*

company's products are within scope. First Valeo does not cite any information indicating that Alcha ever filed a scope inquiry with Commerce regarding its unregistered alloy or any other merchandise. Nor does Valeo cite any information that Alcha's U.S. customer has ever filed a scope inquiry with Commerce regrading [   ] alloy. Accordingly, because Alcha has not participated in a scope inquiry, it is not possible for Commerce's analysis to infer that Alcha's [   ] alloy is included within the scope of the *Orders* based on Alcha's non-existent participation in a scope inquiry.

Further, as explained above in the section "Analysis of (k)(1) sources to determine whether the scope covers unregistered alloys," Alcha's questionnaire responses in the first AD administrative review are relevant insofar as they further clarify language Alcha used in its separate rate applications in the AD investigations. Accordingly, Commerce's analysis of Alcha's [   ] alloy does not rely on any inferences regarding its participation in other segments of this proceeding. Rather, our analysis regarding Alcha's unregistered alloy is centered on the separate rate determination within the *Final AD Determination*. This is consistent with 19 CFR 351.225(k)(1) which states Commerce will take into account the initial investigation and determinations of Commerce.

Next, Valeo argues that Alcha's separate rate application has no probative value.[565] Valeo argues that it not possible to determine from Alcha's separate rate applications that [   ] is an unregistered alloy with a major alloying element of [            ].[566] Valeo argues that because [   ] is not a four-digit numerical code used by the Aluminum Association, Commerce cannot rely on the alloy code name to determine the chemical composition of [   ] alloy. We disagree. *Teal Sheets* is an international alloy designation with both the Aluminum Association

---

[565] *Id.* at 10-13.

[566] *Id.*

located in the United States and the China Nonferrous metals Techno-Economic Research Institute located in China as signatories.[567]   Accordingly, a Chinese CAAS producer/exporter that exports to the United States, such as Alcha, would be familiar with the one-digit alloy series, four-digit alloy registrations, and restrictions regarding designations of unregistered alloys within *Teal Sheets*.

Appendix A of *Teal Sheets* explains the use of designations for unregistered aluminum alloys, "Designations that could be mistaken for a designation described in the recommendation {} shall not be used for unregistered wrought aluminum alloys,"[568]   Accordingly, *Teal Sheets* restricts the use of Aluminum Association four-digit registrations (*i.e.*, designations described in the recommendation *Teal Sheets*) only for alloys that have chemical composition limits identical to the registered limits of that designation.[569]   However,  *Teal Sheets* does not restrict companies from using the one-digit alloy series in the designation of unregistered alloys.[570]   Alcha's use of [    ] is consistent with the *Teal Sheets* restriction on designations for unregistered alloys because the [                    ] prevents the alloy name [    ] from being mistaken for a four-digit Aluminum Association registration (*i.e.*, a designation described in the recommendation of *Teal Sheets*).[571]   Valeo argues that the code [    ] does not indicate any physical or chemical characteristics about the alloy.  We disagree.  The purpose of alloy designations is to express meaning regarding the product's physical and chemical characteristics.  Accordingly, for Alcha to use the [                    ] starting with [ ] to refer to an unregistered alloy with a major alloying element of [            ] would be consistent with the purpose of alloy

---

[567] *See* First Domestic Industry Comments at Attachment 5 (page i – ii).
[568] *Id.* at Attachment 5 (Appendix A).
[569] *Id.*
[570] *Id.*
[571] *Id.* at Attachment 5, showing no registered alloy has a second digit of [ ].

designations, consistent with one-digit alloy-series within *Teal Sheets*, and consistent with the

restrictions regarding designations used for unregistered alloys within *Teal Sheets*.

Next, Valeo argues that Commerce may have granted Alcha's separate rate based on its

sale of [                    ] with [                              ].[572]  We disagree.  Alcha identifies

[        ] products in its commercial invoice as subject merchandise.[573]  The [                    ] is

[                        ] with [                          ].[574]  The [                    ] is [

                              ].[575]  We reject Valeo's argument that Commerce's separate rate

determination may have been limited to Alcha's reported sale of [                        ] with [

                        ] because Valeo does not offer any interpretation of "exporters of

merchandise under consideration" that would explain such a determination.  As explained above,

[        ] alloy is identifiable as an unregistered alloy with a primary alloying element of

[              ].  Accordingly, we find that the scope interpretation that Commerce intended to

cover any alloy that contains a major alloying element corresponding to the Aluminum

Association's alloy groups (including unregistered alloys) adequately explains Commerce's

separate rate determination in regard to Alcha.

