## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

|  |  |  |
|---|---|---|
| VALEO NORTH AMERICA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Court No.  21-00581 |
| v. | ) | |
| | ) | **Public Version** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ALUMINUM ASSOCIATION COMMON | ) | |
| ALLOY ALUMINUM SHEET TRADE | ) | |
| ENFORCEMENT WORKING GROUP et al., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

## PLAINTIFF VALEO NORTH AMERICA, INC.'S
## <u>COMMENTS ON REMAND REDETERMINATION</u>

Daniel Cannistra
Pierce Lee

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

*Counsel for Plaintiff Valeo North America Inc.*

July 20, 2023

**TABLE OF CONTENTS**

INTRODUCTION .......................................................................................................... 1

SUMMARY OF ARGUMENT ..................................................................................... 1

ARGUMENT ................................................................................................................ 3

I.   THE SCOPE LANGUAGE IS NOT AMBIGUOUS REGARDING GOVERNING STANDARDS ................................................................................................... 3

II.  THE ALUMINUM ASSOCIATION SPECIFICATIONS ARE A DEFINITIONAL SOURCE REFLECTING COMMON INDUSTRY USAGE OF A TERM, NOT A K(1) SOURCE .......................................................................................................... 4

III. COMMERCE'S USE OF A SEPARATE RATE APPLICATION TO EXTRAPOLATE A SCOPE DETERMINATION IS UNSUPPORTED BY LAW ............................................ 5

   A.  Commerce's Redetermination Unlawfully Treats a Third Party Confidential Submission Unrelated to Scope as a k(1) Source ............................................. 5

   B.  Alcha's Separate Rate Application is Not a Public Source ............................. 7

   C.  The "Determination" on Alcha's SRA Does Not Provide Ascertainable Standards ....... 7

   D.  Commerce's Separate Rate Determination Is Not an Interpretative Source .................. 8

   E.  There is No Rational Relationship between SRA and Scope Determinations ................. 8

   F.  After Relying on Alcha's SRA as a Scope Determination, Commerce Disavows Alcha's Submissions as Having any Relevancy to Scope ................................. 9

IV.  COMMERCE'S INTERPRETATION OF THE PHRASE "AS DESIGNATED" IS UNLAWFUL ................................................................................................... 9

   A.  Industry Use .................................................................................................. 10

   B.  The Scope Language Itself Defines "As Designated" .................................... 12

V.   COMMERCE UNLAWFULLY CONDUCTED A K(2) ANALYSIS WHEN K(0) AND K(1) ELEMENTS WERE DISPOSITIVE .......................................................... 13

VI.  HEAT-TREATABILITY IS RELEVANT FOR BOTH NON-CLAD AND CLAD PRODUCTS .................................................................................................... 13

VII. COMMERCE MUST REVOKE ITS PREVIOUS CUSTOMS INSTRUCTIONS ............. 16

CONCLUSION ........................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agilent Techs. v. United States*,
   256 F.Supp.3d 1338 (CIT 2017) ...............................................8

*Ams Assocs., Inc. v. United States*,
   737 F.3d 1338 (CAFC 2013) ...............................................17

*Arcelormittal Stainless Belg. N.V. v. United States*,
   694 F.3d 82 (CAFC 2012) ...............................................2, 3, 11, 13

*Baroque Timber Indus. v. United States*,
   971 F.Supp.2d 1333 (CIT 2014) ...............................................8

*Duferco Steel, Inc. v. United States*,
   296 F.3d 1097 (CAFC 2002) ...............................................4

*Eckstrom Industries Inc. v. United States*,
   254 F.3d 1068 (CAFC 2001) ...............................................11

*Fedmet Res. Corp. v. United States*,
   755 F.3d 912 (CAFC 2014) ...............................................10, 13

*Guangzhou Jangho v. United States*,
   181 F.Supp.3d 1265 (CIT 2016) ...............................................8

*King Supply v. United States*,
   674 F.3d 1343 (CIT 2012) ...............................................3

*Mid Continent Nail Corporation v. United States*,
   725 F.3d 1295 (CAFC 2013) ...............................................6, 7, 11

*Morton v. Ruiz*,
   415 U.S. 199 (1974) ...............................................6

*NEC Corp. v. Dep't of Commerce*,
   74 F.Supp.2d 1302 (CIT 1999) ...............................................4, 10

*NLRB v. Bell Aerospace Co.*,
   416 U.S. 267 (1974) ...............................................6

*OMG, Inc. v. United States*,
   972 F.3d 1358 (CAFC 2020) ...............................................13

*Shanghai Foreign Trade Enters. Co. v. United States,*
  318 F.Supp.2d 1339 (CIT 2004) .................................................................8, 12

*Shenyang Yuanda Aluminum Indus. v. United States,*
  776 F.3d 1351 (CAFC 2015) .......................................................................4, 12

