Slip Op. 23-**157**

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| VALEO NORTH AMERICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ALUMINUM ASSOCIATION COMMON ALLOY ALUMINUM SHEET TRADE ENFORCEMENT WORKING GROUP, ET AL., <br><br> Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge <br> Court No. 21-00581 |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's scope redetermination on remand for the antidumping duty and countervailing duty orders on common alloy aluminum sheet from the People's Republic of China.]

Dated: November 8, 2023

<u>Daniel J. Cannistra</u> and <u>Pierce Lee</u>, Crowell & Moring LLP, of Washington, DC, for Plaintiff.

<u>Alison S. Vicks</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director. Of counsel on the brief was <u>JonZachary Forbes</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>John M. Herrmann</u>, <u>Paul C. Rosenthal</u>, and <u>Joshua R. Morey</u>, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenors.

Barnett, Chief Judge:  This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") scope redetermination on

remand for the antidumping duty ("ADD") and countervailing duty ("CVD") orders on

common alloy aluminum sheet ("CAAS") from the People's Republic of China ("China").

*See* Confid. Final Results of Redetermination Pursuant to Court Remand ("Scope

Redetermination"), ECF No. 61-1; *Common Alloy Aluminum Sheet From the People's*

*Republic of China*, 84 Fed. Reg. 2,813 (Dep't Commerce Feb. 8, 2019) (ADD order);

*Common Alloy Aluminum Sheet From the People's Republic of China*, 84 Fed. Reg.

2,157 (Dep't Commerce Feb. 6, 2019) (CVD order) (together, "the *China CAAS*

*Orders*").[1]  The scope of the *China CAAS Orders* covers, *inter alia*:

> aluminum common alloy sheet (common alloy sheet), which is a flat-rolled
> aluminum product having a thickness of 6.3 mm or less, but greater than
> 0.2 mm, in coils or cut-to-length, regardless of width.  Common alloy sheet
> within the scope of this order includes both not clad aluminum sheet, as
> well as multi-alloy, clad aluminum sheet.  With respect to not clad
> aluminum sheet, common alloy sheet is manufactured from a 1XXX-,
> 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association.
> With respect to multi-alloy, clad aluminum sheet, common alloy sheet is
> produced from a 3XXX-series core, to which cladding layers are applied to
> either one or both sides of the core.

---

[1] The administrative records associated with Commerce's original scope ruling and the
ruling issued on remand are contained in public and confidential administrative records
filed in the ADD and CVD proceedings associated with the *China CAAS Orders*.
Because the relevant parts of the administrative records are identical, the court cites
to the documents filed in the ADD proceeding: Public ADD Index ("PR"), ECF No. 18-3;
Confid. ADD Index ("CR"), ECF No. 18-5; Public ADD Remand Record, ECF No. 64-1;
Confid. ADD Remand Record, ECF No. 64-2.  Valeo filed joint appendices containing
the record documents cited in parties' comments on the Scope Redetermination.  *See*
Public Remand J.A., ECF Nos. 72, 72-1–72-6; Confid. Remand J.A. ("CRJA"), ECF
Nos. 73 (table of contents listing eight documents), 73-1 (docs. 1–5), 73-2 through 73-5
(doc. 6), 73-6 (docs. 7–8).

84 Fed. Reg. at 2,815; 84 Fed. Reg. at 2,158.

Commerce previously found that Plaintiff Valeo North America, Inc.'s ("Valeo") T-series aluminum sheet is covered by the scope of the *China CAAS Orders* because it is a clad aluminum product with a 3XXX-series core.  *See* Confid. Final Scope Ruling Determination: Valeo's Heat Treated T-Series Aluminum Sheet, A-570-073, C-570-074 (Oct. 15, 2021) ("Final Scope Ruling") at 10–11, CR 15, PR 40, CRJA Doc. 3. Commerce issued its decision pursuant to an analysis of the sources set forth in 19 C.F.R. § 351.225(k)(1) (2020).[2]  *Id.* at 10.