Valeo then argues that the final results of redetermination must disavow any

representation that Valeo endorsed an interpretation during the investigations that the scope of

the *Orders* encompassed unregistered alloys.[576]  However, Valeo did not identify anywhere in

Commerce's draft results of redetermination where Commerce made such a representation.  To

the extent it is necessary, we clarify that while Alcha [                              ] of its

---

[572] *See* Valeo's Comments on Draft Results at 11.
[573] *See* NFI Memorandum at Attachments 1 (containing Jiangsu Alcha SRA) and Attachment 2 (containing Alcha International SRA).
[574] *Id.*
[575] *Id.*
[576] *See* Valeo's Comments on Draft Results at 2.

unregistered alloy to be [                              ],[577] we understand any representations within

Alcha's separate rate applications to be made on behalf of Alcha, the party that filed the separate

rate applications.

Valeo futher argues that Commerce must explain how Alcha's separate rate application is

a trade publication of a type considered in *ArcelorMittal*.[578]  We disagree.  Commerce has not

analyzed Alcha's separate rate application as a trade publication or source per *ArcelorMittal*.

Rather, Commerce's analysis of the *Preliminary AD Determination* and *Final AD Determination*

— including the separate rate determinations regarding Alcha within those determinations —

was based upon 19 CFR 351.225(k)(1), which states that Commerce will take into account "the

description of the merchandise contained in the petition, the initiation of the investigation, and

the determinations of {Commerce} (including prior scope determinations) and the

Commission."[579]   In order to fully analyze the separate rate determination concerning Alcha in

the *Preliminary AD Determination* and *Final AD Determination*, we analyzed the underlying

separate rate application.

Next, Valeo states that the ITC excluded unregistered alloys in the ITC Final Injury

Determination and, therefore, such alloys are not included in the scope.[580]  However, Valeo does

not reference a determination by the ITC when contending that "the ITC excluded unregistered

alloys."  Rather, Valeo cites its own comments made at the ITC preliminary phase conference.[581]

Valeo's comments to the ITC state that, "As a preliminary matter, we note that the vast majority

of brazing sheet is already excluded from the scope of this case, and presumably already a

---

[577] *See* NFI Memorandum at Attachments 1 (containing Jiangsu Alcha SRA) and Attachment 2 (containing Alcha International SRA).
[578] *See* Valeo's Comments on Draft Results at 2-3.
[579] *See* 19 CFR 351.225(k)(1).
[580] *See* Valeo's Comments on Draft Results at 13.
[581] *Id.*

separate like product. Brazing sheet is sold pursuant to proprietary grades and does not meet the

3000 series specifications of the aluminum association."[582]   Valeo's comments do not address the

question of whether the scope of the *Orders* includes unregistered alloys. Rather, Valeo's

comments address the types of aluminum that is used in brazing sheet. Further, whether Valeo

submitted comments arguing for a particular point of view is not relevant. Rather, the

determinations of the ITC are relevant. Valeo does not cite any evidence from the ITC Final

Injury Determination that indicates that the ITC found that unregistered alloys were expressly

excluded. Rather, evidence on the record appears to indicate that the ITC did include

unregistered alloys in the ITC Final Injury Determination. In its analysis of threat

considerations, the ITC analyzed a questionnaire response from Jiangsu Alcha.[583]   Accordingly,

to the extent that Jiangsu Alcha understood the scope of the *Orders* to include unregistered alloys

consistent with its separate rate application, we can reasonably conclude that the production it

reported to the ITC included its production of unregistered alloys. Accordingly, we find that the

evidence on the record does not demonstrate that the ITC excluded unregistered alloys.

Next, Valeo argues that the HTSUS demonstrates that the term "designate" is not a

general term.[584]   Valeo cites HTSUS Chapter 76 statistical note 6 which states, "For the purposes

of statistical reporting numbers 7604.21.0010, 7604.29.1010, 7604.29.3060, 7604.29.5050,

7606.12.3025 and 7606.12.3091, 'heat-treatable industrial alloys' refers to aluminum containing

by weight 3.0 percent or less of magnesium and 3.0 percent or less of silicon, and/or are

designated as series 6xxx in the Aluminum Association's specifications of registered alloys."[585]

We disagree that the HTSUS demonstrates the term "designation" is not a general term. As

---

[582] *Id.*
[583] *See* Valeo's Scope Initiation Comments at Exhibit 8 (containing ITC Final Injury Determination) (page VII-3).
[584] *See* Valeo's Comments on Draft Results at 15-16.
[585] *See* Valeo's Scope Initiation Comments at Exhibit 19.

explained above in the section, "Analysis of (k)(1) sources to determine whether the scope covers unregistered alloys," *Teal Sheets* as a whole uses the word "designation" to refer to alloys with a four-digit designation from the Aluminum Association.  However, the dictionary definition of the term "designate" does not require the term to be used in reference to a four-digit alloy designation from the Aluminum Association.