*Smith Corona Corp v. United States,*
  915 F.2d 683 (CAFC 1990) .............................................................................12

*Star Pipe Products v. United States,*
  981 F3d 1067 (CAFC 2020) ...............................................................................6

*Sunpreme Inc. v. United States,*
  946 F.3d 1300 (CAFC 2020) .............................................................................16

*United Steel and Fasteners, Inc. v. United States,*
  947 F.3d 794 (CAFC 2020) ...............................................................................16

*Valeo North America, Inc. v. United States,*
  610 F.Supp.3d 1322 (CIT 2022) ............................................................ *passim*

*Walgreen Co. v. United States,*
  620 F.3d 1350 (CAFC 2010) .........................................................................4, 12

## Statutes

44 U.S.C. § 1507 ...................................................................................................6

## Other Authorities

19 C.F.R. § 351.225 ...............................................................................5, 8, 16, 17

19 C.F.R. § 351.225(e).........................................................................................16

19 C.F.R. § 351.225(k) ...........................................................................................1

19 C.F.R § 351.225(d) .........................................................................................16

62 Fed. Reg. 27,296 (May 19, 1997) ...................................................................17

83 Fed. Reg. 29,088 (June 22, 2018) .....................................................................8

86 Fed. Reg. 22,139 (April 27, 2021) ...................................................................15

PUBLIC VERSION
Confidential information redacted from square brackets

## INTRODUCTION

Plaintiff Valeo North America Inc. ("Valeo") hereby comments on the Department of Commerce's ("Commerce's") Final Results of Redetermination Pursuant to Court Remand ("Redetermination") issued pursuant to the opinion and remand order of the U.S. Court of International Trade (the "CIT" or "Court") issued in *Valeo North America, Inc. v. U.S.*, 610 F.Supp.3d 1322 (CIT 2022) ("Remand Order").  This litigation concerns Commerce's final scope ruling dated October 15, 2021[1] that heat-treated T-series sheet imported by Valeo falls within the scope of the antidumping and countervailing duty orders on common alloy aluminum sheet ("CAAS") from the People's Republic of China.

## SUMMARY OF ARGUMENT

Commerce's remand determination would overturn more than 10 years of black-letter law related to scope inquiries.  At issue in this matter is the appropriate framework when determining if a particular product is within the scope of an antidumping order.  Scope determinations for particular products subject to an antidumping or countervailing duty orders generally proceed in the following order:  Initially, Commerce examines the relevant scope language.  If the language is ambiguous, Commerce next interprets the scope with the aid of the sources set forth in the regulation, known as the "k(1)" factors.  If those materials are dispositive, Commerce issues a final scope ruling, but if they are not dispositive, Commerce considers the factors stated in subsection (k)(2) of the regulation.  19 C.F.R. § 351.225(k).

In resolving scope questions, Commerce's first obligation is to examine the scope language for ambiguity, while recognizing and interpreting terms consistent with their trade

---

[1] CR 15; PR 40.  Citations to the confidential record ("CR") and public record ("PR") reflect document numbers in the administrative record index for the underlying scope proceeding (AD), ECF 18.  Citations to the confidential remand record ("CRR") and public remand record ("PRR") reflect document numbers in the administrative record index for the remand proceeding (AD), ECF No. 64.

PUBLIC VERSION
Confidential information redacted from square brackets

usage.  As explained by the Court of Appeals for the Federal Circuit ("CAFC"), Commerce must

first examine the plain language of an antidumping duty order, determine if it is ambiguous, and

define relevant terms based upon customary trade usage.  *Arcelormittal Stainless Belg. N.V. v.*

*U.S.*, 694 F.3d 82 (CAFC 2012).  This is often referred to as a k(0) analysis.

The cornerstone of *Arcelormittal* is that orders may not be interpreted devoid of any

consideration of the way the language of the order is used in the relevant industry.  As the CAFC

observed "{c}ourts have long recognized the importance of considering context, including

industry custom, in interpreting written language. Because the primary purpose of an

antidumping order is to place foreign exporters on notice of what merchandise is subject to

duties, the terms of an order should be consistent, to the extent possible, with trade usage." *Id.* at

88-90.

While Commerce casts this case as based on the factual circumstances of the particular

product at issue, it fails to apply this well-established legal framework.  The industry standards in

this case are not ambiguous as the scope language itself specifies the governing standards.

Because Commerce reaches beyond the express scope language to rely on a non-public,

unpublished source unrepresentative of customary trade usage, Commerce's scope determination

is unlawful.

Moreover, Commerce unlawfully adopted as a k(1) source a confidential submission by a

third-party and unrelated to scope.  Commerce's adoption of this submission as a k(1) source is

not lawful.  Commerce also proceeded to a k(2) analysis notwithstanding the legal prohibition

against doing so when the scope is not ambiguous and the k(1) factors resolve the inquiry.  For

these reasons, this matter should be remanded to Commerce with instructions to conduct its

PUBLIC VERSION
Confidential information redacted from square brackets

inquiry in accordance with the law and rely on determinations that are supported by substantial

evidence.