In *Valeo North America, Inc. v. United States* ("*Valeo I*"), 46 CIT __, 610 F. Supp. 3d 1322 (2022),[3] the court remanded Commerce's Final Scope Ruling.  While the court sustained Commerce's determination that Valeo's T-series aluminum sheet is a multi-alloy, clad product as supported by substantial evidence, *id.* at 1339, the court remanded Commerce's determination that Valeo's product has a 3XXX-series core, *id.* at 1335.  The court concluded that the phrase "3XXX-series" in conjunction with "as designated by the Aluminum Association" is ambiguous as to whether Commerce intended the scope to cover unregistered alloys, such as Valeo's, with "a major alloying element corresponding to the Aluminum Association's alloy groups" or "whether

---

[2] Commerce recently revised its scope regulations; the revisions apply "to scope inquiries for which a scope ruling application is filed . . . on or after the effective date" of November 4, 2021.  *Regulations To Improve Admin. and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,300, 52,327 (Dep't Commerce Sept. 20, 2021).  The court cites to the prior regulations that were in effect when Valeo submitted its complete scope application.

[3] *Valeo I* presents background information on this case, familiarity with which is presumed.

Commerce intended the scope to be limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association." *Id.* at 1335. The court also held that Commerce "exceeded the limits of a (k)(1) analysis" when it interpreted the scope to include unregistered alloys, *id.*, and, further, instructed Commerce to "address evidence that Valeo's product undergoes heat-treatment" and "reconcile such evidence with evidence indicating that 3XXX-series alloys are non-heat-treatable," *id.* at 1341.

On June 20, 2023, Commerce filed its Scope Redetermination. Therein, Commerce concluded that it was unable to resolve the scope inquiry pursuant to 19 C.F.R. § 351.225(k)(1) and, thus, considered the factors enumerated in 19 C.F.R. § 351.225(k)(2). Scope Redetermination at 3. After considering the (k)(2) factors, Commerce again concluded that Valeo's T-series sheet is covered by the scope of the *China CAAS Orders*. *See id.* at 3–4, 122.

Valeo filed comments opposing Commerce's Scope Redetermination. Confid. Pl. [Valeo's] Cmts. on Remand Redetermination ("Valeo's Cmts."), ECF No. 66. Broadly speaking, Valeo challenges various agency conclusions underlying Commerce's decision to consider the (k)(2) factors but does not challenge Commerce's findings with respect to the (k)(2) factors. *See id.* at 3–13. Valeo also presents arguments regarding the relevance of heat-treatment to Commerce's Scope Redetermination. *Id.* at 13–16. Lastly, Valeo challenges Commerce's decision not to revoke the instructions the agency sent to U.S. Customs and Border Protection ("CBP") following issuance of the Final Scope Ruling. *Id.* at 16–18.

Defendant United States ("the Government") and Defendant-Intervenors[4] filed comments in support of Commerce's Scope Redetermination.  Def.'s Cmts. Supporting Remand Redetermination ("Def.'s Cmts."), ECF No. 70; Def.-Ints.' Resp. to [Valeo's] Cmts. on Remand Redetermination ("Def.-Ints.' Cmts."), ECF No. 71.  For the following reasons, the court will sustain Commerce's Scope Redetermination.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(vi) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(vi) (2018),[5] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

"[W]hether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that [the court] review[s] de novo."  *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017).  Whether a product is covered by the language of the scope is "a question of fact reviewed for substantial evidence."  *Id.*

---

[4] Defendant-Intervenors consist of the Aluminum Association Common Alloy Aluminum Sheet Trade Enforcement Working Group and its Individual Members: Aleris Rolled Products, Inc., Arconic Corporation, Commonwealth Rolled Products Inc., Constellium Rolled Products Ravenswood, LLC, Jupiter Aluminum Company, JW Aluminum Company, and Novelis Corporation.
[5] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code and all citations to the U.S. code are to the 2018 edition, unless otherwise specified.

## DISCUSSION

### I.       Legal Framework for Scope Determinations

Because the descriptions of merchandise covered by the scope of an

antidumping or countervailing duty order must be written in general terms, questions

may arise as to whether a particular product is included within the scope of an order.

*See* 19 C.F.R. § 351.225(a).  When such questions arise, Commerce's regulations

direct it to issue "scope rulings" that clarify whether the product is in-scope.  *Id*.

Although there are no specific statutory provisions that govern Commerce's

interpretation of the scope of an order, Commerce is guided by case law and agency

regulations.  *See Meridian Prods.,* 851 F.3d at 1381; 19 C.F.R. § 351.225.