Next, Valeo argues that Commerce failed to address the argument that Granges International is the single largest importer of non-subject heat-treatable alloys from China.[586] We disagree that Commerce failed to address this argument, rather Commerce concludes that Valeo has failed to explain the relevance of this argument.  Commerce has not contested that certain merchandise is outside the scope of the *Orders*, nor has Commerce contested that companies may import merchandise that is outside the scope of the *Orders*.  Valeo offers no explanation regarding the relevance of a company unrelated to this scope inquiry importing merchandise that is not at issue in this scope inquiry; however, the argument seems to be tangentially related to Granges International's merchandise being entered under HTSUS subheading 7606.12.3091.[587]  As explained above, that fact that merchandise enters under HTSUS subheading 7606.12.3091 is not sufficient on its own to demonstrate that a product is not covered by the scope of the *Orders*.  HTSUS subheading 7606.12.3091 was not yet in effect at the time of the *CAAS from China Orders*,[588] and the *CAAS from Italy, et. al. Orders* explicitly state that subject merchandise may enter under HTSUS subheading 7606.12.3091.[589]

Lastly, we address the domestic industry's argument that the sources it placed on the record demonstrate that "3XXX-series alloy" is meant to refer to any alloy with a major alloying

---

[586] *See* Valeo's Comments on Draft Results at 6.
[587] *Id.* at 24.
[588] *See Orders*; *see also* Valeo's Scope Initiation Comments at Exhibit 21.
[589] *See CAAS from Italy, et. al.*

element of manganese.[590]  The domestic industry argues that the sources it placed on the record use the terms "3XXX-series alloy" and "Al-Mn" alloy interchangeably.[591]  We disagree that these sources resolve the ambiguity as to whether Commerce intended the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys), or whether Commerce intended the scope to be limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association.  The interchangeable use of "3XXX-series alloy" and "Al-Mn" alloy can be reasonably accounted for because all 3XXX-series alloys are Al-Mn alloys.

### Comment 3:  Analysis of (k)(2) Factors

*Valeo's Comments:*

- Commerce's (k)(2) analysis does not focus on the ambiguous scope terms.[592]

- Commerce's (k)(2) findings are not supported by substantial evidence and not in accordance with law.[593]

- In the draft results of redetermination, Commerce did not consider that it had already determined in the underlying investigation that heat-treatable alloys are not the same class or kind of merchandise as CAAS.[594]

- T-series sheet is a heat-treatable alloy that is not the same class or kind as CAAS.[595]

- Commerce never defined "solution heat-treatment," yet, in in its (k)(2) analysis, Commerce concludes that T-series sheet is not solution heat-treated.[596]

---

[590] *See* Domestic Industry's Comments on Draft Results at 3-4.
[591] *Id.*
[592] *See* Valeo's Comments on Draft Results at 28.
[593] *Id.* at 21-23.
[594] *Id.* at 21.
[595] *Id.*
[596] *Id.* at 21-22.

- Commerce's determination that there are multiple non-heat-treatable registered 3XXX-series alloys that [

  ] directly conflicts with published industry guidance that 3XXX-series alloys are non-heat-treatable.[597]

- At no point prior to the draft results of redetermination had Commerce challenged Valeo's claim regarding T-series sheet's brown band of dense precipitates and corrosion resistance. Commerce should explain its basis for contesting Valeo's claim.[598]

- Despite having three years to resolve any issues, Commerce has spontaneously challenged Valeo's factual submission regarding the mechanical properties of T-series sheet and 3XXX-series alloys. Commerce should explain its basis for contesting Valeo's claim.[599]

*Domestic Industry's Comments:*

- There is insufficient evidence on the record to analyze the (k)(2) factor of channels of trade.