## ARGUMENT

### I.    THE SCOPE LANGUAGE IS NOT AMBIGUOUS REGARDING GOVERNING STANDARDS

As a preliminary matter, Commerce unlawfully claims the plain language of the scope

ambiguous.[2]  But Commerce never indicates what words, precisely, it found to be ambiguous in

its remand.  Plaintiff infers that Commerce found the governing industry specifications to be

ambiguous.  Such a finding, however, is belied the order itself, which indicates that products

within the scope of the order are those "as designated by the Aluminum Association."

"{T}he plain language of the ... order is paramount" in conducting a scope ruling. *King

Supply v. U.S.*, 674 F.3d at 1345.  "{T}he first step in a scope ruling proceeding is to determine

whether the governing language is in fact ambiguous." *ArcelorMittal*, 694 F.3d at 87.  It is clear

from the scope language that that applicable alloys are those "as designated by the Aluminum

Association" and there is no ambiguity as to the governing source for industry standards.

Commerce, however, declares the scope to be ambiguous, without specifying what part of the

scope language it is referencing in its ambiguity finding.  To the degree that Commerce has

found the source for the applicable industry standard ambiguous, this determination must be

rejected as unlawful and unsupported by substantial evidence.

---

[2] Redetermination, at 38.

## II. THE ALUMINUM ASSOCIATION SPECIFICATIONS ARE A DEFINITIONAL SOURCE REFLECTING COMMON INDUSTRY USAGE OF A TERM, NOT A K(1) SOURCE

At the outset, Commerce miscasts that Aluminum Association specifications as a k(1) source rather than a definitional source.[3]  The language of the scope is the "cornerstone" of any scope determination.  *See Walgreen Co. v. U.S.*, 620 F.3d 1350, 1356 (CAFC 2010); *see also, e.g., Shenyang Yuanda Aluminum Indus. v. U.S.*, 776 F.3d 1351, 1357 (CAFC 2015).  "Review of the petition and the investigation may provide valuable guidance as to the interpretation of the final order.  But they cannot substitute for language in the order itself."  *Duferco Steel*, 296 F.3d at 1097.

"In determining the common meaning of a term, courts may and do consult dictionaries, scientific authorities, and other reliable sources of information, including testimony of record."  *NEC Corp. v. Dep't of Commerce*, 74 F.Supp.2d 1302, 1307 (CIT 1999) (quoting *Holford USA Ltd. v. U.S.*, 912 F.Supp. 555, 561 (CIT 1995)).  The Teal Sheets define the common meaning of the term "as designated by the Aluminum Association" and are not a k(1) source.

Instead, the Teal Sheets provide the common meaning of the phrase "as designated by the Aluminum Association" and reflect the language in the order itself.  As stated in *Duferco Steel*, 296 F.3d at 1097, while review of k(1) materials may provide valuable guidance as to the interpretation of the final order, they cannot substitute for the language in the order itself.  As such, the common meaning of the language governs above any other factor and Commerce fails to recognize the preeminence of definitional sources above other k(1) sources.

---

[3] Redetermination at 44.

PUBLIC VERSION
Confidential information redacted from square brackets

**III.   COMMERCE'S USE OF A SEPARATE RATE APPLICATION TO
EXTRAPOLATE A SCOPE DETERMINATION IS UNSUPPORTED BY LAW**

   **A.   Commerce's Redetermination Unlawfully Treats a Third Party Confidential
       Submission Unrelated to Scope as a k(1) Source**

In its redetermination, Commerce unlawfully disregarded public, discernable standards

published prior to the issuance of the order (i.e., the Aluminum Association standards,

commonly known as the Teal Sheets) as the dispositive k(0) source and miscasts the Teal Sheets

as a k(1) source.  It then adopts a third party's confidential submission, unrelated to scope

(Alcha's separate rate application ("SRA")[4]), as an alternative k(1) source to create "competing"

k(1) sources.[5]  The resulting conflict, according to Commerce, necessitated recourse to a k(2)

analysis.[6]  Commerce's adoption of a confidential submission, unrelated to scope, and unrelated

to any party to this proceeding, as a k(1) source, is unlawful.

First, Commerce erred by considering <u>any</u> determination during the course of the

investigation to be a k(1) source.  This is a misreading of the law.  Commerce's regulations set

forth the framework for resolving scope issues and the types of interpretative sources that can be

relied upon.  *See* 19 C.F.R. § 351.225.  Unlike these sources, SRA is a document that an exporter

can submit to Commerce to demonstrate that it is not subject to government control and thus

should be assigned a separate rate instead of a country-wide rate.  SRAs include information on

the ownership, management, export activities, and relationship with the government.  Alcha's

SRA, indeed *all* SRAs, do not seek clarity regarding scope, nor are SRA determinations

probative in resolving scope issues.  SRA applications and determinations provide no coherent

---

[4] Memorandum, "Placing New Factual Information on Remand" (March 23, 2023) ("NFI Memo") (CRR 26; PRR 41) at Attachments 1-4.
   [5] Redetermination at 103.
   [6] *Id.* 44-46.