Commerce's inquiry must begin with the relevant scope language.  *See, e.g.*,

*OMG, Inc. v. United States*, 972 F.3d 1358, 1363 (Fed. Cir. 2020).  If the scope

language is unambiguous, "the plain meaning of the language governs."  *Id.* (citation

omitted).  If, however, the language is ambiguous, Commerce interprets the scope "with

the aid of" the sources set forth in 19 C.F.R. § 351.225(k)(1).  *Meridian Prods.*, 851 F.3d

at 1382 (citation omitted).  Subsection (k)(1) directs Commerce to consider the

descriptions of the subject merchandise in the petition, initial investigation, and prior

determinations by Commerce (including prior scope determinations) or the U.S.

International Trade Commission.  19 C.F.R. § 351.225(k)(1).  If the (k)(1) sources are

dispositive, Commerce may issue its ruling based solely on the party's application and

the (k)(1) sources.  19 C.F.R. § 351.225(d).[6]  In all other cases, Commerce will initiate a

scope inquiry and may consider the factors enumerated in subsection (k)(2) of the

regulation.  *See Meridian Prods*., 851 F.3d at 1382 (citing 19 C.F.R. § 351.225(k)(2));[7]

*see also* 19 C.F.R. § 351.225(e) (providing for Commerce to initiate a scope inquiry).

## II.    Ambiguity Regarding Governing Standards

Valeo first contends that "Commerce unlawfully claims the plain language of the

scope [is] ambiguous."  Valeo's Cmts. at 3 & n.2 (citing Scope Redetermination at 38).

As the Government points out, however, the court previously concluded that the scope

is "ambiguous as to whether it covers an unregistered alloy such as Valeo's T-series

sheet and therefore a (k)(1) analysis was warranted."  Def.'s Cmts. at 6; *cf.* Def.-Ints.'

Cmts. at 1–2 (stating same).[8]

In *Valeo I*, the court explained that "[t]he phrase '3XXX-series' is not defined in

the scope except in reference to the phrase 'as designated by the Aluminum

Association,' which is also undefined."  610 F. Supp. 3d at 1335.  The court held that the

scope is, however, ambiguous as to whether that phrase indicates Commerce's intent

"to cover any alloy that contains a major alloying element corresponding to the

---

[6] To be dispositive, the (k)(1) sources "must be 'controlling' of the scope inquiry in the
sense that they definitively answer the scope question."  *Sango Int'l, L.P. v. United
States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007).
[7] The (k)(2) factors include: "(i) The physical characteristics of the product; (ii) The
expectations of the ultimate purchasers; (iii) The ultimate use of the product; (iv) The
channels of trade in which the product is sold; and (v) The manner in which the
product is advertised and displayed."  19 C.F.R. § 351.225(k)(2).
[8] The Government further notes that, to the extent Valeo argues that Commerce "should
have found certain sources to be dispositive in its (k)(1) analysis," that argument is
addressed elsewhere in the Government's comments.  Def.'s Cmts. at 6.

Aluminum Association's alloy groups (including unregistered alloys), or whether Commerce intended the scope to be limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association."  *Id.*  Thus, in compliance with the court's holding, Commerce first addressed whether the ambiguity may be resolved pursuant to a (k)(1) analysis.  *See* Scope Redetermination at 38–53.

Valeo also contends that Commerce erred to the extent that the agency "found the source for the applicable industry standard ambiguous."  Valeo's Cmts. at 3. Commerce, however, reviewed the *Teal Sheets* publication by the Aluminum Association first among the sources available.  *See* Scope Redetermination at 39–42.[9] To the extent Valeo argues that the phrase "as designated by the Aluminum Association" is unambiguous, *see* Valeo's Cmts. at 3; *see also id.* at 12 (asserting that the *Teal Sheets* provides the "plain meaning of 'as designated by the Aluminum Association'"), the court has addressed, and rejected, that position, *see Valeo I*, 610 F. Supp. 3d at 1335.  To the extent Valeo instead argues that Commerce should have found the *Teal Sheets* dispositive, the court addresses below the evidence supporting Commerce's Scope Redetermination.