- There is nothing on the record to undermine the credibility of John Newman's declaration that was submitted by the Domestic Industry.[600]

- The published websites of Novelis and Arconic demonstrate an overlap in the channels of trade of Valeo's T-series sheet and other in-scope CAAS.[601]

**Commerce's Position:**  After reviewing the interested party comments, based on the (k)(2) factors, we continue to find that T-series sheet is sufficiently similar to merchandise unambiguously covered by the scope to conclude that the two are merchandise of the same class or kind.

---

[597] *Id.* at 22.
[598] *Id.*
[599] *Id.* at 23.
[600] *See* Domestic Industry's Comments on Draft Results at 4-5.
[601] *Id.* at 5-6.

First, we address Valeo's argument that Commerce's (k)(2) analysis is not focused on the ambiguous scope terms.[602]  We disagree.  The CIT held that, "the scope is ambiguous {…} as to whether Commerce intended to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys) or whether Commerce intended the scope to be limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association."[603]  In *Novosteel S.A.*, the CIT held "the purpose of an analysis under section 351.225(k)(2) is to determine whether a product is sufficiently similar as merchandise unambiguously within the scope of an order as to conclude the two are merchandise of the same class or kind."[604]  The merchandise subject to this scope inquiry is Valeo's T-series sheet.  The merchandise unambiguously within the scope of the *Orders* is CAAS produced from a 3XXX-series alloy with a four-digit registration assigned by the Aluminum Association.  Accordingly, the appropriate comparison to analyze during the (k)(2) analysis is between T-series sheet and CAAS produced from a 3XXX-series alloy with a four-digit registration assigned by the Aluminum Association.  Because this is the comparison we made during our (k)(2) analysis, we disagree with Valeo that our analysis improperly did not focus on the ambiguous scope terms at issue in the underlying (k)(1) analysis.

Next, Valeo argues that T-series aluminum meets the definition of an industrial heat-treatable alloy in accordance with the chemical specifications listed in HTSUS chapter 76 statistical note 6; thus, T-series sheet is already confirmed to not be the same class or kind as registered 3XXX-series alloys.[605]  We disagree.  As explained above, the HTSUS states under statistical note 6 that an aluminum alloy containing by weight 3.0 percent or less of magnesium

---

[602] *See* Valeo's Comments on Draft Results at 28.
[603] *See Remand Order* at 18.
[604] *See Novosteel SA v. United States*, 128 F. Supp 2d. 720, 732 (CIT 2001) (*Novosteel SA*).
[605] *See* Valeo's Comments on Draft Results at 21.

and 3.0 percent or less of silicon would be considered a heat-treatable industrial alloy.  The maximum magnesium composition of any registered 3XXX-series alloy is 1.5 percent (*see, e.g.*, 3004A alloy and 3204 alloy).[606]  The maximum silicon composition of any registered 3XXX-series alloy is 1.8 percent (*see, e.g.*, 3009 alloy).[607]  Accordingly, every registered 3XXX-series alloy has a magnesium composition of 3.0 percent or less and a silicon composition of 3.0 percent of less.  Based on the analysis above, we find the fact that T-series sheet fits the description of an aluminum alloy containing by weight 3.0 percent or less of magnesium and 3.0 percent or less of silicon does not demonstrate T-series sheet is a different class or kind of merchandise.  Rather, the evidence on the record demonstrates that this is a characteristic that T-series sheet has in common with every registered 3XXX-series alloy.

Valeo goes on to argue that Commerce's (k)(2) analysis is unsupported by substantial evidence because Commerce never defined solution heat-treatment.[608]  We disagree. As explained above in the section, "Relevance of Heat-Treatment," *Aluminum Alloys 101* addresses "solution heat-treatment" and describes a process consistent with the definition of "solution heat-treatment given in *Rolling Aluminum* in Appendix C.[609]  Thus, Commerce's use of "solution heat-treatment" refers to the process described in *Rolling Aluminum* in Appendix C and *Aluminum Alloys 101.*  Further Commerce lists the solution heat-treatment process as described in *Rolling Aluminum* in Appendix C and *Aluminum Alloys 101* on pages 23 and 24 of these Final Results of Redetermination.  Accordingly, as explained above, Commerce did define solution heat-treatment.

---

[606] *See* First Domestic Industry Comments at Attachment 5.
[607] *Id.*
[608] *See* Valeo's Comments on Draft Results at 21-22.
[609] *See* Valeo's NFI Rebuttal Comments at Attachment 1 (Appendix C).