PUBLIC VERSION
Confidential information redacted from square brackets

guidance to importers as to the scope of the order.  Therefore, any determination arising from Alcha's SRA is not a relevant determination or a valid k(1) source.

To be a valid k(1) source, Commerce, and the public, must be able to draw ascertainable standards from the source and that source must provide information publicly available at the time the order was issued.  *Mid Continent Nail Corporation v. U.S.*, 725 F.3d 1295, 1305 (CAFC 2013).  Prior determinations of Commerce (including scope determinations) may be relied upon "so long as these prior determinations were publicly available at the time" the order was issued. *Id.*  Rulings that were not publicly available at the time an order was issued cannot be used to articulate new interpretive criteria in a scope determination.  *Id.*  Moreover, public source information must provide coherent and ascertainable standards to be a valid k(1) source.  *Star Pipe Products v. U.S.*, 981 F.3d 1067, 1074 (CAFC 2020).  Published scope guidance must provide a clear and ascertainable standard.  *Id.* Public, coherent, contemporaneous guidance is necessary to provide importers with "adequate notice of what conduct is regulated by the order," before "imposing a significant exaction in the form of an antidumping duty."  *Mid Continent Nail*, 725 F.3d at 1300.

While the Administrative Procedure Act does not forbid agencies from using adjudicative proceedings to develop new interpretations of statutes, regulations, or orders, *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974), it does require agencies "to avoid the inherently arbitrary nature of unpublished *ad hoc* determinations," s*ee Morton v. Ruiz*, 415 U.S. 199, 232 (1974)). *Cf.* 44 U.S.C. § 1507 (providing that "{a} document required by {law} to be published in the Federal Register is not valid as against a person who has not had actual knowledge of it" until it is so published).  *See Mid Continent Nail*, 725 F.3d at 1305.

## B.     Alcha's Separate Rate Application is Not a Public Source

Alcha's SRA (the "determination" cited by Commerce) does not meet the standards

necessary to be a k(1) source.  Neither the grades nor specifications provided in Alcha's SRA are

public and the underlying document cannot be considered a public source.[7]  The excerpts cited

by Commerce are confidential, with no public guidance provided to the industry regarding the

alloying element at issue or the specification.[8]  All product-specific information was confidential

and not capable of being disclosed.  Therefore, Alcha's SRA and any consequent determination

arising from that SRA is not a permissible k(1) source.

While prior scope rulings may be relevant under subsection 351.225(k)(1), such

relevancy is extinguished when those scope rulings are not public.  Rulings that are not publicly

available at the time the antidumping order was issued cannot be used to articulate new

interpretive criteria.[9]  Therefore, the determination based on Alcha's SRA must be disregarded as

a k(1) source because it is not a public determination.

## C.     The "Determination" on Alcha's SRA Does Not Provide Ascertainable
##          Standards

Moreover, the separate rate "determination" used by Commerce does not provide

ascertainable standards.  Courts have cautioned Commerce against "imbed{ing} its test within

the (k)(1) factors by using *ad hoc* determinations that do not provide an "ascertainable standard

that would allow importers to predict how Commerce would treat their {imported} products."

*Mid Continent Nail*, 725 F.3d at 1305.  The SRA determination provides no ascertainable

standards.  In fact, it provides no standards at all and provides no specific or general guidance

---

[7] NFI Memo at 2 ("BPI factual information from prior AD segments (e.g., BPI in Attachments 1-4 {Alcha SRAs} of this memo), should only be filed on ACCESS case number A-570-073 {…}")

[8] *See e.g.,* Redetermination, at 51 (treating the applicable alloying element and grade at issue as confidential).

[9] *Mid Continent Nail*, 725 F.3d at 1300.

regarding scope, or even suggests that it is in any way related to scope.  As such, the

determination must be disregarded as a k(1) source.

### D.    Commerce's Separate Rate Determination Is Not an Interpretative Source

The SRA determination is not an interpretative source for considering a scope issue

because it lacks any discussion about a scope issue.[10]  "In determining whether a particular

product is included within the scope of an antidumping or countervailing duty order, Commerce

must follow an interpretative framework provided by 19 C.F.R. § 351.225."  *Agilent Techs. v.*

*U.S.*, 256 F.Supp.3d 1338, 1345 (CIT 2017).  "Commerce's determination must also be

supported by a reasonable reading of the record evidence."  *Guangzhou Jangho v. U.S.*, 181

F.Supp.3d 1265, 1274 (CIT 2016).  Since the SRA determination lacks any discussion, analysis,

or explanation about a scope issue, it is not an *interpretative* source.