### III.     Commerce's Consideration of the *Teal Sheets* and Interpretation of the Phrase "as Designated by the Aluminum Association"

Valeo contends that Commerce erred in considering "Aluminum Association specifications as a (k)(1) source rather than a definitional source."  Valeo's Cmts. at 4 &

---

[9] "The *Teal Sheets* contain 'designations and chemical composition limits for wrought aluminum and wrought aluminum alloys registered with The Aluminum Association.'" *Valeo I*, 610 F. Supp. 3d at 1335 (citation and emphasis omitted).

n.3 (citing Scope Redetermination at 44).  The Government contends that "[t]here are

several possible interpretations of the argument being advanced by Valeo" and that

each should be rejected.  Def.'s Cmts. at 6.  Defendant-Intervenors contend that

Commerce's regulations do not "elevate information submitted in connection with a

scope ruling application" over the (k)(1) sources.  Def.-Ints.' Cmts. at 3.

    In *Valeo I*, the court explained that the *Teal Sheets*, when considered in its

entirety, suggests that the "use of '3' in '3XXX' in the list of alloy groups indicates a

major alloying element of manganese while contemplating the addition of three more

digits to complete the four-digit designation."  610 F. Supp. 3d at 1335.[10]  While

Commerce previously relied "on the *Teal Sheets* to interpret '3XXX-series' to include

unregistered alloys," the court faulted Commerce for not identifying "anything in the *Teal*

*Sheets* that indicates the Aluminum Association applies [its four-digit] framework to

unregistered alloys."  *Id.* at 1335–36.

    On remand, Commerce recognized that the *Teal Sheets* offers guidance on

"industry usage of the term '3XXX-series,'" Scope Redetermination at 45, and

considered the *Teal Sheets* prior to any other source, *see id.* at 39–42.  Commerce

explained that although "[t]he term '3XXX-series' is an industry-specific term defined

only by the industry publication *Teal Sheets*[,] . . . the term 'designate' is a general term

---

[10] The Aluminum Association uses "a four-digit numerical system for designating registered aluminum alloys," pursuant to which "[t]he first of the four digits in the designation system indicates the alloy group, also called the series."  Final Scope Ruling at 11.  The alloys are "grouped by majoring alloying elements," for example, a 3XXX series alloy has a major alloying element of manganese.  *Id.*

that may be used in the common vernacular" and not solely in relation to the *Teal Sheets*.  *Id.* at 40.  While Commerce ultimately found that the *Teal Sheets* "weighs in favor of finding that the scope of the [*China CAAS Orders*] is limited to registered alloys within the enumerated series with four-digit designations assigned by the Aluminum Association," *id.* at 42, Commerce also concluded that the *Teal Sheets* was not dispositive of the proper scope interpretation, *see id.* at 38–42.  Commerce therefore went on to consider the agency's separate rate determination[11] in the underlying ADD investigation, discussed in more detail below, and found that source weighed against the information contained in the *Teal Sheets*.  *See id.* at 42–46.

　　While, at times, Commerce described the *Teal Sheets* together with the separate rate determination as (k)(1) sources, *see, e.g.*, *id.* at 44, the agency also recognized that the *Teal Sheets* provides evidence of trade usage of relevant terminology, *see id.* at 45, 51, 53.  Commerce explained its weighing this evidence in connection with the separate rate determination.  *See id.* at 45–46.  Commerce ultimately found that because "the (k)(1) sources and certain record information concerning trade usage are

---

[11] In antidumping duty proceedings involving a country, such as China, that Commerce considers to have a nonmarket economy, Commerce employs a rebuttable presumption that all enterprises operating within that country are controlled by the government.  *See, e.g.*, Policy Bulletin No. 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries (April 5, 2005), http://enforcement.trade.gov/policy/bull05-1.pdf.  Commerce assigns each exporter of subject merchandise a single countrywide rate unless the exporter "demonstrates the absence of both *de jure* and *de facto* governmental control over its export activities."  *Id.*  An exporter that fulfills this requirement is eligible for a "separate rate" that "is usually either an individually calculated rate or a weighted-average rate based on the rates of the investigated companies, excluding any rates that are zero, *de minimis*, or based entirely on facts available."  *Id.*

contradictory and the respective weights of these sources are not sufficient to clearly

demonstrate preeminence over the other available record information[,] . . . the (k)(1)

sources are not dispositive." *Id.* at 53; *see also id.* at 100–02 (discussing Commerce's

weighing of the evidence). Thus, whether characterized as evidence of trade usage or

as a (k)(1) source, Commerce considered the *Teal Sheets* and explained why the

information contained therein was not dispositive. It is not the court's role to "reweigh

the evidence." *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir.