Next Valeo argues that Commerce's determination that there are multiple non-heat-treatable registered 3XXX-series alloys that [

] directly conflicts with *Aluminum Alloys 101*, which lists 3XXX-series alloys as non-heat-treatable.[610]  We disagree.  As explained above, in the section "Relevance of Heat-Treatment," aluminum sheet with a copper content of [   ] percent, a silicon content of [ ] percent, a magnesium content of [ ] percent, and a zinc content of [ ] percent could meet the chemical specifications of YB-18 (Example A).[611] Aluminum sheet with a copper content of 0.8 percent, a silicon content of 0.3 percent, a magnesium content of 0.25 percent, and a zinc content of 0.05 percent could meet the chemical specifications of 3065 alloy (Example B).[612]  Valeo argues that the unique chemical combination of Example A allows it to be heat-treatable. Contrary to Valeo's argument,  Example B [

], despite the fact Example B is a 3XXX-series alloy recognized to be non-heat-treatable by Aluminum Alloys 101.[613]  Similarly, aluminum sheet with a copper content of 0.9 percent, a silicon content of 0.6 percent, a magnesium content of 0.9 percent and zinc content of 0.9 percent could meet the chemical specifications of another 3XXX-series alloy, 3019 alloy (Example C).[614]  Similarly, Example C is a 3XXX-series alloy recognized by *Aluminum Alloys 101* as non-heat-treatable,[615] and Example C [

] than Example A.  Based on the analysis above, we find that the evidence on the record demonstrates that YB-18 is [          ] in its inclusion of alloying elements known to

---

[610] *See* Valeo's Comments on Draft Results at 22.
[611] *See* Valeo's June 5, 2020, Submission at 9.
[612] *See* First Domestic Industry Comments at Attachment 5.
[613] *See* Valeo's June 5, 2020, Submission. at Exhibit 4.
[614] *See* First Domestic Industry Comments at Attachment 5.
[615] *See* Valeo's June 5, 2020, Submission at Exhibit 4.

increase heat-treatability.  Accordingly, the evidence on the record demonstrates that there are

multiple non-heat-treatable registered 3XXX-series alloys that [

]. This finding is

not at odds with *Aluminum Alloys 101*, because Commerce found T-series sheet to be non-heat-

treatable according to the meaning of "non-heat-treatable" within *Aluminum Alloys 101* (*i.e.*,

unable to undergo solution heat-treatment).

Next, Valeo argues that at no point prior to this determination has either Commerce or the

domestic industry challenged Valeo's claims regarding the (k)(2) factors.[616]  Valeo argues that

Commerce must explain its basis for contesting Valeo's claims regarding corrosion resistance,

the brown band of dense precipitates, and mechanical properties.[617]  We disagree with Valeo.

The domestic industry did challenge Valeo's claims regarding the (k)(2) factors for T-series

sheet, stating, "the portion of Valeo's submission addressing the section 351.225(k)(2) factors is

nearly devoid of citations to record evidence to support the positions advanced."[618]  Commerce

first analyzed the (k)(2) factors as related to T-series sheet in the draft results of redetermination.

Thus, in all earlier stages of this proceeding, it was unnecessary for Commerce to analyze the

evidence on the record concerning the (k)(2) factors and determine if it agreed or disagreed with

Valeo's claims.

The CIT explained that "whether a product is covered by the language of the scope is "a

question of fact reviewed for substantial evidence."[619]  Accordingly, Commerce can only accept

arguments advanced by Valeo to the extent there is supporting information on the record.

Further, the burden of creating an adequate record lies with interested parties and not with

---

[616] *See* Valeo's Comments on Draft Results at 22-23.
[617] *Id.*
[618] *See* First Domestic Industry Comments at 19.
[619] *See Remand Order* at 14.

Commerce.[620]  In the Scope Initiation Letter, Commerce solicited information relevant to the

(k)(2) factors,  stating, "Commerce may also consider additional physical characteristics such as

*tensile strength*, *yield strength*, *elongation percent*, density, workability, electric conductivity,

*corrosion resistance*, and melting point."[621]  Accordingly, Valeo was given notice that

Commerce may consider mechanical properties and corrosion resistance in its (k)(2) analysis,

and Valeo was provided an opportunity to submit relevant evidence on the record.  Commerce's

determinations must be based on the evidence on the record, and we continue to find that there is

no record evidence to substantiate Valeo's claims regarding mechanical properties, corrosion

resistance, and the brown band of dense precipitates.