### E.    There is No Rational Relationship between SRA and Scope Determinations

The substantial evidence standard requires the agency to provide a "rational connection

between the facts found and the choice made" and "articulate a satisfactory explanation for its

action." *Baroque Timber Indus. v. U.S.*, 971 F.Supp.2d 1333, 1339, 1340 (CIT 2014).  An

agency must do more than offer conclusory statements of its findings. *See, e.g., Shanghai*

*Foreign Trade Enters. Co. v. U.S.*, 318 F.Supp.2d 1339, 1346 (CIT 2004) (rejecting conclusory

agency explanation as inconsistent with the substantial evidence standard).  In this case,

Commerce implies that its granting of Alcha's SRA reflects an interpretive scope determination.

---

[10] *See* Antidumping Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-than-Fair Value, Preliminary Affirmative Determination of Critical Circumstances, and Postponement of Final Determination, 83 Fed. Reg. 29,088 (June 22, 2018) and accompanying Issues and Decision Memorandum, at 12-17.  The decision was unchanged in the final determination.

But there is no rational connection between scope and Alcha's SRA that supports the implied

determination related to scope.

### F.   After Relying on Alcha's SRA as a Scope Determination, Commerce Disavows Alcha's Submissions as Having any Relevancy to Scope

Despite basing its entire analysis on competing k(1) sources derived from inferences on

Alcha's SRA, Commerce, incredibly, then goes on to disavow any conclusions associated with

Alcha's grade [      ], i.e., the grade serving as the basis for Commerce's scope determination.

> Nor does Valeo cite any information that Alcha's U.S. customer has ever filed a scope inquiry with Commerce regrading [      ] alloy. Accordingly, because Alcha has not participated in a scope inquiry, it is not possible for Commerce's analysis to infer that Alcha's [      ] alloy is included within the scope of the Orders based on Alcha's non-existent participation in a scope inquiry.[11]

Thus, on one hand, Commerce claims that that Alcha's treatment of [      ] provides meaningful

industry guidance regarding scope, but then admits that that it is "not possible for Commerce's

analysis to infer that Alcha's [      ] alloy is included within the scope of the Orders."  Given

that admittedly Commerce cannot, and did not, make any finding related to scope concerning [

    ], its claim that Commerce's granting of Alcha's SRA constitutes a k(1) source must be

disregarded.

## IV.   COMMERCE'S INTERPRETATION OF THE PHRASE "AS DESIGNATED" IS UNLAWFUL

Commerce's remand determination unlawfully defines the term "designate" as a general

term without industry-specific meaning.[12]  Commerce claims that it can be interpreted as a

general term used in the common vernacular identifying the "the location of the alloy series

definitions" and that would allow Commerce to rely on only part (i.e., alloy grouping) of the

---

[11] Redetermination at 108 (emphasis added), *Cf. id.* at 44.
[12] *Id.* 40, 103.

Case 1:21-cv-00581-MAB   Document 67   Filed 07/20/23   Page 14 of 23
PUBLIC VERSION
Confidential information redacted from square brackets

Teal Sheets to interpret "3xxx-series alloys."[13]  That claim in unmeritorious for two reasons.

First, even if the term "designate" is only used to identify the location of the series definitions,

that location is the Teal Sheets as a whole.  The CIT held that Commerce's reliance on the Teal

Sheets to interpret "3xxx-series" must account for the Teal Sheets as a whole.[14]  Second,

Commerce must interpret the term "designate" to be consistent with trade usage and the manner

it is used in the tariff schedule generally and in the definition of "industrial heat-treatable alloys"

carved out from CAAS orders.  By disregarding industry usage, Commerce unlawfully departed

from the plain meaning of the scope language.

### A.      Industry Use

Considering the Teal Sheets as a whole, the phrase "3xxx-series alloys" unambiguously

includes only registered alloys.  The scope indicates that the only definitional source of "3xxx-

series alloys" is Aluminum Association's official publication for aluminum designations, the

Teal Sheets.  This is true whether the term "designate" is an industry-specific term or a general

term identifying the location of the series definitions.  Commerce agrees that "{t}he term

"3XXX-series" is an industry-specific term defined only by the industry publication *Teal

Sheets*."[15]

"In determining the common meaning of a term, courts may and do consult dictionaries,

scientific authorities, and other reliable sources of information, including testimony of record."

*NEC Corp.*, 74 F.Supp.2d at 1307.  Antidumping duty orders "should not be interpreted in a

vacuum devoid of any consideration of the way the language of the order is used in the relevant

industry." *Fedmet Res. Corp. v. U.S.,* 755 F.3d 912, 921 (CAFC 2014) (quoting *ArcelorMittal*,

---

[13] *Id.* at 41–42.
[14] Remand Order, at 18-19.
[15] Redetermination, at 40.

Case 1:21-cv-00581-MAB   Document 67   Filed 07/20/23   Page 15 of 23
PUBLIC VERSION
Confidential information redacted from square brackets

694 F.3d at 88).  In *ArcelorMittal*, the CAFC has held that Commerce may draw upon industry or trade usage of a scope term in discerning that term's plain meaning.  *See id.*  In that case, Commerce had relied on a standards publication produced by the American Society for Testing and Materials as evidence of trade usage.[16]  Here, the relevant standard publication is the Teal Sheets.

The CIT held that Commerce's reliance on the Teal Sheets to interpret "3xxx-series" must account for the Teal Sheets as a whole.[17]  The Teal Sheets as a whole support that "3xxx-series" only includes registered alloys.  Commerce agrees that, "In reading *Teal Sheets* as a whole, we find that this source supports the interpretation that scope term '3XXX-series' is limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association."[18]

Commerce's remand determination also fails to address that the term "designate" is used and defined in the tariff schedule.  The tariff schedule demonstrates that this term carries significance in the industry and trade of aluminum alloys.  Statistic note 6 to Chapter 76 of the HTSUS defines out-of-scope heat-treatable alloys as "aluminum containing by weight 3.0 percent or less of magnesium and 3.0 percent or less of silicon, and/or are designated as series 6xxx in the Aluminum Association's specifications of registered alloys."[19]  Thus, this note demonstrates that designation refers to "the Aluminum Association's specification of registered alloys."

---

[16] Remand Order, at 23.
[17] *Id.* at 21 (fn 22), *citing ArcelorMittal*, 694 F.3d 82.
[18] Remand, at 41-42.
[19] Valeo's Comments and Supporting Information for Scope Inquiry ("REM Comments") (CRR 1-25; PRR 13-36), at Exhibit 19 (HTSUS Ch. 7; p. 76-2) (emphasis added).

"Commerce may also consult the HTSUS classification system" to analyze a scope issue. *Mid Continent Nail,* 725 F.3d at 1305.  The tariff schedule is a factor in determining the scope of the order.  See *Eckstrom Industries Inc. v. U.S.*, 254 F.3d 1068, 1073 (CAFC 2001), citing *Smith Corona*, 915 F.2d at 687.  The scope of the CAAS orders uses the term "designate" in the same manner as the tariff schedule, which the remand determination fails to address.

### B.      The Scope Language Itself Defines "As Designated"

The scope language itself defines what is meant by "as designated."  The plain wording of the order is clear.  "As designated" means "as designated *by* the Aluminum Association." Rather than focusing on the scope language itself, as mandated by law, Commerce unlawfully ignores the conjunctive "by" in the scope language and impermissibly broadens the use of the word "designated."

All parties agree that the phrase "as designated by the Aluminum Association" modifies the series designations for non-clad products and the reference to the 3xxx-series core for clad products.[20]  The language of the scope is the "cornerstone" of any scope determination.  *See Walgreen Co. v. U.S.*, 620 F.3d 1350, 1356 (CAFC 2010); *see also, e.g., Shenyang Yuanda Aluminum Indus. v. U.S.*, 776 F.3d 1351, 1357 (CAFC 2015).  Commerce cannot "interpret{} an order in a manner contrary to the order's terms."  *Allegheny Bradford Corp. v. U.S.*, 342 F.Supp.2d 1172, 1183 (CIT 2004) (citing *Duferco Steel*, 296 F.3d at 1094-95).  Therefore, for the plain meaning of "as designated by the Aluminum Association," Commerce must refer to aluminum designations in the Teal Sheets.

---

[20] Transcript, ECF No. 65, at 5:16-6:2.

Case 1:21-cv-00581-MAB   Document 67   Filed 07/20/23   Page 17 of 23
PUBLIC VERSION
Confidential information redacted from square brackets

## V.      COMMERCE UNLAWFULLY CONDUCTED A K(2) ANALYSIS WHEN K(0) AND K(1) ELEMENTS WERE DISPOSITIVE

"{T}he first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous, and thus requires analysis of the regulatory factors previously outlined.  If it is not ambiguous, the plain meaning of the language governs."  *Arcelormittal*, 694 F.3d at 87; *see also OMG, Inc. v. U.S.*, 972 F.3d 1358 (CAFC 2020).

"Only if the (k)(1) sources are not dispositive may Commerce consider the so-called (k)(2) criteria."  *Fedmet Resource*, 755 F.3d at 918.  As discussed above, based on the plain language of the scope, the only lawful interpretative source is the Aluminum Association Teal sheets.  The Teal Sheets confirm that common alloys subject to the scope of the Order are limited to registered alloys.  There is no competing k(1) source.  As such, recourse to k(2) criteria is prohibited.

## VI.     HEAT-TREATABILITY IS RELEVANT FOR BOTH NON-CLAD AND CLAD PRODUCTS

A question in this proceeding is whether T-series sheet is manufactured from a 3xxx-series core.  Heat-treatment is relevant to this question because the term "3xxx-series" refers to non-heat-treatable alloys, whether in reference to non-clad sheets or the core layers of clad sheets.  And the core layer used in the manufacture of T-series is heat-treatable.

3xxx-series alloys are non-heat-treatable.  The Association specifically lists 3xxx-series under non-heat-treatable alloys in its informational material entitled "Aluminum Alloys 101."[21] In the underlying investigation, the ITC specifically stated that 3xxx-series alloys are non-treat-treatable.[22]  Indeed, this Court held, "to the extent that the record shows that 3XXX-series alloys

---

[21] Valeo's Scope Ruling Request (August 7, 2020) ("3rd Scope Ruling Request") (CR 10; PR 24), at Exhibit 4.
[22] REM Comments, at Exhibit 8 (ITC Final Report, at I-11, I-13).

PUBLIC VERSION
Confidential information redacted from square brackets

are not heat-treatable, {…}, the record does not indicate that there are exceptions within the 3XXX-series alloys."[23]

Commerce did not question the Court's finding.  In fact, Commerce used the Court's finding to support that a registered 3xxx-series alloy (selected for comparison to the core layer of T-series sheet) is non-heat-treatable.[24]  However, Commerce made a contradictory finding that the record does not "indicate that the scope excludes heat-treatable sheet."[25]  First, this statement misdescribes the issue in this proceeding, which is whether 1xxx, 3xxx, and 5xxx alloys referenced in the scope are commonly known a non-heat-treatable alloys.  The scope does not *exclude* heat-treatable sheets; it only *covers* aluminum series that are non-heat-treatable.  Second, Commerce's statement is factually incorrect because all alloys in the enumerated series are non-heat-treatable.

In the underlying investigation, the ITC specifically stated, "Aluminum sheet subject to these investigations are of 1XXX, 3XXX, and 5XXX series alloys that are non-heat treatable."[26]  The ITC also specifically stated that heat-treatable alloys are not covered by Commerce's scope.[27]  The record does not indicate that there are exceptions within the three series referenced in the scope.

Commerce's initiation memorandum supports that all alloys in the enumerated series are non-heat-treatable.  In the memorandum, Commerce identified certain HTS subheadings that may include both in-scope and out-of-scope merchandise.[28]  To determine the volume of out-of-scope merchandise, Commerce specifically requested and the Domestic Industry has supplied the

---

[23] Remand Order at 29.
[24] Remand, at 35.
[25] *Id.* at 78.
[26] REM Comments, at Exhibit 8 (ITC Final Report, at I-11).
[27] *Id.* at Exhibit 8 (ITC Final Report, at I-18).
[28] REM Comments, at Exhibit 5 (Initiation Memo; p. 2).

"Aluminum Association information on volume of heat-treated sheet imports (2014-2016)."[29]

Therefore, from the outset, both the Domestic Industry and Commerce have understood that all

alloys in the enumerated series are non-heat-treatable.

The information on the volume of *out-of-scope* heat-treated merchandise was certified by

Mr. Ryan Olsen, Vice President of Business Information & Statistics at the Aluminum

Association.[30]  Mr. Olsen later submitted a declaration in the CAAS investigations involving

other countries ("*CAAS from Italy, et. al.*")[31], which was placed on the record of the underlying

scope proceeding <u>by Commerce</u> as "factual information relevant to the final scope ruling

determination."[32]  In that declaration, Mr. Olsen stated that "out-of-scope merchandise" is

"commonly described as heat-treatable aluminum sheet." [33]

Commerce attempts to undermine Mr. Olsen's declaration by pointing out that the *CAAS

from Italy, et. al.* orders provide that subject merchandise "may also be entered" in the U.S.

under HTSUS subheading 7606.12.3091 (i.e., the subheading described by Olsen as covering

heat-treatable sheet).[34]  However, Commerce fails to mention that this subheading is only listed

as a "secondary HTS number," which does not indicate that in-scope merchandise is *classifiable*

under that number.  Moreover, the scope language of the *CAAS from Italy, et. al.* orders is not a

valid k(1) source for analyzing the intention of Commerce and the Domestic Industry at the time

---

[29] *Id.* at Exhibit 5 (Initiation Memo; p. 2 (fn. 3), Exhibit 2 (p. 2; Attachment 2)).

[30] *Id.*

[31] *Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 221,39 (April 27, 2021).

[32] Memorandum, "Factual Information Relevant to the Final Scope Ruling Determination" (October 15, 2021) (CR 15; PR 41), at 116.

[33] *Id.*

[34] Redetermination, at 80.

Case 1:21-cv-00581-MAB   Document 67   Filed 07/20/23   Page 20 of 23
PUBLIC VERSION
Confidential information redacted from square brackets

of the China CAAS investigations.  If fact, in the China CAAS proceeding, the Domestic

Industry <u>explicitly</u> stated that heat-treatable alloys (under 7606.12.3091) are outside the scope.[35]

Commerce also claims that Mr. Olsen's declaration is not applicable to this scope inquiry

because "subheading 7606.12.3091 is applicable only to non-clad products."[36]  However, even

counsel for Defendant specifically emphasized that the scope is determined by the aluminum

series, not by the clad or non-clad distinction.[37]  And "3xxx-series" is non-heat-treatable whether

the term used in reference to not-clad sheets or the core layers of clad sheets.

## VII.    COMMERCE MUST REVOKE ITS PREVIOUS CUSTOMS INSTRUCTIONS

Commerce must revoke its previous instructions to the U.S. Customs and Border Protection

("Customs").  These instructions have been sent to Customs based on Commerce's final scope

ruling dated October 15, 2021.  However, the CIT held the scope ruling unlawful.  Since there is

no lawful basis for the Customs instructions, Commerce must revoke them.

On February 15, 2023, Commerce initiated a scope inquiry under 19 C.F.R. § 351.225(e).

Under § 351.225(l), when Commerce conducts a scope inquiry under subsection (e), it may only

issue Customs instructions when the inquiry has been *initiated*.  The CAFC has held that

§ 351.225(l) "does not allow suspension of liquidation before a scope inquiry."  *United Steel and*

*Fasteners, Inc. v. U.S.*, 947 F.3d 794, 801 (CAFC 2020); *see also Sunpreme Inc. v. U.S.*, 946 F.3d

1300 (CAFC 2020).  Therefore, suspension of liquidation prior to February 15, 2023 is unlawful.

Commerce claims that "{w}hile Commerce initiated a broader scope inquiry under 19

CFR § 351.225(e) on remand, this does not disturb Commerce's authority to suspend liquidation

---

[35] REM Comments, at Exhibit 9.  The petitioners in *CAAS from Italy, et. al.* also made the same admission. *Id.* at Exhibit 6.
[36] Redetermination, at 80.
[37] Transcript, ECF No. 65, at 62:2-10.

pursuant to a final scope ruling under 19 CFR § 35.225(d)."[38]  However, the Court's remand

order *does*.  The CIT's decision has rendered the final scope ruling unlawful and the continued

suspension of liquidation of and obligation to post cash deposits for Valeo's entries dating back

to October 15, 2021, unlawful.

Commerce further claims that "the initiation of the scope inquiry would continue the

suspension of liquidation pursuant to the Final Scope Ruling" because § 351.225(l) permits

continued suspension when "the product in question is already subject to suspension."[39]

However, the reason why the product is already subject to suspension is because Commerce

issued Customs instructions based on the unlawful final scope ruling.

Commerce is not required "to initiate a formal scope inquiry when the meaning and scope

of an existing antidumping order is clear."  *Ams Assocs., Inc. v. U.S.*, 737 F.3d 1338, 1344

(CAFC 2013), citing *Huaiyin Foreign Trade Corp. (30) v. U.S.,* 322 F.3d 1369, 1378–79

(CAFC2003).  However, a formal initiation of a scope inquiry represents "a finding by the

Department that it cannot resolve the issue on the basis of the plain language of the scope

description or the clear history of the original investigation."[40]  "Accordingly, when Commerce

'clarifies' the scope of an existing antidumping duty order that has an unclear scope, the

suspension of liquidation and imposition of antidumping cash deposits may not

be *retroactive* but can only take effect "on or after the date of the initiation of the scope inquiry."

*AMS Assocs.*, 737 F.3d at 1344.

Here, Commerce initiated a scope inquiry on February 15, 2023.  The initiation of the

scope inquiry required a finding by Commerce that the scope is unclear.  In the prior scope

---

[38] Redetermination, at 71
[39] *Id.* 71, 121.
[40] Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. 27,296, 27,328 (May 19, 1997).

PUBLIC VERSION
Confidential information redacted from square brackets

ruling, Commerce found that the scope is clear and did not require a scope inquiry.  Commerce

cannot rely on conflicting findings to make inconstant decisions.  It would be arbitrary,

capricious, and otherwise unlawful for Commerce to find that the scope is clear so that

retroactive suspension from the date of the final scope ruling is justified and *then* decide that the

scope is unclear so that a formal scope inquiry permitting a k(2) analysis can be initiated.

Commerce simply cannot have it both ways.

## CONCLUSION

Plaintiff respectfully requests that the Court remand this case back to Commerce with an

order to conduct a lawful scope analysis in accordance with the comments above.

Respectfully submitted,

Daniel Cannistra
Pierce Lee

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
202) 624-2500

*Counsel for Plaintiff Valeo*
*North America Inc.*

July 20, 2023

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 4,982 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word used to prepare this brief.

Respectfully submitted,

_____

Daniel Cannistra

*Counsel for Plaintiff Valeo North America Inc.*