2018) (citing *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed.

Cir. 2015)).

  To the extent that Valeo argues that Commerce should have found the *Teal*

*Sheets* dispositive of the meaning of the phrase "as designated by the Aluminum

Association," the court considers this argument in connection with Valeo's subsequent

argument that Commerce wrongly interpreted this phrase. *See* Valeo's Cmts. at 9, 12.

Valeo contends that Commerce "unlawfully define[d] the term 'designate' as a general

term without industry-specific meaning." *Id.* at 9. Valeo relies on the *Teal Sheets* and

Statistical Note 6 to Chapter 76 of the Harmonized Tariff Schedule of the United States

("HTSUS") to support its contentions, *id.* at 10–11, but those contentions are misplaced.

  Commerce acknowledged that the *Teal Sheets* uses the term "designation" to

identify "alloys with a four-digit designation from the Aluminum Association," but went on

to explain that the scope uses the term "designate," which may be defined differently as

"to point out the location of." Scope Redetermination at 40 & n.267 (citing *Designate*,

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/designate (retrieved

by Commerce May 5, 2023)).  Commerce thus found that the term "designate" in the

scope does not necessarily refer "to a four-digit alloy designation from the Aluminum

Association."  *Id.* at 40.  Instead, Commerce explained, "the term 'designate' *could* be

understood" to refer to "any alloy with a primary alloying element corresponding to the

alloy series" such that the term identifies "the location of the alloy series definitions

where we could interpret . . . a 3XXX-series alloy as having a major alloying agent of

manganese."  *Id.* at 41 (emphasis added).  Thus, while Commerce recognized that the

*Teal Sheets* supports interpreting the scope to cover registered alloys with a four-digit

designation, *see id.* at 41–42, Commerce offered a reasoned explanation for its

conclusion that the *Teal Sheets* was not dispositive, *id.* at 44–45, 113.  The possibility of

drawing two inconsistent conclusions from the evidence does not preclude the agency's

finding from being supported by substantial evidence.  *Matsushita Elec. Indus. Co. v.*

*United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

> Commerce also addressed Valeo's reliance on Statistical Note 6, which states:

> For the purposes of statistical reporting numbers 7604.21.0010,
> 7604.29.1010, 7604.29.3060, 7604.29.5050, 7606.12.3025 and
> 7606.12.3091, "heat-treatable industrial alloys" refers to aluminum
> containing by weight 3.0 percent or less of magnesium and 3.0 percent or
> less of silicon, *and/or are designated as series 6xxx in the Aluminum*
> *Association's specifications of registered alloys*.

Scope Redetermination at 112 & n.585 (emphasis added).  Commerce explained that

Statistical Note 6 is not dispositive of the meaning of the term "designate" because other

sources indicate that "designate" may not necessarily refer "to a four-digit alloy

designation from the Aluminum Association" for purposes of the underlying scope.  *Id.*

at 113.[12]

The cases on which Valeo relies do not persuade the court that Commerce must

further address the relevance, if any, of Statistical Note 6.  Valeo's Cmts. at 12 (citing

*Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1305 (Fed. Cir. 2013);

*Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1073 (Fed. Cir. 2001)).  In

*Eckstrom Industries*, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit")

characterized the tariff classification listed in the underlying order as "a factor" for

Commerce to consider "in determining the scope of [an order]."  254 F.3d at 1073.

Here, however, Statistical Note 6 is not referenced in the scope of the *China CAAS*

*Orders*, *see* Scope Redetermination at 4–5, and Commerce explained its reasons for

declining to rely on Statistical Note 6 to define scope terms, *see id.* at 112–13.

*Mid Continent* is inapposite.  There, the Federal Circuit addressed whether steel

nails imported as part of a "mixed media" tool kit were covered by the scope of an order

that otherwise covered the included nails.  725 F.3d at 1298.  The appellate court

explained that Commerce may consult the HTSUS as part of its mixed media analysis if

---

[12] Defendant-Intervenors argue that Statistical Note 6 was not included in the HTSUS until several months after Commerce published the *China CAAS Orders* and, thus, cannot be considered evidence of Commerce's intent with respect to the meaning of the scope language.  Def.-Ints.' Cmts. at 8.  Defendant-Intervenors also argue that the inclusion of the phrase "of registered alloys" in Statistical Note 6 distinguishes the note from the underlying scope, which does not include that phrase.  *Id.* at 9.  Such arguments go beyond Commerce's rationale with respect to the relevance of Statistical Note 6 and, thus, the court need not further consider them.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

the agency had a prior practice of doing so but expressed no view on the weight to be

afforded that analysis.  *See id.* at 1305.  This case does not involve a mixed media

product and, thus, cases addressing Commerce's analytical approach in such situations

are of little value here.

In sum, Valeo's arguments concerning the *Teal Sheets* and Statistical Note 6

reflect mere disagreement with Commerce's weighing of the evidence.  That approach

mistakes the court's function, which is not to "reweigh the evidence."  *SolarWorld Ams.*,

910 F.3d at 1225.

### IV.    Commerce's Consideration of a Separate Rate Determination

Valeo raises several arguments concerning Commerce's consideration of a

separate rate determination made as part of the investigation's final determination.

None are persuasive.

Valeo first contends that Commerce unlawfully considered a confidential

separate rate *application* by a respondent in the investigation underlying the *China

CAAS Orders* to constitute a (k)(1) source.  Valeo's Cmts. at 5.  While Commerce

placed copies of the separate rate application on the record of the remand proceeding,

*see* Scope Redetermination at 42–43 & n.275, Commerce relied on its *determination*

with respect to the separate rate application as a (k)(1) source, *see, e.g.*, *id.* at 42

(referencing the agency's finding based on "Commerce's separate rate determination in

the underlying [ADD] investigation"); *id.* at 44 (inferring Commerce's intent with respect

to the scope language from "Commerce's separate rate determination").

To the extent that Valeo argues that Commerce's separate rate determination is not a permissible (k)(1) source, Valeo offers no reason why language in the regulation referencing "the determinations of the [agency]," 19 C.F.R. § 351.225(k)(1), may not be interpreted to include a separate rate determination which formed part of the final determination in the underlying investigation, *see* Scope Redetermination at 104–05 (addressing the argument).  Valeo instead argues that the separate rate determination is not a public document and does not provide ascertainable standards for scope interpretation.  *See* Valeo's Cmts. at 6–8.  In so doing, Valeo again relies on Federal Circuit opinions governing Commerce's mixed media analysis, which, as stated above, is analytically distinct.  *Id.* (citing, *inter alia*, *Mid Continent*, 725 F.3d at 1305; *Star Pipe Prods. v. United States*, 981 F.3d 1067, 1071 (Fed. Cir. 2020)).

Valeo further asserts that the separate rate determination "is not an interpretive source for considering a scope issue because it lacks any discussion about a scope issue," Valeo's Cmts. at 8, and argues that "there is no rational connection between scope and [the separate rate application] that supports the implied determination related to scope," *id.* at 9.  Such arguments, however, implicate the weight, if any, to be afforded the separate rate determination, a point with which Valeo appeared to concede.  *See id.* (relying on the weight Commerce afforded the separate rate determination to assert that the agency's consideration of the document was in error). The fact that Commerce ultimately decided to give little weight to the separate rate determination does not mean that Commerce may not consider the separate rate

determination at all.  Accordingly, Valeo's arguments regarding Commerce's

consideration of the separate rate determination are not persuasive.[13]

### V.      Relevance of Heat Treatment

Valeo contends that heat treatment is relevant to the question "whether T-series

sheet is manufactured from a 3XXX-series core" because the T-series sheet core "is

heat-treatable" and "3XXX-series alloys are non-heat-treatable."  Valeo's Cmts. at 13.

In *Valeo I*, the court found Commerce's conclusion "that heat-treatment does not

preclude characterization as a 3XXX-series alloy even if such alloys are otherwise

characterized as non-heat-treatable" to be contradicted by evidence indicating that

"3XXX-series alloys are not heat-treatable."  610 F. Supp. 3d at 1340.  The court

therefore directed Commerce, as necessary on remand, to "address evidence that

Valeo's product undergoes heat-treatment" and to reconcile that evidence with

Commerce's conclusion that the core of Valeo's T-series sheet constituted a 3XXX-

series alloy.  *Id.* at 1341 (internal citations omitted).  The court explained that it was

difficult to "discern[] the path of Commerce's reasoning" when Commerce had failed to

define "the phrases 'heat-treated' or 'heat-treatable' for purposes of understanding the

relevance of thermal treatment to classification as a 3XXX-series alloy."  *Id.*

---

[13] Valeo once again argues that the *Teal Sheets* is "the only lawful interpretive source"
and "confirm[s]" that the scope is "limited to registered alloys."  Valeo's Cmts. at 13.  For
this reason, Valeo asserts that Commerce erred in considering the (k)(2) factors.  *Id.*
Valeo's argument, however, simply restates arguments the court has rejected for the
reasons already stated.  Valeo raises no arguments concerning Commerce's findings
with respect to the (k)(2) factors.

Upon review of the record on remand, Commerce found that the phrase "heat-treatment" means "solution heat-treatment" and that the phrase "heat-treatable alloy" refers to "an alloy that can undergo solution heat-treatment."  Scope Redetermination at 25; *see also id.* at 76.  Commerce subsequently addressed whether Valeo's product undergoes solution heat-treatment and found that it does not.  *See id.* at 25–29, 33–37, 76, 88.  Instead, Commerce determined that Valeo's T-series sheet "undergoes a combination of annealing and cold-working" that did not preclude classification as a 3XXX-series alloy.  *Id.* at 29.

Valeo does not present a cogent challenge to these findings.  While Valeo asserts that "the core layer used in the manufacture of T-Series is heat-treatable," Valeo's Cmts. at 13, Valeo does not address Commerce's findings regarding the type of heat-treatment relevant to characterization of 3XXX-series alloys as non-heat-treatable or Commerce's factual finding that Valeo's product does not undergo solution heat-treatment, *see id.* at 13–16.[14]  Commerce's extensive analysis of heat-treatment and the agency's findings with respect to Valeo's T-series aluminum sheet are supported by substantial evidence.  *See* Scope Redetermination at 21–37, 75–95.

---

[14] At most, Valeo appears to argue for a broader interpretation of the term "heat-treatable" that would capture the type of thermal processing its product undergoes.  *See* Valeo's Cmts. at 13–14 (discussing sources generally characterizing 3XXX-series alloys as non-heat-treatable).  Valeo's broad-based arguments do not, however, address, and, thus, do not undermine, Commerce's reasons for defining the term more narrowly for present purposes, including scope language expressly indicating that annealing would not remove a product from the scope of the *China CAAS Orders*.  Scope Redetermination at 76–78.

### VI.    Suspension of Liquidation

Lastly, Valeo contends that "Commerce must revoke" the instructions the agency

sent to CBP following issuance of the Final Scope Ruling.  Valeo's Cmts. at 16.

Commerce considered—and rejected—this argument.  Scope Redetermination at 121–

22.  The Government and Defendant-Intervenors contend that Valeo's arguments are

misplaced.  Def.'s Cmts. at 17–18; Def.-Ints.' Cmts. at 12–13.  The court agrees.

Commerce's regulatory provisions governing suspension of liquidation are

instructive here.  Subsection (l) states:

> (1) When the [agency] conducts a scope inquiry under paragraph (b) or (e)
> of this section, *and the product in question is already subject to
> suspension of liquidation, that suspension of liquidation will be continued*,
> pending a preliminary or a final scope ruling, at the cash deposit rate that
> would apply if the product were ruled to be included within the scope of
> the order.
>
> ***
>
> (3) If the [agency] issues a final scope ruling, under either paragraph (d) or
> (f)(4) of this section, to the effect that the product in question is included
> within the scope of the order, *any suspension of liquidation under
> paragraph (l)(1) or (l)(2) of this section will continue*.  Where there has
> been no suspension of liquidation, the [agency] will instruct [CBP] to
> suspend liquidation and to require a cash deposit of estimated duties, at
> the applicable rate, for each unliquidated entry of the product entered, or
> withdrawn from warehouse, for consumption on or after the date of
> initiation of the scope inquiry.  If the [agency's] final scope ruling is to the
> effect that the product in question is not included within the scope of the
> order, the [agency] will order any suspension of liquidation on the subject
> product ended and will instruct [CBP] to refund any cash deposits or
> release any bonds relating to this product.

19 C.F.R. § 351.225(l)(1), (3) (emphases added).

Valeo does not argue that Commerce improperly instructed CBP to suspend liquidation and collect cash deposits following Commerce's affirmative Final Scope Ruling.  *See* Valeo's Cmts. at 16–18.  Instead, Valeo asserts that the court's opinion in *Valeo I* undermined the legal basis for the suspension of liquidation and collection of cash deposits for any entries that were made prior to the date on which Commerce initiated the formal scope inquiry on remand, i.e., February 15, 2023.  *Id.* at 16 (citing, *inter alia*, *United Steel and Fasteners, Inc. v. United States*, 947 F.3d 794, 801 (Fed. Cir. 2020) ("*USF*")).

*USF* addressed the scenario in which Commerce retroactively suspended liquidation back to the date on which Commerce issued the underlying order following issuance of an affirmative scope ruling without a scope inquiry.  947 F.3d at 800–01.  While recognizing that the regulation is silent when there has been no scope inquiry, *id.* at 800, the court nevertheless held that Commerce "exceeded its regulatory authority under 19 C.F.R. § 351.225(l)(3) by retroactively suspending liquidation to the issuance date of the [order]," *id.* at 803.[15]

Here, however, when Commerce initiated the scope inquiry, Valeo's product was "already subject to suspension of liquidation" and, as such, "that suspension of liquidation [was] continued, pending a preliminary or a final scope ruling."  19 C.F.R.

---

[15] Following the U.S. Court of International Trade's ("CIT") earlier decision in the *USF* litigation that Commerce had exceeded its regulatory authority, Commerce issued revised instructions to suspend liquidation for entries made on or after the date on which Commerce issued its final scope ruling.  *See USF*, 725 F.3d at 798.  The CIT entered judgment, and no party challenged the revised instructions.  *See id.*

§ 351.225(l)(1).  Subsection (l)(3) further provides for the continuation of any

suspension pursuant to subsection (l)(1) when Commerce issues an affirmative scope

ruling pursuant to subsection (f)(4) at the conclusion of a scope inquiry.  *Id.*

§ 351.225(l)(3).  Subsection (f)(4) directs Commerce to "issue a final ruling" concerning

"the product which is the subject of the scope inquiry" conducted pursuant to subsection

(e).  *Id.* § 351.225(f)(4).  While Commerce conducted the scope inquiry during a court-

ordered remand proceeding, that inquiry was nevertheless governed by Commerce's

regulations.  *See, e.g.*, Scope Redetermination at 122 (citing 19 C.F.R. § 351.225(e)).

Unlike in *USF*, at no point in this remand proceeding did Commerce instruct CBP

to suspend liquidation of, or collect cash deposits on, entries made prior to the date on

which Commerce determined that Valeo's product fell within the scope.  Valeo offers no

authority for the proposition that an order remanding Commerce's original scope ruling[16]

invalidates Commerce's prior instructions such that subsection (l)(1) no longer applies.

*See* Valeo's Cmts. at 17 (cursorily declaring continued suspension of liquidation after

*Valeo I* "unlawful").  Notably, subsection (l)(3) directs Commerce to end any suspension

of liquidation only after issuance of a *negative* scope ruling, 19 C.F.R. § 351.225(l)(3),

---

[16] It is well settled "that an order remanding a matter to an administrative agency for
further findings and proceedings is not final."  *Cabot Corp. v. United States*, 788 F.2d
1539, 1542 (Fed. Cir. 1986).  The lack of finality associated with the court's remand
order offers further support for the continuation of any suspension of liquidation during
remand proceedings pending a final decision in the action.  Further, as the Government
notes, requiring modification of "customs instructions as a result of a remand order that
does not provide such direction would present multiple issues beyond the scope
proceeding presently before the [c]ourt," Def.'s Cmts. at 18, including, for example, with
respect to the carefully crafted statutory scheme governing suspension and liquidation
in cases arising under section 1516a, *see* 19 U.S.C. § 1516a(c),(e).

which has not happened here.  Accordingly, the court declines to disturb Commerce's

instructions.

### CONCLUSION

In accordance with the foregoing, Commerce's Final Scope Ruling, as modified

by the Scope Redetermination, will be sustained.  Judgment will be entered accordingly.


/s/      Mark A. Barnett
Mark A. Barnett, Chief Judge


Dated: November 8, 2023
         New York, New York