Finally, we address the domestic industry's argument that the websites of Novelis and

Arconic support its argument that all brazing sheet is sold in the same channel of trade.[622]  We

disagree.  As explained above, the comparison used in Commerce's (k)(2) analysis was between

T-series sheet and CAAS produced from a registered 3XXX-series alloy.  While the websites of

Novelis and Arconic demonstrate that the companies produce and sell brazing sheet, it is unclear

whether or not the brazing sheet is produced from a registered 3XXX-series alloy.  Accordingly,

because we cannot rely on evidence found on Novelis and Arconic's website, we continue to find

that there is insufficient evidence on the record to analyze the (k)(2) factor of channels of trade.

**Comment 4:  Procedural Issues**

*Valeo's Comments:*

- Commerce must revoke its prior customs instruction.[623]

---

[620] *See QVD Food Co., Ltd. v. United States,* 658 F.3d 1318, 1324 (Fed. Cir. 2011).
[621] *See* Scope Initiation Letter, "Under 19 CFR 351.225(k)(2), {}, Commerce further considers. . . Commerce also requests that interested parties submit information addressing these factors."
[622] *See* Domestic Industry's Comments on Draft Results at 4-6.
[623] *See* Valeo's Comments on Draft Results at 33-34.

*No other party submitted comments on this issue.*

**Commerce's Position:**  After reviewing interested party comments, we continue to find that we should wait until after the pendency of appeals to issue any revised instructions to CBP that may be warranted.  Valeo argues that Commerce must revoke its previous customs instructions issued after the Final Scope Ruling. [624]  We disagree.  Commerce's prior customs instructions were properly transmitted following the Final Scope Ruling pursuant to 19 CFR 351.225(l)(3).  Valeo relies on *United Steel and Fasteners* to support its argument that Commerce may not suspend entries pursuant to its affirmative Final Scope Ruling but may only suspend liquidation following the initiation date of scope inquiry on remand.[625]  However, *United Steel and Fasteners* involved a challenge to the retroactive suspension of liquidation to the initial suspension date of entries under the order and held that Commerce may only begin suspension of liquidation of the relevant entries starting on the day that the final scope ruling was issued pursuant to 19 CFR 351.225(d).[626]  Commerce has done so here.

While Commerce initiated a broader scope inquiry under 19 CFR 351.225(e) on remand, this does not disturb Commerce's authority to suspend liquidation pursuant to a final scope ruling under 19 CFR 35.225(d).  Commerce's regulations also provide that, "{w}hen the Secretary conducts a scope inquiry under paragraph (b) or (e) of this section, and the product in question is already subject to suspension of liquidation, that suspension of liquidation will be continued, pending a preliminary or a final scope ruling, at the cash deposit rate that would apply if the product were ruled to be included within the scope of the order" (emphasis added).[627]

---

[624] *Id.*

[625] *See* Valeo's Scope Initiation Comments at 9-10 (citing *United Steel and Fasteners*, 947 F. 3d at 801).

[626] *See United Steel and Fasteners*, 947 F.3d at 800-803.

[627] 19 CFR 355.225(k)(1).

Therefore, the initiation of the scope inquiry would continue the suspension of liquidation pursuant to the Final Scope Ruling.

## IX.    FINAL RESULTS OF REDETERMINATION

We have further considered this scope inquiry in accordance with the terms of the *Remand Order.* After further consideration, we find that the criteria under 19 CFR 351.225(k)(1) are not dispositive in determining whether Commerce intended the scope to cover any alloy that contains a major alloying element corresponding to the Aluminum Association's alloy groups (including unregistered alloys), or whether Commerce intended the scope to be limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association.  Thus, in accordance with 19 CFR 351.225(k)(2), we considered the physical characteristics of the merchandise; the expectations of the ultimate purchasers; the ultimate use of the product; the channels of trade in which the product is sold; and the manner in which the product is advertised and displayed.  Based on these factors, we find that T-series sheet is sufficiently similar to merchandise unambiguously covered by the scope to conclude that the two are merchandise of the same class or kind.  Accordingly, pursuant to 19 CFR 351.225(e) and 19 CFR 351.225(k)(2), we find that the T-series sheet imported by Valeo is included within the scope of the *Orders*.

6/20/2023

X  *James Maeder*
_____

Signed by: JAMES MAEDER

James Maeder
Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations